IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | ) | |
| COMMISSION, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | 09-CV-602-GKF-FHM |
| v. | ) | |
| | ) | |
| ABERCROMBIE & FITCH STORES, INC. , | ) | |
| d/b/a ABERCROMBIE KIDS, | ) | |
| | ) | |
| Defendant. | ) | |

## **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Respectfully Submitted,

BARBARA A. SEELY
EEOC Regional Attorney
St. Louis District Office
1222 Spruce St., Room 8.100
St. Louis, MO 63103
(314) 539-7910
(314) 539-7895 (Fax)

JEFF A. LEE
EEOC Trial Attorney
Oklahoma City Area Office
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, Oklahoma 73102
(405) 231-4375
(405) 231-5816 (Fax)

## TABLE OF CONTENTS

I.      STATEMENT OF THE CASE                                                          6

II.     STATEMENT OF UNCONTROVERTED FACTS                                             7

        Samantha Elauf Wears a Headscarf Because of Her Religion                       7

        Samantha Elauf Applied for a Job with Abercrombie Kids                         9

        Samantha Elauf Was Not Hired Because She Wore a Headscarf                     10

        Defendant Cannot Prove its Affirmative Defense of Undue Hardship              13

III.    ARGUMENT AND AUTHORITIES                                                      19

        A.  Standard for Summary Judgment                                             19

        B.  Plaintiff Has Established a Prima Facie Case of Defendant's Failure
            Accommodate Elauf Because of Her Religion                                 19

            1.  Samantha Elauf Had a Bona Fide Religious Belief That Conflicted
                with an Employment Requirement                                        20

                a.  A hijab is "religious" in Elaug's scheme of things                21

                b.  Elauf's belief that she must wear a hijab in public is sincere    22

                c.  Evidence that Elauf may not regularly practice other tenets
                    of her religion is of no consequence                              25

                d.  Defendant had notice of Elauf's religious belief                  28

                    i.  Elauf was not required to give notice of a need for a
                        religious accommodation where she did not know of any
                        conflict between her religious belief and any employment
                        policy                                                        29

                    ii. Cooke's knowledge of the conflict between Elauf's religious
                        practice of wearing a hijab and Defendant's Look Policy is
                        imputed to Defendant by virtue of the laws of agency          30

            2.  Samantha Elauf was Not Hired Because of Her Failure to Comply
                with the Employment Requirement                                       32

C. Defendant's Affirmative Defense of Undue Hardship Fails Because it Is Based Entirely Upon Speculation and Conjecture ................... 32

   1. The actual evidence shows that accommodating employees' religious beliefs to wear a hijab have not damaged sales or damaged the brand ........... 33

   2. Defendant's claims that granting exceptions to its Look Policy will damage its brand are based entirely on speculation and conjecture ........... 36

   3. Defendant's "slippery slope" argument has been rejected by the Courts ........... 40

IV.   CONCLUSION ........... 41

# TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 19

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986) ............................................................. 21

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238 (10th Cir. 1990) .......... 19

*Banks v. Service America Corp.*, 952 F. Supp. 703 (D. Kan. 1996) ............................................ 38

*Brown v. Dade Christian Schools*, 556 F.2d 310 (5th Cir. 1977) ................................................. 21

*Brown v. General Motors Corp.*, 601 F.2d 956 (8th Cir. 1979)…………………………………33

*Brown v. Polk County, Iowa*, 61 F.3d 650, 654 (8th Cir. 1995)…………………………………28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………………………………………..19

*Cook v. Chrysler Corp.*, 981 F.2d 336 (8th Cir. 1992)……………………………………………33

*Dixon v. Hallmark Cos.*, 627 F.3d 849 (11th Cir. 2010) ............................................................ 28

*EEOC v. Alamo Rent-a-Car, LLC,* 432 F. Supp. 2d 1006 (D. Ariz. 2006)…………..23, 35, 39, 40

*EEOC v. Llona of Hungary , Inc.,* 108 F.3d 1569 (7th Cir. 1996) ........................................ 25, 35

*EEOC v. Reads, Inc.*, 759 F. Supp 1150 (E.D. Pa. 1991) ........................................................... 27

*EEOC v. Papin Enters, Inc.*, 2009 U.S. Dist. LEXIS 30391, 2009 WL
    961108 (M.D. Fla. 2009)………………………………………………………………...35

*EEOC v. Red Robin Gourmet Burgers, Inc.*, 2005 U.S. Dist. LEXIS 36219, 2005 WL
    2090677 (W.D. Wash. 2005).............................................................................. 23, 39

*EEOC v. Sears Roebuck & Co.,* 417 F.3d 789 (7th Cir. 2005 ...................................................... 29

*EEOC v. White Lodging Servs. Corp.,* 2010 U.S. Dist. LEXIS 32492
    (W.D. Ky. Mar. 31, 2010) ........................................................................................ 29

*Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884 (10th Cir. 1985) .............................................. 19

*Forde v. Baird,* 720 F. Supp 2d 170 (D. Conn. 2010)…………………………………………26, 27

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) ............................................................................. 21

*Gallahan v. Hollyfield*, 516 F. Supp. 1004 (E.D. Va. 1981)....................................................... 24

*Heller v. EBB Auto Co.*, 8 F.3d 1433 (9th Cir. 1993) ........................................................... 21, 28

*Hellinger v. Eckerd Corp.*, 67 F. Supp. 2d 1359 (S.D. Fla. 1999)............................................. 28

*Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136 (1987)................................................ 21

*Hussein v. The Waldorf-Astoria*, 134 F. Supp. 2d 591 (S.D.N.Y. 2001)......................... 23, 24, 25

*Int'l Ass'n of Machinists v. Boeing Co.*, 833 F.2d 165 (9th Cir. 1987) ........................................ 21

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430 (2d Cir. 1981)…………...24

*Marshall v. Nelson Elec., Unit. of Gen. Signal,* 766 F. Supp. 1018 (N.D. Okla. 1991) .............. 30

*Mata v. Anderson,* 685 F. Supp. 2d 1223 (D.N.M. 2010)................................................................ 31

*Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476 (2d Cir. 1985).................................... 23, 24, 25

*Pinsker v. Joint Dist. No. 281,* 735 F.2d 388 (10th Cir.1994)………………………………...20

*Redmond v. GAF Corp.,* 574 F.2d 897,(7th Cir. 1978)……………………………21, 22, 25

*Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993) ......................................................... 30

*Smith v. Pryo Min. Co.,* 827 F.2d 1081 (6th Cir. 1987)…………………………………………33

*Snyder v. Murray City Corp.,* 124 F.3d 1349 (10th Cir. 1997) ................................................... 23

*Thomas v. Nat'l. Assoc. of Letter Carriers, et al.*, 225 F.3d 1149 (10th Cir. 2000) .................... 20

*Thomson v. Salt Lake County,* 584 F.3d 1304 (10th Cir. 2009)…………………………………31

*Toledo v. Nobel-Sysco, Inc.* 892 F.2d 1481 (10th Cir. 1989)………………………………...32, 40

*Tooley v. Martin-Marietta Corp.*, 648 F. 2d 1239 (9th Cir. 1981)……………………………33

*Trans World Airlines v. Hardison,* 432 U.S. 63 (1977)…………………………………...20, 32

*U.S. v. New York City Transit Auth.*, Civil Action No. 04-4237, 2010 U.S. Dist. LEXIS 102704, 2010 WL 3855191 (E.D.N.Y. 2010) ...................................................................................... 38

*United States v. Seeger*, 380 U.S. 163 (1965)............................................................................. 21

*Vetter v. Farmland Indus., Inc.*, 884 F. Supp. 1287 (N.D. Iowa 1985) .................................. 26, 38

*Welsh v. United States,* 398 U.S. 333 (1970).............................................................................. 21

## STATUTES

42 U.S.C § 2000e(j) ............................................................................................................. 20, 32, 33

42 U.S.C. § 2000e(b) .................................................................................................................... 30

42 U.S.C. § 2000e-2....................................................................................................................... 19, 20

Fed. R. Civ. P. 56(c) ..................................................................................................................... 19

## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>
## <u>AND BRIEF IN SUPPORT</u>

Plaintiff, Equal Employment Opportunity Commission (hereafter "EEOC" or the "Commission"), moves this Court to enter an order granting partial summary judgment to Plaintiff pursuant to Federal Rules of Civil Procedure 56(c). The Commission states that it is entitled to summary judgment as a matter of law with respect to liability.  In support of this Motion, Plaintiff EEOC states as follows:

## I.      STATEMENT OF THE CASE

This action was filed on September 24, 2009, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") to correct unlawful employment practices on the basis of religion as set forth in Plaintiff's Complaint.  The Complaint alleges that Defendant failed to accommodate Samantha Elauf's religious beliefs and failed to hire her because she is Muslim.  (Complaint, Doc. #2).  All conditions prerequisite to this lawsuit have been fulfilled.  (Def. Answer, ¶ 5, Doc. #7)

EEOC is entitled to summary judgment, as a matter of law, on liability where there is no genuine issue as to any material facts relating to Plaintiff's prima facie case.  At all relevant times, Samantha Elauf has been a practicing Muslim and, in observance of her faith, wears a headscarf or "hijab" at all times when in public. She applied for a sales associate job with Defendant at its Abercrombie Kids store in Woodland Hills Mall in Tulsa, Oklahoma in June 2008, was interviewed, and was not hired because she wore a headscarf.  She filed a charge of employment discrimination with the EEOC alleging that she was denied hire because of her religion.

6

In addition to satisfying its prima facie case, EEOC is entitled to summary judgment since Defendant cannot satisfy its burden of showing it would suffer an undue hardship by accommodating Elauf.  Defendant has provided other employees with the same religious accommodation that Elauf sought and Defendant has failed to proffer any evidence, let alone sufficient evidence, of an *actual* hardship in allowing Elauf to wear her headscarf.  EEOC is entitled to summary judgment on liability.

## II.     STATEMENT OF UNCONTROVERTED FACTS

### Samantha Elauf Wears a Headscarf Because of Her Religion

1.    Islam is currently the third largest religion in the United States of America. The Quran is the sacred scripture of Islam just as the Bible is the sacred scripture for Jews and Christians. Muslims believe that the Quran consists of Allah's revelations to Mohammad which were later reduced to writing. The Quran says that women should ". . . lower their gaze and guard their modesty.  They should draw their veils over their bosoms and not display their beauty."  A headscarf or "hijab" is a form of Islamic dress worn by some Muslim women to observe this instruction. (Ex. 1, Esposito Dep. 24:22-25:5, 26:18-28:13, 42:8-43:5, 44:18-20).

2.    Samantha Elauf was born on July 26, 1990, in Tulsa, Oklahoma.  She graduated from Union High School in Tulsa in 2008.  Her parents are U.S. citizens and have always been practicing Muslims.  Samantha was raised as a practicing Muslim.  (Ex. 2, Elauf Dep. 4:9-12, 24:6-12, 28:16-23, 29:6-8, 20-21).

3.    Elauf began to wear a headscarf at the age of thirteen when her mother, who wears a headscarf, told her she should wear a headscarf to be closer to God.  Since then, Elauf has worn a headscarf at all times when in public.  She wears a headscarf because she believes the Quran

instructs Muslim women to cover their hair.  She believes that she should cover her hair in order to comply with the Quran's instruction.  Wearing a headscarf represents her faith, is a reminder of her faith, is a religious symbol, and is a symbol of Islam. (Ex. 2, Elauf Dep. 26:9-27:12, 30:25-31:10, 32:2-22, 40:14-18, 121:22-24, 123:10-12).

4.   In observance of her faith, in addition to wearing a headscarf, Elauf fasts during Ramadan, the Islamic holy month, and has done so since she was in the fifth grade.  She attends services at her mosque on occasion and on religious holidays.  She prays and reads the Quran several times a month.  She does not drink or gamble.  She plans to make a pilgrimage to Mecca at some point in her life.  In high school, she was a member of the Muslim Student Association and the youth group at her mosque.  (Ex. 2, Elauf Dep. 12:18-21, 36:4-37:14, 38:5-39:16, 40:25-41:13, 42:17-43:4).

5.   Elauf tries to cover a majority of her arms when she dresses.  She wears leggings when she wears a skirt.  She tries not to wear clothing that is too tight.  Otherwise, she wears normal clothes that most American teenagers and young women wear.  Elauf shopped at Abercrombie & Fitch before this lawsuit was filed and bought jeans, sweatshirts, tank tops and t-shirts from its stores.  (Ex. 2, Elauf Dep. 47:15-48:20; 49:11-24).

6.   Some devout Muslim women wear headscarves and others do not.  It is a matter of personal interpretation as to what they believe Islam requires by way of modesty for themselves.  Those devout Muslim women who do wear headscarves wear different styles and colors.  Some are quite fashionable.  (Ex.1, Esposito Dep. 45:3-8, 46:4-49:15).

**Samantha Elauf Applied for a Job with Abercrombie Kids**

7.   Abercrombie Kids is a division of Defendant which sells clothing to a target audience of children ages 7-14.  In 2008, Defendant operated an Abercrombie Kids store in the Woodland Hills Mall in Tulsa, Oklahoma.  (Ex. 3, Moorefield Dep. 14:1-15:9, 69:7-17, 77:1-24, 92:21-93:2).

8.   In 2008, Defendant required its employees in all of its retail stores, including Abercrombie Kids, to comply with its "Look Policy."  The Look Policy then in effect specifically prohibited the wearing of "caps" but made no mention of any other headwear being prohibited.  The Look Policy applied to all employees regardless of where they worked.  The Look Policy also applied to "Impact Associates" who stocked the sales floor and, helped out in the stockroom.  (Ex. 4, Cooke Dep. 23:3-16, 127:4-129:23, Cooke Dep. Ex. 8, p. 29-30; Ex. 3, Moorefield Dep. 52:3-56:7; Ex. 5, Johnson Dep. 45:19-46:4, 69:15-70:14).

9.   While in high school, Elauf worked for two years as a sales associate at Limited Too, a competitor of Abercrombie Kids, also located in the Woodland Hills Mall.  She also worked at a Fruit Fondue kiosk at the mall until it closed.  She wore a headscarf at all times while working for these employers.  (Ex. 2, Elauf Dep. 44:3-17, 52:1-54:20, Elauf Dep. Ex. 1, Ex. 3, Cooke Dep. 34:9-35:8).

10.   Elauf applied for a job as a salesperson or "model" at the Abercrombie Kids store in the Woodland Hills Mall in Tulsa, Oklahoma, on June 25, 2008.  She was seventeen years old at the time.  At around the time she submitted her application for employment, Elauf talked to her friend, Farisa Sepahvand, who was then employed as a model at Abercrombie Kids in the Woodland Hills Mall.  Sepahvand told Elauf that she would not be able to wear a headscarf that

9

was black as Defendant did not sell any clothing that was black.  Sepahvand did not tell Elauf

that she would not be allowed to wear a headscarf if she was hired by Defendant.  (Ex. 2, Elauf

Dep. 53:3-57:12; Ex. 17, Sepahvand Dep. 24:4-25:22, 31:24-33:24).

    11.  Elauf was interviewed for the job by Assistant Manager Heather Cooke on or about June

27, 2008.  She was the only person interviewed by Cooke at that time.  There were no entry

requirements for the job of model.  (Ex. 2, Elauf Dep. 56:5-16, 60:5-8, Elauf Dep. Ex. 1; Ex. 4,

Cooke Dep. 23:3-16, 35:19-36:14, 44:4-22, Cooke Dep. Ex. 1).

    12.  Cooke was the Assistant Manager at the Abercrombie Kids store in the Woodland Hills

Mall from December 2007 until February 2009, responsible for personnel functions.  She was

responsible for recruiting, interviewing, and hiring new store employees.  She supervised models

in the store and had the authority to discipline them.  She had the authority to decide to make an

offer to an applicant for a model job.  She did not usually get approval from the District Manager

before extending a job offer.  The District Manager did not get involved in deciding which

specific applicant for a model position was hired.  (Ex. 4, Cooke Dep. 23:3-16, 27:8-30:18; Ex. 5,

Johnson Dep. 34:9-25, 38:17-25; Ex.  3, Moorefield Dep. 141:22-142:6; Ex. 6, Def. Responses to

Pl. First Interrogatories, No. 9).

**<u>Samantha Elauf Was Not Hired Because She Wore a Headscarf</u>**

    13.  Cooke had seen Elauf in the Woodland Hills Mall previously wearing a headscarf.

Cooke assumed that Elauf would wear a headscarf to work if she was hired by Defendant.

Cooke assumed that Elauf was Muslim because she wore a headscarf.  (Ex. 3, Cooke Dep.

86:87:11-88:25, 96:5-15, 153:5-22).

14.  Elauf wore a headscarf during her interview with Cooke.  It was in the style of the headscarf she is wearing in the photographs marked as Cooke Deposition Exhibits 6 and 7.  She also wore an Abercrombie & Fitch T- shirt and jeans.  During the interview, Cooke told Elauf that models had to look natural and could not wear too much makeup or fingernail polish.  Cooke did not discuss the headscarf with Elauf during the interview.  (Ex. 3, Cooke Dep. 95:12-100:25, 109:1-11, 125:11-17, Cooke Dep. Exs. 6 and 7; Ex., Elauf Dep. 62:21-63:7, 65:2-25).

15.  Elauf did not know that Defendant had a Look Policy before her interview. Cooke did not show Elauf the Look Policy during the interview or explain that it would have been against the Look Policy to wear a headscarf.  The Look Policy in the Store Associate Handbook that was in effect in 2008 prohibited "caps" but did not state that all headwear was prohibited.  Even Cooke did not know whether the Look Policy then in effect prohibited the wearing of headscarves, so she consulted her District Manager, Randall Johnson.  (Ex. 2, Elauf Dep. 47:7-12, 56:17-24, 59:1-11, 61:15-62:5, 65:2-8, 65:15-25; Ex. 4, Cooke Dep. 79:2-5, 79:13-20, 98:14-16, 99:6-15,100:13-24; Ex. 5, Johnson Dep. 47:14-17).

16.  Based on her interaction with Elauf during the interview, Cooke thought that Elauf was attractive, outgoing and stylish.  She believed that Elauf would be a good candidate for the model job and she was in need of additional staff.  Because Elauf wore a headscarf, Cooke consulted her district manager before extending an offer.  (Ex. 4, Cooke Dep. 28:21-29:23, 35:12-15, 86:18-87:1, 121:5-122:4, 125:23-126:20).

17.  When she consulted Johnson, Cooke told him that she wanted to hire Elauf and that she wore a headscarf.  Cooke testified that she told Johnson that Elauf wore a headscarf because of her religion.  Johnson told Cooke that she could not hire Elauf because hats were not allowed to

be worn at work and she wore a headscarf which was not in compliance with the Look Policy.

Johnson did not consult anyone else prior to telling Cooke that she could not hire Elauf.  Johnson

did not give Cooke any other reason why she could not hire Elauf.  He was under the impression

that Cooke would have hired Elauf except that she wore a headscarf. (Ex. 4, Cooke Dep. 106:25-

109:11, 110:2-11; Ex. 5, Johnson Dep. 49:23-52:5, 131:14-132:4).

    18.  Johnson testified that his conversation with Cooke about Elauf lasted 5-10 minutes.  He

could not recall if he asked Cooke if Elauf could take her headscarf off.  He did not recall that

they talked about how Elauf could come into compliance with the Look Policy if she was hired.

Cooke had never asked him any questions about hiring applicants in the past.  This was an

unusual situation.  (Ex. 5, Johnson Dep. 44:4-52:5).

    19.  Johnson's duties as District Manager included interviewing and hiring applicants for the

position of Manager-in-Training.  He had seven stores under his supervision with 100 employees

each, so he did not hire applicants for the position of model. (Ex. 5, Johnson Dep. 21:15-22:1).

    20.  Johnson knew that Muslim women wore headscarves because he had seen them on

television.  He had never seen Elauf before.  Looking at the photographs of Elauf marked as

Johnson Deposition Exhibits 6 and 7, Johnson testified that but for her headscarf, Elauf would

have been a good candidate to hire as a model.  (Ex. 5, Johnson Dep. 47:23-48:23, 70:15-18,

Johnson Dep. Exs. 6 and 7).

    21.  During her interview of Elauf, Cooke filled out a Model Group Interview Guide rating

sheet rating Elauf on certain "competencies" required for the job of model.  Cooke rated Elauf a

2 out of 3 on the competency of "Appearance and Sense of Style."  The rating sheet specified

that an applicant who received a rating of 1 on "Appearance and Sense of Style" could not be

hired.  After Cooke consulted Johnson about hiring Elauf, she changed her rating of Elauf on

"Appearance and Sense of Style" from 2 to 1.  Cooke threw away the original interview rating

sheet and filled out a new one rating Elauf as a 1 in "Appearance and Sense of Style."  (Ex. 4,

Cooke Dep. 92:18-93:23101:4-106:24, 122:13-123:19).

22.  After Johnson told her she could not hire Elauf because she wore a headscarf, Cooke did

not extend a job offer to her. (Ex. 4, Cooke Dep. 106:25-109:11, 110:2-11; Ex. 5, Johnson Dep.

49:23-52:5, 131:14-132:4; Ex. 6, Def. Responses to Pl. First Interrogatories, No. 12).

**Defendant Cannot Prove its Affirmative Defense of Undue Hardship**

23.  Since early 2010, Defendant has allowed female employees in retail stores to wear

headscarves in 8 or 9 instances.  In an interview reported by the New York Times (online) on

September 23, 2010, Defendant's General Counsel, Ronald A. Robins, Jr., said that Defendant

"makes every reasonable attempt to accommodate the religious practices of associates and

applicants, including, where appropriate, allowing associates to wear a hijab." (Ex. 15, New

York Times.com article; Ex. 7, Riley Dep. 92:17-24; 236:1-6; Ex. 12, Def. Response to Pl.

Third Set of Requests for Admissions, Nos. 1 and 2).

24.  Defendant admits that it cannot say whether or not the company's sales have been

negatively impacted by allowing exceptions to the Look Policy in the 8-9 occasions where

exceptions have been granted for headscarves.  Exceptions to the Look Policy that have been

allowed are recorded in the Human  Resources Contact Records database but Defendant has not

tracked the exceptions or measured any negative impact on how customers view the

Abercrombie style as a result of the exceptions.  (Ex. 7, Riley Dep. 129:4-24, 235:1-20).

25.  Dr. Joachimsthaler testified that he was aware that Defendant's Human Resources has approved exceptions to the Look Policy for headscarves at the time he prepared his expert report. He knows of no studies done by Defendant to determine if allowing employees to wear headscarves has resulted in lost sales.  He has not done such a study.  When asked to square his expert opinion that one deviation from the Look Policy could damage the brand and negatively affect sales with the fact that Defendant had allowed employees to wear headscarves contrary to the Look Policy, he testified that Defendant's executives ". . . probably said, we have to make certain exceptions, we are in the business to make money . . . ."  He testified that Defendant allowing exceptions to the Look Policy could be "foolish" or could be one of the "... really smart things that you do because you are in the real world of business . . . ."  He testified that allowing store employees to wear headscarves could actually increase Defendant's sales (Ex. 9, Joachimsthaler Dep. 144:22-148:17, 153:8-154:6, 186:17-188:6).

26.  At all times from 2005 to the present, Defendant's Look Policy has applied to all employees in its Abercrombie Kids, Abercrombie & Fitch, and Hollister stores.  The Look Policy required employees to dress in clothing which is consistent with the style of the clothing sold at the store; required that male employees be clean shaven; prohibited female employees from wearing necklaces and bracelets; required employees to wear specific types of shoes, i.e., flip flops, Converse sneakers or Vans sneakers; and prohibited the wearing of headwear.  The Look Policy required employees to wear merchandise similar to that sold in the stores.  (Ex. 3, Moorefield Dep. 69:7-17, 102:23-103:16, 149:20-167:5, Moorefield Dep. Exs. 7, 8, 9; Ex. 7, Riley Dep. 18:5-17).

27.  In 2008, Defendant employed approximately 160,000-220,000 store employees who were subject to the Look Policy, 70,000 to 100,000 of these employees were models (Ex. 7, Riley Dep. 17:2-19).

28.  The Look Policy is enforced in the retail stores by the Assistant Managers.  If an employee comes to work wearing clothing, jewelry or make-up in violation of the Look Policy, he or she is asked to change or is sent home.  Assistant Managers could write up employees for violations of the Look Policy.  Randall Johnson enforced the Look Policy as to the store managers.  He gave Heather Cooke verbal warnings for violations of the Look Policy (Ex. 5, Johnson Dep. 37:12-24:38:21-39:4, 91:2-21, 93:25-94:16).

29.  Defendant asserts as an affirmative defense that allowing Elauf to wear a headscarf while working for it would cause an undue hardship.  Defendant argues that wearing a headscarf is inconsistent with Defendant's style and thus would (1) create an undue hardship on the conduct of Defendant's business because a primary job function of a model is to model and advertise Defendant's style; (2) damage the brand and hamper Defendant's "in-store experience" marketing efforts; and (3) negatively affect its ability to uniformly enforce the Look Policy.  (Ex. 2, Answer; Ex. 6, Defendant's Responses to Plaintiff's First Interrogatories, No. 4).

30.  A store's compliance with the Look Policy is tracked by the Directors of Stores and the Regional Managers through ratings on store audits in the category of "store experience" and through ratings in Secret Shopper reports in the subcategory of "properly dressed" within the "store experience" category.  Chad Moorefield is the Director of Stores for the Midwest region, which includes Tulsa, Oklahoma.  He never did any statistical or empirical analysis to determine if in any particular store a drop in the "store experience" audit ratings for the store was correlated

to a drop in sales for that store.  He is unaware whether Defendant's corporate office has done any such study.  He did not do any study or analysis to determine whether a low score in the "properly dressed" subcategory in the Secret Shopper Reports has any correlation to a drop in sales for any particular store.  His "gut feeling" is that a low score on the properly dressed subcategory could have a negative effect on sales, but he did nothing to verify his gut feeling. He simply "believe[s] it."  (Ex. 3, Moorefield Dep. 170:2-220:4, Moorefield Dep. Ex. 11).

31.  Based only on her personal experience, Human Resource Director, Amy Yoakum, believes that each Look Policy exception impacts the in-store experience of customers.  But she never saw one of defendant's employees who had been given an exemption to the Look Policy. She was not aware of any study to measure the impact of Look Policy deviations, nor was she aware that Defendant had on 8 or 9 occasions allowed Muslim employees to wear headscarves. (Ex. 11, Yoakum Dep. 62:21-20-68:15, 86:2-90:11).

32.  Defendant designated its Vice President of Human Resources, Deon Riley, to testify on behalf of Defendant pursuant to a Rule 30(b)(6) Notice of Deposition as to the following topic:

> The effect and/or impact, if any, of allowing any and all exceptions to and or deviations from the Look Policy . . .  including but not limited to the details of any and all studies, reports or analyses performed by or at the direction of Defendant to assess such impact.

Through Riley, Defendant admitted that Dr. Joachimsthaler's expert report is the only study or analysis it has conducted on the effect of a Look Policy exception on the operation of its business and Defendant is unable to say whether allowing employees to wear headscarves has a negative impact on sales.  (Ex. 7, Riley Dep. 4:9-15, 5:22-6:12, 13:6-21, 236:7-19, Moorehead Dep. Ex. 1, ¶ 3).

33.  Defendant has not assigned or determined a specific financial cost to allowing Elauf to wear a headscarf in its Abercrombie Kids store in Tulsa.  Defendant has done no studies or analyses to determine whether allowing exceptions to the Look Policy would have or has had any adverse impact on its sales.  (Ex. 8, Def. Supplemented Answers to Pl. First Interrogatories, No. 5; Ex. 7, Riley Dep. 13:9-16:4).

34.  Dr. Joachimsthaler testified that in his opinion allowing even one exception to the Look Policy "*can* damage the brand and *can* hurt the company's sales."  He testified that he did not know for sure that this is the case.  He testified that a model wearing a headscarf "could be a negative in-store experience that is not perceived by anybody." (Ex. 9,  Joachimsthaler Dep. 142:6-143:6, 143:23-144:4, 195:4-197:22, 230:9-17) (emphasis added).

35.  Dr. Kathleen Lundquist, also identified by Defendant as an expert witness, testified that she created the job description for the model position that was in effect in 2008.  That job description contains a summary of the seven tasks of the model position.  According to the job description, a model (1) maintains presentation standards throughout the store including cleaning and organizing the store, (2) represents the brand by creating a fun and engaging environment, (3) develops good working relationships with others and keeps the manager informed of store issues, (4) follows Abercrombie procedures and policies, (5) operates the cash register, clocks in and out promptly and opens and closes the store, (6) participates in team goals, greets, assists and interacts with customers, and (7) follows security policies and assists in loss prevention.  Of these tasks, only one, "representing the brand," deals with the appearance of the employee and adherence the Look Policy.  Dr. Lundquist testified that this one subpart of

the seven job description tasks is an "important" function of the job of model (Ex. 10, Lundquist Dep. 32:14-33:5,4, 37:3-11, 134:19-135:12, 143:16-147:25, Lundquist Dep. Ex. 1).

36.  Dr. Lundquist did not know that Defendant had allowed store employees to wear headscarves on some occasions at the time she wrote her expert report and was deposed on March 11, 2011.  (Ex. 10, Lundquist Dep. 120:14-17).

37.  Requests for exceptions to the Look Policy must be directed to and approved by Defendant's Human Resources department in corporate headquarters.  Human Resources has a process in place for evaluating and deciding whether to grant a request for an exception to the Look Policy, on a case by case basis.  Some requests for exceptions to the Look Policy are granted and some are denied.  The requests and Human Resources' decisions on those requests are documented in the Human Resource Contact Record database.  Human Resources trains store management in this process.  It is Human Resources' responsibility, in partnership with store management, to uniformly enforce the Look Policy.  (Ex. 7, Riley Dep. 64:16-65:2, 109:5-110:19, 129:4-18, 149:11-152:16; Ex. 11, Yoakum Dep. 70:4-74:21).

38.  Since 2006, Defendant's Human Resources department has approved the following exceptions to the Look Policy in its stores; allowing male employees to work with facial hair for religious and medical reasons; allowing female employees to wear bracelets for religious reasons; allowing employees to wear footwear for medical reasons other than approved footwear;  allowing female employees to wear long skirts inconsistent with skirts sold in the stores for religious reasons; allowing male employees to wear baseball caps for medical reasons; and allowing male employees to wear yarmulkes for religious reasons.  (Ex. 3, Moorefield Dep. 262:22-264:4; Ex. 13, Human Resources Contact Records; Ex. 14,

18

Defendant's Supplemented Response to Plaintiff's First Request for Admissions, Nos. 15 and 16; Ex. 7, Riley Dep. 92:17-93:11, 101:20-23, 139:12-140:13, 158:6-238:3, Riley Dep. Exs. 25 and 26).

## III.   ARGUMENT AND AUTHORITIES

### A.  Standard for Summary Judgment

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir. 1985).  A "genuine" factual dispute requires more than a mere scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party meets its burden, the nonmoving party must demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  *Anderson,* 477 U.S. at 250-251.

### B.  Plaintiff Has Established a Prima Facie Case of Defendant's Failure to Accommodate Elauf Because of Her Religion

Title VII makes it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual because of such person's religion.  42 U.S.C. § 2000e-2. Religion is broadly defined by the Act as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (1982).  "The Supreme Court has held that the intent and effect of this definition of 'religion' is to make it a violation of § 2000e-2(a)(1) for an employer not to make reasonable accommodation, short of undue hardship, for the religious practice of employees and prospective employees." *Pinsker v. Joint Dist. No. 281,* 735 F.2d 388, 390 (10th Cir. 1994) (*citing Trans World Airlines v. Hardison*, 432 U.S. 63, 74 (1977).

In order to prove a claim of religious discrimination for failure to accommodate a religious belief, Plaintiff must establish a prima facie case by proving: (1) he or she had a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was not hired for failure to comply with the employment requirement.  The burden then shifts to the employer to: (1) conclusively rebut one or more elements of the plaintiff's prima facie case; (2) show that it offered a reasonable accommodation; or (3) show that it was unable to reasonably accommodate the employee or applicant's religious needs without undue hardship.  *Thomas v. Nat'l. Assoc. of Letter Carriers, et al.*, 225 F.3d 1149, 1155-1156 (10th Cir. 2000).  The undisputed evidence establishes the elements of Plaintiff's prima facie case and rebuts Defendant's affirmative defense of undue hardship.

### 1.   Samantha Elauf Had a Bona Fide Religious Belief That Conflicted with an Employment Requirement

The courts have employed a two-step test for determining whether a person has a bona fide religious belief under Title VII.  A bona fide religious belief is one that: (1) is religious

within the plaintiff's own scheme of things, and (2) sincerely held.  *United States v. Seeger*, 380

U.S. 163, 185 (1965); *See also, Welsh v. United States*, 398 U.S. 333, 338 (1970); *Redmond v.*

*GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978);

### a.  A hijab is "religious" in Elauf's scheme of things

Title VII broadly defines "religion" to include "all aspects of religious observance and

practice" as well as belief.  42 U.S.C. § 2000e(j); *see Ansonia Bd. of Educ. v. Philbrook*, 479

U.S. 60, 69 (1986).  Religious beliefs may have their source in scripture or tradition, revelation,

or mediation.  They may be institutionalized or "be of recent vintage or formed

instantaneously."  *Brown v. Dade Christian Schools*, 556 F.2d 310, 313 (5th Cir. 1977), *cert.*

*denied*, 434 U.S. 1063 (1978).  As long as a party's beliefs are religiously asserted, it is not for

the courts to challenge the truthfulness of such assertions simply because they developed "from

revelation, study, upbringing, gradual evolution, or some source that appears entirely

incomprehensible."  *Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144 n.9, (1987).

Toward this end, the employee's assertion "that his belief is an essential part of a religious faith

must be given great weight."  *U.S. v. Seeger,* 380 U.S. at 184.

Courts may not engage in an extensive inquiry into the religious beliefs of the plaintiff,

but rather must determine only if the practice or belief at issue is religious in nature.  A judicial

inquiry into the verity of a religious belief runs afoul of the First Amendment.  *See Heller v.*

*EBB Auto Co.,* 8 F.3d 1433, 1439 (9th Cir. 1993), *citing Fowler v. State of R.I.,* 345 U.S. 67

(1953) (courts could violate Establishment Clause with in-depth inquiry).  A plaintiff need not

prove that his religious practice or belief is consistent with doctrine of an organized religion.

*U.S. v. Seeger*, 380 U.S. at 184-85; *Int'l Ass'n of Machinists v. Boeing Co.*, 833 F.2d 165, 169

(9th Cir. 1987).  Nor need she prove that her religious practice is required by the tenets of a particular religion.  The Seventh Circuit explained as follows:

> [W]e note that to restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion . . . but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion. We find such a judicial determination to be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island*, 345 U.S. 67, 70 (97 L.Ed. 828, 73 S.Ct. 526 (1953).

*Redmond v. GAF Corp.*, 574 F.2d at 900.

In the instant case, Elauf testified in her deposition that she has worn a headscarf at all times since the age of thirteen to be closer to God.  She believes that the Quran instructs her to cover her hair.  She wears a headscarf as a symbol and reminder of her Muslim faith, as a religious symbol, and as a symbol of Islam (Pl. Fact  3).  Elauf testified that she was raised as a Muslim by Muslim parents; that she fasts during Ramadan, the Islamic holy month, and attends services at her mosque on occasion and on religious holidays.  She prays and reads the Quran and she does not drink or gamble (Pl. Fact 4).  The facts are undisputed that Elauf's practice of wearing a headscarf is religious in nature and is an essential part of her faith.

### b.  Elauf's belief that she must wear a hijab in public is sincere

Elauf was born and raised a Muslim (PL. Fact 2).  Islam is the third largest religion in the world and is an ancient one (Pl. Fact 1).  Elauf believes, consistent with her understanding of the teachings of the Quran, she should wear a headscarf as a symbol of modesty.  In accordance with this belief, she has been wearing a headscarf in public for seven years, since the age of 13, in order to represent her faith (Pl. Fact  3).

22

Where the Court concludes that the belief or practice at issue is religious in nature, the only remaining issue becomes whether the subjective belief that the practice was proscribed or required by the religion is "sincere."  While the issue of whether a religious belief is sincerely held is usually a question of fact, courts will make a finding as to sincerity where the facts support it.  *Cf. Snyder v. Murray City Corp.,* 124 F.3d 1349, 1353 (10th Cir. 1997) (determining on motion for summary judgment that plaintiff's religious beliefs were not sincere and not entitled to First Amendment protection).  *See Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *rev'd on other grounds*, 479 U.S. 60 (1986) ("We acknowledge that it is entirely appropriate, indeed necessary for a court to engage in analysis of the sincerity - as opposed, of course, to the verity - of someone's religious beliefs in both the free exercise context . . . and the Title VII context.") (citations omitted); *Hussein v. The Waldorf-Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) ("On the record before the Court, a reasonable jury could only conclude that [the employee's] religious assertion was not bona fide" where the plaintiff's actions were inconsistent suggesting a lack of conviction as to his religious practice); *EEOC v. Alamo Rent-a-Car, LLC,* 432 F. Supp. 2d 1006, 1012 (D. Ariz. 2006) ("Viewed in the light most favorable to Alamo . . . the evidence does not support the existence of a material factual issue regarding the sincerity of Ms. Nur's religious belief . . . "); *EEOC v. Red Robin Gourmet Burgers, Inc.*, 2005 U.S. Dist. LEXIS 36219, at *1, 2005 WL 2090677, at *2 (W.D. Wash. 2005) (granting plaintiff's motion for summary judgment on issue of whether plaintiff established he had a bona fide religious belief).  The burden on a plaintiff to show sincerity is not a heavy one.  *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d at 481.

Among relevant factors a court may look to in determining one's sincerity are the religion's size and history, the length of time the plaintiff practiced the religious belief, and consistency of one's behavior with regard to the practice at issue. *See*, *e.g. Philbrook v. Ansonia Bd. of Educ.*757 F.2d at 481 (religion's size is relevant); *Gallahan v. Hollyfield*, 516 F. Supp. 1004, 1006 (E.D. Va. 1981) (concluding that a Native American prisoner had demonstrated a sincere religious belief that he must wear long hair because he had practiced his beliefs since he was five years old); *Hussein v. Waldorf Astoria*, 134 F. Supp. 2d at 596 (Court noted that plaintiff had not worn a beard to work in 14 years in determining plaintiff did not have a bona fide religious belief that he could not shave).

The Second Circuit has identified several factors that indicate insincerity: "an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine . . . ." *Philbrook v. Ansonia Bd. of Educ.,* 758 F.2d at 481 (*quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 441 (2d Cir. 1981)) (internal quotation marks omitted). Applying this test, in *Hussein* v. *Waldorf Astoria*, 134 F. Supp. 2d at 596-97, the court granted summary judgment on the issue of whether the plaintiff had a bona fide religious belief that he could not shave holding the undisputed facts showed that the plaintiff behaved inconsistently with respect to that belief in that he had never worn a beard to work in 14 years and shaved his beard again within three months of being fired by the defendant.

That Elauf is sincere in her belief that she must wear a headscarf in observation of her religion is undisputed. There is no evidence in the record to show that Elauf has behaved inconsistently in practicing her religious belief that she must wear a headscarf in public – i.e.

24

there is no testimonial or pictorial evidence to suggest she appeared in public without a hijab since she was 13 years old.  Further, that Elauf has attached the utmost religious significance to the wearing of a headscarf is shown by the fact that she wears it at all times in public including while employed in the only two jobs she held before applying for employment with Defendant. *Cf. Hussein v. Waldorf Astoria, Id. See, e.g.*, *Redmond,* 574 F.2d at 901 (evidence that plaintiff was member of church for over 16 years, appointed lifetime leader of Bible study class and testimony that he felt his participation in Saturday Bible class activities was a religious obligation established sincere belief). Elauf's testimony regarding her religious practices set forth in Plaintiff's Fact Nos. 4 through 7 is undisputed and is sufficient to establish the sincerity of her belief that she must wear a headscarf.

### c.  Evidence that Elauf may not regularly practice other tenets of her religion is of no consequence

Lacking evidence that Elauf's belief that wearing a hijab in public is an insincere religious belief, Defendant may argue that because Elauf does not pray five times a day or attend services at the mosque every week, she is somehow not a devout Muslim.  The courts have rejected similar evidence in considering the sincerity of a religious belief.  In *EEOC v. Llona of Hungary , Inc.,* 108 F.3d 1569 (7th Cir. 1996), the Seventh Circuit affirmed the district court's verdict that the defendant had violated Title VII by refusing to give two Jewish employees the day off without pay to observe Yom Kippur.  The court upheld the district court's finding that one of the plaintiffs had proven the sincerity of her religious beliefs even where she testified that she was not "a particularly religious person" and did not observe every Jewish holiday.  *Id.* at 1575. *See also*, *Philbrook,* 757 F.2d at 482 ("Appellant's financial compromise and failure to attend services regularly would not, by themselves, mean that he

25

does not believe that he should not work on holy days"); *Vetter v. Farmland Indus., Inc.*, 884 F. Supp. 1287, 1307 (N.D. Iowa 1985) (Court held plaintiff was sincere in his belief that he must live in a Jewish community outside of his sales territory even where undisputed facts showed that he had lived in community without a substantial Jewish population in the past).  The relevant inquiry here is whether Elauf behaved inconsistently with respect to her religious belief that she must wear a headscarf in public as opposed to other religious practices, albeit related. Elauf did not need an accommodation to allow her to pray at work nor did she need to miss work to attend religious services.  She needed to be allowed to wear a headscarf at work.  That belief is clearly sincere.  Even if the Court does examine Elauf's overall religious behavior, the evidence is undisputed that she attends the mosque and prays, fasts during Ramadan, does not drink alcohol or gamble, and comports herself according to her Islamic beliefs (Pl. Fact 4).

Defendant may also contend that Elauf's belief cannot be sincere because she shopped at Abercrombie & Fitch which sells "form-fitting" clothes and that wearing such clothes would be conduct inconsistent with the teachings of the Quran and her beliefs that she should dress modestly.  As discussed above, the courts should not engage in determining what is required or prohibited by a religion or, in this case, the Quran.  Elauf testified that she dresses modestly as instructed by the Quran in that she tries not to wear clothes that are "too tight" and that she tried to cover a majority of her arms and covered her legs in addition to wearing a headscarf (Pl. Fact 5).  The issue here is whether her belief that she must wear a headscarf is sincere, not whether her dress complies or does not comply with the Quran in other ways.  The fact that other Muslims dress more modestly is without significance.  See *Forde v. Baird*, 720 F. Supp 2d 170, 177 (D. Conn. 2010).

26

*EEOC v. Reads, Inc.*, 759 F. Supp 1150, 1154-55 (E.D. Pa. 1991), is instructive.  In that case, the district court ruled after a bench trial that plaintiff had established a prima facie case of religious discrimination where the defendant refused to hire her as a school counselor because she wore a headscarf.  The evidence established that she wore a pantsuit, floral blouse and green v-neck sweater along with her headscarf to her interview.  Her Imam testified that while he understood that she attempts to dress modestly, her attire did not fit within the prescriptions of the Quran.  *Id.* at 1154. The plaintiff herself testified that although she covers her head in an attempt to accommodate the teachings of her religion, her dress does not comply with the requirements of the Quran.  *Id.*  The court held nonetheless that the plaintiff had established that she had a bona fide religious belief that conflicted with the defendant's employment requirements.  *Id.* at 1155.  Even if Elauf herself believed that she dressed in a manner that was inconsistent with the Quran, which she does not, the undisputed facts establish that her religious belief that she should wear a headscarf is nonetheless sincere.

Defendant will also argue that not all observant Muslim women wear headscarves and that, accordingly, Elauf does not have to wear a headscarf in order to practice her faith.  This argument must fail.  The critical inquiry is whether Elauf believes that she must wear a headscarf to adhere to the tenets of her faith - not whether other adherents to Islam do or do not wear headscarves in the practice of their faith.  *See Forde v. Baird*, 720 F. Supp. 2d 170, 176-77 (D. Conn. 2010) ("Consequently, what matters here is that Forde sincerely believes that being pat searched by male correctional officers violates her understanding of the tenets of Islam.  That Respondent presented evidence that this belief may not be universally held by all Muslims is without significance.")

27

The undisputed facts establish that Elauf wears a headscarf in observance of her religion; that this practice is religious in nature and she sincerely believes she must observe it. Elauf wore a headscarf at all times in public and would have worn a headscarf at work had she been hired by Defendant. Viewing these facts in the light most favorable to Defendant, Plaintiff is entitled to judgment as a matter of law as to the first element of its prima facie case: Elauf has a bona fide religious belief that conflicted with an employment requirement.

### d.  Defendant had notice of Elauf's religious belief

While the Tenth Circuit has not addressed the specific evidence required to establish the second element of a plaintiff's prima facie case, *i.e.*, an applicant or employee informed the employer of her religious belief, other circuits have. No magic words are required to place an employer on notice of the conflict between an applicant or employee's religious needs and a conflicting work requirement. To request an accommodation, all the employee must provide to the employer is enough information to make the employer aware that there exists a conflict between the individual's religious practice or belief and a requirement for applying for or performing the job. *See Dixon v. Hallmark Cos.,* 627 F.3d 849, 856 (11th Cir. 2010) (holding that it was enough that the company was "aware of" the tension between the order to remove public displays of religious items and the plaintiff's religious beliefs) *citing Brown v. Polk County, Iowa*, 61 F.3d 650, 654 (8th Cir. 1995); *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1439 (9th Cir. 1993) (employee's request for leave to participate in religious conversion ceremony of his wife and children was sufficient to place employer on notice that this was pursuant to a religious practice or belief); *Hellinger v. Eckerd Corp.,* 67 F. Supp. 2d 1359, 1361 (S.D. Fla. 1999) (Although applicant himself did not inform employer about his religious conflict on his job

application, employer had learned when he contacted applicant's former supervisor for a reference that the applicant had refused to sell condoms at prior job due to a religious objection, and was therefore on notice).  An employer cannot "shield itself from liability by . . . intentionally remaining in the dark."  *EEOC v. Sears Roebuck & Co.,* 417 F.3d 789, 804 (7th Cir. 2005; *EEOC v. White Lodging Servs. Corp.,* 2010 U.S. Dist. LEXIS 32492, at *15 (W.D. Ky. Mar. 31, 2010)(to argue that the manager did not know or inquire as to what the staffing contractor had discussed with the applicants "is to bury one's head in the sand").

> **i.  Elauf was not required to give notice of a need for a religious accommodation where she did not know of any conflict between her religious belief and any employment policy**

The undisputed evidence establishes that Elauf was unaware that Defendant had a Look Policy when she applied and was interviewed and was unaware that she would not be permitted to wear a headscarf at work if she was hired (Pl. Facts 10, 14, 15).  Even Assistant Manager Cooke, who interviewed Elauf, was not sure that a headscarf would violate the employment policy, so she consulted with her District Manager (Pl. Fact 15).  Thus, Elauf had no reason to ask Cooke for an accommodation during her interview.  Nor was it necessary for her to do so as Cooke saw Elauf's headscarf during the interview and, although she did not "know" Elauf was a Muslim, in her mind, Elauf's headscarf signified to her that she was a Muslim (Pl. Fact 13).  Even before the interview, Cooke had seen Elauf in the mall wearing a headscarf.  Elauf's wearing of a headscarf to the interview was enough to put Cooke on notice of a potential conflict between Elauf's religious beliefs and the Look Policy.

ii.   **Cooke's knowledge of the conflict between Elauf's religious practice of wearing a hijab and Defendant's Look Policy is imputed to Defendant by virtue of the laws of agency**

Cooke's knowledge of this potential conflict is imputed to Defendant by virtue of their agency relationship.  42 U.S.C. § 2000e(b) provides that an "agent" of an employer is included within the definition of an "employer" who is prohibited from engaging in discrimination.  Thus, the determination of who is an "employer" depends on agency principles.  *Marshall v. Nelson Elec., Unit. of Gen. Signal,* 766 F. Supp. 1018, 1039 (N.D. Okla. 1991).  An individual qualifies as an "employer" if he or she serves in a supervisory position and "exercises significant control over the plaintiff's hiring, firing or conditions of employment."  *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993).  In such a situation, the individual operates as the alter ego of the employer, and the employer is liable for the unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct.  *Id.*

Cooke was an Assistant Manager of the Abercrombie Kids store in the Woodland Hills Mall.  She supervised store employees and her duties included recruiting, interviewing and hiring models.  She had the authority to hire new employees without higher approval.  Until she consulted with Johnson about hiring Elauf, she had never previously asked him about hiring applicants.  She had the authority to discipline store employees (Pl. Fact 12).  She enforced the Look Policy in her store (Pl. Fact 28).  Thus, notice to Cooke that Elauf had a religious belief that had the potential to conflict with the Look Policy was notice to Defendant.

Defendant may argue that Randall Johnson, not Cooke, actually made the decision not to hire Elauf because she wore a headscarf and he testified that he did not know that she wore the headscarf for religious reasons.  A reasonable jury could not believe that Johnson lacked notice

that Elauf wore a headscarf because of her religion.  He admitted that he was aware that Muslim women wore headscarves (Pl. Fact 20).  Enforcement of the Look Policy was the responsibility of the assistant managers and Johnson enforced the Look Policy as to store management.  He had given Heather Cooke verbal warnings for violations of the Look Policy (Pl Fact 28). Since he testified that Elauf would be a good model candidate, had he believed that she wore a headscarf for non-religious reasons, he would have let Cooke hire her and then, if necessary, allow store management to enforce the Look Policy against her at work as was normal procedure.  He never discussed this with Cooke.  Instead, without consulting anyone else at Abercrombie, he simply told Cooke that Elauf could not be hired (Pl. Fact 17).  Thus, it can be assumed that Johnson knew that Elauf could not remove her headscarf for religious reasons if asked to do so and, for that reason, she was not hired.  "When opposing parties tell two different stores, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  *Mata v. Anderson,* 685 F. Supp. 2d 1223, 1256 (D.N.M. 2010) *quoting Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) (internal quotations and citations omitted).

Even assuming, *arguendo*, that Johnson did not know that Elauf wore a headscarf for religious reasons, Cooke's participation in Defendant's decision not to hire Elauf imputes to Defendant her knowledge of the religious requirement that Elauf must wear a headscarf.  Cooke had the authority to hire Elauf but did not do so after consulting with Johnson (Pl. Fact 22).  Johnson's duties did not include making decisions on hiring models; Cooke's did (Pl Facts 12, 19).  She could have exercised that authority despite Johnson's directive and hired Elauf anyway, but she did not do so because she believed Elauf had to wear a headscarf for religious reasons

31

and would not remove it.  She did not hire Elauf because Johnson told her that Elauf's wearing a headscarf would violate the Look Policy (Pl. Facts 17, 22).  She threw away the Model Group Interview Guide rating sheet that she had filled out on Elauf and prepared a new one rating her such that she could not be hired (Pl. Fact 21).  Cooke was thus the ultimate decision-maker under these circumstances.

> ### 2.    Samantha Elauf was Not Hired Because of Her Failure to Comply with the Employment Requirement

It is undisputed that Defendant refused to hire Elauf as a model in the Woodland Hills Mall store because she wore a headscarf in contravention of the Look Policy prohibition on headwear.  Assistant Manager Cooke testified that she interviewed Elauf for the model job and that she told Johnson that she wanted to hire her.  Cooke testified that she told Johnson that Elauf wore a headscarf and that he told her she could not hire Elauf because she wore a headscarf (Pl. Fact 17).  Johnson also testified that he told Cooke she could not hire Elauf because her headscarf was prohibited by the Look Policy.  The evidence is undisputed that Elauf was not hired because of her failure to comply with this employment requirement.

> ### C.    Defendant's Affirmative Defense of Undue Hardship Fails Because It Is Based Entirely Upon Speculation And Conjecture

Title VII requires that an employer provide reasonable accommodation for the bona fide religious belief of an applicant or employee unless it can prove that the accommodation requires it to bear more than a "de minimus" burden and is thus an undue hardship.  42 U.S.C § 2000e(j).  *See Trans World Airlines v. Hardison*, 432 U.S. 63, 74 (1977).  The Tenth Circuit addressed the proof required to establish undue hardship in *Toledo v. Nobel-Sysco, Inc.* 892 F.2d 1481, 1490-92 (10th Cir. 1989), *cert. denied*, 495 U.S. 948 (1990), stating "[A]ny proffered

hardship, however, must be actual; "[a]n employer cannot rely merely on speculation." *Id.*  "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships . . . ." *Id.* at 1492 (citations omitted). "The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted. Indeed, deciding the issue of undue hardship without some background of attempted or proposed accommodation is best resolved by examining the specific hardships imposed by specific accommodation proposals."  *Id.* at 1490 (citations omitted).

Other courts have concurred with the necessity for concrete proof of undue hardship as opposed to that which is hypothetical or speculative in nature.  *See Smith v. Pryo Min. Co.,* 827 F.2d 1081, 1086 (6th Cir. 1987), *cert. denied,* 485 U.S. 989 (1988); *Tooley v. Martin-Marietta Corp.*, 648 F. 2d 1239, 1243 (9th Cir. 1981), *cert. denied*, 454 U.S. 1098 (1981); *Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir. 1992), *cert. denied*, 508 U.S. 973 (1993).  An employer's cost of accommodation "must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Cook v. Chrysler Corp.*, 981 F.2d at 339 *quoting Brown v. General Motors Corp.*, 601 F.2d 956, 962 (8th Cir. 1979).  There must be "evidence of tangible present costs of the accommodation."  The costs need not be ascertained with exactitude but must be "present and real."  *Id.*

### 1.   The actual evidence shows that accommodating employees' religious beliefs to wear a hijab have not damaged sales or damaged the brand

It is undisputed that Defendant has, in fact, made at least 8-9 exceptions to the Look Policy in its stores, to allow employees to wear headscarves (Pl Fact 23).  Notwithstanding Dr. Joachimsthaler's testimony that in his expert opinion allowing even one person to wear a headscarf in Tulsa, Oklahoma could have a negative impact on the brand that could extend as far

as St. Petersburg, Russia (*see* Ex. 9, Joachimsthaler Dep. 236:24-237:5) and Dr. Lundquist's testimony that modeling Defendant's "look" is an important function of the model job (Pl Fact 35), Abercrombie remains a "brand name" despite allowing employees in its retail stores to wear headscarves since early 2010.[1]  Indeed, Defendant's General Counsel told the New York Times that Defendant permits retail store employees to wear headscarves (Pl. Fact  23).  Dr. Joachimsthaler stated the obvious in his testimony: the executives of Abercrombie & Fitch would not intentionally do anything to damage their brand or hurt their sales.  (See Ex. 9, Joachimsthaler Dep. 144:10-21).  It goes without saying that if providing such a religious accommodation would cause an undue hardship on the operation of Defendant's business, its executives would not have done it and continue to do it to this day.  The fact that Defendant now permits exceptions to the Look Policy for headscarves fatally undercuts its argument that to do so would cause an undue hardship.

In addition, Defendant has historically allowed other exceptions to the Look Policy, the strict enforcement of which, it claims, is integral to its business strategy.  It is undisputed that since 2006, Defendant's Human Resources department has allowed male employees to grow facial hair as an exception to the Look Policy, has allowed female employees to wear jewelry not sold in its stores or permitted by the Look Policy, has allowed male employees to wear baseball caps and yarmulkes, and has permitted female employees who cannot wear short skirts to wear

---

[1] Federal Rule of Evidence 407 provides that evidence of subsequent remedial measures is inadmissible to prove culpable conduct.  However, such evidence is admissible if it is offered for another legitimate purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.  Fed. R. Evid. 407.  Thus, Rule 407 does not prevent Plaintiff from using this evidence to show a religious accommodation was feasible where Defendant has controverted the fact that it was feasible based on its argument that to provide the accommodation would work an undue hardship on the business.  Such evidence is not being used to prove liability, or in support of Plaintiff's prima facie case. *See e.g. Rimkus v. Northwest Colo. Ski Corp*., 706 F.2d 1060, 1064 (10th Cir. 1983) (no abuse of discretion to admit evidence of defendant's subsequent remedial measures when jury was instructed that evidence was admissible as to feasibility and not to be considered as bearing on defendant's negligence); *Rodriguez v. Union Pac. Corp*., 2006 U.S. Dist. LEXIS 57010, at *5, 2006 WL 2239043, at *2 (D. Neb. July 31, 2006) (Rule 407 did not prevent plaintiff from using evidence of company change in job posting procedure to show the new procedure was feasible before plaintiff complained).

long skirts that are not sold in its stores and are inconsistent with its "look."  (Pl. Fact  38).

These exceptions are documented in its Human Resource Contact Record database and are

available for all human resources representatives to review in evaluating a request for an

exception to the Look Policy (Pl. Fact 37).  Defendant cannot have it both ways.  If it made these

exceptions to the Look Policy without undue hardship, it could have made an exception to the

Look Policy to allow Elauf to wear a headscarf without undue hardship.

Courts have determined that making exceptions to an employment requirement advanced

by an employer that cannot be waived without undue hardship is evidence contraindicating

undue hardship.  In *EEOC v. Papin Enters, Inc.*, Action No. 07-01548, 2009 U.S. Dist. LEXIS

30391, 2009 WL 961108 (M.D. Fla. 2009) (unpublished opinion attached hereto as Ex. 16), the

court denied defendant's motion for summary judgment on the issue of whether allowing a

Subway franchisee's counter employee to wear a nose ring in violation of company policy

against facial jewelry was an undue hardship.  The court held that undue hardship was not

proven where defendant's owner also contended that he had offered to allow plaintiff to wear his

nose ring while working behind the counter as long as the franchiser did not find out.  *Id.*  at *22-

23.  The court also held that defendant franchiser could not prove undue hardship because it

appeared willing to waive the rule if plaintiff could produce satisfactory evidence that he needed

to wear the nose ring for religious reasons.

Similarly, the court in *Alamo Rent-a-Car,* 432 F. Supp. 2d at 1016-17, rejected

defendant's argument that allowing an employee to wear headscarf while dealing with customers

caused an undue hardship where employer's uniform policy prohibiting headwear was strictly

enforced only after September 11, 2001.  *See also*, *EEOC v.Llona of Hungary*, 885 F. Supp.

1111 (N.D. Ill. 1995), *aff'm in part and rev'd in part,* 108 F.3d 1569 (7th Cir. 1997) (in rejecting defendant's undue hardship defense to allowing Jewish employees to take Saturday off to celebrate Yom Kippur, district court noted that defendant allowed employees to take Saturdays off for non-religious reasons).

> **2.   Defendant's claims that granting exceptions to its Look Policy will damage its brand are based entirely on speculation and conjecture**

Defendant contends that allowing Elauf to wear a headscarf in contravention of its Look Policy would damage its brand and hamper its "in-store experience" marketing efforts.  Yet, Defendant admits that exceptions to the Look Policy that have been allowed are not tracked or correlated  in any manner with customer's view of their store experience  (Pl. Fact  24).

Defendant's "proof" in support of this assertion is based only on personal opinion testimony of three of its managers identified in its Rule 26 Disclosures and Preliminary Witness List and its two retained experts.  Deon Riley, Vice President of Human Resources, summed up her depositions testimony in answer to a question of whether she believed models should be allowed to wear headscarves as follows: "I *think,* as V.P. of H.R., I *believe* in our core business strategy, which is adherence to the Look Policy contributes greatly to the in-store customer experience.  I *believe* that any exceptions that we make need to ensure that we do not, in any way, take away from the in-store experience."  (See Ex. 7, Riley Dep. 106:8-19) (emphasis ours).

Defendant, through Riley as its Rule 30(b)(6) designee on the topic of the adverse impact of exceptions to the Look Policy, could offer no empirical studies or sales figures to support the inference that allowing employees to wear headscarves would cause a present and real undue hardship.  Defendant testified that the only study that it had performed to support its undue hardship contention was that of Dr. Joachimsthaler.  Defendant further testified that it is unable

36

to say that allowing the wearing of headscarves would have a negative impact on its sales (Pl. Facts 24,  32, 33).

Director of Stores Chad Moorefield testified that he has a "gut feeling" that violations of the Look Policy have a negative affect on sales and that he "believes it."  (Pl. Fact 30).  Human Resources Director Amy Yoakum testified that she believes that every exception to the Look Policy that has been allowed has had an impact on the experience of Defendant's customers.  She based her opinion on her personal perception when walking into Defendant's stores.  When pressed, she could not give any specific example of observing in a store an employee who had been granted an exception to the Look Policy.  She further testified that she is not aware of Defendant having done any measurement of the adverse impact caused by allowing exceptions to the Look Policy.  She did not even know that headscarves had, in fact, been allowed in 8 or 9 instances but contended that this did not change her opinion (Pl. Fact 31).

Defendant's expert, Dr. Joachimsthaler, authored the one study that Defendant acknowledged supported its argument that allowing an exception to the Look Policy for a headscarf would cause an undue hardship.  However, Dr. Joachimsthaler did not testify that undue hardship would occur: he testified that allowing a single exception to the Look Policy *could* damage the brand and *could* negatively impact sales.  He could not say for sure, however (Pl. Fact 34).  When asked about the exceptions that Defendant made for headscarves since early 2010, he said that allowing such exceptions could be "foolish" or could be one of the "... really smart things that you do because you are in the real world of business ...." He said that allowing employees to wear headscarves could actually increase sales (Pl. Fact 25).

The testimony of these witnesses is speculative as to the existence of undue hardship and lacks evidentiary support. The testimony comes entirely from Defendant's own employees and retained experts and should therefore be viewed with a critical eye. *See U.S. v. New York City Transit Auth.*, Action No. 04-4237 (SLT)(MDG), 2010 U.S. Dist. LEXIS 102704, at *63, 2010 WL 3855191, at *22 (E.D.N.Y. 2010) (Court questioned evidence of undue hardship coming largely from defendant's own employees and retained experts). The testimony provides no information as to any tangible present costs of providing the accommodation at issue or even that any hardship would actually occur at all and Defendant admits that it assigned no financial value to the undue hardship that it claims. In fact, Dr. Joachimsthaler's testimony provides support for the argument that allowing employees to wear headscarves could be a smart thing and could actually increase the company's sales. While Defendant describes the undue hardship it may suffer in non-monetary terms such as "damage to the brand" and "hampering the in-store experience," the real claim is that it would be financially harmed if it allowed Elauf to work in its store wearing a headscarf. The record is devoid of any such evidence. Accordingly, Defendant's undue hardship defense must fail. *See Vetter v. Farmland Industries, Inc.,* 884 F. Supp. 1287, 1311 (N.D. Iowa 1995) (defendant summary judgment motion denied where record was "nearly devoid of evidence of tangible present costs."

*Banks v. Service America Corp.*, 952 F. Supp. 703, 710 (D. Kan. 1996) is directly on point. The defendant in *Banks* terminated the plaintiffs for refusing to cease greeting customers with religious phrases such as "God bless you." The defendant contended that the plaintiffs' jobs were completely incompatible with their religious practices because plaintiffs were required to serve customers and plaintiffs refused to interact with customers in an appropriate manner.

38

Despite the fact that defendant presented evidence of customer complaints about this practice and testimony from a manager that customer complaints could lead to a loss of business, the court denied defendant's motion for summary judgment on the issue of undue hardship because the record was devoid of any evidence that defendant lost any business due to plaintiffs' religious greetings.  The court held that this fear was "more hypothetical than real."  So too is Defendant's fear that allowing Elauf to wear a headscarf at the Abercrombie Kids store in Tulsa, Oklahoma will damage its brand and lead to lower sales.

Similarly, *Alamo Rent-a-Car,* 432 F. Supp. 2d 1006, 1016 (D. Ariz. 2006), is on all fours with the instant case.  There, the court granted plaintiff's motion for summary judgment on the issue of liability holding that defendant had failed to present evidence that allowing an employee to wear a headscarf as an exception to defendant's uniform policy prohibiting headwear would pose an undue hardship.  The court said:

> Alamo suggests that permitting Ms. Nur to wear a head covering at the rental counter would result in an undue hardship, concluding simply that "any deviation from [Alamo's] carefully cultivated image is a definite burden."  Without supplying any indication of the cost it would have incurred by permitting Ms. Nur to wear a head covering at the rental counter.  Alamo simply assumes the question of cost and argues that "the actual issue to be decided [by the jury] is the magnitude of the burden.  The record provides no material factual basis for Alamo's conclusions about the cost of "any deviation" from the uniform policy.

432 F. Supp. 2d at 1015.  This is exactly what Defendant is attempting to do in this case - assuming the question of cost and asking the trier of fact to determine its magnitude.  See also *EEOC v. Red Robin Gourmet Burgers, Inc.*, 2005 U.S. Dist. LEXIS 36219, 2005 WL 2090677, at *5* (Defendant must provide evidence of actual imposition on co-workers or disruption of the work routine to demonstrate undue hardship).

### 3.   Defendant's "slippery slope" argument has been rejected by the courts

Despite the clear record showing that exceptions to the Look Policy are granted, Defendant also contends that allowing an exception to the Look Policy to allow Elauf to wear a headscarf would negatively affect its ability to uniformly enforce the Look Policy.  If this were so, every exception would have this effect and Defendant would not allow any exceptions.  The courts have routinely rejected this "slippery slope" argument.  *See Id.* ("The court is unmoved by Red Robin's final, "slippery slope" argument that allowing [plaintiff] to work with his tattoos uncovered would force it to allow whatever tattoos, facial piercings or other displays of religious information an employee might claim . . . ."); *Alamo Rent-a-Car,* 432 F. Supp. 2d at 1016-17 (rejecting defendant's argument that allowing employee to wear head covering might affect the efficiency of the company's operations by opening the door for other employees to violate the company's uniform policy).  As the court in *Anderson v. Gen. Dynamics Convair Aerospace Div.,* 589 F.2d 397, 402 (9th Cir. 1978) said:

> Undue hardship means something greater than hardship.  Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts.  Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship.  As the Supreme Court pointed out in Franks v. Bowman, . . . "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.

(citations omitted).

An employer's burden of demonstrating that it cannot accommodate an employee's religious practice without suffering undue hardship is more exacting that its burden of rebutting an employee's prima facie case.  *See, e.g., Toledo v. Nobel-Sysco, Inc.,* 892 F.2d at 1490 ("[A]n employer who has made no efforts to accommodate the religious beliefs of an employee or

40

applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship")  The undisputed facts establish that Defendant cannot sustain its burden.  Accordingly, Plaintiff is entitled to summary judgment on the issue of Defendant's affirmative defense of undue hardship.

## III.     CONCLUSION

The undisputed facts establish that Elauf had a bona fide religious belief that conflicted with an employment requirement, that Defendant had notice of the conflict and that it not hire her because of her failure to comply with the requirement.  The undisputed facts further establish that Defendant could have reasonably accommodated Elauf without undue hardship.  Accordingly, Plaintiff EEOC is entitled to judgment on the issue of liability as a matter of law or, in the alternative on one or more of the elements of its prima facie case and/or on Defendant's affirmative defense of undue hardship.

Respectfully submitted,

/s/ Barbara A Seely
BARBARA A. SEELY
Regional Attorney

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
1222 Spruce St., Room 8.100
St. Louis, MO 63103
(314) 539-7910
(314) 539-7895 (Fax)

/s/ Jeff A. Lee
JEFF A. LEE
Trial Attorney
Oklahoma State Bar No. 13483

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, Oklahoma 73102
(405) 231-4375
(405) 231-5816 (Fax)

## <u>CERTIFICATE OF SERVICE</u>

        This is to certify that a true and correct copy of the above and foregoing instrument was served via e-mail this 15th day of April, 2011 to:

ATTORNEYS FOR DEFENDANT:

Mark A. Knueve
Daniel J. Clark
Joseph Fungsang
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
PO Box 1008
Columbus, OH 43216-1008
maknueve@vorys.com
djclark@vorys.com
jfungsang@vorys.com

Kristen L. Brightmire
Doerner, Saunders, Daniel & Anderson, LLP
320 S. Boston, Suite 500
Tulsa, OK 74103
kbrightmire@dsda.com


                                     /s/ Barbara A. Seely
                                     BARBARA A. SEELY