**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
)
           Plaintiff, )
)    Case No. 09-CV-602-GKF-FHM
v. )
)
)
ABERCROMBIE & FITCH STORES, INC., )
an Ohio corporation, d/b/a Abercrombie )
Kids, )
)
           Defendant. )

## OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment of defendant
Abercrombie & Fitch Stores, Inc. ("Abercrombie") [Dkt. #50] and the Amended Motion for Partial
Summary Judgment of plaintiff, the Equal Employment Opportunity Commission ("EEOC") [Dkt.
#68].

The EEOC brought this action pursuant to Title VII of the Civil Rights Act of 1964 (42
U.S.C. § 2000e-5(f)(1) & (3)) and Title I of the Civil Rights Act of 1991 (42 U.S.C. § 1981a),
alleging religious discrimination against Samantha Elauf ("Elauf"), a Muslim teenager who applied
for a job at an Abercrombie store in Woodland Hills Mall in 2008. [Dkt. #2].  Abercrombie did not
hire Elauf because, as a Muslim, she wears a head scarf and the Abercrombie "Look Policy"
prohibits sales models from wearing head wear.

The EEOC seeks summary judgment on the issue of liability or, in the alternative, on one or
more elements of its prima facie case and/or on Abercrombie's affirmative defense of undue
hardship.  Abercrombie contends the EEOC's motion should be denied and its cross motion should

be granted because the EEOC has not established a prima facie case, and because an accommodation for Elauf would cause Abercrombie undue hardship.

## I. Material Facts

Abercrombie operates retail stores across the country under a variety of brand names, including Abercrombie & Fitch, abercrombie ("Abercrombie Kids") and Hollister. [Dkt. #86, Defendant's Statement of Facts ¶1; Dkt. #77, Plaintiff's Response to Defendant's Statement of Facts ¶1]. The target customer of Abercrombie & Fitch is age 18 to 22 and the target customer of Abercrombie Kids is age 8 to 16. [Dkt. #50, Supplemented Written Testimony of Dr. Erich A. Joachimsthaler, ¶26]. Abercrombie's Vice President of Human Resources, Deon Riley, testified that its largest advertising is its "in store experience with our models (sales associates), the look and feel of the store, what the customer has come to expect." [Dkt. #86, Ex. 3, Deon Riley Dep., 19:1-5].

In 2008, Abercrombie operated an Abercrombie Kids store in the Woodland Hills Mall in Tulsa, Oklahoma. [Dkt. #68, Plaintiff's Statement of Facts ¶ 7]. At all times from 2005 to the present, Abercrombie has required employees in its Abercrombie Kids, Abercrombie & Fitch, and Hollister stores to comply with a "Look Policy." [#68, Ex. 3, Chad Moorefield Dep., 69:7-17, 102:23-103:16, 149:20-167:5 and Moorefield Dep. Exs. 7, 8, 9; Ex. 7, Riley Dep. 18:5-17]. Kathleen Lundquist, an expert for Abercrombie, has stated that the Look Policy is inherent to a model's role and is a major component of the in-store experience. [#50, Ex.G, Lundquist Declaration, ¶8]. The Look Policy requires employees to dress in clothing and merchandise consistent with that sold in the store; requires that male employees be clean shaven; prohibits female employees from wearing necklaces and bracelets; requires employees to wear specific types

2

of shoes; and prohibits "caps" but does not mention any other head wear.  [Dkt. #68, Ex. 4, Heather Cooke Dep., Ex.8 thereto, pp. 29-30].  The policy applies to all store employees, but applicants are not required to be in compliance at the time of the interview. [Dkt. #50, Ex. C, Riley Dep., 63:18-24].

 Abercrombie trains store managers "never to assume anything about anyone" in a job interview, and not to ask applicants about their religion. [Dkt. #68, Ex. 7, Riley Dep., 62:18-63:3].  If there are issues or questions regarding the Look Policy or an employee requests a religious accommodation, the store  manager is instructed to contact Abercrombie's Human Resources Department and/or their direct supervisor. [Dkt. #50, Ex. C., Riley Dep., 32:10-21, 113:2-114:7].  The Human Resources managers have the individual discretion to grant accommodations "as long as it's not going to distract from the brand." [*Id.,* 114:2-7].

 Samantha Elauf has been a Muslim since birth. [Dkt. #68, Ex. 2, Elauf Dep., 28:18-20].  Her parents are both practicing Muslims. [*Id.,* 29:6-8].  Her mother wears a head scarf on a daily basis [*Id.,* 30:23-31:10], and Elauf began to wear a head scarf[1] at age 13. [*Id.,* 31:14-16].  Since then, she has worn a head scarf at all times when in public or in the presence of male strangers. [*Id.* 32:7-33:5].  She considers it a representation and reminder of her faith, a religious symbol, a symbol of Islam and of modesty. [*Id.,* 32:2-6;121:22-24; 123:10-21].  She testified that the head scarf becomes an obligation after one reaches puberty, and "that's the only time you'll be able to decide whether or not you want to wear a head scarf." [*Id.,* 34:3-10].

---

[1]A head scarf is a type of hijab, a head covering common in Islamic cultures. [Dkt. #68, Ex. 1, John Esposito Dep., 44:1-20].  There are different styles of hijabs. [*Id.,* 47:8-15].  Elauf wears one that does not appear to cover her face, neck or shoulders. [#68, Ex. 4, Cooke Dep., Exs. 6 and 7 thereto; Ex. 1, Esposito Dep., 47:19-48:4].

Elauf acknowledged the Quran does not explicitly require women to wear head scarves. [*Id.,* 124:16-25; Ex. 50, Ex. A, Elauf Dep., 125:1-4]. She admitted that someone could be an observant Muslim without wearing a head scarf, and testified that several members of her family, and her friend Faris Sepahvand, do not wear head scarves, but she does not think they are looked down upon or are not "good Muslims." [*Id.,* 30:8-11; 35:10-21; 45:1-20; 121:2-17].

Elauf fasts during Ramadan and has done so since she was in fifth grade. [*Id.,* 40:21-41:13]. She does not pray five times a day[2] or daily, but prays and reads verses of the Quran twice a month and also studies the Quran during Ramadan. [*Id.,* 38:12-39:16]. She does not drink, party or gamble, as they are considered "not Islamic." [*Id.,* 38:5-10]. She tries to cover the majority of her arms and legs when she dresses. [*Id.,* 48:6-20].

Elauf "occasionally" attends services at her mosque,[3] the Islamic Center in Tulsa, but said she is not sure where it is located as far as the street name. [Dkt. #86, Ex. 1, Elauf Dep., 13:2-6].

### Elauf's Application and Interview

On June 25, 2008 Elauf, then 17, applied for a job as a model at the Abercrombie Kids store in Woodland Hills Mall. [Dkt. #68, Ex. 2, Samantha Elauf Dep., 52:4-53:7]. Assistant store manager Heather Cooke interviewed her on June 26, 2008. [*Id.,* Ex. 4, Heather Cooke Dep., Ex 5 thereto].

As a high school student, Elauf had worked at Woodland Hills Mall in the Fruit Fondue

---

[2]Elauf testified that part of the Muslim religion is to pray five times a day. [Dkt. #68, Elauf Dep., 42:6-16].

[3]She estimates she attends two of the weekly Friday prayer services plus two holiday services each year provided she is not working, i.e., four services a year. She testified that it is "not [as] necessary for a woman to go to the Friday prayers as it is for a man." [Dkt. #86, Ex. 1, Samantha Elauf Dep., 13:25-14:10, 15:5-24].

kiosk and the Limited Too store. [Dkt. #68, Ex. 2, Samantha Elauf Dep., 44:3-17; 54:6-17]. Before she applied for a job at Abercrombie, she had shopped there and bought jeans, sweatshirts, tank tops and t-shirts from its stores. [*Id.,* 49:8-18]. Elauf's friend, Farisa Sepahvand, who worked as a model at Abercrombie Kids, encouraged her to apply. [*Id.,* 45:23-46:1; ]. Like Elauf, Sepahvand is a Muslim. [*Id.,* 12:12-13].

Elauf was unaware, before she applied, that Abercrombie had a Look Policy. [*Id.,* 59:6-11]. Elauf testified that Sepahvand told her she had discussed with Cooke whether it was okay if Elauf wore a black head scarf, and Cooke said she would probably have to wear a different color. [*Id.,* 57: 7-58:2]. Sepahvand told Elauf she would not be able to wear a head scarf that was black because Abercrombie required models to wear clothing similar to what it sold, and Abercrombie did not sell black clothing. [*Id.,* 56:17-57:12; Ex. 17, Farisa Sepahvand Dep., 32:24-33:24]. Elauf testified she knew Abercrombie does not sell head scarves, although it sold scarves she could wear as head scarves. [#86, Defendant's Statement of Fact ¶5 and Ex. 1, Elauf Dep., 117:4-15].

Elauf testified that during the interview, Cooke never mentioned the Look Policy, but told her she would "wear clothing that either looked like Abercrombie and then the fact that I wasn't supposed to wear heavy makeup or like polish, nail polish." [Dkt. #86, Ex. 1, Elauf Dep., 65:2-8]. It is undisputed that Cooke did not tell her Abercrombie would not permit models to wear head scarves or to wear black clothing. [*Id.,* 65:15-21; #68, Ex. 4, Cooke Dep.98:14-99:1].[4]

---

[4]The witnesses' testimony on this subject conflicts to some extent. Elauf was "pretty sure" Cooke told her that "what I was wearing that day would be fine but I would just have to wear a different color scarf because I think I was wearing a black scarf and I was wearing black sandals, and you weren't allowed to wear black shoes..." [*Id.,* Ex. 2, Elauf Dep., 61:23-62:13]. Cooke testified she did not discuss with Elauf the fact that she wore a head scarf during the interview or tell her should could not wear black if she was hired as a model. [#68, Ex. 4, Cooke Dep., 98:14-99:1].

Cooke was responsible for recruiting, interviewing, and hiring new store employees. She supervised models in the store, had the authority to discipline them, and decided which model applicants would receive job offers. She did not usually seek approval from the District Manager before extending a job offer, and the District Manager was usually not involved in deciding whether to hire a specific applicant. [Dkt. #68, Ex. 4, Cooke Dep., 23:3-16, 27:8-30:18, Ex. 5, Johnson Dep. 34:9-25, 38:17-25; Ex. 3 Moorefield Dep. 141:22-142:6; Ex. 6 Def. Responses to Pl. First Interrogatories, No. 9.].

During the interview with Cooke, Elauf wore an Abercrombie & Fitch like T-shirt and jeans, and a head scarf. [Dkt. #68, Ex. 4, Cooke Dep., 95:12-96:3; 109:1-8]. Cooke had previously seen Elauf wearing a head scarf in the Woodland Hills Mall. [*Id.,* 96:5-10]. Cooke testified that the head scarf signified to her that Elauf was Muslim and, "I figured that was the religious reason why she wore her head scarf, she was Muslim," [*Id.,* 96:11-15] and "I just assumed that she was Muslim because of the head scarf was for religious reasons." [*Id.,* 153:19-22]. Cooke believed Elauf was a good candidate for the job, but she was unsure, at the time, whether it would be a problem for Elauf to wear the headscarf to work as a model for Abercrombie. [*Id.,* 99:6-16; 109:9-11]. She testified:

Q:     Did you, at that time, feel that she should not be able to work as a model at Abercrombie Kids because she was wearing the head scarf?

A:     No. I did not feel. I felt like she could. I didn't feel like there was anything wrong with it. But I knew that in–not in this, but in the Employee Handbook, it does say that we're not supposed to wear the color black. But they had just said we could wear black converse tennis shoes. So I was a little unclear.

And I think it says in the handbook you can't wear hats. So I was unclear. So that's why–I was the assistant manager and that's why I asked the store manager and the district manager.

[*Id.,* 99:17-100:9].

The store manager was unable to answer Cooke's question about head scarves, so she consulted with her District Manager, Randall Johnson. [*Id.,* 106:24-107:8]. She testified Johnson told her not to hire Elauf because she wore the head scarf, that employees were not allowed to wear hats at work, and that if Elauf wore the head scarf, then other associates would think they could wear hats at work. [*Id.,* 107:8-12]. Cooke further testified:

> Q:     And did you–did you discuss it with him in sort of—did you have any
>        discussion with him over this?
>
> A:     Yes, I did. I thought she was a very good candidate to work here.
>        And I asked him, you know, she wears the head scarf for religious reasons, I believe.
>        And he said, "You still can't hire her because someone can come in and paint
>        themselves green and say they were doing it for religious reasons, and we can't hire
>        them.
>        And I told him that I believed that she was Muslim, and that was a recognized
>        religion. And that she was wearing it for religious reasons. And I believe that we
>        should hire her.
>
> Q:     And what did he say?
>
> A:     He told me not to hire her.

[*Id.,* 107:14-108:5].

In his deposition, Johnson denied Cooke told him Elauf wore the head scarf for religious reasons and also denied making the remark about people painting themselves green. [Dkt. #68, Ex. 5, Randall Johnson Dep., 86:4-21].

Johnson testified that Abercrombie's Human Resources Department is responsible for compliance with the Look Policy, and if he had a question whether a head scarf was the same as a cap, he would have called his HR manager. [*Id.,* 48:24-49:10]. However, he believed the head scarf would not have complied with the Look Policy. [*Id.,* 48:20-23]. He testified that during the

time he was district manager, the Abercrombie Kids store had never had any exception to the Look policy. [*Id.,* 69:15-21]. He was not aware Abercrombie allowed any exceptions nationwide from 2001 to 2009. [*Id.,* 70:25-71:12]. He was unaware that in other stores, Abercrombie had allowed store models to wear a yarmulke. [*Id.,* 71:9-12]. In his opinion, there was no difference between a yarmulke, a head scarf, "[o]r a ball cap or a helmet for all that matters. It's still a cap," and if an applicant asked to wear a ball cap for religious reasons, he "[s]till would have denied them, yes, sir." [*Id.,* 71:13-72:3].

Johnson testified that the process for considering a request for an exception would be that he would contact his HR director, "and they would make that exception or determination if we could hire them or go forward with that applicant." [*Id.,* 72:4-14]. He stated that he had "never had to make an exception, no, or make–or call HR to make an exception." [*Id.,* 72:15-20].

Johnson knew that some Muslim women wear head scarves because he had seen them on television. [*Id.,* 47:23-25]. Viewing photographs of Elauf, he stated that she would have been a good candidate to hire as a model except for the head scarf. [*Id.,* 70:15-18].

Johnson could not recall if he asked Cooke whether Elauf could remove her head scarf. [*Id.,* 50:13-18]. He did not recall any discussion about how Elauf could comply with the Look Policy if hired. [*Id.,* 51:20-23].

During her interview of Elauf, Cooke had filled out a Model Group Interview Guide rating sheet, rating Elauf on three "competencies" required for the job of model: "outgoing and promotes diversity," "sophistication and aspiration," and "appearance and sense of style." [Dkt. #68, Ex. 4, Cooke Dep., 104:10-105:7]. A candidate who scores below a total combined score of 6 is classified as "below expectations" and not recommended for hiring. [#68, Ex. 4, Cooke Ep., Ex. 5 thereto at

A&F001997].

Originally, Cooke gave Elauf a "2" (on a scale of 1-3, with 3 being the highest) in all three competencies. [*Id.,* 104:15-105:23]. She also originally marked the "hiring recommendation" as "recommend." [*Id.,* 106:17-23]. She testified that when Johnson told her not to hire Elauf, "he told me to give her a 1 on appearance, so then her score would be a 5 instead of a 6, and I would not hire her." [*Id.,* 122:13-25]. After Cooke consulted Johnson, she threw away Elauf's original rating sheet and filled out a new one, changing Elauf's score on "Appearance and Sense of Style" from 2 to 1. [*Id.*, 123:1-19]. After she changed the rating, Cooke did not extend a job offer to Elauf. [#68, Plaintiff's Statement of Facts ¶ 22].

Elauf testified that, at the end of her interview, Cooke told her she would call her the next day or the day after and let her know when orientation was. [Dkt. #68, Ex. 2, Elauf Dep., 66:1-5]. Elauf never got a call, and her friend Farisa told her three days after the interview that the district manager had told Cooke not to hire her because of the head scarf. [*Id.,* Ex. 2, Elauf Dep., 66:13-67:13].

### Look Policy Exceptions

Requests for exceptions to the Look Policy must be approved by Abercrombie's Human Resources Department in corporate headquarters. [#68, Ex. 7, Riley Dep., 109:5-110:19]. Riley testified that exceptions to the Look Policy are recorded in the Human Resources contact records database, but Abercrombie has not tracked the exceptions or measured whether they have had any negative impact on how customers view the Abercrombie style. [*Id.,* 129:4-24].

In 2006, Abercrombie's Human Resources Department approved a head scarf exception to the Look Policy. [Dkt. #68, Ex. 7, unnumbered exhibit thereto, Contact Records, A&F004313].

Additionally, since 2006, the department has approved the following exemptions to the Look Policy: allowing males to work with facial hair for religious and medical reasons; allowing females to wear bracelets for religious reasons; allowing female employees to wear long skirts inconsistent with skirts sold in the stores for religious reasons; and allowing males to wear yarmulkes for religious reasons.  [#68, Plaintiff's Statement of Facts ¶ 35, Ex. 3, Moorefield Dep. 262:22-264:4; Ex. 13, HR Contact Records; Ex. 14, Defendant's Supp. Resp. To Pl.'s First Request for Admissions, Nos. 15 and 16; Ex. 7, Riley Dep, 92:17-93:11; 101:20-23; 139:12-140:13; 158:6-138:3, Riley Dep. Exs. 25-26].

Subsequent to its rejection of Elauf's application, Abercrombie began to allow more head scarf exceptions.  [#68, Ex. 7, Riley Dep., 92: 17:24; 236:1-6].  In an interview reported by the New York Times (online) on September 23, 2010, Abercrombie's General Counsel Ronald A. Robins, Jr., said that Abercrombie "makes every reasonable attempt to accommodate the religious practices of associates and applicants, including, where appropriate, allowing associates to wear a hijab." [*Id.,* Ex. 15, NY Times.com article; Ex. 12, Defendant's Response to Requests for Admission ##1-2].  Abercrombie's Vice President of Human Resources, Deon Riley, testified Abercrombie now allows exceptions to the policy against headwear and, with respect to the head scarf, has allowed eight or nine exceptions. [#68, Ex. 7, Riley Dep., 236:1-6].

Abercrombie executives uniformly testified that allowing exceptions to the Look Policy has a negative impact on the brand and on sales.  Riley testified she believes the Look Policy leads to a better in-store experience and more repeat customers and the in-store experience "is a core driver of our business."  [#50, Ex. C., Riley Dep., 31:13-32:].  However, she also admitted that the report of Dr. Erich A. Joachimsthaler, Abercrombie's expert in this case, is the only study or analysis

Abercrombie has conducted in the last two years on the effect of a Look Policy exemption, and

Riley's department has not been asked to assess whether or how deviations impact customer views

or to review sales for that purpose.  [Dkt. #68, Ex. 7, Riley Dep., 13:9-16:4; Ex. 8, Def. Supp.

Answers to Pl. First Interrogatories, No. 5].

A store's compliance with the Look Policy is tracked by the Director of Stores and the

Regional Managers through ratings on store audits and in Secret Shopper reports.  [#68, Plaintiff's

Statement of Facts ¶ 28, Ex. 3, Chad Moorefield Dep., 170:2-173:15].  Chad Moorefield, Director

of Stores for Abercrombie, testified that he never did any empirical analysis to determine if a drop

in store audit scores is correlated to a drop in sales for any store [*Id.,* 195:1-199:20], although he

has "seen stores or managers that do a poor job of enforcing our Look Policy and ha[s] seen low

sales scores because of it." [*Id.,* 218:1-9].

Human Resources Director Amy Yoakum testified she believes that granting an exception

for Elauf would have created an undue burden because it could negatively affect the "store

experience" for Abercrombie's customers and the uniform enforcement of the Look Policy.  [Dkt.

#68, Ex. 11, Yoakum Dep. 62:16–63:23; 68:16-69:2].  In her deposition on March 18, 2011, she

was not aware that Abercrombie had, since the Elauf incident, granted eight or nine exceptions for

head scarves, but stated that knowledge would not change her opinion.  [*Id.,* 65:2-10].  Yoakum

was not aware of any study to measure the impact of Look Policy deviations. [*Id.,* 68:8-15].

Abercrombie's expert, Lundquist, testified that she created the job description for the model

position that was in effect in 2008.  [#50, Ex. G., Kathleen K. Lundquist Decl., ¶7].  She stated that

an essential function of the job as an Abercrombie model is to "act as a model for the brand," and in

so doing "represent the [Abercrombie] brands in their appearance and sense of style."  [*Id.,* ¶8].

She opined that "it is both critical to the job and an essential function of the job of Model at Abercrombie to maintain an appearance and sense of style consistent with the brand" and "critical...to comply with standards of conduct including the Look Policy." [*Id.*, ¶23]. Lundquist has not performed any study or read any report regarding the impact of any store not being in compliance with the Look Policy and/or its impact on the brand. [Dkt. #68, Ex. 10, Kathleen Lundquist Dep., 135:10-18].

Abercrombie relies on the Joachimsthaler report in support of its position that an exception would create an undue burden. [*Id.,* Ex 8, Def. Supp. Answers to Pl. First Interrogatories, No. 5]. Abercrombie has not assigned a specific financial value to the alleged undue burden. [*Id.*].

Joachimsthaler testified regarding marketing strategy and brands. [Dkt. #50, Ex. F., Joachimsthaler Written Testimony; Dkt. #68, Ex. 9, Erich Joachimsthaler Dep.]. The declaration and deposition of Joachimsthaler establish:

- Abercrombie does not use television advertising and uses only minimal print advertising, and that its "brand identity" is communicated through the "in-store brand experience," including interactions with employees. [Dkt. #50, Ex. F, Joachimsthaler Dec., ¶11(ii)].

- Abercrombie's Look Policy plays a critical role in "communicating the overall brand experience and desired brand image to consumers" because "it ensures consistent and positive portrayals of the Abercrombie brand in the important in-store environment." [*Id.,* ¶11(iii)].

- "An employee's look or dress that is contrary to the guidelines of the...Look Policy is identity distorting and would appear visibly 'off-brand' to the Abercrombie target, and negatively impact Abercrombie's ability to communicate a consistent 'on brand' experience to its target customers," and "[t]here is potential to cause consumer confusion and decrease brand preference and valule perceptions for the Abercrombie brand," including "a decreased ability to effectively market to its target and establsih strong emotional bonds with them; a decreased ability to retain exiting customer; and increased costs of marketing and merchandising its products successfully." [*Id.,* ¶11(iv)].

- Joachimsthaler was aware that Abercrombie's Human Resources Department has approved exceptions to the Look Policy for head scarves. He knows of no studies done by Abercrombie to determine if allowing employees to wear headscarves has resulted in lost sales. He has not done such a study himself. [#168, Ex. 9, Joachimshtaler Dep., 187:8-22].

- When asked to "square" his opinion that allowing models to wear head scarves could cause a negative impact on the brand with the fact that Abercrombie now allows exceptions to the policy to permit wearing of the head scarf, Joachimsthaler opined that the exceptions "still negatively impact the brand." [*Id.,* 147:22-24].

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden to show that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1984).

The non-moving party must set forth facts sufficient to establish the existence of a genuine issue for trial. *Rocky Mountain Rogues, Inc. v. Town of Alpine,* 375 Fed. Appx. 887, 891 (10th Cir. 2010). Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere existence of "a scintilla of evidence" in support of the non-moving party's position is insufficient. *Id.* To survive a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would

require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997) (quoting *Williams v. Rice,* 983 F.2d 177, 179 (10th Cir. 1993)).

### III. Analysis

Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 20003-2(a)(1). "Religion" is defined to include only those "aspects of religious observance and practice" that an employer is able to "reasonably accommodate ... without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Title VII imposes an obligation on the employer "to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business." 29 C.F.R. § 1605.2(b)(1), (2).

On summary judgment, the principles outlined above are applied using the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, the plaintiff initially bears the burden of production with respect to a prima facie case by showing that (1) she had a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of this belief; and (3) she was not hired for failing to comply with the employment requirement. *Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). The burden then shifts to the defendant, who must: "(1) conclusively rebut one or more elements of the plaintiff's prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable to accommodate the employee's religious needs reasonably without undue

hardship." *Id.* at 1156 (emphasis added).[5]

## A. Prima Facie Case

The EEOC introduced evidence that Elauf wears a head scarf based on her belief that the Quran requires her to do so**,** and that this belief conflicts with Abercrombie's prohibition against headwear;[6] that Abercrombie had notice she wore a head scarf because of her religious belief; and that it refused to hire her because the head scarf conflicted with its Look Policy. Thus, plaintiff has established a prima facie case.

## B. Rebuttal of Prima Facie Case

Abercrombie challenges two elements of the prima facie case, asserting Elauf's wearing of the head scarf is not based on a bona fide religious belief and the notice requirement was not

---

[5]The court in *Thomas* explained that the burden shifting approach is different in ADA and religious discrimination cases than in other types of discrimination cases:

> In [an ADA or religious failure to accommodate] case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee *is* unlawful discrimination. Thus, we use the burden-shifting mechanism, not to probe the subjective intent of the employer, but rather simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered.

226 F.3d at 1155.

[6]The Look Policy prohibits the wearing of "caps" on the sales floor.

satisfied.

## 1. Bona Fide Religious Belief

A "bona fide religious belief" is one that (1) is religious within the plaintiff's own scheme of things, and (2) is sincerely held. *United States v. Seeger,* 380 U.S. 163, 185 (1965). As long as a party's beliefs are religiously based, it is not for the courts to inquire whether those beliefs "derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible." *Hobbie v. Unemployment Comm'n of Fla.,* 480 U.S. 136, 144 n. 9 (1987). Thus, the individual's assertion "that [her] belief is an essential part of a religious faith must be given great weight." *Seeger,* 380 U.S. at 184. Courts may not engage in an extensive inquiry into the religious beliefs of the plaintiff in order to determine whether religion mandates the employee's adherence. *See Heller v. EBB Auto Co.,* 8 F.3d 1433, 1439 (9th Cir. 1993), citing *Fowler v. State of R.I.,* 345 U.S. 67 (1953). The Supreme Court has stated, "[I]t is no business of courts to say . . . what is a religious practice or activity." *Fowler v. Rhode Island,* 345 U.S. 67, 70 (1953).

### a. Whether Elauf Wears a Scarf Based on a Religious Belief

Citing testimony of an expert witness for the EEOC, John Esposito, Abercrombie suggests Elauf wears a head scarf for cultural reasons rather than because of a religious belief.[7] Elauf, though, testified that she considers the head scarf to be a representation and reminder of her faith, a religious symbol, a symbol of Islam and of modesty. Indeed, the record is devoid of evidence that *her* decision to don a head scarf at age 13 and continue to wear it to this time is based on anything *other* than her religious belief.

_____

[7]Esposito an expert on Islam and the Muslim faith, testified generally that head scarfs can be worn for many different reasons, including cultural, religious or nationalistic reasons. [Dkt. #86, Ex. 8,John Esposito Dep., 41:9-21, 53:4-8]

Abercrombie also asserts that since the Quran does not explicitly state that women must wear head scarves, Elauf's belief is not a religious belief. However, the broad definition of "religion" does not require that a belief have a textual basis. In *Redmond v. GAF Corporation,* 574 F.2d 897, 900 (7th Cir. 1978), the court held that the protection of Title VII is not limited to situations involving "a practice specifically mandated or prohibited by a tenet of the plaintiff's religion." The court explained:

> First, we note that the very words of the statute ("all aspects of religious observance and practice....") leave little room for such a limited interpretation. Secondly, we note that to restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion, which by itself perhaps would not be beyond the province of the court, but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion. We find such a judicial determination to be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953),"(I)t is no business of courts to say...what is a religious practice or activity...."

*Id.*

Here, Elauf acknowledged that the Quran does not directly command women to wear head scarves, that some of her friends and family members do not do so, and that she does not consider them to be bad Muslims. However, based upon the Quran's teaching that women must display modesty, Elauf believes *she* should wear a head scarf, and she has done so since puberty at age 13. Heeding the cautionary language of *Fowler,* the court finds that Elauf wears a head scarf based on her religious belief.

### b. Whether Elauf's Belief is Sincerely Held

Abercrombie also challenges the sincerity of Elauf's religious belief because she did not know the street address of her mosque, does not regularly attend Friday services, and does not pray five times a day or every day.

As the Second Circuit Court of Appeals has observed, "[I]t is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity–as opposed, of course, to the verity–of someone's religious beliefs in ... the Title VII context." *Philbrook v. Ansonia Board of Education,* 757 F.2d 476, 481 (2nd Cir. 1985). "[T]he sincerity of [a claimant's] religious beliefs is relevant to *whether or not the observance or practice for which an accommodation was requested* will be considered 'religious' in nature." *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569,1575 (7th Cir. 1996) (emphasis added).

The court in *Philbrook* stated, "[A] sincerity analysis is necessary in order to differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.* at 482. The court further instructed:

> In *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 441 (2d Cir. 1981) (citations omitted), we outlined several factors that indicated insincerity, noting that "an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief ... or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." The *Barber* court also stated that "the religion's size and history" is relevant to the sincerity determination. *Id.* The burden on plaintiff, however, is not a heavy one. We must avoid any test that might turn on "the factfinder's own idea of what a religion should resemble" L. Tribe, *supra,* at 861.

*Id.*

Citing *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico,* 279 F.3d 49 (1st Cir. 2002),[8] Abercrombie argues the issue of Elauf's sincerity is one

---

[8]In *Union Independiente,* the EEOC brought an action on behalf of a member of the Seventh-Day Adventist Curch who claimed "the tenets of his religion" prohibited him from joining a labor organization. 279 F.3d at 51. The appellate court found the district court erred because the union had presented evidence of "conduct on [claimant's] part that is contrary to the tents of his professed religious belief." *Id.* at 56. In this case, the religious belief is much more narrowly framed because the *sole* belief asserted is Elauf's belief that she must wear a head

of credibility and therefore must be submitted to a jury.  The court agrees that the sincerity of a Title VII claimant's religious belief goes to credibility.  However, as stated in *Ilona, supra,* this court's focus must be on the sincerity of Elauf's belief that she must wear a head scarf–not whether she observed all tenets of the Muslim faith–because it was her belief about head scarves that required accommodation.  And the *purpose* of the inquiry, according to *Philbrook, supra,* is whether this belief is held as a matter of conscience or instead, animated by motives of deception and fraud.

The record is devoid of *any* evidence Elauf's belief is animated by motives of deception and fraud.  To the contrary, the type of inquiry suggested in *Philbrook* shows that Elauf has, since age 13,  worn the head scarf consistently and continuously when in public or in the presence of men who are strangers–this despite the fact that she resides in Tulsa, Oklahoma, and is a fashion conscious young woman.   There is no evidence Elauf has sought or received financial gain by wearing the head scarf.  Finally, the Muslim practice of wearing a head scarf is neither new nor uncommon.

There being no genuine dispute that Elauf wears a head scarf because of a bona fide religious belief, the court finds Abercrombie has not rebutted this element of plaintiff's prima facie case.

### 2. Notice

Citing *Thomas,* Abercrombie argues that since Elauf did not tell the interviewer she had a religious belief that conflicted with the Look Policy and that she needed an accommodation, the

scarf.

notice element of the prima facie case has not been satisfied.[9]  The EEOC urges a less restrictive approach, asserting that although Abercrombie is required to have had notice that Elauf needed an accommodation, the notice need not have been strictly in the form of Elauf verbally requesting such an accommodation.

Courts in other circuits have held that the notice requirement is met when an employer has enough information to make it aware there exists a conflict between the individual's religious practice or belief and a requirement for applying for or performing the job.  *See Dixon v. Hallmark Cos.,* 62 F.3d 849, 856 (11th Cir. 2010); *Brown v. Polk County, Iowa,* 61 F.3d 650, 654 (8th Cir. 1995) ("It would be hyper-technical ... to require notice of the Plaintiff's religious beliefs to come only from the Plaintiff); *Heller,* 8 F.3d at 1439 (9th Cir. 1993); *Helllinger v. Eckerd Corp.,* 67 F.Supp.2d 1359, 1361 (S.D. Fla. 1999).

While the Tenth Circuit has not addressed the question of whether notice must be explicitly requested  by the employee, the court in *Thomas* discussed at some length the reason notice was essential to the interactive process of accommodation:

> This statutory and regulatory framework, like the statutory and regulatory of the Americans with Disabilities Act (ADA), involves an interactive process that requires participation by both the employer and the employee.  *See Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 69 ...(stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "Courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") (internal quotations and citations omitted); *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987) ("Although the burden is on the employer to accommodate the employee's religious needs, the employee must make some effort to cooperative with an employer's attempt at accommodation."); *cf. Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1171-72

---

[9]In *Thomas,* it was undisputed that plaintiff, a postal employee, had explicitly requested five religious accommodations.  *Id.* at 1156.  Thus, the adequacy of notice was not at issue.

(10th Cir. 1999) (en banc) (discussing the interactive process between an employer and an employee under the ADA).

*Id.* at 1155.

In *Smith v. Midland Brake, Inc.,* the Tenth Circuit stated:

In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job.

180 F.3d at 1171-72. In a footnote, the court, citing *Beck v. University of Wisconsin,* 75 F.3d 1130, 1134 (7th Cir. 1996), stated:

An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations–a duty dictated by common sense *lest a disabled employee keep his disability a secret and sue later for failure to accommodate.*

*Id.,* n. 9 (emphasis added).

These cases teach that the purpose of the notice requirement is to facilitate the interactive process and prevent ambush of an unwitting employer. Thus, faced with the issue of whether the employee must explicitly request an accommodation or whether it is enough that the employer has notice an accommodation is needed–the Tenth Circuit would likely opt for the latter choice.

In this case, it is undisputed that Elauf wore her head scarf at the interview with assistant store manager Heather Cooke, and Cooke knew she wore the head scarf based on her religious belief. Because Cooke was uncertain whether Elauf would need an accommodation, she consulted the District Manager.[10] Thus, Abercrombie has failed to rebut the second element of the prima facie

---

[10]Abercrombie argues an issue of fact exists as to whether Cooke told the District Manager, Randall Johnson, that Elauf wore a head scarf for religious reasons. This is not, however, a material fact issue, because the knowledge of Cooke–who had responsibility for hiring decisions at the Abercrombie Kids store–is attributable to Abercrombie.

case–that the employer had notice that Elauf wore a head scarf based on her religious belief.[11]

## B. Undue Hardship

Abercrombie asserts that even if it has not rebutted the prima facie case, allowing Elauf to wear a head scarf would result in "undue hardship."

An employer must prevail as a matter of law if the employer cannot reasonably accommodate the employee's religious beliefs without "undue hardship on the conduct of the employer's business." *Lee v. ABF Freight Sys.,* 22 F.3d 1019, 1022 (10th Cir. 1994). An accommodation which results in "more than a *de minimus* cost" is an undue hardship to the employer and the employer need not provide the accommodation. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 53, 84 (1977).

Several Abercrombie executives have testified they believe granting Elauf an exception to the Look Policy would negatively impact the brand, sales and compliance. However, none have conducted any studies or cite specific examples to support this opinion. Instead, Abercrombie relies on Joachimsthaler's expert opinion.

Joachimsthaler, in turn, testified extensively about the importance of the in-store experience to Abercrombie's marketing strategy, and opined that the granting of even one exception to the Look Policy would negatively impact the brand. He has made no effort, however, to collect or analyze data to corroborate his opinion. If Abercrombie had never granted exceptions, or perhaps even if it had never granted exceptions for head scarfs, this omission might be understandable.

---

[11]Under the uncontested facts in this case, there could be no bilateral, interactive process of accommodation because, although Abercrombie was on notice that Elauf wore a head scarf for religious reasons, it denied Elauf's application for employment without informing her she was not being hired or telling her why.

Eight or nine head scarf exceptions, though, *have* been made, and the expert has completely failed to consider the impact, if any, of those exceptions.

The Tenth Circuit has stated:

> An accommodation that requires an employer to bear more than a "de minimis" burden imposes undue hardship. Any proffered hardship, however, must be actual; [a]n employer cannot rely merely on speculation. A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardship... The *magnitude* as well as the *fact* of hardship must be determined by examination of the facts of each case.

*Toledo v. Nobel-Sysco, Inc.,* 892 F.2d 1481, 1492 (10th Cir. 1989). In light of the fact that Abercrombie has granted numerous exceptions to the Look Policy since 2001, and in particular has recently granted eight or nine head scarf exceptions, Joachimsthaler's opinion is too speculative to establish actual hardship, as required by *Toledo.*

Abercrombie has failed to meet its burden of establishing that granting Elauf an exception to the Look Policy would have caused undue hardship.[12]

### III. Conclusion

There being no genuine dispute as to any material fact, Abercrombie's Motion for Summary Judgment [Dkt. #50] is denied and the EEOC's Amended Motion for Partial Summary Judgment [Dkt. #68] as to liability is granted.

ENTERED this 13th day of July, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

[12]Abercrombie may be able to show undue hardship in other hijab cases, but it has not done so here.