1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   EQUAL EMPLOYMENT OPPORTUNITY )
    COMMISSION,                   )
5                                 )
                  Plaintiff,      )
6                                 )
    V.                            )   No. 09-CV-602-GKF-FHM
7                                 )
    ABERCROMBIE & FITCH STORES,   )
8   INC., an Ohio Corporation     )
    d/b/a abercrombie kids,       )
9                                 )
                  Defendant.      )
10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                 HAD ON JULY 20, 2011

13                JURY TRIAL - VOLUME III

14

15

16   BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

17

18   APPEARANCES:

19   For the Plaintiff:    Ms. Barbara A. Seely
                           Equal Employment Opportunity Commission
20                         1222 Spruce Street, Room 8100
                           St. Louis, Missouri 63103
21
                           Mr. Jeff A. Lee
22                         Equal Employment Opportunity Commission
                           215 Dean A. McGee, Suite 524
23                         Oklahoma City, Oklahoma 73102

24                         Ms. Jennifer L. Hope
                           Equal Employment Opportunity Commission
25                         801 Market Street, Suite 1300
                           Philadelphia, Pennsylvania 19107

```
 1   (APPEARANCES CONTINUED)

 2   For the Defendant:   Mr. Mark A. Knueve
                          Mr. Daniel J. Clark
 3                        Vorys Sater Seymour & Pease LLP
                          52 East Gay Street
 4                        Columbus, Ohio 43215

 5                         -   -   -   -   -

 6                          CONTENTS

 7                                                   Page No.
```

```
 8   INSTRUCTION CONFERENCE.................................. 441

 9   CLOSING ARGUMENTS:

10        By Ms. Seely...................................... 447

11        By Mr. Knueve..................................... 463

12        By Ms. Seely...................................... 474

13   TESTIMONY OUTSIDE THE PRESENCE OF THE JURY

14   DEON RILEY

15        Direct Examination by Ms. Seely................... 490

16        Cross-Examination by Mr. Knueve................... 505

17   ARGUMENT ON INJUNCTIVE RELIEF

18        By Ms. Seely...................................... 507

19        By Mr. Knueve..................................... 508

20   JURY VERDICT.......................................... 513
```

```
21                     -   -   -   -   -

22                        PROCEEDINGS

23                       July 20, 2011

24        (The following proceedings were had outside the

25   presence and hearing of the jury.)
```

1          THE COURT:  We are on the record outside the hearing

2    of the jury.  The Court has conducted an informal jury

3    instruction conference and has made some modifications to its

4    first proposed draft of jury instructions based upon those

5    informal discussions.  The Court has produced a second draft to

6    counsel, and at this time the Court will ask counsel for the

7    plaintiff, Ms. Hope, are there any objections to the Court's

8    proposed set of jury instructions?

9          MS. HOPE:  Your Honor, the plaintiff still needs a

10   moment to review the revisions to the instructions.

11         THE COURT:  All right.  Mr. Clark, many objections?

12         MR. CLARK:  Just a few briefly, Your Honor.  On

13   Instruction No. 3, where the Court's finding of liability is

14   referenced.  I just want to preserve for the record that we

15   maintain our objections to that.

16         THE COURT:  Of course.

17         MR. CLARK:  By not objecting to the instruction, we'd

18   lose that.

19         THE COURT:  Yes.

20         MR. CLARK:  The nominal damages instruction, which is

21   now Instruction No. 13.

22         THE COURT:  Yes, sir.

23         MR. CLARK:  As we mentioned earlier, we believe that

24   the language under the Tenth Circuit caselaw, the instruction

25   should read "then you may return a verdict."

```
1              THE COURT:  All right.  And for some reason -- just

2      one second.  I don't have Instruction No. 13.  It has fallen

3      out.

4              MS. SEELY:  It's now after 14.

5              MR. CLARK:  It's actually been moved to after the

6      punitive damages instruction.

7              THE COURT:  Okay.  All right, thank you.

8              MS. SEELY:  I think it's just out of order in your

9      stack.

10             MR. CLARK:  It may make sense to change the order.

11             THE COURT:  Yes, I think we'll switch -- put 13 in its

12     proper place.  All right, go ahead.

13             MR. CLARK:  And then finally, with respect to the

14     punitive damages instruction, which in the packet I have is

15     Instruction No. 14.

16             THE COURT:  Yes.

17             MR. CLARK:  We had proposed a model instruction,

18     defendant's proposal 2.02 that was based upon the model

19     punitive damages instruction in a case such as this.

20             THE COURT:  Yes.

21             MR. CLARK:  And we maintain our position that that's

22     the appropriate instruction and that the applicability of the

23     undue burden defense should be incorporated into the

24     instructions to the jury.

25             THE COURT:  All right.  And specifically, that was a
```

1    model jury instruction adopted by the Litigation Section of the

2    ABA at some point; is that correct?

3             MR. CLARK:  That's correct, Your Honor.

4             THE COURT:  All right.  And specifically, as I

5    understand your argument, it would incorporate a slightly

6    different undue burden defense in the context of punitive

7    damages; correct?

8             MR. CLARK:  That's correct, Your Honor.  It's our

9    position that under Kolstad, if the defendant reasonably

10   believes that liability was not present or that Title VII did

11   not prohibit the conduct it engaged in, it can't be found

12   liable for punitive damages, even if the court later finds that

13   conduct was in violation of Title VII.

14            THE COURT:  Well, that's an interesting issue.  I

15   mean, it basically allows defendants to raise the same defense

16   with respect to punitive damages in a separate defense, but

17   very similar to the defense raised on liability.

18            MR. CLARK:  Certainly, Your Honor.  And in a classic,

19   you know, race discrimination case under Title VII where

20   defendant is found to have intentionally discriminated on the

21   basis of race, that's not going to be particularly applicable

22   because it's hard to argue that we believe we can discriminate

23   lawfully against someone based on their race.

24            However, in a case such as this where there's, you

25   know, it's a requirement for accomodation, but the requirement

1    for accommodation can be overridden by an existing undue

2    burden, a defendant that reasonably believes that an undue

3    burden is present, is not acting recklessly with respect to the

4    protected rights, but is making a reasonable decision based on

5    what it believes the law to be.

6              THE COURT:  I understand.

7              MR. CLARK:  So our position would be that the jury

8    should be instructed as to the availability of that defense.

9              THE COURT:  Yes, sir.

10             MR. CLARK:  And then I guess, additionally, as to the

11   good faith defense raised in Kolstad, as we mentioned this

12   morning, it's our position that that defense is not an

13   affirmative defense and not one that the burden should be

14   allocated to the defendant to prove.  And as to the specific

15   language, we would preserve our language in our proposal, which

16   was --

17             THE COURT:  Yes, sir, and just for the record here, I

18   was told this morning in the informal conference by Ms. Hope

19   that five circuits have determined that it is, in fact, an

20   affirmative defense and I was told this morning that no

21   circuits have decided to the contrary.  Is that your

22   understanding?

23             MR. CLARK:  That is, Your Honor.

24             THE COURT:  All right.  Go ahead.

25             MR. CLARK:  And I guess, finally, as to the good faith

 1    defense further, as we mentioned this morning, is the case of

 2    Hardman vs. Autozone, which we believe is consistent with our

 3    proposed language on the good faith defense.

 4            THE COURT:  Yes, sir.  All right.

 5            MR. CLARK:  I think those are the extent of the

 6    defendant's objections.

 7            THE COURT:  Thank you, those are noted.  And any

 8    objections from the plaintiff?

 9            MS. HOPE:  Your Honor, plaintiffs offer Plaintiff's

10    Requested Instruction No. 37.

11            THE COURT:  All right.  We touched briefly on agency

12    concepts in the informal instruction conference this morning

13    and the Court determined that because the language, and I think

14    it's from Kolstad, with regard to managerial agents is slightly

15    different in the context of punitive damages, that we would take

16    out the Court's typical agency instruction and we would rely on

17    the language set forth in the punitive damage instruction with

18    regard to vicarious liability and agency; right?

19            MS. HOPE:  I did also want to note, Your Honor, for

20    the record that while I did indicate there were five circuits

21    that have found that the Kolstad good faith defense is

22    affirmative, I did not know of any that had not.

23            THE COURT:  Yes, that was my understanding.  Yes.

24    Thank you.

25            MS. HOPE:  Thank you.

```
 1            THE COURT:  Any other objections?

 2            MS. HOPE:  No, Your Honor.

 3            THE COURT:  Very well.  We will make copies of these

 4  for each of the jurors.  It is my practice to allow the jurors

 5  to have an individual copy and take that copy back into

 6  deliberations with them.  It should not take very long and we

 7  will be back here as soon as possible.

 8            Now, how much time do you wish to use in closing?

 9            MS. SEELY:  Your Honor, my understanding from Mr.

10  Overton was that we had a half an hour and could ask for more?

11            THE COURT:  No, half an hour, as a colleague of mine

12  who was chief judge in Tulsa County used to say, the United

13  States Supreme Court reserves a half an hour per side in the

14  most important cases in this country and this ain't one of

15  them.  But if you need a half an hour, if that's what you were

16  planning on.

17            MR. KNUEVE:  Your Honor, I was planning on 10 to 15

18  minutes.

19            THE COURT:  Well, I think more than 15 might be

20  appropriate here.  Do you have 30 minutes plotted out here?

21            MS. SEELY:  I do, Your Honor.  I kind of thought that

22  that's what I would get.

23            THE COURT:  I was thinking more in terms of 20 here,

24  per side.

25            MR. KNUEVE:  I have no objection to 20, Your Honor.
```

1          MS. SEELY:  Your Honor, I would ask for -- I would ask

2   for 30 and reserve five out of that 30 for rebuttal.  I can do

3   my best to talk fast, but I did think we were going to get 30

4   minutes.

5          THE COURT:  All right.  Well, based upon the

6   representation, we will give you the 30.  Use them at your

7   peril.  See if you can be a little faster than that, if you

8   can.

9          MS. SEELY:  I'll try to do that.

10         THE COURT:  All right.  Anything else?

11         MR. KNUEVE:  No, Your Honor.  Thank you.

12         THE COURT:  All right, thank you very much.

13         (Recess).

14         (The Court instructed the jury.)

15                      *   *   *   *   *

16         THE COURT:  Ladies and gentlemen, at this time we will

17   hear closing arguments of counsel.  Now, under our procedures,

18   the plaintiff, who bears the burden of proof on the plaintiff's

19   case, has both the opportunity to begin closing arguments and

20   to offer a short rebuttal after the defendant's lawyer has

21   spoken to you.  Ms. Seely has opted to reserve five minutes of

22   her time for rebuttal.  We have allowed the attorneys, if they

23   wish, to utilize up to 30 minutes for closing argument.

24         So Ms. Seely, when you are ready, you may begin.

25         MS. SEELY:  Ladies and gentlemen of the jury, thank

1    you for your time and attention in this matter.  Juries are the

2    cornerstone of our American justice system and your

3    participation is much appreciated by myself and I'm sure by

4    everyone in this room.

5         This case is it about colors.  It's about green

6    because green is the color of money and that's what the Look

7    Policy is all about.  And it's about green because Randall

8    Johnson said anyone can paint themselves green and call it a

9    religion when Heather Cooke told him that Samantha Elauf wore a

10   headscarf because of her religious beliefs.  And it's about

11   red, white and blue, because Samantha Elauf in June of 2008 was

12   a typical American teenager when she applied for a job with

13   Abercrombie at the age of 17.  And it's about red, white and

14   blue because in 1964, the United States Congress passed Title

15   VII of the Civil Rights Act to protect the rights of applicants

16   and employees to religious accommodation in the workplace.

17   Please think about these colors when you retire to the jury

18   room.

19        Samantha Elauf.  Who was she before she applied for a

20   job with abercrombie kids and who is she now and how has she

21   changed?  In June of 2008, Samantha was a typical American

22   teen.  She was 17 years old, lived at home with her family, had

23   a messy room, she likes Taylor Swift, she hangs out with

24   friends and her favorite activity is shopping for clothes.  She

25   worked at the mall in high school and she has dreams.  She

1    hopes to open a women's retail fashion store when she grows up.

2    She wears a headscarf because she is Muslim, as a sign of her

3    faith.

4        Samantha applied for a job with abercrombie kids and

5    she knew she was qualified and she was really excited to work

6    there.  It was a cool store, her best friend Farisa worked

7    there and she got a great discount on clothes.  And she thought

8    she had the job because she had had retail experience with

9    Limited Too.  And she had never been discriminated against

10   before that time.

11       She was just like any other 17 year old until

12   Abercrombie & Fitch rejected her for a job because of her

13   headscarf, because of who she was.

14       Now this trial, the Court has instructed you, is on

15   damages only and your job is to determine what monetary damages

16   are due to Samantha Elauf and how much to award.

17       The Court read a number of instructions to you and

18   they are all important, but I wanted to talk about one in

19   particular and that's the instruction regarding burden of

20   proof.  The Court -- and I think at the beginning of this

21   trial, the Court reminded you that the burden of proof in a

22   civil trial such as this is not beyond a reasonable doubt.

23   That is a burden of proof applicable in criminal trials and

24   that is not what you're going to be deciding here, that's not

25   the standard you will be using.

1          The burden of proof that is in your instruction that

2     the Court just read is that any party who is proving a claim or

3     defense must prove that claim or defense by the greater weight

4     of the evidence.  And that means that the party must prove that

5     the claim is more likely, the claim or defense is more likely

6     to be true than not to be true.

7          Think of it as a scale.  If the scale tips, even

8     slightly to one side with the evidence, the party has satisfied

9     its burden of proof by the greater weight of the evidence.

10          Now, the EEOC is asking for two types of damages in

11     this case.  We are asking first, for compensatory damages to

12     compensate Samantha Elauf for her emotional distress.  The

13     instruction you have received is that you can award compensatory

14     damages for emotional pain, emotional suffering, mental anguish,

15     inconvenience, humiliation or embarrassment.  The plaintiff

16     does not have to prove that Samantha Elauf suffered all of

17     these things, only one or more.

18          Now, why should you award compensatory damages to

19     Samantha Elauf?  Ms. Elauf testified that she considered

20     herself to be an American teen and she had no reason not to

21     feel that way before June of 2008.  She had worn a headscarf

22     since the age of 13 and had never been discriminated against in

23     her life, not in work.  She wore a headscarf at work for over a

24     year, she had never had a problem there.  She went to an

25     American high school.  She had never had any problem in her

1   personal life, no discrimination because of her headscarf.  It

2   never occurred to her that anyone thought she was different.

3   It never occurred to her that she couldn't do anything she

4   tried to do.  She was excited about her job with Abercrombie,

5   she wanted to work in the coolest store in the mall.  Everyone

6   was wearing the clothes, she testified.  And like most teens,

7   she wanted to be cool, she wanted to fit in and be like

8   everybody else.

9        Then she found out she was not being hired because she

10  wore a headscarf because of her religion, because of who she

11  was.  She was angry, she felt disrespected and insulted, and

12  most of all she felt different from all the other teenagers

13  because of her religion, because of who she was.  She was a 17

14  year old girl at that time, in her formative years.  No teen

15  wants to feel different.  We've all been there.  We all wanted

16  to fit in and be like everybody else.  And Abercrombie told her

17  that she couldn't work in the cool store, she didn't have the

18  look because she wore a headscarf.

19       The most compelling evidence that you should consider

20  in deciding whether to award compensatory damages and how much,

21  was Samantha Elauf's reaction to my question when she was on

22  the witness stand, how did it make you feel.  You remember, she

23  couldn't speak for 20 seconds.  You could see that she was

24  welling up with tears.  And it's been over three years, but

25  these things, but the things that happen to you when you're a

1    teenager stick with you for a long time and she obviously still

2    feels the pain, and it's not surprising, and she will continue

3    to feel it for a long time, maybe the rest of her life.  She

4    lives with the feeling that people judge her now, that when

5    they look at her, they see only her scarf and not who she

6    really is.

7         You can help her by sending a message that you

8    understand the way she feels by awarding her damages to

9    compensate her for her emotional distress.

10        Now, Abercrombie's attorney will tell you that you

11   should not award any damages, any compensatory damages, to Ms.

12   Elauf because she found another job within about five days at

13   Forever 21 and that she didn't see a doctor or a therapist and

14   she didn't take any pills.  That doesn't matter.  The fact that

15   she got another job within a few days did not erase the pain of

16   being made to feel different.  She found comfort with her

17   family and friends and did not need to see a therapist or a

18   counselor and she certainly didn't need to take pills at the

19   age of 17.

20        Emotional pain, suffering, mental anguish.  These are

21   high-sounding words, but I want you to consider them from

22   Samantha Elauf's point of view.  17-year old teen,

23   discriminated against for the first time because of her

24   religious beliefs, beliefs that are intrinsic to her being.

25   She wears a headscarf as a sign of her faith.  That experience

 1   will be with her forever and, ladies and gentlemen, I submit

 2   that the scales tip towards the plaintiff's evidence.

 3          Now, we're also going to be asking you to award

 4   punitive damages.  And the purpose of punitive damages is to

 5   punish an employer and to deter an employer from doing -- from

 6   discriminating again.

 7          The plaintiff must show by the greater weight of the

 8   evidence that Abercrombie acted with reckless indifference to

 9   the federally protected rights of Samantha Elauf when it

10   discriminated against her.  The plaintiff must show by the

11   greater weight of the evidence, that Abercrombie acted with

12   reckless indifference if it acted with knowledge that it might

13   be acting in violation of Title VII.

14          Now, what evidence should you look at?  Remember the

15   stipulation that was read at the beginning of the trial?

16   Abercrombie stipulated that at all relevant times it knew that

17   Title VII required it to provide religious accommodation to its

18   applicants and employees.

19          THE COURT:  Just one second, Ms. Seely.  We will

20   suspend your time.  Your opposing counsel can't see this on --

21          MR. KNUEVE:  I can see it just fine.  May I approach,

22   Your Honor?

23          THE COURT:  All right.  I'm sorry, I misunderstood.

24   You have an objection, sir?

25          (Whereupon counsel approached the bench and the

1    following proceedings were had out of the hearing of the jury.)

2         MR. KNUEVE:  Your Honor, we were not provided with

3    that document.  Mr. Overton was very explicit that

4    demonstrative exhibits needed to be exchanged.  We've never

5    seen this document.

6         MS. SEELY:  Your Honor, it's not an exhibit.  It's

7    simply a visual aid.  I did not realize we had to do that with

8    things we would use in closing.

9         MR. KNUEVE:  Your Honor, Mr. Overton was very explicit

10   about demonstrative exhibits, he said they had to be exchanged.

11   We have not been provided this document.

12        THE COURT:  Well, a demonstrative exhibit, arguably,

13   is different from highlighting one's closing arguments.

14   Obviously, Ms. Seely could pull out a board and a marker and

15   write these things down.  Is that essentially what you're

16   trying to do --

17        MS. SEELY:  That's exactly right, Your Honor.

18        THE COURT:  -- just summarize your argument.

19        MS. SEELY:  Summarizing my four points.

20        THE COURT:  It will be overruled.

21        (Whereupon counsel returned to their respective places

22   and the following proceedings were had within the presence and

23   hearing of the jury.)

24        THE COURT:  The objection is overruled.  Ms. Seely.

25        MS. SEELY:  Again, what evidence should you look at to

1    determine if Abercrombie knew that it was acting with reckless

2    indifference to Samantha Elauf's rights.  Remember the

3    stipulation.  Abercrombie knew at all times that it was

4    required to provide religious accommodation, by Title VII, to

5    its applicants and employees.

6           Number two, district manager Randall Johnson

7    instructed his assistant manager, Heather Cooke, not to hire

8    Samantha because she wore a headscarf.  When Heather Cooke told

9    him that she wears it for religious reasons, he said you still

10   can't hire her because someone can come in and paint themselves

11   green and say they were doing it for religious reasons and we

12   can't hire them.  To Randall Johnson, a scarf was no different

13   than a cap, a hat, or a helmet, that's what he testified to.

14   This was reckless indifference.

15          Number three.  Randall Johnson had been trained in the

16   interview process.  He knew that Samantha could not be hired if

17   she was given a number one rating in appearance and sense of

18   style on her rating sheet in the Model Group Interview Guide.

19   So he told Heather Clark to change the rating, to cover it up.

20   He knew what he did was wrong, otherwise he would not have

21   attempted to cover up his conduct.  Assistant manager Heather

22   Cooke threw away Samantha's original interview rating document

23   and falsified a new one, again to cover up what had happened.

24          Heather Cooke had a feeling this was going to be a

25   problem, that's what she testified to.  She knew it was wrong,

1    she knew it was discrimination, but she didn't want to lose her

2    job.  This was reckless indifference.

3         Now you need to consider the credibility of the

4    witnesses.  You have received an instruction on that.

5    Abercrombie's attorney will tell you that Randall Johnson

6    denied making the comment about green and that he denied

7    instructing Heather Cooke to falsify the records.  But you need

8    to consider his credibility.  He had reason to lie to cover up

9    his wrongdoing, and you know that he lied to you when he was on

10   the witness stand.  He told you that he had left Abercrombie

11   because he was laid off in a downsizing, but director of stores

12   Chad Moorefield testified that Randall Johnson was fired for

13   poor performance in April of 2009.

14        Consider Heather Cooke's credibility.  She testified

15   to what she did, even though she knew it was wrong.  She, too,

16   like Randall Johnson, had a reason to lie to protect herself,

17   but she didn't, she told you the truth.  But you can't view

18   Randall Johnson and Heather Cooke's action in a vacuum.  You

19   should also attribute Abercrombie's reckless indifference to

20   human resources in corporate headquarters in Ohio.  Human

21   resources designed the interview and hiring procedures, which

22   resulted in applicants who needed to wear religious headwear as

23   an accommodation, from being screened out and not being hired.

24   Managers were trained that only human resources could authorize

25   a religious accommodation.  Managers were trained to contact

1    human resources only if an applicant made a request for

2    religious accommodation during the interview.  Managers were

3    trained not to contact human resources if no request for

4    religious accommodation was made.  So why didn't Samantha Elauf

5    ask for religious accommodation?  Because Abercrombie set up

6    the interview process so that people like Samantha Elauf, who

7    wore a headscarf, would not know that they needed to ask for an

8    accommodation.  They never told the applicants that they

9    couldn't wear headwear during the interview or before the

10   interview on the kiosk application.  This was reckless

11   indifference.

12        Managers were not supposed to raise the subject of

13   religion during interviews or take notes if the subject came

14   up.  Managers were not supposed to make assumptions if someone

15   came in wearing religious headwear.  They were not supposed to

16   assume that the person would need to wear it on the sales

17   floor.

18        Applicants did not have to be in compliance with the

19   Look Policy during the interview.  Deon Riley testified to that

20   and so did Dr. Lundquist.  But nonetheless, the manager was

21   supposed to consider the applicant's headscarf in evaluating

22   her appearance and sense of style.  And you heard Deon Riley

23   testify that a headscarf was inconsistent with the Abercrombie

24   style.  And under the interview guide, the applicant had to be

25   given a one rating in appearance and sense of style if she was

1    wearing clothing that was inconsistent with the Abercrombie

2    style.  And an applicant with a one rating in appearance and

3    sense of style could not be recommended for hire.  This is how

4    every interviewing manager was trained corporate-wide and this

5    is what happened to Samantha Elauf.  She didn't make a request

6    for religious accommodation, for an exception to the Look

7    Policy during her interview because she didn't know she needed

8    to.  Because she didn't make a request, it was never considered

9    for her.

10        Now, Heather Cooke did exactly what she was trained to

11   do.  She reached out to her district manager, Randall Johnson,

12   and district manager Randall Johnson did exactly what he was

13   trained to do, to not contact human resources because Samantha

14   was not in compliance with the Look Policy and had not

15   requested an exception to the Look Policy.

16        Abercrombie will tell you that Randall Johnson was

17   rogue manager.  He was not.  He did what he'd been trained to

18   do.  If someone complains about discrimination, roll it up to

19   HR.  If you have a question about the Look Policy, roll it up

20   to HR.  If an applicant raises religion, report it to HR.  If

21   an applicant requests religious accommodation, roll it up to

22   HR.  Otherwise, don't call.  This is reckless indifference,

23   ladies and gentlemen.

24        If Heather Cooke had followed the interview process

25   and not made any assumptions about Samantha Elauf's headscarf,

1    Samantha Elauf would not have been hired and nobody would have

2    been any the wiser.

3         Plaintiff must prove by the greater weight of the

4    evidence that Randall Johnson and Heather Cooke were acting in

5    a managerial capacity and were acting within the scope of their

6    employment when they discriminated against Samantha Elauf.  The

7    evidence is clear that they were both managers.  Randall

8    Johnson, was a district manager responsible for seven stores

9    with over a hundred employees at each store.  He had the

10   authority to hire, fire and discipline.  Deon Riley testified

11   that Randall Johnson, as a district manager, had the authority

12   to give store management advice and assistance with questions

13   on hiring, interviewing and the Look Policy.

14        Heather Cooke was responsible for interviewing and

15   hiring models in the Woodland Hills store.  She had the

16   authority and obligation to seek advice from her district

17   manager if she had a question about hiring or the interviewing

18   process.  Both were managers and both were acting within the

19   scope of their employment when they refused to give Samantha

20   Elauf a job because of her headscarf.

21        Now, you heard Deon Riley testify for the defendant

22   that the Look Policy was critical to the business strategy by

23   advertising the clothing through the in-store experience.  In

24   2008, Abercrombie & Fitch employed approximately a hundred

25   thousand models.  I submit to you that allowing Samantha Elauf

1    to work at the Woodland Hills store wearing a headscarf would

2    not have damaged the Abercrombie brand.  And remember,

3    Abercrombie did make exceptions to the Look Policy, but the

4    exceptions were made only for employees who knew they had to

5    ask and Abercrombie made those exceptions when they had to and

6    they are still going strong.

7           Did Abercrombie act with reckless indifference to the

8    federally protected rights of Samantha Elauf to be free of

9    religious discrimination and to be provided with religious

10   accommodation, when it refused to hire her?  Ladies and

11   gentlemen, I submit to you the evidence clearly tips the

12   scales.

13          Now Abercrombie -- if you determine that Abercrombie

14   acted with reckless indifference to Samantha Elauf's rights,

15   Abercrombie can avoid liability for punitive damages only if it

16   proves that it made a good faith attempt to comply with Title

17   VII's requirement that it must provide religious accommodation

18   to its applicants and employees.  The defendant bears the

19   burden of proving by the greater weight of the evidence that it

20   made good faith attempts to comply with the law.  I submit to

21   you, ladies and gentlemen, the evidence is clear that it did

22   not meet that burden.  It cannot meet that burden.  The

23   defendant, Abercrombie, did not have a religious accommodation

24   policy in the stores.  It had one in HR in Ohio, in cooperate

25   headquarters.

1            Abercrombie did not train its managers in the stores

2     about religious accommodation and the company's obligation to

3     provide it.  And Abercrombie did not enforce the -- or did not

4     pursue violations of the religious accommodation policy when it

5     knew violations had occurred.

6            What policy is most important to Abercrombie & Fitch?

7     The Look Policy.  The religious accommodation policy was only

8     in HR at corporate.  Only HR could decide whether or not

9     religious accommodations could be granted.  And Deon Riley

10    testified that the company had too many store managers, too

11    much turnover and the company really couldn't trust them to

12    handle these matters.  So the policy was to roll it up, but

13    only if the applicant or employee asked for an accommodation.

14    And once in HR, pursuant to the religious accommodation policy,

15    the request was considered on a case-by-case basis.

16           It is clear that there was no training by HR for store

17    managers about religious accommodation and how to recognize

18    religious accommodation issues.  You heard four managers

19    testify they did not receive training in religious

20    accommodation.  And we're going to look at their testimony

21    again now.

22           "Question:  Do you remember at any time while you

23    worked for Abercrombie & Fitch having any training in religious

24    accommodation?

25           "Answer:  No.

1          "Question:  Now, when I say the phrase religious

2     accommodation to you, do you know what that means, do you have

3     any impression in your head what that means?

4          "Answer:  Yes, I believe it means that, within a

5     certain parameter, like people are allowed certain permissions,

6     special permissions, depending on their religious beliefs.

7          "Question:  And did you ever get any training in that

8     topic while you worked for Abercrombie?

9          "Answer:  I cannot remember.

10         "Question:  And as to any -- your training, do you

11    recall any actual training on religious accommodation?

12         "Answer:  Any trailing?

13         "Question:  Any training?

14         "Answer:  Besides just to roll it up to HR and they

15    make the decision, that's it."

16         You heard Deon Riley admit that none of the training

17    documents we looked at during the trial made any mention of

18    religious accommodation.  She said managers were trained to

19    call HR if there was any question or issue about religion, but

20    you have no evidence of this other than her testimony?  Ms.

21    Riley is group vice president of human resources, ultimately

22    responsible for what happened here today.  You should consider

23    her testimony in light of this.

24         Ms. Riley testified that a store manager, that store

25    managers were trained to call HR when a request for

1    accommodation was made, but not otherwise.  There would be no

2    need to call, she said.  Deon Riley summed it up.  We don't

3    train our managers to be HR experts.

4            This case is about colors, ladies and gentlemen.

5    Green is the color of money, and Abercrombie & Fitch's Look

6    Policy and its refusal to grant Samantha Elauf an exception to

7    the Look Policy was all about money.  To make money,

8    Abercrombie adopted a business model that required its store

9    employees to look like cookie cutter kids.  Now, Abercrombie

10   has a right to make money, we don't argue that, that's

11   American, too, but not at Samantha Elauf's expense, not when

12   the result is to tell a 17 year old that she is not like

13   everybody else because of her religion and not at the expense

14   of other applicants and employees to be free from religious

15   discrimination.  Those rights are guaranteed by Title VII of

16   the Civil Rights Act and only you, ladies and gentlemen of the

17   jury, can make this right.  Only you can tell Samantha Elauf

18   that you understand what she went through and you understand

19   her emotional distress.  Only you can send a message to

20   Abercrombie that its discriminatory conduct matters and that

21   laws prohibiting discrimination, passed by the United States

22   Congress, cannot be trumped by money.  Please send this message

23   to Abercrombie with your verdict in this case.  Thank you.

24            THE COURT:  Thank you, Ms. Seely.  Mr. Knueve.

25            MR. KNUEVE:  Ladies and gentlemen of the jury, like

1    Ms. Seely, I thank you very much for your service and I thank

2    you very much for your attention during this trial.

3           Now, in my opening statement, I told you that the

4    evidence would show two things.  First, that this whole

5    situation was caused by a bad communication, but not by bad

6    people or by bad policies; and second, that Ms. Elauf had no

7    damages that were caused by Abercrombie and that's exactly what

8    all the evidence has shown.

9           Now, the judge has instructed you on the law on

10   damages and he told you that the EEOC is seeking two types of

11   damages in this case, compensatory damages and punitive

12   damages, and I want to talk about punitive damages, first.

13          There's absolutely no basis to award punitive damages

14   in this case.  The judge has instructed you that you can award

15   punitive damages only if you first find that Abercrombie's

16   managers were recklessly indifferent to Ms. Elauf's rights.

17   Even then, if you find that the managers acted in violation of

18   Abercrombie's policies, you cannot award punitive damages.

19          In other words, in order to award punitive damages you

20   would first have to find some pretty serious violations of the

21   law, and there's no evidence of that type of problem here.

22   There was no evidence that anyone called Ms. Elauf any names or

23   was rude or mean to her.  There was no evidence that Abercrombie

24   dislikes Muslims.  In fact, Ms. Elauf's best friend, Farisa

25   Sepahvand, was Muslim and testified that she was hired by

 1   Abercrombie on the spot.  Ms. Sepahvand stayed at Abercrombie

 2   for a long time, including after Ms. Elauf's interview.  And

 3   you heard evidence that Abercrombie has made religious

 4   accommodations for other Muslim employees.  There's no evidence

 5   that anyone at Abercrombie dislikes Muslims.

 6        All of the evidence is that this was a

 7   miscommunication, and the miscommunication started with Ms.

 8   Elauf.  She bears some of the responsibility here.  Her best

 9   friend, Farisa Sepahvand, testified here in front of you under

10   oath that Ms. Elauf knew there was a Look Policy before she

11   even interviewed with Abercrombie.  And that only makes sense,

12   Ms. Elauf shopped at Abercrombie a lot, she had friends at the

13   store.  Her best friend worked at the store and complained all

14   the time that she couldn't wear black at work.  Her best friend

15   also told her that she would have to wear the Abercrombie style

16   and that the job title was model.  You have seen how much this

17   company emphasizes the Look Policy.  Does anyone really believe

18   that Ms. Elauf had no idea about the Look Policy?

19        Now, at interview, Ms. Elauf was read the closing

20   instructions by Heather Cooke.  And you've seen the closing

21   instructions.  They include a brief description of the Look

22   Policy including a section that says that the model has to have

23   a natural hair style.  Ms. Cooke asked Ms. Elauf if she had any

24   questions about the company's expectations.  Ms. Elauf never

25   mentioned her hijab or that she was Muslim.  Ms. Elauf was even

1    asked about the meaning of the word diversity and never

2    mentioned her hijab or her religion.

3           Ask yourselves, if you were applying for a model job

4    with a company that you know has a strict dress code and you're

5    wearing a religious symbol that's important to you and you've

6    never seen anyone else at the store wear that symbol, wouldn't

7    you at least mention it?  Wouldn't you ask a question?

8           After the interview, Ms. Elauf testified that she

9    didn't think the decision was fair, but she never called human

10   resources, she never called Randall Johnson.  Ms. Sepahvand,

11   Ms. Elauf's best friend who testified here, testified that when

12   she and Ms. Elauf bumped into Heather Cooke at the mall after

13   the decision was made, Ms. Elauf didn't even ask Heather Cooke

14   about the interview, even though Ms. Elauf and Ms. Cooke were

15   friends.  Now if you were that upset, wouldn't you ask a

16   question?

17          Now, Ms. Cooke also had some bad communication.  She

18   made an assumption about Ms. Elauf's religion.  And as Ms.

19   Seely told you, if she hadn't made that assumption, we wouldn't

20   be here.  But guess what, she was trained not to make an

21   assumption.  She made an assumption in violation of

22   Abercrombie's policies.

23          Ms. Sepahvand also had some bad communication because

24   she also failed to call HR.  If Ms. Sepahvand thought something

25   was wrong or unfair or if Ms. Cooke thought something was wrong

1    or unfair, they had both been trained to call HR on the toll

2    free number.  They didn't do it.  And I'll refer you, when you

3    go back, to Defendant's Exhibits 6 and 8, they both clearly

4    state if you think something is in violation of federal law,

5    call HR.  They didn't call HR, in violation of Abercrombie's

6    policies.

7            Now, there was also some bad communication between

8    Heather Cooke and Randall Johnson.  And Ms. Cooke says that she

9    told Mr. Johnson that there was a religious issue here.  Mr.

10   Johnson said, no, Heather Cooke never said that.  Ms. Seely

11   called Mr. Johnson an liar.  Why would Mr. Johnson lie?  He was

12   no longer employed by Abercrombie & Fitch at the time of his

13   deposition.  He's not an individual defendant here.  He has no

14   reason to lie about this at all.  Heather Cooke is a friend of

15   Ms. Elauf.  Heather Cooke is a friend of Ms. Sepahvand.

16   Heather Cooke had numerous Look Policy violations herself.

17   Heather Cooke also no longer works at Abercrombie.

18           Weighing who do you think is telling the truth and who

19   wasn't.  Personally, I think this was just bad communication.

20   I think that there was a bad conversation and I'm not going to

21   call either one of them a liar.  But there are some things that

22   are true, that are very clear.  If Mr. Johnson said the things

23   that Ms. Seely claims that he said, he was acting in violation

24   of Abercrombie's policies.  You saw all the training.  The

25   policies say diversity is very important to this company.

1    Respect is very important to this company.  The policies all

2    say that the company does not discriminate based upon religion.

3    If Mr. Johnson said the things that is claimed he said, he

4    acted in violation of Abercrombie's policies.

5         Actually, the evidence shows that Mr. Johnson's

6    mindset wasn't that he wanted to discriminate against Muslim

7    people.  Remember, Ms. Sepahvand was Muslim and was already

8    working in the store.  Mr. Johnson was simply trying to protect

9    the brand and enforce this very important Look Policy, which is

10   central to the Company's business.  And you heard a ton of

11   evidence about the Look Policy and how important it is to this

12   company.  In fact, you have heard Dr. Kathleen Lundquist, an

13   expert, testify that an Abercrombie model who doesn't comply

14   with the Look Policy is like a typist who can't type or a truck

15   driver who can't drive.

16        To Abercrombie, the Look Policy is like the formula

17   for Coca-Cola, it's the entire key to the company's success,

18   and exceptions to the Look Policy are like changing the formula

19   to Coca-Cola.  It's not something you want to take lightly and

20   it's bad for the business.  Mr. Johnson was trying to protect

21   the business, he was not trying to discriminate against

22   Muslims.

23        Now, the other thing that's clear from all the

24   evidence is that this issue should have been rolled up to HR by

25   someone.  That's how Cooke was trained, that's how Ms.

 1    Sepahvand was trained and that's how Johnson was trained.  And

 2    you heard Ms. Seely make some representations about the

 3    training.  Those representations are not true.  You heard the

 4    evidence over and over and over, if religion is raised at all

 5    by anyone, call HR.  And that's the training, the training

 6    there in front of you.  I refer you to Exhibit 10.  And there

 7    is training on religious accommodation, it's right there, it's

 8    in evidence.  The representation that Ms. Seely made that

 9    there's no training on religious accommodation is not a true

10    representation.

11          Now, you also heard the evidence about what happens

12    when issues get rolled up to HR.  A trained human resources

13    manager considers the issue and these things get resolved.

14    Abercrombie has make exceptions for religious reasons when the

15    HR department is involved.  You heard about exceptions made for

16    Muslim employees.  You heard about an exception made for a war

17    veteran with a battle scar and you heard about an exception

18    made for someone with cancer.  I think that we all know that if

19    HR had been called, we probably wouldn't be here in the

20    courtroom today and that's bad communication, but it's not

21    because of bad people or bad policies.

22          Now, you have heard Ms. Seely complaining about

23    Abercrombie's hiring and interview procedures.  And the EEOC

24    has even suggested that Abercrombie's managers should be

25    trained to ask applicants about religion and trained to make

1    assumptions about religion.

2          Anyone who has ever interviewed people knows you can't

3    ask an applicant about their religion, you can't make an

4    assumption about religion.  If Abercrombie trained its managers

5    to ask questions about religion or to make assumptions about

6    religion, you can be pretty sure that we would be here in this

7    court getting sued about that.

8          Now, you heard the evidence that Abercrombie's hiring

9    procedures, training and interview script were drafted by an

10   outside expert, Kathleen Lundquist.  And Dr. Lundquist is very

11   highly regarded.  In fact, she's so highly regarded that she

12   has been hired by the government before.  She has even been

13   invited to testify before the EEOC.  In other words, this is

14   someone who the government respects.  And Dr. Lundquist told

15   you that she drafted Abercrombie's procedures, the ones that

16   we've been talking about throughout this whole trial, in

17   compliance with the EEOC's guidelines and in compliance with

18   existing law.  And she explained that the best practice for an

19   employer is to explain the expectations of the job to an

20   applicant and then ask the applicant if she has any question

21   about the expectations.  That's when an applicant is supposed

22   to raise a religious issue, so that the manager doesn't have to

23   ask about religion.  And that's exactly what Abercrombie's

24   policy is.

25         Now, you have also heard Ms. Seely complaining about

1    Abercrombie's training, but Deon Riley explained the training

2    to you.  Abercrombie has trained experts who are highly trained

3    on religious accommodation, they work in HR.  It's their job to

4    handle these kind of issues and it's just impossible for an

5    employer to train thousands and thousands of managers on all of

6    the legal issues involved in a business.

7         Think about how much time we've spent in this

8    courtroom wrestling about the legal issues in this one case.

9    There's no way to train thousands of managers on every legal

10   issue that could come up and that's exactly why Abercrombie

11   trains its managers to roll issues up to the experts in HR.

12   Think about it, if you need brain surgery, would you rather go

13   to an expert surgeon or someone who's job it is to focus on

14   sales?  My guess is you would rather have your issue go to the

15   expert.  And the training works, exceptions have been made.

16   You saw the evidence of the exceptions for religious

17   accommodation.  The training didn't work in this case because

18   of bad communication, but not because of a bad policy.

19        What happened here was the result of bad

20   communication, but Ms. Cooke is not a bad person, Mr. Johnson

21   is not a bad person, and Abercrombie's policies aren't bad

22   either.  Under these facts and under this evidence, there's no

23   reason to award punitive damages and there's no reason to

24   punish Abercrombie.  You should not award punitive damages to

25   Ms. Elauf.

1          Now, the second type of damages that the EEOC seeks

2     are compensatory damages.  And they claim that Ms. Elauf

3     suffered emotional pain and suffering, and the judge has

4     instructed you that you may award damages only for injuries

5     that the EEOC proves were caused by Abercrombie.  And I want to

6     emphasize that the EEOC has to prove damages.  And the judge

7     has also instructed you that if you find that Ms. Elauf's

8     injuries have no monetary value, then you must award her a

9     nominal amount of one dollar.

10          There's no evidence that Ms. Elauf suffered damages

11     from any of this and the EEOC has definitely not proved

12     damages.  The EEOC admits, and the judge has instructed you,

13     that Ms. Elauf did not lose any money or pay.  That's because

14     she got two different jobs in less than five days after her

15     interview with Abercrombie.

16          Now, we've all been through some tough times.  Here,

17     Ms. Elauf didn't get the job she claimed she wanted at

18     Abercrombie, but she got two other jobs five days after her

19     interview.  If you-all are like me, you've probably been

20     through worse in your lives.  Can you really say that Ms. Elauf

21     was damaged here?  And ask yourselves how much did she want the

22     job at Abercrombie, anyway?  Her best friend told her one thing

23     about the interview, don't wear black.  But what did Ms. Elauf

24     do?  She wore a black headscarf and black shoes to the

25     interview.  Ask yourselves, if you have a job interview for a

1    job you really want and your best friend tells you one thing

2    not to do, are you going to do that one thing?  If you're told

3    not to wear jeans to an interview, are you going to go ahead

4    and wear jeans anyway?  And remember, Ms. Elauf was

5    interviewing at other jobs before she even knew she didn't get

6    the job at Abercrombie.  She had a job at Old Navy before Ms.

7    Sepahvand even told her that she didn't get the job at

8    Abercrombie.  Ms. Elauf was not sitting at home holding her

9    breath waiting to be called by Abercrombie.

10          Simply put, the EEOC has not proven that Ms. Elauf

11   suffered emotional damages.  We already know that she never

12   went to a doctor, psychologist, or therapist.  But what I think

13   is even more telling is that although she text messages and

14   Facebooks all the time, she never sent a text about any of

15   this, not once in three years.

16          Ask yourselves, if something happened in your life

17   that really bothered you, wouldn't you talk about it to your

18   friends?  Wouldn't you send at least one text?  This was not

19   big enough of a deal for Ms. Elauf to send a single text

20   message.

21          Now, Ms. Elauf did testify that when she interviews,

22   she's worried that people will think differently about her

23   because of her headscarf.  She said when she interviews.  The

24   problem with that is she hasn't interviewed with anyone for the

25   past three years because she's been employed by Forever 21 the

1   whole time.  It seems to me that Ms. Elauf just kind of made

2   that testimony up out of thin air.

3         The best evidence of Ms. Elauf's mental state came

4   from her best friend, Farisa Sepahvand, who testified here

5   before you.  Ms. Sepahvand didn't say that Ms. Elauf was

6   crying.  Ms. Sepahvand didn't say that Ms. Elauf was forever

7   changed.  Ms. Sepahvand didn't even say that Ms. Elauf was

8   hurt.  Ms. Sepahvand told you that Ms. Elauf moved on with her

9   life.  And that seems right.  Ms. Seely asked you how Ms.

10  Elauf's life has changed from 2008 to now.  And the evidence is

11  her life has not changed at all.  The fact is that Ms. Elauf

12  has a pretty good life.  She has a job she likes, she has been

13  promoted three times, she's going to school, she does community

14  service, she wants to open her own clothing store, she has

15  friends, and she has no medical issues.

16        Ms. Elauf was not damaged and the EEOC has not proven

17  damages.  The judge has instructed you that if the EEOC has not

18  proven damages or that if Ms. Elauf's damages have no monetary

19  value, that you must award Ms. Elauf one dollar.  That's the

20  evidence and that's exactly what you should do.

21        Thank you very much for your attention.

22        THE COURT:  Thank you, Mr. Knueve.  Ms. Seely.

23        MS. SEELY:  Ladies and gentlemen, Mr. Knueve told you

24  that in order to find Abercrombie liable for punitive damages,

25  there has to be a pretty serious violation of the law.  I

1    submit to you, ladies and gentlemen, that all the evidence in

2    this case has shown that what happened to Samantha Elauf is a

3    pretty serious violation of the law.  It's discrimination based

4    on religion and it's against the law.  It's serious enough.

5         Now, I don't need to tell you or remind you that the

6    closing statement that was read to applicants at Abercrombie

7    said nothing about no headwear permitted.  There was no reason

8    why Samantha Elauf should have known that she couldn't wear the

9    scarf that she had worn for a year and a half at two other

10   employers without question, if she had gone to work for

11   Abercrombie.

12        I want you to think about the evidence that Heather

13   Cooke gave.  Heather Cooke never testified that she was a

14   friend of Samantha Elauf's.  In fact, her testimony was that

15   she knew who she was, she had seen her around the mall.

16        Now, Mr. Knueve put up on the TV screen a section or a

17   part of the PSP, the People Selection Program, that defendant

18   offered into evidence and it said the words "taboo topic."  It

19   said if a taboo topic is brought up, contact HR.  I want to

20   remind you that the PSP, the People Selection Program, was the

21   document that pertained to hiring and interviewing.  And what

22   it said was that if a taboo topic was brought up, meaning by

23   the applicant, the interviewing manager was to contact HR.

24   This does not apply in the context of Heather Cooke, who went

25   to her district manager and said Samantha needs to wear a

1    headscarf.

2         Mr. Knueve said that Deon Riley has trained experts in

3    HR and she testified that it was impossible to train thousands

4    of employees in every legal issue that comes up.  Ladies and

5    gentlemen, the EEOC is not here claiming that human resources

6    at Abercrombie should have trained its managers on the ground

7    in every single legal issue.  But when it comes to religious

8    accommodation, people who interview for Abercrombie need to

9    know that religious accommodation is required and they need to

10   know how to recognize that an applicant might need an

11   accommodation.  They need to recognize when a religious issue

12   does come up.  And that's the kind of training that Abercrombie

13   never gave its managers on the ground.  That was training it

14   gave its HR managers in corporate headquarters and it depended

15   upon these operating managers in the stores to roll it up to HR

16   in order for the system to work.  But if they didn't train the

17   managers in the stores to roll it up, to recognize there was a

18   religious issue, then there was no way that human resources was

19   ever going to get involved and that anyone's request or

20   anyone's need for a religious accommodation would be granted or

21   even dealt with.

22         Now, I will say, with respect to Mr. Knueve's argument

23   about compensatory damages, he said that it wasn't a big deal

24   to Samantha because she didn't text about how she felt.  Ladies

25   and gentlemen, she testified that she talked to her friends and

 1    family.  I submit to you that this was a big enough deal that

 2    she thought it was too important to put in a text message, that

 3    she needed to have face-to-face communications with her family

 4    and friends, and that is she did.

 5          Now, ladies and gentlemen, as the instructions tell

 6    you, compensatory damages are difficult to evaluate in terms of

 7    how much you should award.  They're intangible.  And I don't

 8    know what to tell you, it's going to be your decision on how

 9    much compensatory damages to award.  There's no formula, but I

10    might throw out that if you break it down, Samantha Elauf --

11    it's been about a thousand days since June 25th when Samantha

12    Elauf, in 2008, was denied the job at Abercrombie.  So you

13    might want to think about it as how much a day is Samantha

14    Elauf's emotional distress worth.  Is it worth $50 a day, $25 a

15    day, is it worth more than that?  It's some, just some way I

16    suggest to you, you might want to think about it when you are

17    deciding what to do.  And you need to consider the fact that

18    Samantha Elauf has not gotten over this and that she may hold

19    this and carry this with her for the rest of her life.

20          Thank you, ladies and gentlemen.  I appreciate your

21    time.

22          THE COURT:  Thank you, Ms. Seely.

23          Ladies and gentlemen, that completes the argument.  If

24    you'll turn with me to Jury Instruction No. 17.

25          This case is now submitted to you for your decision

1    and verdict.  When you go to the jury room to begin considering

2    the evidence in this case, you should first select one of the

3    members of the jury to act as your foreperson.  This person

4    will help to guide your discussions in the jury room.

5          After you have reached a unanimous agreement on your

6    verdict, your foreperson alone will sign it and you will, as a

7    body, return with it into court.  Forms of verdict will be

8    furnished for your consideration and use.

9          If during your deliberations it becomes necessary to

10   communicate with the Court, you may send a note by the bailiff.

11   Bear in mind that you are not to reveal to the Court or to any

12   person how the jury stands -- that should be "how" rather than

13   "who."  We'll change that on the original.

14         Bear in mind that you are not to reveal to the Court

15   or to any person how the jury stands, numerically or otherwise,

16   until you have reached your verdict.

17         The bailiff will now come forward to be sworn.

18         (Bailiff sworn).

19         THE COURT:  Ladies and gentlemen, the courtroom will

20   rise, assembled, as the jury retires to deliberate.

21         (The following proceedings were had outside the

22   presence and hearing of the jury.)

23         THE COURT:  Be seated, please.  Counsel, when do you

24   wish to put on additional evidence with regard to the requested

25   injunctive relief?

```
 1            MR. KNUEVE:  Right now.  Can you do it now?

 2            MS. SEELY:  Do you want us to call Deon or do you want

 3       to talk about it.  I thought we were going to talk about

 4       possibly stipulating.

 5            MR. KNUEVE:  Yes, we might be able to stipulate, Your

 6       Honor.

 7            THE COURT:  All right.  Let's recess for lunch, then.

 8       I have a judge's meeting and will not be out until after 1:00.

 9       We will talk when we reconvene then.

10            Is there anything else we need to address?

11            MR. KNUEVE:  Not from defendant's perspective, Your

12       Honor.

13            MS. SEELY:  No, Your Honor.

14            THE COURT:  Counsel are to be commended for their

15       closing arguments.  Is there anything else?  Ms. Seely?

16            MS. SEELY:  Not now, Your Honor.  We will talk about

17       the stipulations.

18            THE COURT:  Very well.  We are in recess.

19            MR. KNUEVE:  Thank you, Your Honor.

20            (Recess).

21            (The following proceedings were had outside the

22       presence and hearing of the jury.)

23            THE COURT:  We're on the record.  It is currently

24       1:15.  The Court received the following note from the jury, the

25       time of the note was 12:45, but the Court received the note
```

1    soon after returning from a judge's meeting right around 1:00.

2    The Court has conferred with the attorneys and has drafted a

3    response agreed to by the attorneys.

4         For the record the note from the jury reads as

5    follows.  "Will Samantha Elauf have legal fees, question mark.

6    If so, comma, are we allowed to differentiate between an amount

7    awarded to cover legal fees and an amount awarded for her

8    personal compensation, question mark."

9         The proposed response penned by the Court reads as

10   follows:  "Ms. Elauf does not have attorney fees, comma, as she

11   is represented by the EEOC.  But, comma, you are not to

12   consider attorneys' fees in any way in connection with your

13   verdict, period.  You should only consider the instructions

14   given to you in rendering your verdict, period."

15        Is that response satisfactory to the plaintiff?

16        MS. SEELY:  Yes, it is, Your Honor.

17        THE COURT:  And to the defendant?

18        MR. KNUEVE:  It is, Your Honor.

19        THE COURT:  All right.  Thank you, very much.  We will

20   deliver that response to the jury.  We are off the record.

21        (Recess).

22        (The following proceedings were had outside the

23   presence and hearing of the jury.)

24        THE COURT:  In an abundance of caution just to be

25   ready, the Court has prepared a proposed jury instruction

```
 1   relative to a second stage proceeding on punitive damages.

 2   Jury Instruction No. 18 plus a set of verdict forms, one for

 3   the plaintiff and one for the defendant.  Are there any

 4   objections?  Ms. Hope?

 5            MS. HOPE:  Yes, Your Honor, the plaintiff does have

 6   some objections.

 7            THE COURT:  All right.

 8            MS. HOPE:  In particular, the "factors to consider"

 9   language.

10            THE COURT:  Yes.

11            MS. HOPE:  Set forth.  I believe that's taken from the

12   ABA Model Jury Instruction.  And, you know, I'll note that the

13   language of Kolstad and the courts in this circuit have

14   identified the language in the first part of this paragraph,

15   which is that the purpose of punitive damages is to punish and

16   deter.

17            It's my understanding that these aren't taken from

18   Tenth Circuit caselaw or in holdings caselaw and I'll also note

19   that some of these factors are just inapplicable in this

20   circumstance.  For instance --

21            THE COURT:  All right.  I agree with that.  And would

22   you agree potential profits are inapplicable?

23            MS. HOPE:  Yes, I would, Your Honor.

24            THE COURT:  All right, I take it Abercrombie has no

25   objection to taking that out?
```

 1          MR. KNUEVE:  No, Your Honor.

 2          THE COURT:  All right.  We will take that out.  What

 3     else does the plaintiff contend is inapplicable with regard to

 4     factors?  And I do -- I want to say I do think we've got to

 5     give them some guidance in terms of factors they may consider

 6     and if these are from the ABA Model Instruction, then I would

 7     ask the EEOC to suggest substitute factors that they may

 8     consider.

 9          MS. HOPE:  Well, I would like to at least make an

10     addition and that is the last paragraph of our Model Jury

11     Instruction No. 40, which is -- sets forth that the jury may

12     consider the defendant's financial resources, in particular,

13     the company's net worth, in determining what's an appropriate

14     figure to punish and/or deter.

15          THE COURT:  Don't we have that here?

16          MS. HOPE:  We have, I guess, the effect of the damages

17     award on defendant's financial condition.

18          THE COURT:  Well, they can certainly consider

19     financial resources, I mean that's a standard factor.

20          MS. HOPE:  Oh, I'm sorry.  You're right, I apologize.

21     That is in there.  So other than those, we don't have any

22     additional objections.

23          THE COURT:  All right.  So the one thing I've done as

24     a result of your suggestion, and we had thought you might

25     suggest this, we've taken out the factor with regard to the

1    potential profits.  Anything else?

2         MS. HOPE:  No, Your Honor.

3         THE COURT:  All right.  Mr. Clark?

4         MR. KNUEVE:  Your Honor, we actually object to the

5    final sentence of the jury instruction.  Although you can

6    instruct the jury to consider the net worth, we don't believe

7    that it is appropriate to do so in this case.  We think that

8    that is, it's just not justified by the facts and the

9    circumstances in the case and we object.

10        THE COURT:  All right.  I think it's a standard

11   consideration and I would be amenable to placing net worth in

12   the list of factors, as opposed to highlighting it in a

13   separate sentence.  If the Court is inclined to add net worth

14   here, would you agree that that ought to be included in the

15   list of factors?

16        MR. KNUEVE:  Your Honor, I believe that that's the

17   kind of the last clause, the effect of the damages award on

18   defendant's financial condition.  I guess what we really object

19   to is the jury being informed of the net worth of Abercrombie &

20   Fitch.  I think that that is totally out of proportion to the

21   facts and circumstances given in this case.

22        THE COURT:  Well, obviously there's a number of

23   safeguards in that regard, but I think net worth is a standard

24   consideration for a jury in affixing punitive damages.  And I

25   understand your objection, but to the extent that I give it,

1    would you agree that it ought to be listed in the list of

2    factors, as opposed to highlighted in this last sentence?

3            MR. KNUEVE:  Yes, I would, Your Honor.

4            THE COURT:  All right.  Any objection to that?

5            MS. HOPE:  No, Your Honor.

6            THE COURT:  All right.  Anything else?  Mr. Clark.

7            MR. KNUEVE:  Your Honor, one thing I wanted -- it's

8    not an objection to this instruction, but one other thing that

9    I wanted to mention.  The parties have been working out some

10   stipulations on some of these issues and as I read the

11   instruction, I see one of the factors is the attitudes and

12   actions of defendant's top management after the misconduct was

13   discovered.  And some of the stipulations actually relate to

14   conduct of the company after these events took place and I

15   believe that the stipulation should be provided to the jury

16   when they're considering punitive damages, if they do.

17           THE COURT:  I'm not sure I fully understand, but Ms.

18   Seely, your response?

19           MS. SEELY:  I would disagree, Your Honor.  This case

20   is about what happened prior to June 25th, 2008 and it is not

21   about what the company is currently doing, except with respect

22   to the Court's decision on injunctive relief and that is for

23   the Court to hear and not for the jury to hear.

24           MR. KNUEVE:  Your Honor, let me explain a little bit

25   more fully.  The instruction indicates that a factor that the

1    jury may consider are the attitudes and actions of defendant's

2    top management after the misconduct was discovered.  And the

3    time stipulations that I'm talking about are the fact that

4    after all of these events took place, Abercrombie modified its

5    associate handbook.

6            THE COURT:  I think that's entirely proper and that's

7    a standard consideration for juries in second stage

8    proceedings.  Are you suggesting, then, that but for the

9    stipulation, you would have no other way to address it in the

10   second stage?

11           MR. KNUEVE:  Your Honor, we can have Deon -- Ms. Riley

12   come in and testify.

13           THE COURT:  I think that's what you need to do if

14   she's not willing to stipulate.  I'm not going to force her to

15   stipulate.  I can't.

16           MR. KNUEVE:  I guess we can -- the parties can discuss

17   stipulations, but if we can't stipulate, what I'm asking for is

18   leave to present that type of evidence to the jury.

19           THE COURT:  Oh, absolutely, that's what the second

20   stage would be for, in part.  Go ahead, Ms. Seely.

21           MS. SEELY:  Your Honor, this is a surprise to me.  Mr.

22   Knueve did not tell me that these stipulations would be -- that

23   he was going to propose that they be read to the jury and I'm

24   going to have to take a look at them with a new eye.

25           THE COURT:  Yes, I understand.  You thought that the

 1    stipulations were intended to be presented to the Court in

 2    connection with the request for injunctive relief?

 3              MS. SEELY:  That's correct, Your Honor.

 4              THE COURT:  All right, that's fine, I understand that.

 5    I'm glad it came up now.

 6              MS. SEELY:  So am I.

 7              THE COURT:  So let me make these changes.  We will get

 8    this ready in the event they check that they do find that the

 9    plaintiff has met its burden with regard to punitive damages.

10              Oh, and one other thing that we did not mention on the

11    record, but I wanted to make sure that the record reflected.

12    The language of the special interrogatory concerning punitive

13    damage claims was language that counsel for both parties

14    proposed and agreed to in the informal jury instruction

15    conference; correct?  Ms. Seely?

16              MS. HOPE:  Yes, that's correct.

17              THE COURT:  Ms. Hope?

18              MS. HOPE:  I'm sorry, yes, that's correct, Your Honor.

19              THE COURT:  Thank you.  And Mr. Clark?

20              MR. KNUEVE:  I'm sorry, Your Honor.  What are you

21    referring to?

22              THE COURT:  Oh, the special interrogatory on the

23    verdict form that we sent back with the jury.  This language,

24    "we do, do not, check one, find by a preponderance of the

25    evidence that the plaintiff has proven that Ms. Elauf is

```
 1    entitled to punitive damages."  That was language that was
 2    hammered out in the informal conference this morning and it was
 3    a variation from that which the Court originally proposed and
 4    this language was agreed to by the parties; correct?
 5             MR. CLARK:  Yes, sir.
 6             THE COURT:  Very good.  Thank you, very much.  We will
 7    make those changes.  What about the portion of the trial
 8    addressed to injunctive relief or any further evidence on
 9    injunctive relief?  Ms. Seely?
10             MS. SEELY:  If we agree to the stipulations we have
11    been discussing, Your Honor, then the plaintiff will have no
12    additional evidence.  And I would assume.
13             MR. KNUEVE:  That is true, Your Honor.
14             MS. SEELY:  So if we can talk about that.
15             THE COURT:  But for Ms. Riley, possibly; correct?
16             MR. KNUEVE:  Your Honor, if the jury enters -- comes
17    back and we get to a second stage.
18             THE COURT:  No, I'm talking now about injunctive
19    relief.
20             MR. KNUEVE:  If we can work out these stipulations,
21    Ms. Riley won't need to testify again.
22             THE COURT:  I see.  Got it.  Okay.  I'm now confusing
23    second stage with additional evidence on injunctive relief.
24    All right.  Thank you, very much.  And I'll come back here
25    after we get this jury instruction hammered out and I will find
```

 1    out whether you wish to merely present the stipulation with

 2    regard to injunctive relief.

 3          You might also discuss amongst yourselves whether you

 4    would like to make some argument to the Court with regard to

 5    injunctive relief.  Thank you.

 6          Ms. Seely, I'm sorry to interrupt, but one more thing.

 7    Any objection to the verdict forms?  I just want to make

 8    absolutely clear for the record, the proposed verdict forms in

 9    the second stage.  Ms. Hope.

10          MS. HOPE:  That's fine, Your Honor.

11          THE COURT:  Mr. Clark.

12          MR. KNUEVE:  No objection.

13          THE COURT:  Thank you.

14          (Recess).

15          (The following proceedings were had outside the

16    presence and hearing of the jury.)

17          THE COURT:  Be seated please.  We are here relative to

18    the request for injunctive relief, and as the Court previously

19    stated, the Court would entertain evidence during jury

20    deliberations with respect to the request for injunctive relief

21    that could not be presented to the jury.

22          The plaintiff may call its first witness.

23          MS. SEELY:  The plaintiff calls Deon Riley.

24          MR. KNUEVE:  I'm sorry, Your Honor.  I thought we had

25    agreed to the stipulations.

```
 1            THE COURT:  I had, as well, but I was told that there

 2   was some problem that if Riley was going to testify in the

 3   punitive damage second stage, if that were to occur, that the

 4   plaintiff would not stipulate with regard to injunctions, which

 5   doesn't make any sense to me, but if the plaintiff can't agree,

 6   I can't force her to agree.

 7            MS. SEELY:  Well, Your Honor --

 8            MR. KNUEVE:  It's fine, she'll testify.

 9            THE COURT:  Ms. Riley, if you will approach, please.

10            MS. SEELY:  Your Honor, perhaps we could resolve this.

11   My big issue is I can agree to make these stipulations that we

12   have discussed if Ms. Riley is not going to be testifying

13   before the jury.

14            THE COURT:  We don't know whether she is or not.  The

15   jury will have to answer yes on the special interrogatory, but

16   in the meantime, I've got time that I'm burning, I've got lots

17   of other cases and I need to use this time, so we need proceed.

18            MS. SEELY:  Okay, Your Honor.  Your Honor, we will

19   stipulate to --

20            MR. KNUEVE:  Well, no, Deon come on up.  That's fine.

21            MS. SEELY:  Okay.

22                             DEON RILEY

23   Called as a witness on behalf of the plaintiff, having been

24   previously sworn, testified as follows:

25            THE COURT:  Ms. Riley, let me remind you you remain
```

1    under oath.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Ms. Seely, you may inquire.

4              MS. SEELY:  Yes.

5                        DIRECT EXAMINATION

6    BY MS. SEELY:

7    Q.   Ms. Riley, am I correct that in the winter or March of

8    2010, that human resources or the company made some changes in

9    the closing statement of the Model Group Interview Guide?

10   A.   Yes.

11   Q.   And do you recall the changes in the closing statement?

12   A.   Yes, we clarified and included the statement that headwear

13   is prohibited.

14   Q.   Okay.  Is it true that in the closing statement of the

15   Model Group Interview Guide, as of March 2010, the sentence was

16   added "headwear of any kind is not permitted"?

17   A.   That's correct.

18   Q.   Were there any other changes made to the closing

19   statement, at that time, from the statement that has been

20   admitted into evidence in the Model Group Interview Guide in

21   this case?

22   A.   No.

23             THE COURT:  Let me just interject here, Ms. Riley.  I

24   don't have that, I don't believe, before me.  Does that mean

25   that headwear is not permitted in the interview or does that

1    mean that the interviewer is to inform the applicant that

2    headwear of any kind is not permitted.

3            THE WITNESS:  It would be the latter, Your Honor.  It

4    was a clarify of that Look Policy summary that's read at the

5    end of the interview, prior to the interviewing manager asking

6    are there any questions.

7            THE COURT:  Thank you.

8            THE WITNESS:  So it was a clarification.

9            THE COURT:  Thank you.  Ms. Seely, go ahead.

10   Q.   (By Ms. Seely)  So if an applicant comes to the interview

11   now and is wearing a headscarf, is it true that that applicant

12   is told that headwear of any kind is prohibited by the Look

13   Policy?

14   A.   Yes, they read the statement which says that.

15   Q.   Now, is it true also that the practice continues to be

16   that the interviewing manager is not supposed to ask the

17   applicant wearing a headscarf if she needs a religious

18   accommodation?

19   A.   That's correct.

20   Q.   And is it true that currently, the interviewing manager is

21   still not supposed to ask the applicant anything about the

22   headscarf?

23   A.   They don't ask about the headscarf.  They read the

24   statement and then they ask whether or not the individuals who

25   are applying for the role have any questions.

1    Q.   And is it true that the practice continues to be now that

2    the interviewing manager, in the situation where the applicant

3    wears a headscarf, is trained not to take notes to indicate

4    that the applicant is wearing a headscarf?

5    A.   They do not take notes.

6    Q.   Now, isn't it true that the practice continues to be that

7    the interviewing manager is supposed to call human resources

8    only if the applicant requests an accommodation, that being to

9    wear the headscarf?

10   A.   That's not true.

11   Q.   If the applicant wearing the headscarf does not raise the

12   issue of religion or the headscarf, isn't it true that the

13   interviewing manager is currently not supposed to call HR?

14   A.   That's not true.

15   Q.   Can you tell me what is true, then?

16   A.   What is true is that our managers are instructed, whether

17   or not the individual applicant asks for religious

18   accommodation or any other taboo/protected class items, that if

19   they have any questions in their mind whatsoever, they need to

20   call HR.

21   Q.   And if they have no questions in their mind, they don't

22   need to call HR; correct?

23   A.   If they have no questions in their minds, then they don't

24   have to call HR.

25   Q.   So if an applicant comes to an interview now, wearing a

1    headscarf and the applicant doesn't ask a question relating to

2    the headscarf - of the interviewing manager - the interviewing

3    manager is supposed to do nothing; correct?

4         MR. KNUEVE:  Objection, Your Honor.  Mischaracterizes

5    the testimony that just occurred.

6         THE COURT:  Just one second.  The objection is

7    sustained, rephrase.

8    Q.  (By Ms. Seely)  If the interviewing manager -- strike

9    that.  Am I correct that currently, the interviewing manager is

10   still supposed to take into consideration the fact that an

11   applicant is wearing a headscarf, in making the rating for

12   appearance and sense of style?

13   A.   I think I testified earlier that although you talked about

14   the rating from one to three, that we do not expect anyone who

15   turns up for the interview to be in total compliance.  That's

16   one of the reasons we read the Look Policy summary and that is

17   one of the reasons we ask if there are any questions.  So it's

18   not just purely one.  If someone has a sense of style, is

19   well-groomed and is beautiful and is wearing a headscarf, we

20   don't ask them to make the assumptions that the individual is

21   not willing to adhere to the Look Policy if they are hired.

22        MS. SEELY:  Excuse me.

23        THE WITNESS:  That's fine.

24   Q.  (By Ms. Seely)  Ms. Riley, the current Model Interview

25   Guide, is it your testimony that it has not changed from the

1    interview guide that was offered into evidence as Defendant's

2    Exhibit 2, except with respect to the statement in the closing

3    statement we have already discussed?

4            MR. KNUEVE:  Objection, asked and answered.

5            MS. SEELY:  I'm talking about the whole guide, now.

6            MR. KNUEVE:  That question was asked and answered.

7            THE COURT:  All right.  As I understand it, the

8    question is other than what we've just discussed, nothing else

9    has changed.  Is that --

10           MS. SEELY:  The question is other than the additional

11   statement that's been added to the closing statement in the

12   interview guide, has anything else in the Model Group Interview

13   Guide that is currently in use, changed from the Defendant's

14   Exhibit 2.

15           THE COURT:  Overruled.  You may answer.

16   A.   Not that I'm aware of.

17   Q.   (By Ms. Seely)   Now, am I correct then that on the rating

18   sheet for appearance and sense of style in the current Model

19   Interview Guide, that the language -- that there is still

20   language in the below expectations column that says that an

21   applicant is to be graded a one if she does not wear

22   attractive, stylish, fashionable clothes and hair style, makeup

23   and accessories or wears clothes that are inconsistent with the

24   Abercrombie brand?

25   A.   It still says that.

1    Q.   And is it your testimony that today, Abercrombie believes

2    that a headscarf is inconsistent with the Abercrombie brand?

3    A.   It is inconsistent with our Look Policy.

4              THE COURT:   What page is that on, Ms. Seely?

5              MS. SEELY:   Your Honor, the current Model Interview

6    Guide is not in evidence.   It was not listed on the plaintiff's

7    exhibit list, so I'm simply trying to elicit testimony about it

8    from Ms. Riley.

9              THE COURT:   All right.   But it's not listed in the

10   pretrial order, at all?

11             MS. SEELY:   No, it's not, Your Honor.   May I approach

12   the witness, Your Honor?

13             THE COURT:   You may.

14   Q.   (By Ms. Seely)   Ms. Riley, I've handed you what's been

15   marked as Plaintiff's Exhibit No. 20.   Can you tell me what

16   that document is?

17   A.   This is our store manager training that we did in the fall

18   of 2010.

19   Q.   And is this the current store manager training that is

20   done every fall?

21   A.   This is the training specifically to fall 2010.

22   Q.   Have you done a more recent training for store managers

23   than fall 2010?

24   A.   No, we train each fall, so the next time will be fall

25   2011.

1    Q.   So Exhibit 20 represents the training, the most recent

2    training that's been given to store managers; am I correct?

3           MR. KNUEVE:   Objection.   This is a specific type of

4    training, not all the training.

5           THE COURT:   All right.   Rephrase, please.

6    Q.   (By Ms. Seely)   Does Exhibit 20 contain a summary of the

7    store manager training done in your training sweep as of fall

8    2010?

9    A.   Yes, it does.

10   Q.   Now, Ms. Riley, is there any page in Exhibit 20 that

11   refers to the company's obligation to provide religious

12   accommodation?

13   A.   I'm sorry, just a moment.   I'm just going through the

14   sections.

15   Q.   All right.

16          MR. KNUEVE:   Your Honor, I wouldn't object if Ms.

17   Seely directed the witness to the page.

18          MS. SEELY:   Well, I don't think there is a page.

19   That's why I would like the witness to look.

20   A.   If you go to A&F 3300, the top of this is titled "what's

21   the scenario".   You will see that we --

22          MS. SEELY:   Just a second, Ms. Riley.   Plaintiff

23   offers Plaintiff's Exhibit 20 into evidence, Your Honor.

24          THE COURT:   Any objection?

25          MR. KNUEVE:   No objection, as long as it's solely for

```
 1   purposes of injunctive relief.
 2        THE COURT:  Yes, of course.  Plaintiff's 20 admitted
 3   solely for injunctive relief purposes.
 4   Q.   (By Ms. Seely)  Now, Ms. Riley, you referred me to page
 5   37; is that correct?
 6   A.   That would be correct.
 7   Q.   Okay.  And where on page 37 is religious accomodation and
 8   the company's obligation to provide religious accommodation
 9   mentioned?
10   A.   If you go down to scenario number four.
11   Q.   Yes.
12   A.   You will see that we included in the training, this is
13   role plays and this one says "You interview Jackie, who is a
14   great looking model applicant.  Her interview went extremely
15   well.  Under normal circumstances, you would have given her the
16   highest score for appearance and sense of style.  However,
17   Jackie showed up to the interview wearing a headscarf.  After
18   covering the Look Policy in the interview, Jackie asked if her
19   headscarf would be an issue.  How do you address the
20   situation?"
21        We train our managers that if she addresses the issue
22   in any way, they would need to call HR.  And if they think that
23   there may be an issue, whether it's just in their mind or an
24   inkling or a clarification or whatever the reason may be, in
25   much the same way they call HR for everything else, they need
```

1    to call HR.

2    Q.   Now, in scenario number four, it says that Jackie, the

3    applicant, asked if her headscarf would be an issue; correct?

4    A.   That's correct.  But in the role play, as I just stated

5    earlier, we instruct with all of our managers that whether

6    Jackie asks or whether they just think.  So, for example, we

7    get this all the time.  I have a fabulous looking young woman

8    who I want to hire, she's wearing a headscarf.  What do you

9    think I should do?  Call HR.

10   Q.   But the scenario in Exhibit No. 4 only refers to a

11   situation where the applicant, Jackie, asks if her headscarf

12   would be an issue; correct?

13          MR. KNUEVE:  Objection, Your Honor.  Asked and

14   answered and the document speaks for itself.

15          THE COURT:  Sustained.  Let's move on.

16          MS. SEELY:  Okay.

17          THE COURT:  You can touch on this, but that question,

18   the document does speak for itself.

19   Q.   (By Ms. Seely)  Now is there any other page in Exhibit 20,

20   Ms. Riley, that references the company's or refers to the

21   company's obligation to provide religious accommodation?

22   A.   The only other page is if you -- that I can see at the

23   moment, is if you go to, I think it's A&F 3314, we ask all of

24   our managers, Your Honor, to go back to the stores and make

25   sure that all the managers in their stores are aware of what

 1    they have been trained on.  And in that one -- if you look at

 2    the second bullet point, I'm sorry, the second phrase, it says

 3    "get the facts."  It says "increase your awareness, understand

 4    company policies and how you can best accommodate the diverse

 5    needs of your associates while meeting the needs of the

 6    business."  And it's in that that we reiterated that if they

 7    had any questions whatsoever that were implied, asked, just in

 8    their head, they needed to make sure they got all the facts and

 9    that they spoke to us about it.

10         THE COURT:  All right.  Let me ask in that regard,

11    because it would appear from this exchange between Ms. Seely

12    and yourself that unless the applicant asks a question, the

13    interviewer will downgrade the applicant, because the applicant

14    is not -- and let me see if I can get the exact language, here.

15    "Is wearing clothes that are inconsistent with the Abercrombie

16    brand;" correct?

17         THE WITNESS:  Right.

18         THE COURT:  Okay.  Let's take two scenarios because

19    obviously, Ms. Seely is thinking, as she should as a good

20    advocate, about a Muslim woman who is applying.  And you are

21    saying that if she applies, if the Muslim woman applies and

22    otherwise meets all of the standards, if she is wearing a

23    headscarf and she does not ask the question or imply the

24    question in some way, she will not be hired.  Is that what I

25    understand you're saying?

1          THE WITNESS:  No, Your Honor, what I have been trying

2     to convey to Ms. Seely is that as you take a look at the

3     document -- she has dwelled on one part of the document.  The

4     interview is in totality.

5          THE COURT:  All right.

6          THE WITNESS:  So even in the last two years, I know of

7     at least eight or nine cases where a manager has met someone

8     who met all the requirements and specific to headscarves, I'm

9     not sure if the individual is Muslim or not, they said they

10    meet all the requirements outside of this particular piece of

11    the Look Policy, what should we do?  We instruct them to call

12    us immediately.

13         THE COURT:  So those were questions raised by the

14    interviewer with HR without a question being raised by the

15    interviewee?

16         THE WITNESS:  That's correct.

17         THE COURT:  All right.  So if Audrey Hepburn applies,

18    all right, and we would assume that Audrey Hepburn, if she were

19    19 years old, might meet your qualifications; right?

20         THE WITNESS:  I think she definitely would, even at 44

21    years old.

22         THE COURT:  I think you're probably right.  We used

23    Grace Kelly, earlier, but Audrey Hepburn shows up and she's

24    wearing a headscarf.  Now, if she doesn't ask the question

25    about the headscarf, you're not going to ask about her

1    religion; correct?

2           THE WITNESS:  No, I'm not going to ask.

3           THE COURT:  But then you would hope that the

4    interviewer would put in the call to you and say look, but for

5    the fact that she's wearing clothes inconsistent with the

6    Abercrombie brand, i.e. Audrey's headscarf, what should I do?

7           THE WITNESS:  Yes.  And the scenarios, Your Honor,

8    just to give you a history, the scenarios are actually taken

9    from real cases that we've had.  So we do have this happen

10   frequently where people call and say I have a wonderful young

11   man, he has to wear a beard or he has a beard, he looks Jewish.

12   I didn't ask.  What should I do?  He meets all the

13   requirements.

14          So I think what has been conveyed is that store

15   managers only call us because there's a script.  We get 25,000

16   calls a year.  They call us for everything.  An average store

17   manager is about 25 years old, they have been out of school for

18   three years.  It's one of the reasons we take a lot of the

19   expertise in-house is because they don't have the tenure of an

20   IBM or a Procter & Gamble, where they can live through these

21   experiences.

22          THE COURT:  They don't have a degree from Wellesley

23   and a doctorate?

24          THE WITNESS:  Actually, there are quite a few of them

25   with degrees.  Well, we only people who are degreed, but we are

1    usually their first job that they get out of college and they

2    move very quickly up the ranks, so we tell them to call us for

3    everything, and literally we get called for everything.

4              THE COURT:  Which is what you want?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  Ms. Seely, go ahead.

7    Q.   (By Ms. Seely)  Ms. Riley, I believe you testified that

8    there have been eight or nine situations since 2008 in which

9    someone has been hired with a headscarf; correct?

10   A.   Eight or nine that I'm aware of Ms. Seely.

11   Q.   And is it your testimony, then, in each of those -- strike

12   that.  Are you familiar with the details of each of those eight

13   or nine occasions?

14   A.   I have read them.  Quite honestly, I cannot tell you all

15   the details of them.  The gist is that there's a mixture of

16   people asking and people not asking.  But our training in March

17   2010 and onward has always been if you have any inkling,

18   whether a question is asked, whether you just have something in

19   your head or whether you just don't know, you just need to call

20   us.

21   Q.   Now, you say that your training since March 2010 has been

22   call us if you have something in your head?

23   A.   We've always said that.  I don't think it's been very

24   clear to people, so we were very clear in training our district

25   managers and then we trained all our store managers in the 2010

1    training sweep.  So yes.

2    Q.   But the Exhibit 20, the fall 2010 store manager training

3    booklet, that reflects the most current training; is that

4    correct, for store managers?

5    A.   That reflects the most current store manager training.

6    Q.   Yes.

7    A.   That's correct.

8    Q.   And we've discussed the only portions of that document

9    that pertain, in your view, to the obligation to provide

10   religious accommodation?

11   A.   Based on the time I just reviewed this now, those are the

12   two pieces I could point out.

13   Q.   Do you need more time?

14   A.   It probably would take me about half an hour just to read

15   it.

16   Q.   You are familiar with it, are you not?

17   A.   Yes, Ms. Seely, I am familiar with it, but I'm also

18   familiar with probably 30 or 40 other training documents that

19   we have used since then.

20          MR. KNUEVE:  Your Honor, we are getting a little

21   badgering, argumentative here.  If there's a point to be made,

22   let's make it.

23          THE COURT:  Sustained.

24   Q.   (By Ms. Seely)  So just so the record is clear, of the

25   eight or nine instances that you are aware of in which women

```
 1   were allowed to work for Abercrombie wearing a headscarf, it is

 2   not your testimony that every one of them -- strike that.  Some

 3   of those applicants actually made a specific request during the

 4   interview to wear a headscarf; correct?

 5   A.   Yes, some of those applicants asked.

 6   Q.   And do you know specifically which applicants did not ask,

 7   but the interviewing manager thought to call HR, nonetheless?

 8   A.   No.  No, I do not.

 9        MR. KNUEVE:  Objection, Your Honor, relevance.

10        THE COURT:  Yes, we're getting a little bit beyond the

11   bounds of relevance here.  The objection is sustained.  Let me

12   ask, do you know how many of those eight or nine were as a

13   result of phone calls from the interviewer as opposed to

14   request for accommodation by the interviewee?

15        THE WITNESS:  No, Your Honor, I don't know how many.

16        THE COURT:  All right.  Go ahead.

17   Q.   (By Ms. Seely)  Now, Ms. Riley, isn't it true that since

18   2008, there have been at least two situations in which an

19   applicant or an employee has either not been hired or been

20   fired because she wore a headscarf?

21        MR. KNUEVE:  Objection, Your Honor, relevance.

22        THE COURT:  Sustained.

23        MS. SEELY:  Your Honor, if I may respond?

24        THE COURT:  Go ahead, but we're getting beyond, we're

25   getting into the California case here.  Go ahead.  I'm not
```

1    intending to try anything other than what's relevant before me.

2    Go ahead, respond to the objection.

3        MS. SEELY:  Well, Your Honor, I think it's relevant

4    because Ms. Riley is testifying that the company is allowing

5    headscarves now and implying that they no longer discriminate

6    on the basis of headscarves with respect to anyone, and I think

7    it's relevant to show that there are at least two people who

8    claim that they have been discriminated against because of

9    their headscarves since 2008.

10       MR. KNUEVE:  Your Honor, this is so far out of the

11   scope of this case in controversy, it's ridiculous.  The EEOC

12   put into evidence at summary judgment evidence that the company

13   has made eight or nine exceptions for hijabs.  Now, Ms. Seely

14   is getting into stuff she knows happens before 2010.

15       THE COURT:  Those are the subject of other lawsuits.

16   The objection is sustained.  Go ahead.

17       MS. SEELY:  No more questions, Your Honor.

18       THE COURT:  Mr. Knueve.

19                        CROSS-EXAMINATION

20   BY MR. KNUEVE:

21   Q.   I'm not going to belabor anything, Ms. Riley, I'm just

22   going to ask you a couple of questions.  Are you familiar with

23   a company document called the Hair Style Sketch Book?

24   A.   Yes, I am.

25   Q.   What is that document?

1    A.   That document shows or trains our managers on hair styles

2    and headscarf styles that may be accommodated if someone

3    requires accomodation for religious or medical reasons.

4    Q.   Does it say anything about headwear?

5    A.   Yes.

6    Q.   What does it say?

7    A.   It says we will try to make the right accommodations.

8    Q.   Now, who is that provided to?

9    A.   That's provided to managers and pretty much anyone who

10   does any hiring.

11   Q.   Now, you have described a number of changes the company

12   has made in or around the beginning of 2010; correct?

13   A.   Yes.

14   Q.   Why did the company make those changes?

15   A.   We wanted to make sure that there was no further confusion

16   from anyone who is an applicant or a manager.

17          MR. KNUEVE:  No further questions.

18          THE COURT:  Redirect.

19          MS. SEELY:  No, Your Honor.

20          THE COURT:  Very well, you may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  The plaintiff may call its next witness.

23          MS. SEELY:  No more witnesses, Your Honor.

24          THE COURT:  Very well.  The defendant may call its

25   first witness.

```
 1              MR. KNUEVE:  No witnesses, Your Honor.

 2              THE COURT:  Very well.  Any argument?  Ms. Seely.

 3              MS. SEELY:  Yes, Your Honor.  Your Honor, whether or

 4    not to issue injunctive relief is within this Court's

 5    discretion and the standard is whether or not the evidence

 6    shows that there exists some cognizable danger of recurrent

 7    violations.  I think the evidence is clear that defendant's

 8    current policies and procedures regarding religious

 9    accommodations to applicants who wear headscarves continues to

10    be flawed and will likely result in continued discrimination

11    against applicants for store positions who wear headscarves

12    because of their religious beliefs.

13              Nothing has changed, Your Honor, in the way that the

14    company conducts interviews and makes hiring decisions.  The

15    only thing that has changed is that the Look Policy block on

16    the new current Model Interview Guide tells the applicant that

17    no headwear is allowed to be worn.  The onus is still placed on

18    the applicant who is hearing a headscarf to ask for an

19    accommodation.  And the problem is that I think that most of

20    the people who are applying for jobs at the abercrombie stores

21    are teenagers.  And if someone comes to an interview wearing a

22    headscarf and is told by an older person, a manager, that no

23    headwear is allowed, I think it's highly likely that those

24    people will not ask for an accommodation, they won't even know

25    that that's a possibility.
```

1          And it's our position that Abercrombie should be

2     required, that an injunction should issue requiring Abercrombie

3     to follow up that statement, the statement being no headwear is

4     allowed, with a statement that if you need religious

5     accomodation, please see me after the interview.  And at that

6     point in time, the interviewing manager then will contact HR

7     because a request has been made.

8          I don't think anything has changed in Abercrombie's

9     interviewing procedures at all since 2008, except that now,

10    applicants are told they can't wear headwear.  I think there's

11    definitely a danger that recurrent discrimination will occur.

12         We also ask that the company train its managers in

13    their obligation to inform all applicants that they may ask for

14    religious accommodation and also train their managers in the

15    company's obligation to provide a religious accommodation so

16    that they may recognize when one is needed, so that they know

17    when there's a religious issue, short of an express request for

18    accommodation.

19         THE COURT:  Thank you.  Mr. Knueve.

20         MR. KNUEVE:  Your Honor, a lot has changed since 2008

21    and we just heard what has changed.  The Look Policy has

22    changed to clarify that headwear is not permitted.  The Model

23    Group Interview Guide has been changed so that no applicant can

24    ever be confused as to whether or not headwear is permitted by

25    the Look Policy.  The applicant is read language that

1    specifically states headwear is prohibited, then they are asked

2    if they have questions.  There can be no further confusion.

3         The other things that have changed are the training

4    that was described by Ms. Riley.  There was training to all

5    managers that the company -- and it's exactly the situation of

6    this case, that headwear can be permitted as a reasonable

7    accommodation.  It's what Ms. Seely has been saying or talking

8    about for two days.  The company has done it.

9         And then, in addition, what's been introduced into

10   evidence is the store manager training sweep which specifically

11   provides training on this scenario that we've been talking

12   about.

13        Now, the relief that the EEOC requests far exceeds the

14   scope of this case in controversy.  As Your Honor said, this

15   case was decided based upon facts and circumstances unique to

16   this particular case.  The company has insured that the facts

17   and circumstances that relate to this case can never happen

18   again, because no applicant can ever be confused about whether

19   or not headwear is permitted.  To the extent Ms. Elauf was

20   confused about whether headwear was permitted by the Look

21   Policy, that will never happen again.  We're outside the scope

22   of this case and the injunctive relief is inappropriate.

23        Furthermore, the EEOC has made no showing that

24   violations are likely to recur.  In fact, the evidence is

25   exactly the opposite.  The evidence is that the company has

1    made eight to nine exceptions for hijabs since 2010.  There is

2    no evidence of any likelihood of a recurring violation.  And I

3    would cite you to the case KarenKim 2011 U.S. Dist. Lexis

4    64487, which says that the burden is on the EEOC to prove that

5    violations are likely to recur.

6           The other problem with the injunctive relief requested

7    by Ms. Seely is that it exceeds the scope of Title VII.  What

8    she is asking for is not required by law.  And again, I will

9    refer you to the EEOC's own compliance manual which says in

10   black and white, the applicant cannot remain silent.  And I'm

11   quoting, this is from the EEOC's own compliance manual:

12          "An applicant or employee who seeks religious

13   accommodation must make the employer aware, both of the need

14   for accommodation and that it's being requested due to a

15   conflict between religion and work.  The employee is obligated

16   to explain the religious nature of the belief or practice at

17   issue and cannot assume that the employer will already know or

18   understand it."  That's what the EEOC has written.  There's

19   nothing in Title VII, nothing, that justifies the relief that

20   has been requested here.

21          Finally, the relief requested is moot because, as Ms.

22   Riley testified, the company has taken steps to address the

23   situation that happened in this case.  This case is about the

24   facts and circumstances relating to Ms. Elauf, that's it.

25   Those circumstances are not going to recur.  There has been no

1    evidence here that they will.  Thank you.

2         THE COURT:  Thank you.  The Court will decline to

3    enter an injunction here.  The Court concurs with Mr. Knueve,

4    the facts and circumstances here have changed.  The Look Policy

5    has changed to change the prohibition from caps to headwear, so

6    that it's clear.  The Model Interview Guide has changed,

7    instructing the interviewers to tell the interviewees that no

8    headwear is to be worn.  And in addition, the interviewee is to

9    be asked if they have questions.  Just as the EEOC states in

10   its guidelines, the applicant cannot remain silent.

11        Here, the particular facts were such that the Court

12   found and, as specifically set forth in the Court's written,

13   what 23, 24 page order on summary judgment, that under the

14   facts here, Ms. Elauf could not have been reasonably required

15   to ask that question herself or to ask for reasonable

16   accomodation.  First of all, she was 18 years old.  Had she

17   read the Look Policy, which was not provided to her, it said

18   caps weren't allowed, which arguably, doesn't apply to

19   headscarves.  I think to an 18 year old teenager, a cap isn't

20   necessarily stylish and certainly a headscarf can be.

21        Secondly, if Abercrombie now complies with its current

22   policy of telling its applicants that no headwear is to be

23   worn, that reasonably places the applicant on notice that they

24   need to ask, that they cannot remain silent with regard to

25   their religious belief in wearing headwear.

1           The evidence before this Court indicates that managers

2     are now instructed that headwear may be permitted as a

3     reasonable accommodation and that if questions arise, that they

4     are to call HR.  I also agree with Mr. Knueve here that there

5     is no substantial likelihood of recurrent violations, and I'm

6     not saying that under no circumstances will recurrent

7     violations ever occur, but that's what cases and controversies

8     are for.  There is no cognizable danger of recurrent violations

9     of the type presented by the facts here where Ms. Elauf was not

10    placed on reasonable notice that she needed to request an

11    accommodation for her headscarf.

12          With due respect, the request for an injunction will

13    be denied.  Anything further?

14          MS. SEELY:  No.

15          THE COURT:  All right.  Have we heard anything from

16    the jury, Mr. Overton?

17          THE CLERK:  No, we have not.

18          THE COURT:  Very well, we are in recess.

19          (Recess).

20          (The following proceedings were had outside the

21    presence and hearing of the jury.)

22          THE COURT:  Be seated please.  The Court has received

23    a note with the time of 4:15 p.m. stating that "We, the jury,

24    have reached a verdict."  Is there anything we need to take up

25    before we retrieve the jury?

```
 1              MS. SEELY:  No, sir.

 2              MR. KNUEVE:  No.

 3              THE COURT:  Very well.

 4              (The following proceedings were had in the presence

 5    and hearing of the jury.)

 6              THE COURT:  Please be seated.  Mr. (Jury Foreperson -

 7    name omitted), it's my understanding that the jury has reached

 8    a verdict.  Is that correct, sir?

 9              JURY FOREPERSON:  Yes, we have, Your Honor.

10              THE COURT:  And it is a unanimous verdict, sir?

11              JURY FOREPERSON:  Yes, sir.

12              THE COURT:  Very well.  If you will hand the verdict

13    to the bailiff, the Court will review it to make sure it's in

14    proper order.

15              All right, the Court has reviewed the verdict and

16    finds that it is in proper order.  The Court will hand the

17    verdict to Mr. Overton for publication on the record to the

18    courtroom assembled.  Mr. Overton.

19              THE CLERK:  "In the United States District Court for

20    the Northern District of Oklahoma.  Equal Employment

21    Opportunity Commission, plaintiff vs. Abercrombie & Fitch

22    Stores, Inc., an Ohio corporation doing business as abercrombie

23    kids, defendant.  Case number 09-CV-602-GKF-FHM.  Verdict form.

24              "We the jury, empaneled and sworn in the above

25    entitled cause, do upon our oaths award compensatory damages
```

1    for plaintiff and against defendant Abercrombie & Fitch Stores,

2    Inc. in the amount of $20,000.

3         "Interrogatory concerning punitive damages.  We do not

4    find by a preponderance of evidence that plaintiff has proven

5    that Ms. Elauf is entitled to punitive damages.  Signed by the

6    jury foreperson.  Dated July 20th, 2011.

7         THE COURT:  Does either counsel wish to poll the jury?

8         MS. SEELY:  No, Your Honor.

9         MR. KNUEVE:  No, Your Honor.  Thank you.

10        THE COURT:  Very well.  Ladies and gentlemen, just for

11   your understanding, the parties have a right to poll the jury,

12   both have declined to do so.  Polling the jury would be having

13   the Court ask each of you, individually, whether this verdict

14   represents your personal verdict in the case.

15        Ladies and gentlemen, you have now completed your

16   duties as jurors in this case and you are discharged.  Now, the

17   question may arise as to whether or not you are free to discuss

18   this case with anyone.  Let me inform you of the rules of this

19   Court.  No one may contact you with regard to your verdict and

20   your deliberations unless that individual has first obtained

21   specific permission from this Court to do so.

22        In nearly five years of being in this court, I have

23   never been asked for permission to contact jurors and it would

24   not be my proclivity to grant such a request because jury

25   deliberations, in my view, are sacrosanct.  Now, if you,

```
 1   yourself, wish to approach anyone, talk to your family, your

 2   friends, your neighbors or the lawyers involved in the case,

 3   that's entirely your decision, but that has to be initiated by

 4   you and not from anyone else.

 5        If anyone attempts to contact you regarding your

 6   verdict and continues to do so over your objection, please

 7   contact me or Mr. Overton and I will immediately address the

 8   situation.

 9        Ladies and gentlemen, we thank you very much for

10   resolving this controversy.  I know, by the amount of time that

11   you spent with it, you considered it closely and did your duty

12   as jurors to try to reach the truth in this case.  We very much

13   appreciate the sacrifice of your time and you are discharged.

14        (The following proceedings were had outside the

15   presence and hearing of the jury.)

16        THE COURT:  Is there anything else for the record?

17        MS. SEELY:  No, Your Honor.  Thank you.

18        MR. KNUEVE:  No, Your Honor.

19        THE COURT:  Very well.  We are adjourned.

20        (Court adjourned.)

21

22        A TRUE AND CORRECT TRANSCRIPT.

23

24        CERTIFIED:  s/ Glen R. Dorrough
                       Glen R. Dorrough
25                     United States Court Reporter
```