```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   EQUAL EMPLOYMENT OPPORTUNITY )
     COMMISSION,                  )
 5                                )
                     Plaintiff,   )
 6                                )
     V.                           )   No. 09-CV-602-GKF-FHM
 7                                )
     ABERCROMBIE & FITCH STORES,  )
 8   INC., an Ohio Corporation    )
     d/b/a abercrombie kids,      )
 9                                )
                     Defendant.   )
10

11                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                    HAD ON JULY 18, 2011

13                    JURY TRIAL - VOLUME I

14

15

16   BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

17

18   APPEARANCES:

19   For the Plaintiff:    Ms. Barbara A. Seely
                           Equal Employment Opportunity Commission
20                         1222 Spruce Street, Room 8100
                           St. Louis, Missouri 63103
21
                           Mr. Jeff A. Lee
22                         Equal Employment Opportunity Commission
                           215 Dean A. McGee, Suite 524
23                         Oklahoma City, Oklahoma 73102

24                         Ms. Jennifer L. Hope
                           Equal Employment Opportunity Commission
25                         801 Market Street, Suite 1300
                           Philadelphia, Pennsylvania 19107
```

1    (APPEARANCES CONTINUED)

2    For the Defendant:    Mr. Mark A. Knueve
                          Mr. Daniel J. Clark
3                         Vorys Sater Seymour & Pease LLP
                          52 East Gay Street
4                         Columbus, Ohio 43215

5                          -   -   -   -   -

6                          CONTENTS

7                                                    Page No.

8    OPENING STATEMENTS:

9        By Ms. Lee......................................... 29

10       By Mr. Knueve...................................... 36

11   WITNESSES CALLED ON BEHALF OF PLAINTIFF:

12   HEATHER COOKE (By video deposition)

13       Examination by Ms. Seely.......................... 47

14       Examination by Mr. Clark.......................... 96

15       Examination by Ms. Seely.......................... 98

16   FARISA SEPAHVAND

17       Direct Examination by Mr. Lee..................... 102

18       Cross-Examination by Mr. Clark.................... 114

19       Redirect Examination by Mr. Lee................... 123

20   RANDALL JOHNSON (By video deposition)

21       Examination by Mr. Lee............................ 124

22       Examination by Mr. Clark.......................... 148

23       Examination by Mr. Lee............................ 149

24   KALEN MCJILTON (By video deposition)

25       Examination by Ms. Seely.......................... 150

1   (CONTENTS CONTINUED)

2        Examination by Mr. Clark.......................... 167

3        Examination by Ms. Seely.......................... 168

4                        -   -   -   -   -

5                              PROCEEDINGS

6                            July 18, 2011

7            (The following proceedings were had outside the

8   presence and hearing of the jury.)

9            THE COURT:  Be seated, please.

10           THE CLERK:  We're here in the matter of Equal

11  Employment Opportunity Commission vs. Abercrombie & Fitch

12  Stores, Inc., Case Number 09-602-GKF.  Will the parties please

13  enter their appearance.

14           MS. SEELY:  Barbara Seely for the Equal Employment

15  Opportunity Commission.

16           MR. LEE:  Jeff Lee for the Equal Employment

17  Opportunity Commission.

18           MS. HOPE:  Jennifer Hope for the Equal Employment

19  Opportunity Commission.

20           MR. KNUEVE:  Mark Knueve for Abercrombie & Fitch

21  Stores, Inc.

22           MR. CLARK:  Dan Clark also for Abercrombie & Fitch

23  Stores, Inc.

24           THE COURT:  Good morning.  We have, I think, a number

25  of matters to address this morning before we bring in the jury.

1   I noticed a copy of an e-mail from Mr. Lee, plaintiff's counsel,

2   with regard to an additional designation in the Cooke deposition

3   that wasn't shown as designated.  Is there any issue with

4   regard to that particular designation?

5          MR. KNUEVE:  Yes, Your Honor, we do object to that.

6   It wasn't in the original designation that was made.  We didn't

7   have a chance to --

8          THE COURT:  Well, then it also raises the alleged

9   discrimination against Cooke.  Mr. Lee?

10          MR. LEE:  Your Honor, with the numerous designations

11   that flew through the night, that was one that was overlooked,

12   that was just our mistake in not including it in the amended

13   designations.

14          THE COURT:  I think the oral objection here should be

15   granted for a couple of reasons.  First, it wasn't in the

16   original designations.  Secondly, it raises this collateral

17   issue of alleged discrimination, as I recall sexual

18   discrimination, unwanted touching of Cooke.  We don't need to

19   be dealing with that here.

20          MR. LEE:  Thank you.

21          THE COURT:  All right.  What other matters?  I noticed

22   there were a couple of interesting defenses raised by the

23   defendant, one getting into alleged good faith, good faith

24   defense on punitive damages, based on a good faith belief that

25   to allow an exception would cause an undue burden.  And I've

1    got a few problems with that.

2         Number one, I've already ruled on summary judgment on

3    the undue burden affirmative defense.  Second, it's clear here

4    that neither Cooke nor Johnson were contemplating or relying on

5    an undue burden defense here in making that decision.  That

6    wasn't part of their calculations in deciding not to hire Ms.

7    Elauf.  Any other thoughts there, Ms. Seely?

8         MS. SEELY:  Your Honor, I think you're absolutely

9    right that any evidence regarding a good faith or reasonable

10   belief that the company was relying on an undue hardship when

11   it decided not to allow Heather -- I'm sorry, not to allow Ms.

12   Elauf to wear a headscarf and work at Abercrombie has been

13   decided by the Court and we believe that that evidence should

14   not come in.

15        THE COURT:  Well, there's certainly enough here to

16   defend the alleged malice, the alleged reckless disregard.  As

17   I was reading the depositions, it seemed to me that an obvious

18   defense here is that, you know, ladies and gentlemen, even if

19   we did deprive Ms. Elauf of her rights under Title VII, they

20   clearly didn't do it with malice, there's no evidence of malice

21   here.  I'm not saying this, I'm just trying to explain my

22   thinking, in terms of why I'm letting in these concepts of

23   their subjective intent.  No evidence of malice and no evidence

24   of reckless disregard.  It was merely a bad communication

25   between Cooke and Johnson that may well, of course, according

1    to the plaintiff, be due to poor training by Abercrombie.  And

2    the other interesting thing had to do with the last objections

3    in connection with Mr. Johnson's deposition.  And I first

4    sustained those objections as I read through them and then I

5    thought, no, it's clear from -- or relatively clear, as clear

6    as it can be from reading the cold hard pages of a deposition,

7    that Johnson was having continual problems with Cooke in terms

8    of the Look Policy.  Cooke was recruited, as I recall, from

9    California.  Abercrombie, through Johnson, was having problems

10   with Cooke in her adherence to the Look Policy, too much

11   makeup, hoop earrings, various things.  They were also having

12   problems with Cooke insofar as she was lax in the people below

13   her and she was human relations.

14        So that appears to be relevant, with regard to

15   Johnson's state of mind, that Johnson, in his intent here, may

16   well have been reacting to the continual pushing of the

17   envelope of the Look Policy by Cooke, and that may be relevant

18   with respect to punitive damages and whether or not they

19   deprived Ms. Elauf of her Title VII rights with reckless

20   disregard.

21        Now, in response, the plaintiff can certainly argue,

22   well, in focusing on Cooke's pressing of the Look Policy, they

23   entirely overlooked and ran over Ms. Elauf's federally

24   protected rights.  So I think there's plenty of room here for

25   argument, without some of these more unique defenses that I'm

1    reading in the pretrial order.

2        There was one other defense, Ms. Seely, that you-all

3    mentioned, I believe it was in your trial brief.  You were

4    responding to a defense raised in Kolstad, the Kolstad good

5    faith compliance defense.  Is that the alleged defense of good

6    faith belief that violation of the Look Policy would constitute

7    an undue burden?

8        MS. SEELY:  No, Your Honor, I think any evidence that

9    you might allow in, and plaintiff believes that there should be

10   no evidence, would go to evidence showing that the company had

11   a reasonable belief that it was relying on the defense of undue

12   hardship.  That is something that goes to malice or reckless

13   indifference.  If the plaintiff's evidence establishes malice

14   and reckless indifference and you agree to give a jury

15   instruction on punitive damages to the jury, then the company

16   can only escape punitive damages by showing that it had made

17   good faith efforts to comply with Title VII.

18       THE COURT:  All right.

19       MS. SEELY:  Regarding religious accommodations.

20       THE COURT:  That's right.  All right, help me out,

21   though, with regard to the law, insofar as training of Johnson,

22   here.  Johnson clearly, in his deposition, he repeats over and

23   over we are rolling on up, the issue on up to HR.  At least,

24   there's an indication that he was trained to roll these things

25   up.  And can Abercrombie be held liable, assuming that the jury

1    finds that he was so trained, and he failed and refused to do

2    it, can there be liability, vicarious liability on the part of

3    Abercrombie for punitive damages.

4         MS. SEELY:  Your Honor, I believe our evidence will

5    show that all Mr. Johnson was trained to do was to roll it on

6    up, if there was a request for a religious accommodation.  If

7    there was no request, our evidence will show that Mr. Johnson

8    was trained not to roll it up to HR.  And so HR never had an

9    opportunity or was never required to make a decision on whether

10   or not Ms. Elauf was entitled to a religious accommodation.

11        So our evidence will show that HR did some training,

12   but the training was basically don't you worry about it,

13   Johnson, Cooke.  If anything comes up, if someone -- I'm sorry,

14   strike that.  If an applicant makes a request for a religious

15   accommodation or an exception to the Look Policy, roll it up to

16   HR.  If they don't make a request, you don't roll it up to HR

17   and you just comply with the Look Policy.  And what happened

18   here, our evidence will show that as a result, Ms. Elauf was

19   not hired.

20        THE COURT:  Well, that segues into an injunctive

21   relief question that my senior law clerk and I were talking

22   about today.  You've made one request in the pretrial order for

23   injunctive relief -- and let me find that here -- that has some

24   appeal on the surface, but as I think about it, it's somewhat

25   problematic.  The request is to require Abercrombie to notify

1    any and all applicants who wear headscarves to an interview for

2    employment in any of its retail stores, that they may request

3    to be allowed to wear a headscarf as a religious accommodation.

4         And as I say, that had some superficial appeal because

5    it's closely tied to the facts here.  It begs the question what

6    does the law require in the case of say, handicap

7    discrimination, if someone comes in and applies for an

8    interview, for a position, interviews for a position and what

9    is the requirement of an employer in terms of informing a

10   potential employee of federally protected rights?

11        MS. SEELY:  Well, Your Honor, the employer is supposed

12   to ask the employee if they can do the job with or without a

13   reasonable accommodation.  And so the applicant would then

14   respond yes, I can do the job without an accommodation or they

15   can say I can do the job, but I need this accommodation.  So it

16   will come up, it is required to come up.

17        The reason that we think this injunctive relief is

18   important is that our evidence will show that Abercrombie has

19   changed its interviewing policy to a certain extent.  And it

20   now tells all applicants that no headwear is allowed.  And we

21   are concerned that particularly teenagers, and most of the

22   applicants are teenagers, if someone comes in in a headscarf

23   and is told no headwear is allowed, we're concerned that that

24   teenager might say well, I guess, in her head, I guess I can't

25   wear my headscarf and not ask.  And so we feel if someone comes

1    in with a headscarf on, that Abercrombie can say no headwear is

2    allowed, but then they need to say to the applicant, do you

3    need a religious accommodation?  And then they have to roll it

4    up to HR and HR has to make a decision.

5         THE COURT:  All right.  This highlights the fact that

6    this case kind of falls in the cracks, because the law is more

7    geared to existing employees than it is to applicants.  And if

8    I were to require Abercrombie to tell all of those who appear

9    at an interview in headscarves that they may request an

10   accommodation, it puts both parties in an odd position because

11   if one is not hired, it's then an invitation to file both a

12   request for religious accommodation and to file a claim that

13   one was denied employment by reason of one's religion.  And it

14   begs the question, well, should then Abercrombie be required to

15   provide everyone with both the Look Policy and perhaps in the

16   Look Policy in writing, a provision that they can request, if

17   they are applying for employment and they do not get hired, a

18   request for religious accommodation?  Do you see where I'm

19   going here, because it carves out a group of people who apply

20   to Abercrombie and it puts both parties in a very awkward

21   position, if I were to require, nationwide, Abercrombie to tell

22   all of those who appear in a headscarf, now, you can seek

23   religious accommodation.  That's almost a statement that we're

24   not going to hire you, but you can apply for religious

25   accommodation.  Do you see what I'm saying?

1       MS. SEELY:  I do, Your Honor.  But the problem is that

2   Abercrombie's current practice, as we understand it, is that

3   unless the applicant, just as it was in 2008, it is still if

4   the applicant doesn't make a request for accommodation, then no

5   accommodation is ever considered.

6       THE COURT:  In other words, you're basically deprived,

7   as a practical matter, of your rights under federal law?

8       MS. SEELY:  Exactly.

9       THE COURT:  But isn't the law itself -- you know, and

10  this is the problem with good intentioned law -- it doesn't

11  cover the entire ground, does it?

12      MS. SEELY:  You mean it doesn't cover people who would

13  need other religious accommodations?

14      THE COURT:  It doesn't cover applicants.

15      MS. SEELY:  Oh, it does, Your Honor.

16      THE COURT:  Oh, I understand.  I wouldn't have ruled

17  as I ruled.  But it's not, it's not machined well for

18  applicants.  In other words, Congress was mainly, it appears to

19  me, thinking about those who already had jobs who were being

20  discriminated against for religious reasons.  It's not well

21  suited for the applicant process.

22      MS. SEELY:  Well, I guess I would have to disagree,

23  Your Honor.  I think it's very clear that Title VII applies to

24  both employees and applicants and, also, in the definition of

25  religion.

1          THE COURT:  Once again, I don't disagree it applies,

2    but it's very difficult in application.  You see what I'm

3    saying?

4          MS. SEELY:  Yes.

5          THE COURT:  I mean, how does one fashion an injunction

6    requiring Abercrombie to tell everyone during the interview

7    process, now, you can apply for religious accommodation.  But

8    that's almost tantamount to saying we ain't going to hire ya,

9    but you can sure apply for religious accommodation.

10         MS. SEELY:  Well, I think, Your Honor, their current

11   practice is to definitely consider applicants who have

12   headscarves and to allow them, as you know from the summary

13   judgment motion, they've done it in eight or nine instances.

14         And so I don't think that it follows that by asking,

15   by Abercrombie telling the applicant that they have a right to

16   ask for religious accommodation, that they won't get hired.  We

17   hope they will, we think they are being hired now, certainly in

18   more numbers than they were.

19         THE COURT:  But apparently, the eight or nine were

20   only hired after asking for religious accommodation, they were

21   exceptions that were approved by HR in Ohio; correct?

22         MS. SEELY:  Yes.  And that is why the applicant needs

23   to be told they can make a request for religious accomodation.

24         THE COURT:  Does the written material supplied by

25   Abercrombie to applicants inform them of that?

1        MS. SEELY:  No, it does not, not to my knowledge.  The

2    closing statement in the Model Group Interview Guide has been

3    changed to add the sentence, no headwear of any kind is

4    allowed, in the part talking about the Look Policy, and that's

5    what they tell them.  And we think that it's extremely

6    important that if someone comes in in a headscarf, that they be

7    told they can make the request, because the request only gets

8    considered -- I mean, if letting someone have a religious

9    accommodation by wearing a headscarf is only considered by HR

10   if a request is made, that applicant must know that she can

11   make a request.  She can't be told no headwear is allowed.

12        THE COURT:  Oh, I understand, I understand the

13   problem.  All right.  Well, I wanted to wrestle with you-all a

14   little bit with this so I could think about this during the

15   trial.

16        Mr. Knueve, any observations that I can consider here.

17        MR. KNUEVE:  Yes, Your Honor, a few.  First, my

18   compliments to you because you predicted my opening statement.

19   I feel like you actually may have read it and now you know it,

20   with your argument --

21        THE COURT:  Well, I've read the depositions.

22        MR. KNUEVE:  Yes.  So our position is that with

23   respect to punitive damages, our position is as a matter of

24   law, there should not be a punitive damages instruction to the

25   jury and based on, frankly, the evidence that you have now

1    read.

2           In order to get punitive damages, the plaintiffs first

3    have to show reckless disregard of Ms. Elauf's federal rights.

4    First, there's no evidence of malice, and we would submit

5    there's precious little evidence of reckless disregard.

6    Johnson's state of mind, pure and simple, was enforcing the

7    Look Policy and protecting the brand.

8           There are, if the plaintiffs are able to get through

9    that threshold, reckless disregard, there are some exceptions

10   that Kolstad provides.  Number one, the employer discriminates

11   in the belief that the discrimination is lawful.  Number two,

12   the underlying theory of discrimination may be novel or poorly

13   recognized; or number four, the statutory exception defense,

14   that we have cited in our papers, and that's at Kolstad, 536

15   and 537.  Here, that's why the evidence regarding the Look

16   Policy and the way that Abercrombie does its business, that's

17   why it's all relevant, because the evidence is that Abercrombie

18   believed that making exceptions to the Look Policy would hurt

19   its business.

20          Now, on undue burden, Your Honor, you have decided a

21   liability.  And you decided liability, in part, in large part,

22   based on exceptions that were made in 2010.  Those exceptions

23   weren't relevant to the state of mind in 2008.  You haven't

24   decided, Your Honor, whether the managers acted in bad faith.

25   You haven't decided, yet, their state of mind in 2008.  And

```
 1     that's why we believe undue burden is relevant if this punitive

 2     damages, if the plaintiffs are going to continue to pursue

 3     punitive damages.

 4            Now, on the notice issue, the evidence is going to

 5     show that if the applicant mentions religion at all, or any

 6     other protected category, it's supposed to go to HR, not just

 7     if you request an exception.

 8            THE COURT:  But communication is made both verbally

 9     and nonverbally.  If I wear a headscarf, am I not communicating

10     that I am a Muslim?

11            MR. KNUEVE:  Your Honor, I think that there --

12            THE COURT:  If I were a woman, let's say.

13            MR. KNUEVE:  Your Honor, I think there are people that

14     wear headscarves that are not Muslim.  And, in fact, I just saw

15     an article the other day, on Friday, that said headscarves are

16     in vogue now and it's going to be the must-have fashion item

17     coming up in the next fashion season.

18            So I think what you are inviting, is you're inviting

19     managers to make assumptions about people's religion if you say

20     any time that somebody wears a headscarf, you are supposed to

21     assume that they are Muslim.  And that's contrary to Title VII

22     and it's contrary to EEOC's own guidelines.

23            THE COURT:  Well, it's the problem with social

24     engineering.

25            MR. KNUEVE:  It is the problem with social
```

1    engineering.  Now, you raised an excellent point, Your Honor,

2    about the disability discrimination context.  And there, the

3    framework is very simple.  You tell the applicant what are the

4    essential functions of the job and you ask the applicant can

5    you do these -- do you have questions about the essential

6    functions.  That's exactly what Abercrombie does.  We say this

7    is the Look Policy.  Do you have questions about these

8    expectations?  Now, admittedly, in 2008, we didn't mention the

9    caps or the headwear.  We do now, in 2010.  That's one of the

10   corrective things that have been done and that's why the

11   equitable relief that they are seeking is completely

12   inappropriate.

13           THE COURT:  You mention them in the interviews?

14           MR. KNUEVE:  In the interview.

15           THE COURT:  Do you mention their opportunities to seek

16   religious accommodation?

17           MR. KNUEVE:  We don't specifically say at that section

18   of the interview you can ask for religious accomodation for the

19   very reasons that you've mentioned.  But at the beginning of

20   the interview, the applicant is read that Abercrombie is an

21   equal employment opportunity employer and that diversity is

22   very important.

23           And, again, the law doesn't require an employer to say

24   to an applicant here's the rules and by the way, you can have

25   an exception.  The applicant -- there's some burden on the

1    applicant.  If you're told the expectations of the job and then

2    you're said, hey, do you have any questions about that?  The

3    law places the burden on the applicant to say wait a second.  I

4    have this religious belief that needs an accommodation.  The

5    law does not -- and in fact, the EEOC's own compliance manual

6    states that an applicant cannot simply sit there and remain

7    silent.  They have a burden to do something affirmatively.

8         You cannot place the burden on employers to make

9    assumptions about religious beliefs or to make inquiries about

10   religious beliefs.  The equitable relief that they seek is

11   inappropriate.

12        THE COURT:  But of course, here, Cooke did believe

13   that Ms. Elauf was a Muslim, I mean, under the facts here.

14        MR. KNUEVE:  She made an assumption, Your Honor, and

15   you found that that was enough to impute liability to

16   Abercrombie in this instance, but that's very different.  And I

17   would submit, first of all, that the law on that, Your Honor,

18   was unclear prior to your decision and for that reason, there's

19   another reason that the punitive damages instruction is

20   inappropriate, because Kolstad says if the law is unclear,

21   punitive damages don't apply.

22        THE COURT:  Well, of course, I based my decision on

23   the facts that were presented to me.  Ms. Cooke knew, I believe

24   her testimony was, that Ms. Elauf's friend was Muslim, that Ms.

25   Elauf's friend had asked Ms. Elauf to apply.  So obviously,

1    there are opportunities there for appeal.

2          All right.  Well, I appreciate your views on this.  I

3    think we can get this thing begun with the jury.  Is there

4    anything else we need to discuss, before we bring them in?

5          MS. SEELY:  Your Honor, we're going to be starting,

6    after we pick the jury, obviously, with some video depositions

7    and I would like to move to pre-admit the exhibits that will be

8    on the video.  The defendant has made no objections to these

9    and I'd rather do that and play the video straight through than

10   to stop it and offer exhibits.

11         THE COURT:  I appreciate the suggestion.  Will there

12   be any objections to any of those exhibits that are used in the

13   videos?

14         MR. KNUEVE:  Your Honor, I don't believe so, but we

15   would like the opportunity to double check, but if there's not,

16   we don't object to her proposal.

17         THE COURT:  Ms. Seely, if you could simply delineate

18   for Mr. Knueve those exhibits that you believe are in those

19   videos so that he can just double check, please.

20         MS. SEELY:  Sure.  And one other thing, Your Honor,

21   with respect to our testimony.  It won't be today, but we will

22   be reading a part of a deposition, it's not video, and as

23   opposed to going Q and A, Q and A, boring the jury to death,

24   would you have any objection or would defendant object to us

25   having one of our staff members sitting in the witness chair

1    pretending to be the witness?

2            THE COURT:  Oh, no, that's how we prefer it.  In fact,

3    anything to liven that process up.

4            MR. KNUEVE:  Absolutely no objection, Your Honor.

5            THE COURT:  All right.  Anything else, Mr. Knueve?

6            MR. KNUEVE:  No, thank you, Your Honor.

7            THE COURT:  All right.  Well, bring them in.

8            Ms. Seely, Mr. Knueve, have you spoken with Mr.

9    Overton about the number of jurors here?  Do you wish to have

10   seven or eight?

11           MS. SEELY:  Mr. Overton offered us six or seven and we

12   both said six.

13           THE COURT:  All right.

14           MR. KNUEVE:  That's correct, Your Honor.

15           THE COURT:  All right.  So we will empanel 14 and give

16   you three strikes apiece -- or seat 14, rather.

17           MS. SEELY:  How do you want, how do you want us to do

18   strikes for cause versus peremptories?  I suspect there may be

19   some strikes for cause.

20           THE COURT:  Sure.  I will ask for strikes for cause

21   and call you up here and we'll discuss it at sidebar.  There's

22   a microphone here and then we have the white noise so that the

23   jury can't hear us.  And then, of course, the peremptory

24   challenges will be made after I excuse them.  I will give you

25   about 15 minutes, or actually I'll give you about 10 minutes to

1    discuss your peremptories and then in the last five, we will

2    exercise those peremptories, bring them back in and then I'll

3    strike the six.

4        MS. SEELY:  Will we have any break to discuss strikes

5    for cause or will you want that done immediately?

6        THE COURT:  If you would like a break to do that, you

7    certainly can.  There may be an opportunity at midmorning to

8    make those discussions.  If I haven't given you enough time,

9    just ask for it.

10       MS. SEELY:  Okay.

11       MR. KNUEVE:  Thank you, Your Honor.

12                         *  *  *  *  *

13       (A jury was selected and sworn.)

14       THE COURT:  Members of the jury, I will now explain to

15   you your duties as jurors.  It is vital to the administration

16   of justice that you fully understand and faithfully perform

17   these duties.  It is my duty to determine all of the law

18   applicable to this case and to inform you of that law by these

19   instructions and by the instructions that I will give you after

20   all the evidence has been received.  It's your duty to accept

21   and follow all of these instructions as a whole, not accepting

22   one or more of these instructions and disregarding the others.

23       It's your duty to determine the facts of this case

24   from the evidence produced in open court.  You should consider

25   only the evidence introduced while the Court is in session.  It

1   is then your duty to apply the law as determined by the Court

2   to the facts as determined by you and thus render a verdict.

3   You should not allow sympathy or prejudice to influence your

4   decision.  Your decision should be based upon probabilities not

5   possibilities.  It may not be based upon speculation or

6   guesswork.

7          Now the evidence you are to consider in this case

8   consists of the testimony of the witnesses, the exhibits

9   admitted into evidence, any facts admitted or agreed to by the

10  attorneys and any facts which I instruct to you to accept as

11  true.  The term "witness" means anyone who testifies in person

12  or by deposition, including the parties to this case.

13         In addition, you are permitted to draw such reasonable

14  inferences from the testimony and the exhibits as you feel are

15  justified when considered with the aid and the knowledge which

16  you each possess in common with other persons.  You may make

17  deductions and reach conclusions which reason and common sense

18  lead you to draw from the facts which you have found to have

19  been established by the testimony and the evidence in the case.

20         The production of evidence in court is governed by

21  rules of law and I touched upon this a bit during the voir dire

22  process.  From time to time, it may be the duty of the

23  attorneys to object to the production of evidence and then my

24  duty, in turn, to rule on those objections.

25         If I say the objection is sustained, you may not

1    consider the testimony or exhibit covered by this objection.

2    If, on the other hand, I say the objection is overruled, you

3    may consider the testimony or exhibit covered by that

4    objection.   Now, the attorneys' objections and my rulings on

5    those objections, together with the reasons for the objections

6    and those rulings, are not evidence and may not be considered

7    by you.

8          Now the statements, remarks and arguments of the

9    attorneys are intended to help you in understanding the facts

10   and in applying the law, but are not themselves evidence.   If

11   any statement, remark or argument of an attorney has no basis

12   in the evidence, then you should disregard it.

13         You are the sole judges of the believability of each

14   witness and the value to be given the testimony of each

15   witness.   You should take into consideration the witness' means

16   of knowledge, strength of memory and opportunities of

17   observation, also consider the reasonableness, the consistency

18   or inconsistency of the testimony.   You should also consider

19   the bias, prejudice or interest, if any, the witness may have

20   in the outcome of the trial, the conduct of the witness upon

21   the witness stand and all other facts and circumstances that

22   bear upon or reflect the believability of the witness.

23         Now my rulings and remarks made during the course of

24   this trial are not intended to indicate my opinion as to the

25   facts.   Frankly, my opinion as to the facts is totally and

1   completely irrelevant, because you are the judges of the facts

2   in this case and I am merely the judge of the law.

3          During all recesses and adjournments, while this case

4   is in progress, you must not discuss this case or anything

5   about this case with anyone and you must not allow anyone to

6   discuss it with you.  This rule applies not only to court

7   employees, the attorneys involved in the case and others you

8   might meet in the courthouse, but also to your husband, your

9   wife, your family, your friends and anyone else you might meet

10  during the course of this trial.

11         If, during the trial, anyone talks to you or tries to

12  talk to you about this case, you must immediately report it to

13  me or to Mr. Overton, who will immediately report it to me.

14         Now, we expect this case only to go into perhaps early

15  Wednesday, in terms of the evidence.  So as we look at it now,

16  we will probably go to you with closing arguments sometime on

17  Wednesday morning, so it's a fairly short trial.  Inevitably,

18  people will ask you, if they find out that you're a juror in a

19  trial, they will ask you what the case is about.  I suggest

20  that you merely tell them that the judge has told you that you

21  can't discuss anything about the case until after you have

22  rendered a verdict.  And even then, you don't have to discuss

23  the case with anyone, that's entirely your decision.

24         Now do not, before this case is finally submitted to

25  you for your decision, do not talk to your fellow jurors about

1    this case or anything about this case or form or express an

2    opinion about it.  Do not read newspaper reports or obtain

3    information from the internet or any other media about the

4    issues, parties or witnesses involved in this case.  Do not

5    attempt to investigate this case in any way on your own.

6          Now, the reasons for these rules are that it's

7    essential that you should keep your minds free and open at all

8    times throughout this trial and that you should not be

9    influenced by anything except the evidence you hear and see in

10   this courtroom.  From now on, at the beginning of each recess

11   or adjournment, I'll refer to these instructions as my

12   instructions or my usual instructions.  But whether or not this

13   is done, you will carefully observe these rules at all times.

14         Ladies and gentlemen, because it's noon -- and

15   counsel, I apologize, I presume that you would not want to go

16   with opening statements immediately before noon, but perhaps

17   that was an unreasonable assumption.  Do you care to proceed

18   here with opening statements, Ms. Seely?

19         MS. SEELY:  No, Your Honor, I think we would prefer to

20   wait until after lunch.

21         THE COURT:  All right.  I think that's wise.  Ladies

22   and gentlemen, we will take a recess for lunch.  Once again,

23   the Court's usual instructions apply.  Don't talk about this

24   case with anyone or allow anyone to discuss it with you.  We

25   will be in recess until 1:15 p.m.

1          Anything before we go for lunch?  Ladies and

2    gentlemen, we are in recess until 1:15.

3          (Recess).  Afternoon session.

4          (The following proceedings were had outside the

5    presence and hearing of the jury.)

6          THE COURT:  Be seated, please.  A couple of matters

7    before we bring the jury in.  After taking a brief look at

8    Kolstad, I want to modify something I said at the beginning or

9    at the outset of the day.  My comment earlier about not

10   permitting the defendant to claim that it was reasonably

11   believing that it's actions were motivated by the fact that

12   allowing an individual to wear a headscarf would cause an undue

13   burden, I think was colored because I didn't want to relitigate

14   before this jury the issue of undue burden.  But what I'm

15   hearing Mr. Knueve say is Judge, that's not what I'm trying to

16   do, but rather I'm simply trying to do what Kolstad allows me

17   to do -- and this is probably inartfully stated because I've

18   only skimmed Kolstad, I'm not terribly familiar with Kolstad.

19   But as I understand it, it basically allows you on the issue of

20   punitive damages, to defend yourself, to say that even if we

21   committed a violation, we were not unreasonable.  And I think

22   one of the things Mr. Knueve said earlier today was revealing,

23   that you cannot attribute to us in July 2008, the fact that we

24   granted eight or nine subsequent hijab exceptions.  And I want

25   to just make clear for this record that the Court didn't base

1    its decision on summary judgment upon those eight or nine hijab

2    exceptions.  All we pointed out was that now that Abercrombie

3    has granted those eight or nine hijab exceptions, it could have

4    satisfied the Tenth Circuit's requirement that undue burden be

5    shown by more than mere speculation, by bringing in evidence

6    that having granted those eight or nine hijab exceptions, those

7    have created undue hardship one way or another, by showing that

8    sales have gone down or those individuals as to whom exceptions

9    were granted showed markedly less sales than others.  But they

10   didn't do that.

11        So the Court's decision was very, I guess, fact

12   intensive given the availability or potential availability of

13   being able to satisfy the Tenth Circuit's standard in the case

14   that Judge Seymour decided, saying you've got to show more than

15   mere speculation of undue hardship.

16        Now, it seems to me, because I don't want to foreclose

17   Abercrombie from being able to argue that they were not

18   unreasonable, for purposes of this jury deciding the issue of

19   punitive damages, they weren't unreasonable in July of 2008 in

20   thinking that we should be able to prevent -- or we should be

21   able to enforce our ban on caps.  And, of course, I've read

22   through the depositions.  You-all can argue what caps mean, et

23   cetera, et cetera.  But I think Abercrombie should be able to

24   make that argument.  Obviously, we don't want to reargue

25   whether or not the granting an exception would create an undue

1  burden.  As I've decided on summary judgment, Abercrombie

2  didn't meet its burden in that regard.  But simply focusing on

3  punitive damages, it seems to me that they ought to be able to

4  defend themselves by saying it was not unreasonable for

5  purposes of punitive damages.  And though they may disagree

6  with the Court's decision as to liability, they should be able

7  to speak of that perceived reasonableness in order to challenge

8  the plaintiff's position that their actions were in reckless

9  disregard.

10       And perhaps there's a more artful way to characterize

11  this, but Mr. Knueve.

12       MR. KNUEVE:  I can't think of a more artful way to

13  characterize it.  I agree, Your Honor, that's our argument.

14       THE COURT:  Well, I'm struggling a little bit here

15  trying to wrestle with this because, at least for me, and it

16  seems that in caselaw, that there's not much out there; right?

17       MR. KNUEVE:  There is, with respect to the Kolstad

18  defense or with respect to undue burden, Your Honor?

19       THE COURT:  With regard to Kolstad as applied to what

20  you contend is undue burden.  And see, what turned me off to

21  undue burden is, Mr. Knueve, I've already decide that issue.

22  But you're not arguing undue burden as an affirmative defense,

23  here, you're arguing a variant of undue burden.

24       MR. KNUEVE:  Our argument is essentially you cannot

25  hold -- Abercrombie was not in reckless disregard of Ms.

1    Elauf's rights and for a variety of reasons, but one of those

2    reasons is the company believed, in good faith and reasonably,

3    that exceptions to the Look Policy were harmful to the

4    business.  And the law permits an employer to enforce a dress

5    code and specifically, you know, we cited the Costco case, you

6    recall, in our summary judgment papers.  So we're not raising

7    undue burden to say there's no liability.  You're right, Your

8    Honor, you have decide that.  What we are saying is for

9    purposes of punitive damages and our state of mind, these

10   matters are all relevant.

11        THE COURT:  All right.  Well, I know this is an

12   ongoing issue, here and we will continue to wrestle with it

13   together.  Is there anything else we need to address before we

14   bring the jury in.  Ms. Seely?

15        MS. SEELY:  No, Your Honor.

16        THE COURT:  Very well.

17        (The following proceedings were had in the presence

18   and hearing of the jury.)

19        THE COURT:  Be seated, please.  Ladies and gentlemen,

20   you are about to hear the opening statements of counsel.  You

21   need to understand that opening statements are not themselves

22   evidence, but are to be considered by you as road maps, so to

23   speak, of where the attorneys believe the evidence will take us

24   in the next day and a half to two days of trial.

25        The attorneys have undertaken fact-finding in this

1    case by means of deposition and formal fact-finding techniques

2    allowed by the law.  And as we sit right here at the current

3    time, these lawyers know more about this case from a bird's-eye

4    view and also close-up.  They have been embroiled in this case

5    now for a couple of years and they know the facts better than

6    anyone else in this courtroom.  You are not, however, to

7    consider these opening statements as evidence, but rather

8    merely as a roadmap of where they believe the evidence will

9    take us and what they believe the evidence presented to you

10   will be.  So please consider these opening statements in that

11   light.

12        I will not allow you to take notes during the opening

13   statements, but after those are completed, I will give you a

14   jury instruction relative to note taking, so that if you're a

15   note taker, like me, and you are by no means obligated to take

16   notes, but if you are a note taker, believe you would to take

17   notes to jot down certain things for your own memory, you may

18   do so and I will give you a jury instruction in that regard.

19        At this time, ladies and gentlemen, we will hear the

20   opening statement of the Equal Employment Opportunity

21   Commission.  Ms. Seely -- or Mr. Lee.

22        MR. LEE:  I will have my notes.  Going to the case.

23   Before, I felt like I was a normal American teen.  Afterwards,

24   I felt like I was somehow different.  That's how Samantha

25   described the impact of Abercrombie refusing to hire her

1    because she wore a headscarf.

2            Someone could paint themselves green and call it a

3    religion.  Change her score.  Give her a lower evaluation.

4    Make her ineligible for hire.  That's what Abercrombie's

5    district manager, Randall Johnson, in effect, told Heather

6    Cooke, the assistant manager for Abercrombie, who interviewed

7    Samantha for the position.  Randall Johnson was referring to

8    the Abercrombie Look Policy, that she could not hire Samantha

9    because she wore a headscarf, because she, being Samantha, had

10   not asked specifically for an accommodation.  That's how the

11   managers at Abercrombie used their training and company

12   policies when Samantha Elauf applied for a job in 2008.

13           I think the Court has introduced us, but I'm going to

14   do it again.  My name is Jeff Lee, my co-counsel is Barbara

15   Seely and Jennifer Hope of the Equal Employment Opportunity

16   Commission and we're here because of what happened to Samantha

17   Elauf, who is also sitting at the table with us.  It's her

18   experience that we would like to share with you today, what

19   happened back in 2008.

20           The experience that, thus far, has changed her life,

21   certainly is one that she will remember forever.  It all

22   started when Samantha applied for a job and Abercrombie refused

23   to hire her because she, as a Muslim, her religious belief

24   required her to wear a headscarf.

25           The Court has already found that Abercrombie

1    discriminated against Samantha and the Court has already

2    determined that when Abercrombie discriminated against

3    Samantha, it violated the law.  We are here to determine what

4    must be done to put things right, to determine the amount of

5    damages to try to make Samantha whole for her emotional

6    distress and her disillusionment caused by Abercrombie's

7    discrimination.  We're also here to determine if Abercrombie

8    should be punished for what it did, to determine if punitive

9    damages should be awarded against it and, if so, what amount.

10           The evidence will focus on Samantha and the harm done

11   to her.  The evidence will also focus on Abercrombie and its

12   conduct, was it of a nature which it should be punished for,

13   back in 2008?

14           In June 2008, Samantha Elauf was a normal 17-year old

15   American girl.  She had been working at the mall for about a

16   year and a half and was ready for a new job.  So she applied at

17   Abercrombie, where her friend Farisa worked as a sales clerk.

18   Samantha got an interview, she was excited.

19           So let's talk about the interview and the process that

20   she went through.  As always, she wore a headscarf.  She wasn't

21   asked about her headscarf at the interview.  She wasn't asked

22   why she wore it.  She wasn't told it could be a problem.  She

23   wasn't asked about her religion or if she wore the headscarf

24   for religious reasons.  Instead, they talked about her job, her

25   experiences.  And then finally, she was asked when could she be

1    available for the next new employee orientation.

2        So Samantha thought the employee interview went well,

3    she thought she had the job.  She was excited and she waited

4    for the phone call to come to tell her when that next new

5    employee orientation would be.  She didn't hear back from

6    Abercrombie after that interview, but after three or four days

7    of not hearing anything, she couldn't understand why and, as a

8    teenager and her friend working there, she asked her friend

9    Farisa to find out what the hold up was, why nobody had called

10   her back yet.  When Farisa reported back to her, they said --

11   Farisa told Samantha they didn't hire you because you wore a

12   headscarf.

13       Samantha was 17 at that time, in 2008.  She couldn't

14   understand it, she was born and raised in Tulsa and considered

15   to be an all-American girl, no different than any of the rest

16   of her friends who were going to high school here in the Tulsa

17   area.  She was shocked that Abercrombie saw her differently.

18   She's moved on with her life, but it still bothers her, even

19   now.

20       Well, let's talk about what Abercrombie did.  Heather

21   Cooke was Abercrombie's assistant store manager and she was

22   responsible for interviewing and hiring.  She interviewed

23   Samantha, she liked Samantha, she thought Samantha was a good

24   fit for Abercrombie, she rated her highly and she wanted to

25   hire her.  But Abercrombie had a dress code and they call it

1    the Look Policy.  You have heard us refer to it, previously.

2    And Ms. Cooke wasn't sure if she could hire Samantha because

3    her headscarf might be in conflict with that Look Policy.

4        To Abercrombie, the Look Policy was critical and their

5    interviewing procedures were designed with that Look Policy in

6    mind.  But only Abercrombie's human resources office can decide

7    whether someone can wear a religious headscarf while working,

8    as an exception to that Look Policy.

9        And Abercrombie has trained their managers on how to

10   conduct these interviews.  They trained them on what to write,

11   what not to write, what to say, what not to say, what to ask,

12   what not to ask, and more importantly, when to call human

13   resources and when not to call human resources.  And if an

14   applicant needed a religious accomodation or exception to the

15   Look Policy, the applicant must ask the interviewing manager,

16   the applicant, Samantha Elauf, in this case, who can then, the

17   manager can then ask human resources.  A request to wear a

18   headscarf cannot be granted unless the applicant asks for one.

19       So why didn't Samantha ask to wear a headscarf back in

20   2008?  She didn't even know she needed to ask, she didn't know

21   she needed an exception, she didn't know she needed an

22   accommodation.  She didn't know what that was.

23       Why didn't she know?  Well, because Abercrombie

24   designed its interviewing practices so that people who wore

25   religious headwear like Samantha would not know that they had

1    to ask for an accommodation and thus, Abercrombie would not

2    have to hire them.

3            Here's how it worked back 2008.  When an applicant

4    came for an interview wearing a religious headscarf or any

5    religious headwear, they were not told headwear is forbidden.

6    They were not told they aren't in compliance with the

7    Abercrombie Look Policy during the interview.  They are not

8    told, when they don't meet Abercrombie's appearance and sense

9    of style rating.  The applicant doesn't even know they were

10   being graded on what they were wearing, such as a religious

11   headwear.

12           Abercrombie tells its manager to rate each applicant

13   by the appearance and sense of style criteria which judges that

14   applicant on whether they comply with the Look Policy when they

15   come to an interview.  An applicant has to get a high rating in

16   appearance and sense of style to be hired as a sales clerk.

17   But applicants wearing religious headscarves or any religious

18   headwear get the lowest rating, because Abercrombie believes a

19   headscarf is not consistent with the Abercrombie style.  So

20   this means they can't get hired.  An applicant never knows why

21   they are not hired.  If Farisa had not told Samantha, she would

22   not have known why they wasn't hired back in 2008 and we

23   wouldn't be here today.

24           Any applicant who needs an accommodation to the Look

25   Policy for their headscarf never gets to ask for an

1    accommodation, because they don't even know they need one.

2    This is exactly what happened here to Samantha.

3          So Abercrombie's assistant manager who did the hiring,

4    Heather Cooke, who wanted to hire Samantha, but she knew that

5    the headscarf might violate the Look Policy, and that Samantha

6    had not asked specifically for an accommodation, she went and

7    talked to her district manager, Randall Johnson.

8          Heather Cooke told Johnson, Mr. Johnson, that Samantha

9    wore a headscarf because of her Muslim religion.  Well, what

10   was her district manager's reaction?  He was following

11   Abercrombie's policy.  Since Samantha had not asked for an

12   accommodation, Abercrombie wasn't going to give her one.

13   Instead, he said, someone could paint themselves green and call

14   it a religion, and we can't hire them because of the Look

15   Policy.  He told Cooke to lower Samantha's original score, make

16   her ineligible for hire, do a new rating sheet that showed her

17   appearance and sense of style rating was not acceptable.

18         So again, Samantha never knew she had to ask for an

19   accommodation and she didn't ask for an accommodation and so

20   she was not hired by Abercrombie.

21         There will likely be evidence that Abercrombie

22   believed that granting Samantha an accommodation to the Look

23   Policy would have caused undue hardship on its business.  But

24   the Court has already found that Abercrombie did not prove this

25   to be the case, did not prove that granting Samantha an

1    accommodation or exception to the Look Policy would have been

2    an undue hardship to its business.  So it's up for you today to

3    decide whether Abercrombie's actions and the actions of its

4    managers were reckless or reasonable for what it did to

5    Samantha in 2008.  This is the evidence that you will hear from

6    our side.

7         At the close of the evidence, we will have another

8    opportunity to speak to you before you retire to the jury room

9    to decide what damages to award, and at that time, we will

10   speak more to you about the defendant's obligations under the

11   law and how it applies to circumstances such as what happened

12   to Samantha.  You will have to decide what damages should be

13   awarded in this case to compensate Samantha for Abercrombie's

14   discrimination against her, and you will have to decide whether

15   punitive damages should be awarded to deter Abercrombie from

16   discriminating again.  Thank you.

17        THE COURT:  Thank you, Mr. Lee.  Mr. Knueve.

18        MR. KNUEVE:  Thank you, Your Honor.  Ladies and

19   gentlemen of the jury, good afternoon.  Thank you for your

20   service.  We were introduced this morning, but again, my name

21   is Mark Knueve, I'm a lawyer for Abercrombie & Fitch.  With me

22   here is Dan Clark and Stacia Jones from Abercrombie's in-house

23   legal department.

24        Now, as you heard earlier this morning, Abercrombie &

25   Fitch is a business in the fashion industry.  And Abercrombie &

1    Fitch operates both Abercrombie & Fitch Stores and abercrombie,

2    with small A, abercrombie stores.  And you will hear me refer

3    to Abercrombie with a small "a" sometimes as abercrombie kids.

4    Abercrombie kids markets to children ages 8 to 16 years old.

5    And this case is about the abercrombie kids store that was in

6    the Woodland Hills Mall here in Tulsa, Oklahoma.

7           Now, Abercrombie sells a certain of clothes and it has

8    a certain brand image.  And the Abercrombie brand is preppie,

9    casual and is inspired by the East coast and the Adirondack

10   Mountains.  It's energetic, woodsy, and it's outdoorsy.  The

11   Abercrombie symbol is a moose, just like you might see in the

12   woods of New England.  And Abercrombie clothes are typically

13   fairly tight and form fitting.  And Abercrombie typically sells

14   jeans, T-shirts, skirts, and Polos.

15          Now, Abercrombie has a distinct business strategy.

16   This is a unique business strategy.  And that's because

17   Abercrombie does almost no traditional advertising.

18   Abercrombie does no advertising on the television, no

19   advertising on the radio and almost no advertising in the

20   newspapers or magazines.  And if you stop and think about it,

21   you've probably seen an ad for other businesses in the fashion

22   industry on television, but you've never seen a commercial for

23   Abercrombie.

24          Instead of doing that kind of advertising, Abercrombie

25   advertises through its in-store experience.  As I said earlier,

1    Abercrombie's target customer is between 8 and 16 years old.

2    And what Abercrombie wants is for these target customers to

3    walk through the mall, come into the store and be blown away.

4    And the goal is that the customer will remember the store,

5    think it's cool, talk about it to their friends and come back.

6    The in-store experience is so important to Abercrombie, because

7    that's the only way that Abercrombie advertises, that

8    Abercrombie spends a lot of time making sure that everything in

9    the store is consistent with the Abercrombie brand.  Now, this

10   isn't Macy's or Nordstrom's, this is something completely

11   different.  Abercrombie stores usually have a canoe hanging

12   from the ceiling, a large moose head hanging from the wall and

13   a lot of dark hardwood.  Unlike a lot of stores in the mall,

14   the lighting is kind of dark.  The music is loud, fast-paced

15   and what someone who is 8 to 16 years old might want to hear

16   playing.  And you will hear evidence that Abercrombie even

17   makes sure that the store smells a certain way by spritzing a

18   cologne all over the store at certain times throughout the day.

19        Now, the employees who work in the store are a big

20   part of the in-store experience and Abercrombie expects the

21   employees who work in the store to be fashion models.  The idea

22   is, since Abercrombie doesn't have fashion models who appear on

23   television, the employees who work in the store are its fashion

24   models and, in fact, the job title for the part-time position

25   that works on the sales floor is model.

1             And the job is pretty simple.  Greet customers while

2    looking good, wearing the Abercrombie style.  Now, obviously,

3    if you're going to model a certain style of clothing, you have

4    to wear that style of clothing and not another style of

5    clothing.  To ensure that employees are modeling the

6    Abercrombie style, Abercrombie maintains the Look Policy, which

7    is basically a dress code.  And one of the things that

8    Abercrombie's Look Policy says is that employees have to wear

9    the Abercrombie style of clothing.  The Look Policy also

10   prohibits the kind of things that would distract from the

11   Abercrombie style of clothing, things like piercings, streaks

12   in hair, heavy makeup, noticeable tattoos and facial hair.  The

13   Look Policy also prohibits any kind of caps, hats or headwear,

14   because headwear distracts from Abercrombie's style of

15   clothing.

16             And Abercrombie's catch phrase is that if you are

17   wearing something and it's the first thing someone would

18   notice, and it's not Abercrombie clothes, then it's distracting

19   from the brand, it's distracting from Abercrombie's clothes.

20             And think about it.  If you see a person for the first

21   time wearing a headscarf or a baseball hat or a cowboy hat,

22   there's a pretty good chance the first thing you are going to

23   notice is the headwear, not the clothes that the person is

24   wearing.

25             Now, Abercrombie doesn't make any big secret about any

1    of this.  In fact, it's just the opposite.  Abercrombie trains

2    its managers, people like Heather Cooke and Randall Johnson, to

3    enforce the Look Policy because it's so critical to the

4    business.  And enforcing the Look Policy is equated with

5    protecting the brand and protecting Abercrombie's very business

6    model.

7         And the evidence will also show that Abercrombie tells

8    applicants for employment, before they are even hired, that

9    they will have to wear the Abercrombie style and that they will

10   have to comply with the Look Policy.  A portion of the Look

11   Policy is read to the applicant at the interview.

12        Now, Abercrombie has a policy prohibiting

13   discrimination based upon religion and it trains its managers

14   on that policy.  And the evidence will show that Abercrombie

15   has a process for considering requests for religious

16   accommodation.  Abercrombie does train its managers not to make

17   assumptions about an applicant's religion and Abercrombie does

18   train its managers not to ask questions about religion.  And it

19   trains its managers that way because that's the law.

20   Abercrombie trains its interviewing manager to read a portion

21   of the expectations of the model job to an applicant and then

22   ask the applicant if she has any question under that

23   expectation.  That's when the applicant is supposed to ask for

24   an accommodation.  If the applicant requests a religious

25   accommodation or mentions religion, the manager is trained to

1   immediately contact Abercrombie's Human Resources Department,

2   the trained professionals who handle these types of situations.

3        Once human resources is called, the case is assigned

4   to a human resources manager.  From there, the human resources

5   manager talks to the applicant and determines, on a case-by-case

6   basis, what to do.  And the evidence will show that

7   Abercrombie's Human Resources Department does make religious

8   accommodations when the exception is not distracting from the

9   Abercrombie style.  In other words, Abercrombie allows

10  exceptions for religious reasons, when the exception will not

11  hurt its business.

12       Now, let's talk about what happened in this case.

13  Samantha Elauf interviewed for a model position at the

14  abercrombie kids store in the Woodland Hills Mall, here in

15  Tulsa, on or about June 26, 2008.  And the evidence will show

16  that Ms. Elauf wore a black headscarf, which in the Islamic

17  religion is called a hijab, to the interview.  And the evidence

18  will also show that a black headscarf violates the Look Policy

19  and is not in the Abercrombie style.  It's off-brand, like all

20  headwear.

21       Now, Ms. Elauf was interviewed by the assistant

22  manager, Heather Cooke.  Neither Ms. Elauf nor Ms. Cooke asked

23  any questions or said anything at all about Ms. Elauf's hijab,

24  nor did they discuss Ms. Elauf's religion.  At the end of the

25  interview, Ms. Cooke asked Ms. Elauf if she had any questions.

1     And Ms. Elauf didn't ask any questions.

2          After the interview, Ms. Cooke called her district

3     manager, Randall Johnson, and asked if she could hire a model

4     who was wearing a headscarf.  Mr. Johnson said no, because, as

5     I mentioned earlier, headwear violates the Look Policy and

6     headscarves are not in the Abercrombie style.

7          Now, the evidence will show that there was some

8     miscommunication here.  The evidence will also show that some

9     of that miscommunication started with Ms. Elauf, who never

10    mentioned her religion, didn't ask any questions and didn't

11    mention the fact that she was wearing a hijab due to her

12    religion.  Ms. Cooke, meanwhile, made an assumption about Ms.

13    Elauf's religion, which was not the way she had been trained by

14    Abercrombie.

15         Mr. Johnson, on the other hand, testified that he

16    never met Ms. Elauf, never spoke to Ms. Elauf and never knew

17    her religion and that he was simply enforcing the Look Policy

18    and protecting the brand as he had been trained.  What's clear

19    and what is undisputed is that no one called Abercrombie's

20    Human Resources Department about Ms. Elauf.  As a result, the

21    people that were trained and the people that were responsible

22    for making decisions on exceptions for religious accommodations

23    were never told about Ms. Elauf or her hijab.  The evidence

24    will show that the human resources departments never had a to

25    address the issue.

1          Now, you've heard already that the judge has already

2     found that Abercrombie should have hired Ms. Elauf for the

3     model position, and as a result, you will be asked to decide

4     whether Ms. Elauf suffered any damages when she was not hired

5     by Abercrombie.  And I'm going to ask you not to just assume

6     that Ms. Elauf had damages and to remember that the government

7     must prove that Ms. Elauf has damages.  In fact, the evidence

8     will show that Ms. Elauf had no damages.  Ms. Elauf lost no

9     wages and no pay because of Abercrombie, and that's because Ms.

10    Elauf got another job that she liked at Forever 21, another

11    store in the Woodland Hills Mall, five days after her interview

12    with Abercrombie.  And so it's undisputed, the government is

13    not even seeking lost pay for Ms. Elauf.  Instead, the

14    government is seeking damages for emotional pain and suffering,

15    but the evidence will show that Ms. Elauf did not suffer those

16    type of damages either.  The evidence will show that, in fact,

17    as counsel said, she moved on with her life.  She never went to

18    see a doctor about any of this, never went to psychologist,

19    never went to a therapist and didn't take any medication.  And

20    I said before, she got another job five days after her

21    interview with Abercrombie.  Five days.  Simply put, the

22    evidence will show that Ms. Elauf suffered no emotional

23    damages.

24          Now the other thing that I want to emphasis here is

25    that this whole thing was caused by bad communication, but not

1    by bad people.  You're not going to hear any evidence that

2    anyone at Abercrombie has malice towards Muslim people.  In

3    fact, Ms. Elauf's best friend, Farisa Sepahvand, is Muslim and

4    worked at the abercrombie store before Ms. Elauf's interviewed

5    and for a long time after Ms. Elauf's interview.

6            You're also not going to hear any evidence that anyone

7    said anything mean to Ms. Elauf.  Ms. Elauf and Ms. Sepahvand

8    were both friendly with Heather Cooke, the person who

9    interviewed Ms. Elauf, before and after the interview.

10           With respect to Mr. Johnson, the evidence will show

11   that he never met Ms. Elauf and was simply responding to the

12   question that Heather Cooke asked, whether she could hire a

13   model wearing a headscarf, which violated the Look Policy.  Mr.

14   Johnson's state of mind was, plain and simple, enforcing the

15   Look Policy and protecting the brand.  These were not bad

16   people.

17           And the evidence will show that Abercrombie's policies

18   aren't bad, either.  As I said earlier, you will hear evidence

19   that Abercrombie has a policy prohibiting religious

20   discrimination, that it trains managers on that policy and that

21   it trains managers to call human resources if anyone ever

22   raises a religious issue.

23           You will also hear evidence that Abercrombie has made

24   exceptions for religious accommodation, including for Muslim

25   employees.

1          At the end of the day, the evidence will show two

2    things.  First, that Ms. Elauf was not damaged.  Second, that

3    all of Abercrombie's actions were taken in good faith and that

4    no decision was made out of malice or reckless disregard for

5    Ms. Elauf's rights.

6          Thank you for your time and your attention.

7          THE COURT:  Thank you, Mr. Knueve.  Ladies and

8    gentlemen, as I told you, I would give you an instruction

9    relative to the taking of notes.  That instruction is as

10   follows.  You may take notes during the presentation of

11   evidence in this case.  In that regard, remember this:

12         Number one, note taking is permitted but is not

13   required.

14         Number two, take notes sparingly.  Do not try to write

15   down all of the testimony.  Notes will only be used for the

16   purposes of refreshing your memory.  Notes are helpful when

17   dealing with measurements, times, distances, identities and

18   relationships.

19         Number three, be brief in your note taking.  You must

20   pass on the credibility of the witnesses and to do so you must

21   observe them.  Do not let note taking distract you from this

22   duty.

23         Number four, your notes are for your private use only.

24   Do not share your notes with any other juror during the

25   presentation of the case.  You may discuss the contents of your

1    notes only after all sides have rested and you have commenced

2    your deliberations.

3           Could I see a show of hands of those jurors who

4    believe they would like to take notes and Mr. Overton will give

5    you both a note pad and a pen or a pencil.

6           Very well, the plaintiff may call its first witness.

7           MS. SEELY:  Plaintiff calls Heather Cooke by video

8    deposition.

9           THE COURT:  Very well.  Ladies and gentlemen, certain

10   witnesses to be presented to you will be presented by video

11   deposition.  You have the monitors in front of you and they

12   will also be, the deposition testimony will be presented to you

13   on this monitor to your left.

14          You are to consider the testimony of such witnesses

15   presented to you by video just as if that witness was

16   testifying before you live, the witness is treated in exactly

17   the same way.  That witness is sworn and is subject to

18   cross-examination by the other side of the lawsuit.

19          You may begin the playing of the deposition.

20          MS. SEELY:  Your Honor, before we begin, plaintiff

21   moves the admission of Plaintiff's Exhibits 1, 2, 4, 5, 6, 7, 8

22   and Defendant's Exhibit 4, which will be referred to in the

23   video deposition of Heather Cooke.

24          THE COURT:  Any objection to any of those exhibits?

25          MR. KNUEVE:  Just a moment, Your Honor.  No objection,

1    Your Honor.

2         THE COURT:  Very well.  Plaintiff's 1, 2, 4, 5, 6, 7,

3    8 and Defendant's Exhibit 4 are admitted.  You may begin.

4                         HEATHER COOKE

5    Called as a witness on behalf of the plaintiff, testified by

6    video deposition as follows:

7    EXAMINATION BY MS SEELY:

8    Q.   Heather, where were you born?

9    A.   In California, Fountain Valley.

10   Q.   Okay.  And what's your date of birth.

11   A.   XXXXXXXX.

12   Q.   And at some point in time, am I correct that you moved to

13   Tulsa, Oklahoma?

14   A.   Yes.

15   Q.   And when was that?

16   A.   November of '07 -- '08 -- '07.  '07.

17   Q.   And why did you move to Tulsa in November of '07?

18   A.   My boyfriend and my father and my sister all lived there

19   so I wanted to be close with them.

20   Q.   And your mother, was she -- where was your mother living

21   at that time?

22   A.   She lived in Aliso Viejo, California.

23   Q.   Had you been living with your mother before you moved to

24   Tulsa?

25   A.   Yes.

1    Q.   And how long did you live in Tulsa?

2    A.   Three and a half years.

3    Q.   And where did you go next?

4    A.   I came back here to Downey, California, where my grandpa

5    lives.

6    Q.   Where did you go to high school?

7    A.   Jenks High School in Jenks, Oklahoma.

8    Q.   Is that near Tulsa?

9    A.   It is very near, it's just like a little suburb of Tulsa.

10   Q.   Okay.  And when did you graduate?

11   A.   In '03.

12   Q.   So you graduated from high school in 2003 and then did you

13   go immediately to college?

14   A.   Yes.

15   Q.   Where did you go to school?

16   A.   I went to Oral Roberts University.

17   Q.   And when did you graduate there?

18   A.   May of '07.

19   Q.   Okay.  Now when you were in high school in the Tulsa area,

20   did you have -- were you employed?

21   A.   Yes.

22   Q.   Where did you work?

23   A.   The first job I worked at was at Mango and Salsa, it was a

24   little boutique store.

25   Q.   Where was that located in Tulsa?

```
 1    A.    It was in Brookside.

 2    Q.    Did you have any other job?

 3    A.    Yes, I was a model/brand rep for Abercrombie & Fitch in

 4    Tulsa.

 5    Q.    And that was when you were in high school?

 6    A.    That was when I was in college.

 7    Q.    Can you remember what years you were model for

 8    Abercrombie?

 9    A.    From '05 to '07.  I was there for two years as a sales

10    associate.

11    Q.    Okay.  And when you were there, were you called a model or

12    a sales associate?

13    A.    We were called models, was our official title.

14    Q.    And the store that you worked at, where was it located?

15    A.    At the Woodland Hills Mall in Tulsa.

16    Q.    Was it the Abercrombie & Fitch Store or the abercrombie

17    kids store?

18    A.    It was the Abercrombie & Fitch Store.

19    Q.    Okay.  And, okay.  Were you a model the whole time you

20    worked there, from 2005 to 2007?

21    A.    Yes.

22    Q.    And then you moved back to California; am I correct?

23    A.    Yes, uh-huh.

24    Q.    When you moved to California, did you continue working for

25    Abercrombie?
```

1    A.   Yes, I was an assistant manager.  I started out as a

2    Manager in Training and then I got promoted to assistant

3    manager after three months.

4    Q.   What store?

5    A.   It was the Abercrombie & Fitch store at Mission Viejo.

6    Q.   Were you a Manager in Training in Tulsa or only when you

7    got to California?

8    A.   Only when I got to California.

9    Q.   And how many months were you in training?

10   A.   Three.

11   Q.   And how long did you work as an assistant manager in the

12   Mission Viejo store?

13   A.   I started there in June and I left there in November.

14   Q.   Of 2007?

15   A.   Yes.

16   Q.   So you moved back to Tulsa?

17   A.   I moved back to Tulsa.

18   Q.   All right.  And when you moved back to Tulsa, did you

19   continue working for Abercrombie?

20   A.   Yes.

21   Q.   What store did you work at?

22   A.   I worked at the abercrombie kids store in the Woodland

23   Hills Mall.

24   Q.   And what was your position, your first position there?

25   A.   Assistant manager.

1    Q.   Can you remember about when you started working there in

2    Woodland Hills?

3    A.   I would say December.

4    Q.   Of 2007?

5    A.   Uh-huh.

6    Q.   And how long did you continue working there?

7    A.   Until February '09, they moved me to the Hollister store,

8    which is the same company, but they just moved me a store.

9    Q.   And that was in February of 2009?

10   A.   Yes.

11   Q.   And was that Hollister store also in Woodland Hills Mall?

12   A.   Yes.

13   Q.   What was your position there?

14   A.   Assistant manager.

15   Q.   And how long did you work as an assistant manager for

16   Hollister?

17   A.   I quit the day, the first of the year, so the first.

18   Q.   January, 2010.  Let's talk about the time period when you

19   were an assistant manager at the abercrombie kids store in

20   Tulsa.  And as I understand it, that was from approximately

21   December of 2007 until February of 2009; correct?

22   A.   Yes.

23   Q.   Okay.  What were your job duties as assistant manager, at

24   that time, in that store?

25   A.   I was in charge of hiring new employees, managing,

1    supervising the floor.  I did audits for the store, like, to

2    make sure all the clothing was out on the floor.  I did some

3    visual stuff.

4    Q.    Okay.  And who was -- who was your store manager, at that

5    time?

6    A.    Andrew Sturm-Hamilton.

7    Q.    And who did you report to, directly?

8    A.    Andrew Sturm-Hamilton and then Randall Johnson was my

9    district manager.

10   Q.    Was Randall Johnson actually located in your store?

11   A.    No.

12   Q.    Did you ever see him in your store?

13   A.    Oh yeah, all the time.

14   Q.    Really.  About how often would he come to the store?

15   A.    Usually, once a week.

16   Q.    Would he spend the whole day there?

17   A.    Yes.

18   Q.    And what interaction did you have with him, generally,

19   when he would be in the store?

20   A.    He would just kind of go over what, you know, the visual

21   displays, staffing goals, just like where the store needed to

22   be, stuff like that.

23   Q.    And was he your district manager the whole time you were

24   the assistant manager there?

25   A.    Yes.

1    Q.   Now, you mentioned -- strike that.  Did you supervise

2    anyone?

3    A.   Besides the associates, like the models, no.

4    Q.   But you did supervise the models?

5    A.   Yes.

6    Q.   All right.  Now you mentioned that one of your duties as

7    assistant manager was, I think you said you were in charge of

8    hiring?

9    A.   Yeah.

10   Q.   Can you tell me, generally, what your duties were with

11   respect to hiring?

12   A.   I would do interviews, I would go recruiting around the

13   mall or colleges or coffee shops, just stuff like that, make

14   sure our staffing goals were good.  I did the schedule,

15   scheduled the associates.  I worked around their schedules at

16   school or whatever, work or whatever they had going on.

17   Q.   Okay.  Now you said that you did the interviews for, would

18   that be for models?

19   A.   Yes.

20   Q.   Did you make the decisions on -- the final decision on

21   whether an applicant for a model position would be hired?

22   A.   If I had a question about something, I was to ask my store

23   manager and then if he didn't know, ask my district manager.

24   Q.   When you say a question about something, what do you mean?

25   A.   Like, if I wasn't sure if this person had enough

1    experience or we have a certain Look Policy that Abercrombie

2    has, I would just ask.

3    Q.   Okay.   Did you have the authority, as assistant manager,

4    to decide to make an offer to an applicant, after you had

5    interviewed him or her?

6    A.   Yeah, I mean -- yes.

7    Q.   Did you have to get an okay from either your store manager

8    or your district manager?

9    A.   I usually had to get the store manager to like, you know,

10   look over the interview guide or sit in on the interview

11   sometimes, like if you didn't have anything like a meeting or

12   something really important to do.

13   Q.   Now you say you usually had to.   I mean, was it your

14   understanding that you could decide to hire somebody after the

15   interview?

16   A.   It was my understanding, but if I had any questions or

17   anything like that, wasn't sure, someone didn't have enough

18   work experience or they, you know, just something about their

19   look or the Look Policy, they were violating the Look Policy, I

20   was to ask.

21   Q.   Did you normally consult or get approval from the district

22   manager on whether or not to hire someone you had interviewed?

23   A.   Umm.

24   Q.   Is that your normal --

25   A.   Usually not, usually not, no.

1   Q.   Were there ever any occasions when you did?

2   A.   Yes.

3   Q.   And what were those occasions?

4   A.   Samantha.

5   Q.   Do you remember any other occasions when you sought advice

6   from your district manager about whether or not to hire an

7   applicant that you had interviewed?

8   A.   I don't -- that's the only time, I think that I can

9   remember at all.

10   Q.   Okay.  We will talk about that in a minute.  Let's -- I

11   want to talk a little bit about abercrombie kids, the store.

12   A.   Uh-huh.

13   Q.   What size clothing did abercrombie kids sell when you were

14   there?

15   A.   Children's, it was like, I think, from size 8 to size 16.

16   Q.   Have you ever heard of a clothing store called Limited

17   Too?

18   A.   Yes.

19   Q.   And was there a Limited Too at the Woodland Hills Mall

20   when you were there?

21   A.   Yes.

22   Q.   And can you tell me what kind of clothing Limited Too

23   sells?

24   A.   It's children's clothing.  My sister actually works for

25   them.  I think they are like the same sizes we have, they carry

1  really bright, like clothing, and kind of fun, funky styles.

2  Like we're a little bit more like --  Abercrombie is more like

3  preppy, I would say, and Limited Too is kind of bright and

4  cheery and kind of funky.

5  Q.   Would you say that Limited Too was a competitor of

6  abercrombie kids?

7  A.   Yeah.

8  Q.   Same kids might look in both stores?

9  A.   Yeah, I saw a lot of kids with the bags that would come

10  in.

11  Q.   So you would see kids coming into Abercrombie that had

12  Limited Too bags in their hands?

13  A.   Yes.

14  Q.   Now you said that you were responsible for interviewing

15  and hiring models for the abercrombie kids store; correct?

16  A.   Yes.

17  Q.   Did you ever see a job description for a model?

18  A.   Yes.

19  Q.   Heather, I'm going to hand you what's been marked Exhibit

20  1.

21  A.   Okay.

22  Q.   And ask you to just look that over and let me know when

23  you are done, see if you have ever seen it before?

24  A.   Yes, I have seen this before.

25  Q.   All right.  Can you tell me what it is?

1    A.   This looks like a job description for a model.

2    Q.   For a model for Abercrombie & Fitch?

3    A.   Yes.

4    Q.   And is this the job description for a model position at

5    the abercrombie kids store when you were there?

6    A.   Yes.

7    Q.   And what -- the task of representing the brand, what does

8    that mean?

9    A.   Like, I would just say like wearing the clothes, the jeans

10   and shirts, like they had certain colors they would like

11   everybody to wear and certain shoes and no jewelry and no

12   piercings and no tattoos that were on the neck or offensive

13   tattoos or something like that, I think they mean by that.

14   Q.   Okay.  And where it says adheres to Abercrombie guidelines

15   in personal appearance, what does that mean?

16   A.   Like guys could -- had to be clean shaven everyday at

17   work, your fingernails couldn't be painted a certain color.

18   They had to be clean, they had to not be -- there's a certain

19   length they had to be, stuff like that.  Even your toes had to

20   be a certain color.  You couldn't have fake nails, just stuff

21   like that.

22   Q.   So am I correct, then, that the models' duties that are

23   outlined in Exhibit 1 were to clean and organize and maintain

24   the store?

25   A.   Yes.

1    Q.    And also to respect and value the diversity of others?

2    A.    Yes.

3    Q.    And also to operate the cash register?

4    A.    Yes.

5    Q.    And to open and close the store?

6    A.    Yes.

7    Q.    To train new models?

8    A.    Yes.

9    Q.    Also to help customers when they come in the store to find

10   sizes?

11   A.    Yes.

12   Q.    And greet them?

13   A.    Yes.

14   Q.    And also to be sure that there is no shoplifting?

15   A.    Yes.

16   Q.    So is it correct that the model at the abercrombie kids

17   store where you worked did more than just stand around and

18   model the clothes?

19   A.    Yes.

20   Q.    Now looking on page 1 of the model job description, under

21   entry requirements?

22   A.    Uh-huh.

23   Q.    The exhibit indicates that there was no educational, no

24   minimum education that a model had to have; is that correct?

25   A.    Yes.

1   Q.   So they didn't have to have graduated from high school?

2   A.   No.

3   Q.   All right.   The next entry requirement listed on page 1 of

4   Exhibit 1 says specialty retail experience and under that it

5   says none is required?

6   A.   That's correct.

7   Q.   Was it your understanding that a model applicant didn't

8   have to of had previous retail experience in order to be hired?

9   A.   Yes.

10  Q.   Now did, in your opinion with respect to your hiring

11  duties, did you find previous retail experience to be helpful?

12  A.   Yes, of course.

13  Q.   And is that something that you liked to see?

14  A.   Yes.

15  Q.   And you considered in making a hiring decision?

16  A.   Yes.

17  Q.   Now we talked about Limited Too, remember?

18  A.   Yes.

19  Q.   And if an applicant for a model position had previous

20  experience as a sales representative at Limited Too, did you

21  think that that was a plus?

22  A.   Yes.

23  Q.   Now, I would like to go over the general hiring process in

24  the abercrombie kids store when you were assistant manager.

25  When an applicant or when someone was interested in getting a

1   job at abercrombie kids, in your store, what was the first

2   thing that he or she would do?

3   A.   They would approach a manager and I would just talk to

4   them about the position.  And then we actually didn't have a

5   hiring kiosk that they could fill out the application.  It was

6   actually upstairs, so they would just go upstairs and fill out

7   the application up there and I would invite them to group

8   interviews, which were twice a week and they would come to the

9   group interview.

10  Q.   Okay.  When you say that after the applicant would

11  approach a manager, they would then fill out an application in

12  the kiosk?

13  A.   Uh-huh.

14  Q.   Is that like a computerized application?

15  A.   Yes.

16  Q.   So generally, anyone that approached you and said I'm

17  interested in a job, you would say go to the kiosk and fill out

18  an application?

19  A.   Yes, yes.

20  Q.   Now you said that you conducted group interviews twice a

21  week?

22  A.   Yes.

23  Q.   And what's a group interview?

24  A.   It was just me and the people that wanted to be hired

25  there.  They would show up and I had a little script that I

```
 1    would usually read from and when I was a Manager in Training, I

 2    sat in on group interviews with the store manager and watched

 3    her do it.  I basically did it exactly how she did it.

 4    Q.   And did you interview more than one applicant at the same

 5    time?

 6    A.   Yes, usually, yes.

 7    Q.   Okay.  If there was only one applicant, would you just

 8    interview that person alone?

 9    A.   Yeah, yes.

10    Q.   I'm going to show you what's been marked Exhibit 2 and ask

11    you to look that over and let me know when you are done.

12    A.   Yes, I remember this.

13    Q.   Okay.  Can you tell me what Exhibit 2 is?

14    A.   It looks like Sam's -- Samantha's application form.

15    Q.   Okay.  Is this a printout, then, of the application that

16    Samantha Elauf filled out on the kiosk?

17    A.   Yes.

18    Q.   And do you remember reviewing this at some point in time?

19    A.   Yes.

20    Q.   Did you review it before you interviewed her?

21    A.   I don't think I did.  I think I reviewed it after.

22    Q.   And when did you review it after you interviewed her?

23    A.   I know I had to go in and like, put on there if I was

24    going to hire her or not hire her, so that's probably when I

25    reviewed it and made sure it was her.
```

```
1    Q.   So you believe you reviewed it before making the decision

2    on what your hiring recommendation would be?

3    A.   Yes.

4    Q.   Okay.  And why did you review it then?

5    A.   I just always look to see if they had other retail

6    experience and she did, and what their jobs were, you know.

7    Q.   Okay.  And according to Exhibit 2, Samantha Elauf's

8    application, she had previous experience working at Limited Too

9    as a sales brand rep; correct?

10   A.   Yes.

11   Q.   And you thought that was a plus at the time?

12   A.   Yes.

13   Q.   Now, when you had the -- when you had the -- conducted the

14   group interviews, did you have a guide or a document that you

15   worked from?

16   A.   Yeah, there was like a Model Group Interview Guidebook

17   that you were supposed to use.

18   Q.   And did you use that when you did hiring interviews?

19   A.   Yes.  Yes.

20   Q.   I'm going to show you what's been marked Exhibit 4 and ask

21   you to look at that to yourself and let me know when you are

22   done.

23   A.   Yes.

24   Q.   What is Exhibit 4?

25   A.   It is the Model Group Interview Guide.
```

1    Q.   And this is the interview guide that you used when you

2    were interviewing applicants for model positions?

3    A.   Yes.

4    Q.   And what topics did you generally discuss with your

5    applicants for model positions?

6    A.   Usually what was on this guide.  Looks like how would your

7    friends and family describe your personality?  What's the

8    strongest characteristics of your personality?  How much time

9    do you like to spend by yourself versus hanging out with

10   others?  I asked them --

11   Q.   You are reading the questions that are contained in the

12   group interview guide; is that right?

13   A.   Yes.

14   Q.   And then on page, the third page of Exhibit 4, which is

15   marked A&F 15, it says instructions to interviewers.  Is this

16   something you read over every time before you conducted an

17   interview?

18   A.   Yes.

19   Q.   At the very top, it says review competency descriptions.

20   As an interviewer, prior to administering the structured

21   interview, you should review competency descriptions.  Do you

22   see that?

23   A.   Where is it?  No. Oh.

24   Q.   Do you see that?

25   A.   Yes.

1    Q.   And then there are three bullet points under there, which

2    I assume are competency descriptions.   One is outgoing and

3    promotes diversity.

4    A.   Yes.

5    Q.   Is that right?   Is that something you were looking for in

6    an applicant?

7    A.   Yes.

8    Q.   And is that something you were supposed to explore with

9    the applicant while you were doing the interview?

10   A.   Yes.

11   Q.   Okay.   And how did you go about figuring out if they

12   promoted diversity?

13   A.   If they knew what the word diversity meant, they could

14   define the word diversity, if they knew what diversity was.

15   Q.   Is that what you were taught to ask them during an

16   interview to determine if they promoted diversity?

17   A.   Yes.

18   Q.   Okay.   And how would you tell if they were outgoing?

19   A.   By like, there was a question on there like how much time

20   do you spend by yourself?   How much time do you spend alone?

21   So if somebody said they were, you know, spent a lot of time

22   with their friends, they were really outgoing and were involved

23   in stuff, like, I figured they were an outgoing person.

24   Q.   Would also try to just tell from watching them during the

25   interview whether they seem to be outgoing?

1    A.    Yeah, the ones that seemed to be really nervous and like

2    very quiet and had like one word answers usually weren't very

3    outgoing.

4    Q.    The next competency that is listed on page 2 of Exhibit 4,

5    is sophistication and aspiration.  Do you see that bullet

6    point?

7    A.    Yes.

8    Q.    How did you determine whether someone was sophisticated

9    during the interview?

10   A.    Like how they dressed at the interview, if they knew,

11   like, anything about the store or if they have ever shopped in

12   there or anything -- I think that's -- that's all I can really

13   remember on that one.

14   Q.    What about aspiration?  What did that mean to you when you

15   are interviewing applications for models?

16   A.    A lot of them, like, if they had, if they were inspired,

17   like, to go maybe be an assistant manager or, you know, be a

18   Manager in Training or if they, you know, were in school and

19   they were getting their degree, because you had to have a

20   degree to be a manager at Abercrombie.  So, you know, if they

21   were working on their degree, that was -- and they would say

22   like oh, yeah, I one day want to be a store manager, like.

23   Q.    So if they had a desire to get ahead?

24   A.    Yeah.

25   Q.    That's what aspiration meant?

1    A.    Uh-huh.

2    Q.    I see.  And then the third bullet point, the third

3    competency that you were looking for in the interviews was

4    appearance and sense of style; correct?

5    A.    Yes.

6    Q.    And how did you evaluate their appearance during the

7    interview?

8    A.    Like if they had something on that was consistent with our

9    brand and they didn't have a bunch of like, piercings, or like

10   really funky colored hair.  If they had really like fake nails

11   is a big thing with girls, because a lot of them have fake

12   nails and they couldn't have them at work, so that was one

13   thing I looked at.

14   Q.    Did you look at their clothing to see if it was either

15   Abercrombie clothing or something that looked like it?

16   A.    Look, yes.

17   Q.    And if they were wearing that kind of clothing, was that a

18   positive?

19   A.    Yes.

20   Q.    And sense of style, how did you evaluate their sense of

21   style during the interview?

22   A.    Like if what they had on was current.  If they, you know,

23   had a, if they had -- if what they had on was like in the store

24   and they were current and, you know, kind of that preppy look

25   is kind of what we had.

```
1    Q.   You were looking for that?

2    A.   Kind of a preppy look.

3    Q.   Okay.  And how did you -- what does the preppy look mean

4    to you?

5    A.   Like jeans and like a Polo shirt or like a woven shirt or

6    something like that, tennis shoes and like a brown belt or

7    something like that.

8    Q.   It sounds like you are describing a male applicant here?

9    A.   Yeah.

10   Q.   What about a female preppy look?

11   A.   I mean, the same thing, I would think jeans, like a Polo

12   seems to be preppy to me.

13   Q.   Okay.  All right.  If you would look, please, at the

14   fourth page of Exhibit 4, it's at the bottom, it says A&F 16.

15   A.   Yes.

16   Q.   There's a big block on the page and it says opening

17   script.  Do you see that?

18   A.   Yes.

19   Q.   And I think you said you read some kind of script when you

20   did an interview, a group interview?

21   A.   Yes, uh-huh.

22   Q.   Is this the script that you read?

23   A.   Yes.

24   Q.   Did you read all of it every time you did a group

25   interview?
```

1    A.   I mean, sometimes we like a little bit deviated,

2    especially like if there's just one person.  You know, we just

3    tell them about the position.  I usually told them how I got to

4    where I was, and that, you know, you could be a store manager

5    at some time if you wanted to and...  I can't say that I read

6    this every single time.

7    Q.   And at the top of this page, it says choose one question

8    from each group.  Tell me how you, you know, how you worked

9    with these questions during the interview?

10   A.   I usually read from group A, questions one and two and

11   then I usually read from group B, question one.

12   Q.   Okay.  Any particular reason or that was just your habit?

13   A.   That was just kind of my habit.

14   Q.   And on group B questions, you said you usually asked the

15   first question, which is what is your definition of diversity?

16   Is diversity important in the workplace?  Why, or why not?  Is

17   that correct?

18   A.   Yes, yes.

19   Q.   And why did you ask about diversity?

20   A.   I don't know.  That's just what we did in the first

21   interview that I sat in on.

22   Q.   That's what you were trained to do?

23   A.   That's what I was trained to do is just ask that question.

24   Q.   And was there a right answer to that?

25   A.   Usually, if somebody actually knew what diversity was and

1    they could semi-explain it, that was good.  I had a lot of them

2    that didn't know what that word meant.

3    Q.   And what was your definition of diversity at that time?

4    A.   I'm trying to think of what, at my time.  Anybody that,

5    you know, is different or from a different culture or different

6    background.  And why was it important in the workplace, like

7    because we're all different, we are a melting pot and just to

8    be respectful of everyone's background is kind of what I

9    thought.

10   Q.   Now, underneath the -- in the column for group A questions

11   and group B questions, there are blank squares.  Would you

12   normally write the answers that the applicants gave, in there?

13   A.   Yes.

14   Q.   Summarize them?

15   A.   Summarize them.

16   Q.   Now if you would look, please, at page -- at A&F 19, there

17   are columns, but it's headed sophistication and aspiration;

18   right?

19   A.   Yes.

20   Q.   That's one of the competencies we previously discussed?

21   A.   Uh-huh.

22   Q.   One of the things you were supposed to evaluate?

23   A.   Yes.

24   Q.   Okay.  And what questions did you normally ask under

25   sophistication and aspiration?

1    A.   I would ask, on group A, I would usually ask one and two

2    and then on group B, I would ask one and two.

3    Q.   And then you would write the answers down or summarize the

4    answers?

5    A.   Yes.

6    Q.   On Exhibit 4.

7    A.   Yes.

8    Q.   At the top it says Section 4, Closing the Interview.  Does

9    this contain the information about ending the interview?

10   A.   Yes.

11   Q.   Okay.  And there's a big block on the page and it says

12   "closing statement", parenthesis "read to candidates" close

13   parenthesis.  Did you always read everything in this block or

14   this closing statement at your group interviews?

15   A.   Yes.

16   Q.   There is a section in the closing statement that says Look

17   Policy.  Do you see that?

18   A.   Yeah I do.

19   Q.   And do you remember, did you always read that entire

20   section on the Look Policy during your group interview?

21   A.   Yes.

22   Q.   You did?

23   A.   Yes.

24   Q.   Now, is there anything written in the Look Policy section

25   on page 21 in Exhibit 4, that says anything about head

1    coverings?

2    A.   I do not see anything.

3    Q.   Okay.  And is there anything in the section entitled Look

4    Policy on page 21 of Exhibit 4 that says anything about not

5    being able to wear the color black if you work at Abercrombie?

6    A.   I don't see it, no.

7    Q.   So the section on the Look Policy that you read during

8    your closing statements in your group interviews did not say

9    that models cannot wear anything on their head; correct?

10         Exhibit 4, at the top, it says section five, interview

11   evaluation standards.

12   A.   Yes.

13   Q.   Can you tell me what this page, what's on this page and

14   what did you use this page for?

15   A.   We just used this as like a grading scale on how they

16   answered.  You know, I just used this as my grading scale.

17   Q.   Okay.  So, in other words, for outgoing and promotes

18   diversity, the section at the top of the page, this section

19   tells you based upon your evaluation of the -- or strike that.

20   Based upon your observations of the applicant, you would assign

21   them either a three, a two or a one in this competency,

22   outgoing and promotes diversity?

23   A.   Yes.

24   Q.   And then you would do the same for the competency,

25   sophistication and aspiration?

1    A.   Yes.

2    Q.   And on the next page, page 23 of Exhibit 4, would you also

3    assign either a one, two or three to the applicant on

4    appearance and sense of style competency?

5    A.   Yes.

6    Q.   And the next page of Exhibit 4, page 24, what is this?

7    This says interview rating sheet.  Can you tell me what you

8    used this for?

9    A.   Whatever you scored them, you would put, you know, put the

10   candidate's name and then you would put your score and then you

11   would tally it up and then it would tell you down here on the

12   little score if you were going to -- if they meet

13   recommendations or below recommendations, not recommended or

14   highly recommended.

15   Q.   Okay.  So you would, on the left-hand column, you would

16   write, under candidate name, you would put their name?

17   A.   Yes.

18   Q.   And then you would give them either a one, two or three in

19   the three competencies --

20   A.   Yes.

21   Q.   -- that are listed there?

22   A.   Yes.

23   Q.   And you'd total it up under total store?

24   A.   Yes.

25   Q.   And then under hiring recommendation, would you -- how

1   would you decide whether or not your recommendation was going

2   to be highly recommend, recommend or not recommend?

3   A.   Just based on what your score was here, you added it up

4   and if it came out in the -- at these levels, you would choose

5   from one of these and mark an X in the recommended or highly

6   recommended or not recommended.

7   Q.   Okay.  Under the block at the bottom of the page, it says

8   hiring recommendation on the left and then on the right, there

9   are the scores.  Do you see that?

10  A.   Yes.

11  Q.   And at the very bottom of that block, it says if you gave

12  an applicant a one in appearance, then according to the block

13  on the left, they were below expectations and were not

14  recommended for hire; is that correct?

15  A.   Yes.

16  Q.   And did you follow that routinely?

17  A.   Yes.

18  Q.   And then once you'd filled out these model group interview

19  guides, what did you do with them?

20  A.   They were in the office.

21  Q.   Did they get kept or sent somewhere?

22  A.   They -- after you had so many of them, the store manager

23  would put them in an HR form and send them to home office.

24  Q.   Do you know Samantha Elauf?

25  A.   I do, yes.

1   Q.   How do you know here?

2   A.   Her friend, Farisa, worked at the store and it was

3   approaching our tax-free weekend, where you don't pay tax on

4   any clothing and so we were going to be really, really busy and

5   our staffing goals went up quite a bit and I needed a lot of

6   employees very fast.

7   Q.   Okay.  And what did Farisa have to do with Samantha?

8   A.   I think she's best friends with her and she had approached

9   me and said I have a friend, Sam, who wants to come do an

10  interview.  What day should she come?  And I told her to come.

11  I told her she needed to fill out an application, to go

12  upstairs and fill it out.  And...

13  Q.   Had you ever met Samantha before?  I mean, did you know

14  who Samantha was at the time that Farisa spoke to you about

15  her?

16  A.   I -- she had worked in the mall, I think at like a little

17  fondue place and I had seen her.  I knew she was friends with

18  Farisa because Farisa worked quite often, so I knew who she

19  was.

20  Q.   But you had seen her at the mall before?

21  A.   I had see her, uh-huh, at the fruit fondue place.

22  Q.   Yeah.  Had you seen her once or more than once?

23  A.   I would say more than once, yeah.

24  Q.   And when you saw her, was she wearing a headscarf?

25  A.   Yes.

1    Q.   Did you have any opinion when you saw her in the mall, as
2    to her appearance?
3    A.   I thought she was very pretty.
4    Q.   So when Farisa spoke to you, did you remember who she was?
5    A.   Yeah, uh-huh.
6    Q.   Did Farisa say anything to you at that time about Samantha
7    wearing a headscarf?
8    A.   No.
9    Q.   But you knew that she did?
10   A.   I did, yes.
11   Q.   And you assumed if she worked at Abercrombie, she would
12   still be wearing that?
13   A.   Yes, I did.
14   Q.   And you told Farisa have her go and fill out an
15   application on the kiosk?
16   A.   Yes.
17   Q.   So what is the next thing that happened with respect to --
18   strike that.  Do you know if Samantha filled out an application
19   on the kiosk?
20   A.   Yes, I do.
21   Q.   How do you know that?
22   A.   From this piece of paper, the application form.  This is
23   what she filled out.
24   Q.   Okay.  So you are pointing to what's been marked Exhibit
25   2?

```
 1    A.    Oh, Exhibit 2, sorry.

 2    Q.    Okay.

 3    A.    Yes.

 4    Q.    And you looked, did you see that Exhibit 2 on the computer

 5    in your abercrombie kids store?

 6    A.    Yes.

 7    Q.    And did you interview Samantha Elauf for a job as a model?

 8    A.    Yes, I did.

 9    Q.    And did you have a Model Group Interview Guide with you at

10    that time?

11    A.    Yes, I did.

12    Q.    That you filled out?

13    A.    Yes.

14    Q.    Heather, I'm going to give you what's been marked Exhibit

15    5.

16    A.    Okay.

17    Q.    I'd ask you to take a look through that and let me know

18    when you are done.

19    A.    Okay.

20    Q.    What is that document?

21    A.    It is a group interview with Samantha.

22    Q.    So this is the Model Group Interview Guide that you filled

23    out for Samantha Elauf?

24    A.    Yes.

25    Q.    And looking at page 2 of Exhibit 5, which is A&F 8?
```

1    A.   Yes.

2    Q.   Does that refresh your recollection as to whether Samantha

3    was the only applicant you interviewed at that time?

4    A.   Yes, she was.

5    Q.   Okay.  Now just to go back a minute and make sure that we

6    are all talking about the same person, I'm going to show you

7    what's been marked Exhibit 6 and 7.  Heather, are Exhibit 6 and

8    7 photographs of Samantha Elauf?

9    A.   Yes.

10   Q.   Okay.  So you remember what she looked like?

11   A.   Oh, yeah.

12   Q.   Okay.  And in Exhibit 6 and 7, she's wearing a headscarf;

13   is that right?

14   A.   Yes, she is.

15   Q.   And do you recall if this was the type of headscarf she

16   was wearing when you interviewed her?

17   A.   Yes, I think this was.

18   Q.   Okay.  Now, when you -- you said you had seen her around

19   the mall before you interviewed her; correct?

20   A.   Yes.

21   Q.   And she was wearing a headscarf at that time?

22   A.   Yes.

23   Q.   And what did her wearing a headscarf signify to you, if

24   anything?

25   A.   That she was Muslim.  I figured that there was a religious

1    reason why she wore her headscarf, she's Muslim.

2    Q.   ... this guide; correct?

3    A.   Yes, I was.

4    Q.   So at the time Samantha came for the interview, you

5    assumed she was Muslim; correct?

6    A.   That's, yes, I assumed.

7    Q.   Because she wore the headscarf?

8    A.   Yes.

9    Q.   All right.  Now, do you remember anything in particular

10   that you discussed with Samantha during her interview, other

11   than the questions that are on the Model Group Interview Guide?

12   A.   I think, I know I mentioned like, that this was going to

13   be a really busy time and the tax free was coming, you know,

14   and that I needed as many people.  You know, it was going to be

15   really hectic and, you know, the three days that we had tax

16   free was just going to be really hectic and I explained to her

17   like, what I assumed was going to happen, because I had never

18   been through one.  But I think I talked to her about that,

19   that, you know, it was going to be really busy.

20   Q.   And you asked her the questions that are contained on the

21   Model Group Interview Guide; correct?

22   A.   Yes, yes.

23   Q.   Do you remember anything else that you discussed with her

24   during the interview?

25   A.   I think no, not anything, I mean, this.  I don't think

1    anything else I talked to her about.

2    Q.   Okay.  Did you discuss the fact that she wore a headscarf

3    during that interview?

4    A.   No.

5    Q.   And do you remember if the headscarf she was wearing at

6    that time was black or some other color?

7    A.   I think it was black.

8    Q.   Did you discuss with her the fact that she could not wear

9    black if she was hired as a model?

10   A.   No.

11   Q.   Did you, at that time, feel that she should not be able to

12   work as a model at abercrombie kids because she was wearing the

13   headscarf?

14   A.   No, I did not feel.  I felt like she could.  I didn't feel

15   like there was anything wrong with it.  But I knew that in, not

16   in this, but in the employee handbook, it does say that we're

17   not supposed to wear the color black.  But they had just said

18   that we could wear black Converse tennis shoes, so I was a

19   little unclear.  And I think it says in the handbook you can't

20   wear hats, so I was unclear, you know.  That's why, I was an

21   assistant manager and that's why I asked the store manager and

22   the district manager.

23   Q.   Why didn't you say to Samantha, you know, the Look Policy

24   requires no -- you know, you can't wear anything on your head.

25   Why didn't you bring that up with her if you knew that the

1    handbook said that was against the Look Policy?

2    A.   Because it was in the handbook and it wasn't in this.   I

3    was told just to follow this.

4    Q.   By this, you mean the Model Group Interview Guide?

5    A.   Yeah, the Group Interview Guide.

6    Q.   So you were sticking to the script?

7    A.   I was just sticking to the script, that's what most people

8    do, so that's what my store manager did.

9    Q.   On Exhibit 5, Samantha's Model Group Interview Guide, on

10   page, the third page.  Not the third page, sorry.  Do you

11   remember reading the opening script, as you sit today, to

12   Samantha?

13   A.   Yes.

14   Q.   And then on the page after that, and it says at the bottom

15   A&F 1996?

16   A.   Yes.

17   Q.   Is that your handwriting, under outgoing and promotes

18   diversity under the group A questions and the group B

19   questions?

20   A.   Yes, it looks like it.

21   Q.   So, did you write, basically, a summary of Samantha's

22   answers to your questions on page 1996?

23   A.   Yes.

24   Q.   Okay.  And under -- when you asked her the question what

25   is your definition of diversity, do you think she gave a good

1    answer?

2    A.   Yeah, she -- it looks like she said something about the

3    different types of people come from different backgrounds, just

4    different people.

5    Q.   And if you could look over at the last page of Exhibit 5,

6    which is A&F 1997?

7    A.   Yes.

8    Q.   Okay.  Is that your hand writing on this interview rating

9    sheet?

10   A.   Yes.

11   Q.   And is this the interview rating sheet that you filled out

12   for Samantha Elauf after your interview was over?

13   A.   I do not believe this is the actual one that I filled out.

14   I believe this is one that I printed out later on and was told

15   what to score her.

16   Q.   Okay.  Well, let's talk about that.  So at the conclusion

17   of your interview with Samantha, am I correct that you filled

18   out an interview rating sheet?

19   A.   Yes.

20   Q.   Okay.  And do you recall -- under the column outgoing and

21   promotes diversity, there's a number two written there?

22   A.   Yes.

23   Q.   Do you recall if that was the score you originally gave

24   her?

25   A.   Yes, I believe it is.

1    Q.   And under the column headed sophistication and aspiration,

2    there's a two written in that column; correct?

3    A.   Yes.

4    Q.   Is that the score you originally gave here?

5    A.   Yes, I believe so.

6    Q.   And under the column headed appearance and sense of style,

7    there's a number one written there; correct?

8    A.   Yes.

9    Q.   Is that the number or the rating that you gave her

10   originally?

11   A.   I think I gave her a two.

12   Q.   Okay.

13   A.   But I'm not sure, but I think I gave her a two.

14   Q.   Did you give her a one, originally?

15   A.   No.

16   Q.   Might you have given her a three?

17   A.   No, I'm pretty sure.  Somebody had to be really, really

18   good as a three.  I mean, I hardly ever gave threes.  I'm

19   pretty sure on most of them, I gave twos.

20   Q.   But you know as you sit here today that you did not give

21   her a one, originally?

22   A.   I do not believe I gave her a one on my own.

23   Q.   And then there's a total score written five; is that

24   correct?

25   A.   Yes.

1    Q.   Okay.  Now if you had given her a two under appearance and

2    sense of style, is it fair to say that the total score that you

3    originally gave her was a six?

4    A.   Six, yes.

5    Q.   Is that correct?

6    A.   Yes.

7    Q.   Okay.  And then under hiring recommendation, there's an X

8    in the column headed not recommended; is that right?

9    A.   Yes.

10   Q.   Was that your original recommendation?

11   A.   No.  It was recommended was my original.

12   Q.   Okay.  And so after you filled out your original interview

13   rating sheet, what happened next in terms of the decision on

14   whether or not to hire Samantha Elauf?

15   A.   I was unsure about the headscarf so I asked the store

16   manager and he did not know anything about it.  And so I asked

17   the district manager and -- Randall Johnson, and he told me not

18   to hire her because she had a headscarf and that we were not

19   allowed to wear hats at work and if she wore the headscarf,

20   then other associates would think they could wear hats at work.

21   Q.   And did you discuss it with him and sort of -- did you

22   have any discussion with him over this?

23   A.   Yes, I did.  I thought she was a very good candidate to

24   work here and I asked him, you know, she wears the headscarf

25   for religious reasons, I believe.  And he said you still can't

1    hire her because someone could come in and paint themselves

2    green and say they are doing it for religious reasons and we

3    can't hire them.  And I told him that I believed that she was

4    Muslim and that that was a recognized religion and that she was

5    wearing it for religious reasons and I believed we should hire

6    her.

7    Q.   And what did he say?

8    A.   He told me not to hire her.

9    Q.   And I take it you specifically -- you remember that he

10   said someone could paint themselves green and claim it was a

11   religion?

12   A.   Yes.

13   Q.   That stuck in your head?

14   A.   It did, yes.

15   Q.   Okay.

16   A.   Very much.

17   Q.   Now, did he make any -- and this is Randall Johnson we are

18   talking about; correct?

19   A.   Yes.

20   Q.   Your district manager?

21   A.   Yes.

22   Q.   Did you tell him during this discussion anything about her

23   appearance, your view of her appearance?

24   A.   I told him that she wore a black headscarf and that she

25   was very pretty.  From what I recall, I remember that she did

1    have like an Abercrombie & Fitch, like, T-shirt on, I think a

2    paper of jeans.  And I thought she would be a really good

3    candidate to work there and I told him that, that I thought

4    that we should hire her.

5    Q.   Do you remember if he made any remarks, any disparaging

6    remarks about her headscarf?

7    A.   No.

8    Q.   After Randall Johnson told you that you could not hire

9    Samantha, what happened next?

10   A.   Nothing.  I only called candidates that I was going to

11   hire.  I told them at the end of the interview, kind of treat

12   this as a casting call.  We will call you, don't call us, and I

13   just never had any contact with her, Samantha.

14   Q.   About hiring her?

15   A.   About hiring her.

16   Q.   Now, at some point in time, did Farisa talk to you about

17   whether or not Samantha was to be hired?

18   A.   Yes.

19   Q.   And when did that occur, relative to the interview?

20   A.   A couple of days, a week, a week later.  She asked like,

21   are you going to hire my friend and I told her no, that I was

22   not going to.

23   Q.   Did you tell her why?

24   A.   I told her I couldn't discuss anything in the interview

25   but I just I was not going to hire her.

```
1    Q.   Did you tell Farisa that it had anything to do with the

2    fact that she was wearing a headscarf?

3    A.   No.

4    Q.   Did Farisa ask you if it had to do with her wearing a

5    headscarf?

6    A.   Yes.

7    Q.   What, as best you can recall, did Farisa say to you?

8    A.   She said is it something -- why aren't you going to hire

9    her, she's really good.  She's like my best friend.  You know,

10   she seemed very upset.  And I just said I can't hire her and I

11   can't talk to you about anything that goes on in the interview

12   and interview questions or anything like that.  I'm just not

13   going to hire her.

14   Q.   Did Farisa mention her headscarf, Samantha's headscarf?

15   A.   Yeah.

16   Q.   What did she say about it?

17   A.   She was like are you not going to hire her because of her

18   headscarf, and I said no.  I was just told I couldn't hire

19   because of the headscarf.  I did tell her that.

20   Q.   Okay.  So you told Farisa that you could not hire -- that

21   you were told you couldn't hire her because of the headscarf?

22   A.   And I said I really can't discuss this any more, because I

23   don't want to get in trouble or fired or lose my job over

24   something like this and I really can't talk to you about any

25   more of this.
```

1    Q.   Now, when you told Farisa that you couldn't say anything

2    more because you didn't want to get in trouble or get fired,

3    why did you say that?

4    A.   I had a feeling this was going to be a problem.  I wanted

5    to hire her, I thought that she would be a good candidate to

6    come work for us.  I had a feeling this was going to be a

7    problem.  Like, I thought this was wrong.  I just, I didn't

8    like it and that's why I figured that there was going to be a

9    problem.

10   Q.   Now, you said that you thought that the Abercrombie's

11   refusal to hire Samantha because of her headscarf was wrong?

12   A.   Yes, I did.

13   Q.   Why did you think it was wrong?

14   A.   I just -- I thought she was a good candidate.  I thought

15   she could -- you know, I just thought that she would be good

16   working there.  I didn't see anything wrong with the headscarf.

17   She was a very pretty girl, she had a lot of -- she was excited

18   to come work there, she had retail experience.  Like, I just

19   thought she would have been a good employee to work with, too.

20   Like, you know.

21   Q.   And the clothes that you had seen her in, did they appear

22   to be the kind of clothes that Abercrombie sold?

23   A.   Yes, she had an Abercrombie & Fitch T-shirt on at the

24   interview, so I figured...

25   Q.   And you had seen her at other times and she appeared to

```
1    sort of fit the Abercrombie & Fitch clothing brand?

2    A.   Yes, uh-huh.

3    Q.   Now did you ever talk to Samantha after the interview,

4    again?

5    A.   I know like she said hello to me and would wave at me, and

6    ask me how my day was, because, I guess she got a job at

7    Forever 21, which was a store that I frequently went in.  So I

8    would see her and she would say hi, Heather, and I would say

9    hi, Sam, you know, how are you?  Just casual conversation.

10   Q.   Did you talk with any of the other managers at the store

11   about the situation, after the decision had been made not to

12   hire her?

13   A.   I know I told Andrew and Kalen that, like, I thought we

14   should hire her and I thought this might be a problem at one

15   point.

16   Q.   Now, do you recall ever hearing or knowing -- strike that.

17        Now you said that you said a couple of times that you

18   thought Samantha was a good candidate to work at Abercrombie as

19   a model; correct?

20   A.   Yes.

21   Q.   And why did you think that?  What was it about her that

22   made you think that?

23   A.   She was excited to -- like she was excited about the

24   company and the brand.  She had retail experience.  She just

25   seemed like a good person to work there.  Like, we had a lot of
```

1    problems with, like, we have tag lines up in the front room and

2    they had to say things within a certain amount of time and some

3    of them were embarrassed to talk to customers and I figured she

4    would, you know, she was outgoing, I figured that she would say

5    the tag lines.  And I know we would get secret shopped and if

6    we had a bad secret shop, it was usually based on somebody

7    didn't say a tag line.  And so I figured that I could put her

8    up there and she would say the tag line or she would help

9    customers, because, you know, she worked in retail.  So I

10   figured that she would be really good.

11   Q.   Going back to Exhibit 5, the Model Group Interview Guide

12   that you filled out for Samantha.

13   A.   Yes.

14   Q.   You testified that you originally filled out an interview

15   rating sheet that was different than the one that is in Exhibit

16   5; is that correct?

17   A.   Yes.

18   Q.   So how is it -- when did you fill out the interview rating

19   sheet that is in Exhibit 5, which is numbered A&F 1997?

20   A.   When my district manager, Randall Johnson, told me not to

21   hire her and he told me to give her a one on appearance, so

22   then her score would be a five, instead of six and I would not

23   hire her.

24   Q.   So he gave you those instructions and then you went and

25   filled out a new interview rating sheet?

```
1    A.   Yes.

2    Q.   And that's the interview rating sheet that's in front of

3    us now?

4    A.   Yes.

5    Q.   Which is number A&F 1997?

6    A.   Yes.

7    Q.   What happened to the original interview rating sheet that

8    you filled out?

9    A.   It was thrown away.

10   Q.   Did you throw it away?

11   A.   Yes.

12   Q.   Why did you throw it away?  Did someone tell you to do

13   that.

14   A.   Well, he told me to make sure that she was not hired.  So,

15   I mean, I couldn't put it on the back of it, so I just threw it

16   away.

17   Q.   Now, I want to take you back to your interview with

18   Samantha Elauf.

19   A.   Yes.

20   Q.   And I think you testified that she was wearing a

21   Abercrombie & Fitch T-shirt when you interviewed her?

22   A.   Yes.

23   Q.   Okay.  And she was wearing a headscarf similar to the one

24   that we looked at in Exhibit.

25   A.   6.
```

1    Q.    6, yes.  Okay.  6 and 7.  Now, at the time you interviewed

2    her, did you think she was attractive?

3    A.    Yes, very pretty.

4    Q.    Did you think she was stylish?

5    A.    Yes.

6    Q.    Did you think she appeared to be happy?

7    A.    Yes.

8    Q.    Did she appear to you to be a fun person?

9    A.    Yes.

10   Q.    Did she appear to you to be confident?

11   A.    Yes.

12   Q.    Why did she appear diverse to you?

13   A.    She -- well, I mean, the headscarf, she's a little bit,

14   like, darker complected.  You know, that's all I noticed, that

15   she was diverse.

16   Q.    Are we on 8?  I think we're on 8; right?  Okay, Heather,

17   I'm going to hand you what's been marked Exhibit 8 and ask you

18   to take a look at that and let me know if you can identify it.

19   Is Exhibit 8 the employee handbook that was in effect when you

20   were the assistant manager at the abercrombie kids store in

21   Tulsa?

22   A.    I believe so.

23   Q.    Okay.  Would you please look at page 29 of Exhibit 8.  The

24   page number of the book is 29.  It's also marked A&F 53.  Can

25   you see that?

1    A.   Uh-huh.

2    Q.   And up towards the top, there is a heading that says

3    Appearance/Look Policy?

4    A.   Yes.

5    Q.   Do you see that?  Okay.  And about halfway down the page

6    it says A&F Look Policy Guidelines.  Do you see that?

7    A.   Yes.

8    Q.   And it goes over on to the next page, page 30 and on page

9    30, there's actually, the second paragraph says caps.

10   A.   Uh-huh.

11   Q.   Do you see that?  Caps, even -- and it reads "Caps.  Even

12   though Abercrombie & Fitch sells caps, they are considered too

13   informal for the image we project.  Caps are not allowed to be

14   worn on the sales floor."  Did I read that correctly?

15   A.   Yes.

16   Q.   Now, the Look Policy that is set forth on page 29 and 30

17   of Exhibit 8, it doesn't say anything, does it, about no

18   headwear, other than caps is allowed?

19   A.   No, it doesn't.

20   Q.   Now I believe you testified that Randall Johnson, the

21   district manager, told you that you could not hire Samantha

22   because she wore a headscarf; is that correct?

23   A.   Yes.  Yes.

24   Q.   And to your knowledge, was there any other reason why

25   Samantha Elauf was not hired as a model?

```
 1   A.   Not that I -- not to my knowledge.

 2   Q.   Mr. Johnson didn't give you any other reason?

 3   A.   No.

 4   Q.   Why you couldn't hire her?

 5   A.   No.

 6   Q.   And no other manager ever told you any other reason why

 7   she wasn't hired?

 8   A.   No.

 9   Q.   Now you talked a little bit at the beginning of our

10   conversation here today about going through a training program

11   to be a manager?

12   A.   Yes.

13   Q.   Do you remember how long that was?

14   A.   Three months.

15   Q.   And how did that work?  Were you -- everyday, you would

16   come to work and cover some new topic or how did they train you

17   to be a manager?

18   A.   I would just kind of follow, for the first, I think,

19   couple of months or the first month, I would kind of follow the

20   store manager and go through what she did for the day.  I would

21   have different things that they would teach me.  And I know

22   when I started, we didn't have like an MIT, a Manager in

23   Training, like, booklet that they would follow, but I guess

24   they made one and then they would have them go through the

25   book.  But I wasn't really -- we didn't have that, so I just, I
```

1   think it was up to the store manager how she wanted to train

2   you.  That's how it went, I mean.

3   Q.   Do you remember having any, you said -- well, strike that.

4   I'm going to show you what's been marked Exhibit 11 and ask you

5   to just look through that on your own and let me know when you

6   are done.

7   A.   Okay.

8   Q.   Have you ever seen Exhibit 11 before?

9   A.   I have never seen this before.

10  Q.   I'll represent to you that this document is entitled a

11  management training program for Abercrombie & Fitch and it was

12  provided to the EEOC by Abercrombie during this litigation.

13  And it's dated, it says R-E-V, which I think stands for

14  revised, 6/14/2002.  But it's your testimony that you never

15  received a copy of this booklet?

16  A.   I might have received a copy of this, but I don't recall

17  ever going through this training process of like, checking any

18  of this off or going through this with my store manager, ever.

19  Q.   Okay.

20  A.   I don't know if I -- I may have received it in my handbook

21  and just never saw it, but I don't ever recall going through

22  any of this, like week one, week two, ever.

23  Q.   All right.  And each -- it appears from this Exhibit 11

24  that at the bottom of every page, the Manager in Training is

25  supposed to sign off and date it?

1   A.   Yeah.  Yes.

2   Q.   And you don't remember ever doing that?

3   A.   I do not remember ever doing this.

4   Q.   Now, when you were a Manager in Training, what training

5   did you have in terms of hiring, how to perform your hiring

6   duties?

7   A.   I sat in on an interview with the store manager a couple

8   of times and that's basically it.  I mean, I didn't get a lot

9   of training in it, to be really honest.

10  Q.   Okay.  All right.  Do you remember when you were a Manager

11  in Training, having any -- taking any online training courses,

12  you know, like on the computer?

13  A.   I might have.  I'm not sure.  I know they had training on

14  the computer that we would have to complete.  I'm not sure if a

15  hiring one was done.  I don't know.  But I know they did have

16  some training.  But I don't know if hiring was one of the...

17  Q.   Do you remember anything -- do you remember a phrase

18  called a People Selection Program?  Does that mean anything to

19  you?

20  A.   That sounds maybe like something, maybe, that I did.

21  Q.   Now, did you ever receive, at any time when you worked for

22  Abercrombie & Fitch, in any of your jobs, did you ever receive

23  any training, any diversity training, any training where the

24  topic of the training was diversity and the importance of it?

25  A.   I don't believe so.  I know I did a sexual harassment

1    training that I went to, but I don't remember a diversity

2    training, if we had one.  We might have, but I really don't

3    know, I can't recall.

4    Q.   Do you recall at any time when you worked for Abercrombie

5    & Fitch, having any training on discrimination in employment?

6    A.   I don't recall anything about it.

7    Q.   Do you remember ever having training while you worked for

8    Abercrombie & Fitch on religious discrimination?

9    A.   No, I do not.

10   Q.   Do you remember at any time while you worked for

11   Abercrombie & Fitch having any training in religious

12   accommodation?

13   A.   No.

14   EXAMINATION BY MR. CLARK:

15   Q.   Were you also responsible for making sure the models were

16   within compliance with the Look Policy?

17   A.   Yes, I was.

18   Q.   Was that a big part of your job?

19   A.   Yes.

20   Q.   How often would you say, in your time as an assistant

21   manager at the abercrombie kids store, would you have a model

22   come into work, in some way deviate from the Look Policy?

23   A.   Quite often.  Like, I would have to send them home, they

24   would have to change if they weren't in Look Policy.

25   Q.   Okay.  So on some instances they would be sent home?

1    A.   Yes.

2    Q.   And told to come back in compliance?

3    A.   Yes.

4    Q.   And in other instances, they would be allowed to change

5    what they were wearing?

6    A.   Yes.  And like if they weren't shaved, they would have to

7    go in the bathroom and shave with the razor and the shaving

8    cream.

9    Q.   In the interview itself, you had no discussion with Ms.

10    Elauf regarding her headscarf?

11    A.   No.

12    Q.   And you had -- there was no discussion in the interview

13    with Ms. Elauf regarding her religion?

14    A.   No.

15    Q.   Are you friends with Farisa?

16    A.   Yes.

17    Q.   When is the last time you spoke with her?

18    A.   She sent me a text message, asked me for my address and I

19    gave it to her.

20    Q.   Okay.  When was that?

21    A.   A couple of weeks ago.

22    Q.   Did she tell you why she was asking for your address?

23    A.   No.  I assumed why she was, about this.  I assumed I was

24    going to get subpoenaed and they needed my address to subpoena

25    me.

1  Q.   Okay.  Why did you assume that?

2  A.   Because I know this was an ongoing thing and I know it

3  wasn't resolved and I got an e-mail from an Abercrombie lawyer

4  that said I was going to get subpoenaed so that's why I pretty

5  much knew that that's why she wanted my address.

6  Q.   Okay.  And you gave it to her?

7  A.   Yes, I did.

8  Q.   Are you -- as an assistant manager, were you permitted to

9  talk about hiring decisions with models?

10  A.   No.

11  Q.   Just so I'm clear then, you never spoke to Farisa or to

12  Samantha Elauf about the headscarf being an issue in her

13  interview?

14  A.   No, I did not talk to them about this.  There was a lot of

15  talk around the store and this was a big deal and everybody was

16  talking about it and I refused to talk about any of it because

17  I did not want to get fired.

18  EXAMINATION BY MS. SEELY:

19  Q.   You were asked on cross-examination if you had to send

20  models home because they weren't in compliance with the Look

21  Policy?

22  A.   Yes.

23  Q.   And you said yes?

24  A.   Yes.

25  Q.   And other than having to send male models home or in the

1    back room to shave, do you recall any other reasons why you had

2    to send models home at abercrombie kids?

3    A.   I was sent home, personally, like myself, by my district

4    manager because I had too much makeup on.

5    Q.   What about something to do with the clothes.  Did you ever

6    have people come in with the wrong clothes on?

7    A.   I got sent home because I had Abercrombie & Fitch jeans on

8    instead of Hollister, when I worked at Hollister, so I was sent

9    home for that.  On the same day, I had too much makeup on and I

10   had the wrong jeans on, so.

11   Q.   Bad day for you?

12   A.   It was a bad day, yes.

13   Q.   Can you think of any other reason why you had to send

14   models home?

15   A.   Again, with prom, like they would come in the day after

16   and their hair would be in this big updo and they'd have

17   sparkles in it and like, a crazy updo and it wasn't a natural.

18   They liked you to look very natural and I'd have to send them

19   home and tell them, you know, you can't have your hair up in

20   that huge prom updo.

21   Q.   Now I want to make sure that I understand your testimony

22   because I, like Mr. Clark, was a little confused.  When Farisa

23   came to you and said are you going to hire my friend and you

24   said no, I'm not, and she said did it have to do with her

25   headscarf, I thought on direct examination, when I was asking

1   the questions that you said that you indicated to her that yes,

2   it did have to do with the headscarf?

3   A.   I think she had an idea that that was why we didn't hire

4   her and she was upset and I think she wanted to know if I was

5   the reason, that I didn't -- like because of me, that I didn't

6   hire her because of her headscarf.  Like, I think she was upset

7   with me and she thought that like, I had not hired her because

8   of her headscarf and that's when I told her like, I really

9   can't talk about this.  Like, you know, there was a lot of

10  conversation and it was quite a long time ago and I really...

11  I may have told her that, you know, it was Randall that didn't

12  want to hire her friend or something like that, because it was

13  -- I didn't want -- I think she was under the -- that I was the

14  one who didn't hire her, because I was the people manager and I

15  didn't hire her friend and...

16  Q.   Did you, in any way, affirm her belief that she wasn't

17  hired because of her headscarf, Samantha wasn't hired because

18  of her headscarf?

19  A.   I don't think I -- I mean, if I did, I didn't mean to.  I

20  think she already had that assumption before she talked to me.

21  I think she was very upset about it.

22  Q.   And was it your impression that when that conversation

23  ended, that she still believed that either you or Randall, if

24  you told her Randall, had made that decision because of

25  Samantha's headscarf?

1    A.   Yes, I think that's, yes.

2    Q.   And that was the truth; correct?

3    A.   Yes.

4    Q.   Is anything that you have testified to here today not

5    true?

6    A.   No, it's all true.

7              (Videotape deposition ends.)

8              THE COURT:  Does plaintiff wish to take a break.  Let

9    me ask the jury, first.  Any need to take a short recess?  This

10   would normally be the time where we would take a midafternoon

11   recess.  Anybody care to?  All right.  Well, we see one

12   affirmative response.  Let's take our recess, we'll take about

13   a 15 minute recess.  The jury will recall our usual

14   instructions during breaks and recesses.  We are in a short

15   recess.

16             (Recess).

17             THE COURT:  Be seated, please.  The plaintiff may call

18   its next witness.

19             MR. LEE:  The plaintiff calls Farisa Sepahvand.

20             THE COURT:  Farisa, if you would state your full name

21   for the jury, please.

22             THE WITNESS:  It is Farisa Sepahvand.

23             THE COURT:  Mr. Lee, you may inquire.

24             MR. LEE:  Thank you.

25                        FARISA SEPAHVAND

1    Called as a witness on behalf of the plaintiff, being first

2    duly sworn, testified as follows:

3                          DIRECT EXAMINATION

4    BY MR. LEE:

5    Q.   Farisa, I just want to take you back in time to 2007,

6    2008.  Where were you living back then?

7    A.   I was currently living at 41st and Mingo, XXXX XXXXX XXXXX

8    XXXX XXXXXXX XXXXX.

9    Q.   Okay.  Are you a little bit nervous today?

10   A.   Yes.

11   Q.   At that time, how old were you?

12   A.   I was 17 at the time.

13   Q.   And were you living at home?

14   A.   Yes, I was.

15   Q.   And that was with your parents?

16   A.   Yes, I was living with my parents.

17   Q.   Okay.  And back in 2007, were you going to high school?

18   A.   Yes, I was.

19   Q.   What high school was that?

20   A.   Union High School.

21   Q.   And did you graduate from high school?

22   A.   Yes, I did.

23   Q.   Okay.  What year did you get out?

24   A.   May 2008.

25   Q.   Is that the same high school that Samantha went to?

```
 1    A.   Yes, it was.

 2    Q.   How long have you known Samantha Elauf?

 3    A.   I've known here for about five years.

 4    Q.   How did you come to know Ms. Elauf?

 5    A.   We met each other in chemistry class, in the 10th grade.

 6    Q.   What?

 7    A.   In chemistry.

 8    Q.   I didn't mean to act surprised that you'd actually took

 9    chemistry or anything.  Sorry.  So is it fair to say that

10    you-all are friends?

11    A.   Yes, we are very close friends.

12    Q.   Okay at some point in time in high school, did you go to

13    work for Abercrombie?

14    A.   Yes, I did.

15    Q.   And which store did you go to work for?

16    A.   I went to abercrombie & kids at Woodland Hills Mall.

17    Q.   And do you remember about when that was?

18    A.   Yes, it was on the first floor of Woodland Hills Mall on --

19    71st and Memorial?

20    Q.   That's right.  Do you remember when that was?

21    A.   Oh, sorry.  I applied at the end of September of 2007,

22    from what I remember.

23    Q.   Can you describe to the jury the process you went through

24    to get hired at abercrombie kids?

25    A.   Basically, I just went in and I asked for a job and I got
```

1    hired on the spot.

2    Q.   Who did you -- who did you talk to about getting a job

3    there?

4    A.   I talked to Andrew Sturm-Hamilton.

5    Q.   And what did you know his title to be?

6    A.   He was just a regular manager at the time.

7    Q.   And so did you have to fill out any type of paperwork to

8    get the job?

9    A.   Yes, the next day I went in for orientation and that's

10   when he had me fill out the paperwork.

11   Q.   Before he hired you, did you fill out any type of

12   application with Abercrombie?

13   A.   Yes, he had told me to go upstairs to Abercrombie & Fitch,

14   the adult store, and there's like a little kiosk in the back

15   and to apply on the computer screen back there and that I

16   should come in the next morning for orientation.

17   Q.   Okay.  So did Mr. Sturm-Hamilton, did he conduct any type

18   of interview with you where you went through a series of

19   questions?

20   A.   No, he did not.

21   Q.   And during the time that you were talking to him about

22   being hired, did he describe what your job duties were going to

23   be?

24        MR. KNUEVE:  Objection, Your Honor, relevance.

25        THE COURT:  Response?

1          MR. LEE:  I think it's relevant as to what she was

2     actually doing at the time and we're dealing with the

3     application process.

4          THE COURT:  Oh, as opposed to the impact versus --

5          MR. LEE:  The model position, and I was going to get

6     into the --

7          THE COURT:  Overruled.  Go ahead.

8          THE WITNESS:  Could you repeat the question again?

9     Q.   (By Mr. Lee)  When you were talking to Mr. Sturm-Hamilton,

10    did he describe what you were going to be doing at the store,

11    what your job description was going to be?

12    A.   No, he did not.

13    Q.   Did he tell you what your title was going to be?

14    A.   Just the brand representative model.

15    Q.   Okay.  Did he refer to it as a brand representative or was

16    it a model?

17    A.   They referred to it as a model.

18    Q.   Okay.  And so it's my understanding that your orientation

19    was the very next day?

20    A.   Yes, it was.

21    Q.   And do you recall any type of documents that you completed

22    during that orientation?

23    A.   Just the paperwork, the hire-on employee paperwork.

24    Q.   And during that time, did anybody go over any of the

25    company policies with you during that orientation?

1   A.   I'm pretty sure Andrew just briefly went over, just, you

2   know, for instance what we could wear.  We could wear plain

3   clothing that resembled the Abercrombie style.  Obviously, we

4   couldn't wear Hollister, because it was considered as a

5   competitor, but it didn't necessarily have to have the

6   Abercrombie label on it.

7   Q.   Did he emphasis or did he ever mention that there was a

8   dress code called the Look Policy?

9   A.   Yes.

10   Q.   Okay.  And is that what you were just describing to me was

11   the dress code or the Look Policy?

12   A.   Yes.

13   Q.   Do you recall about how many people took part in the

14   orientation with you.

15   A.   I was the only person.

16   Q.   And so within a day, you were hired as a model.  What

17   actually ended up being your job duties in that model position?

18   A.   Customer service, greeting guests, folding clothes, doing

19   go-backs, cashiering, pretty much, that's it.

20   Q.   So you weren't just standing in the store modeling

21   clothes?

22   A.   No.

23   Q.   And while you were working at Abercrombie at the Woodland

24   Hills Mall store was Samantha also working at the mall?

25   A.   Yes, she was.

1    Q.   Do you know where she was working at that time?

2    A.   She was working at Limited Too.

3    Q.   And did Samantha ever come by the store while you were

4    working at Abercrombie?

5    A.   Yes, she would come pretty often, sometimes during my

6    breaks or just when she was at the mall, shopping.

7    Q.   And when she visited the store, did she ever get a chance

8    to meet any of your co-workers or managers?

9    A.   They never personally met, it's just they all knew who she

10   was because she would come in during my breaks, you know, a

11   familiar face, so.

12   Q.   Okay.  And in 2008, who were your managers at the

13   abercrombie kids store?

14   A.   They were Heather Cooke, Kalen McJilton, Whitney Procter

15   and Andrew Sturm-Hamilton.

16   Q.   And were they all the same level of managers?

17   A.   No, they were not.  At that time, Andrew was our store

18   manager, Heather was the hiring manager and other two, one of

19   them did, like, visual and the other one, I don't remember.

20   Q.   And did you ever -- let me strike that.  So at some point

21   in time, did you ever talk to Samantha about coming to work for

22   abercrombie kids?

23   A.   Yes, I had talked to her.  She had just left Limited Too

24   and I told her that she should come and apply at abercrombie

25   kids, just because they hire everyone.

1    Q.   And what year was that?

2    A.   It was the summer of 2008.

3    Q.   At that time, were you aware of any job openings at the

4    store?

5    A.   Yes, there's always job openings.

6    Q.   Okay.  And at that time, when Samantha expressed an

7    interest in coming to work there, did you go talk to any of

8    your managers about Samantha wanting to work there?

9    A.   I had briefly brought up --

10             MR. KNUEVE:  Objection, Your Honor, hearsay.

11             THE COURT:  The question is whether or not she talked

12   to any of the managers.  That's a yes or no answer.  You can't

13   talk about what the substance was, but yes or no, did you in

14   fact?

15             THE WITNESS:  Yes.

16             THE COURT:  Very well.  The objection is overruled.

17   Go ahead, Mr. Lee.

18   Q.   (By Mr. Lee)  And who did you talk to?

19   A.   I had talked to Kalen McJilton.

20   Q.   And what did he say?

21             MR. KNUEVE:  Objection, Your Honor, hearsay.

22             THE COURT:  Sustained.  That's hearsay.

23             THE WITNESS:  I had briefly --

24             THE COURT:  I'm sorry.  That's sustained.  If I

25   sustain the objection, the jury can't hear the answer.  Go

1    ahead, Mr. Lee.

2    Q.   (By Mr. Lee)  Okay.  And did you explain to, did you talk

3    to Samantha about what she would then needed to do to come

4    apply at Abercrombie?

5    A.   I just told her that she couldn't wear black.

6    Q.   Okay.  Did you at least tell her she needed to come fill

7    out an application?

8    A.   Yes.

9    Q.   All right.  What else did you tell her about going to work

10   for Abercrombie?

11   A.   I just told her that it was a pretty easy job and

12   basically, that black was against the Look Policy, which she

13   already knew that.

14   Q.   And is that the -- did you ever tell Samantha that

15   Abercrombie's dress code did not allow headscarves?

16   A.   No, I did not.

17   Q.   And why not?

18   A.   Because I didn't think that was an issue.

19   Q.   And why didn't you think that that was an issue?

20   A.   During --

21          MR. KNUEVE:  Objection, Your Honor, speculation.

22          THE COURT:  It's what's in her mind.  Overruled.  You

23   may answer.

24   Q.   (By Mr. Lee)  You can answer.

25   A.   Could you say the question one more time?

1    Q.   Why did you not think that Samantha wearing of a headscarf

2    would be a problem in going to work for Abercrombie?

3    A.   Because during the interview process they ask you the

4    definition of diversity.

5    Q.   Okay.  And did you talk to Samantha about going to work

6    there and still wearing a headscarf?

7    A.   No, I had not.

8    Q.   Okay.  And did you think she would have a good chance of

9    getting hired at Abercrombie in the summer, 2008?

10            MR. KNUEVE:  Objection, Your Honor, relevance.

11            THE COURT:  Overruled.

12            THE WITNESS:  Yes, I did.

13   Q.   (By Mr. Lee)  And why was that?

14   A.   She was over-qualified.  She had worked at Limited Too for

15   over a year and they loved her.

16   Q.   And do you know, at some point in time, did Samantha

17   actually go in and apply for a job at Abercrombie?

18   A.   Yes, she did.

19   Q.   And do you know if she got interviewed by Abercrombie?

20   A.   Yes, I know she did.

21   Q.   Did you give her any hints on what to do during the

22   interview with Abercrombie?

23   A.   I told her to know the definition of diversity, because

24   that's their main question that they asked.

25   Q.   Okay.  Did you tell her what to wear during the interview?

```
1    A.   Not that I remember.

2    Q.   And after the interview, did you talk to Samantha on how

3    it went?

4    A.   Yes, I think I briefly may have talked to her over the

5    phone and she said it was pretty easy.  It was simple.

6    Q.   Did she call you or you call her?

7    A.   I do not remember that.

8    Q.   Okay.  So what was the next step that -- as far as

9    Samantha being hired, do you know, after she did the interview?

10   A.   The next step that I knew about was that they would call

11   her and that they would tell her when to come in for

12   orientation.

13   Q.   Is that what Samantha told you?

14   A.   No, that's just what I knew from every, like, previous

15   employees getting hired on.

16   Q.   And after Samantha's interview, did you talk to -- did

17   Samantha ever talk to you about that she hasn't heard from

18   Abercrombie in awhile?

19   A.   Yes, she brought it up about a week, maybe a week later.

20   Q.   Okay.  And what did she say?

21   A.   She just asked as to what happened with that and why they

22   hadn't called her yet.

23   Q.   Okay.  Did she ask you to do anything for her?

24   A.   No, she didn't.  I just said that I would ask one of the

25   managers myself as to what was going on with that.
```

```
 1    Q.   And did you do that?

 2    A.   Yes, I did.

 3    Q.   Who did you talk to?

 4    A.   I had talked to Heather Cooke about it.

 5    Q.   Okay.  And what did Heather say?

 6              MR. KNUEVE:  Objection, Your Honor, hearsay.

 7              THE COURT:  Sustained.

 8              MR. LEE:  Your Honor, may I make a record on that?

 9              THE COURT:  You may?

10              MR. LEE:  Do we just approach?

11              THE COURT:  Just give me the exception.

12              MR. LEE:  It's just an admission against party

13    interest.  Heather Cooke was the interviewing manager of

14    Samantha and she also binds the store because she's the one

15    that had the hiring decision.

16              THE COURT:  All right.  Any response to the exception?

17              MR. KNUEVE:  Your Honor, it's hearsay and we've

18    already heard directly from Ms. Cooke, her testimony about what

19    was said.

20              MR. LEE:  Well, this is in rebuttal to what Ms. Cooke

21    has said.  This is from Farisa.

22              THE COURT:  This is a matter in controversy.  The

23    objection is overruled.  You may answer.

24              THE WITNESS:  I had asked her about Samantha and why

25    she hadn't been hired yet or had gotten a call.  And at first,
```

1    she said I don't know, but then later on she said that

2    basically she had talked to Randall Johnson, who was our

3    district manager at the time.  And she had mentioned the fact

4    that she wore a headscarf and he said that she couldn't ask

5    questions like that.  And then she said well, what if she wears

6    a white headscarf and that he had told her you can't answer

7    questions or you can't ask me questions like that, was his

8    response to her.

9    Q.    (By Mr. Lee)  Okay.  And after that, did you talk to

10   Samantha about what Heather had said?

11   A.    Yes, I did.

12   Q.    What did you tell her?

13   A.    I had told her basically that everyone at work wanted her

14   to work there and that they all really liked her and that

15   Heather believed that she was over-qualified for the job, but

16   it wasn't her decision, ultimately and that it was Randall's.

17   Q.    Okay.

18   A.    And basically, she didn't get hired because of her

19   headscarf.

20   Q.    What did she say to that?

21   A.    She was angry and she said that that was messed up and I

22   agreed with her.

23   Q.    Did she act any different after not getting the job at

24   Abercrombie?

25   A.    She was just, I mean, she was angry about it, but there

```
 1   was nothing she could do about it.

 2   Q.   Did she stay angry?

 3   A.   No, she did not.

 4   Q.   And at the time, did Samantha ever talk to you about if

 5   she felt the not being hired was fair or not?

 6   A.   She had mentioned it wasn't fair and obviously, I knew

 7   that too.  I mean, I agreed with her.

 8              MR. LEE:  I'll tender the witness, Your Honor.

 9              THE COURT:  Cross-examination.  Mr. Clark.

10              MR. CLARK:  Thank you, Your Honor.

11                       CROSS-EXAMINATION

12   BY MR. CLARK:

13   Q.   Ms. Sepahvand, we met, as you'll recall, in March of this

14   year when I took your deposition.  My name is Dan Clark.  I'm

15   one of the attorneys representing Abercrombie in this case.  I

16   want to ask you a couple of questions about some of the topics

17   you just covered and some of the issues we talked about at your

18   deposition.  I think you mentioned that September 2007 was when

19   you were hired by abercrombie kids; is that correct?

20   A.   Yes.

21   Q.   And you got that job because your parents wanted you to

22   get a job and you liked being in the mall; is that right?

23   A.   Yes.

24   Q.   You were hired for the model position?

25   A.   Yes, I was.
```

```
 1   Q.   And you are also Muslim; is that correct?

 2   A.   Yes.

 3   Q.   Now, when you were hired, you were told about the Look

 4   Policy that Abercrombie had?

 5   A.   Yes.

 6   Q.   All right.  And you were told that you should not wear

 7   black, the color black?

 8   A.   Yes.

 9   Q.   And you were told that you needed to dress consistent with

10   the Abercrombie style?

11   A.   Yes.

12   Q.   You were told you need to have a very natural appearance?

13   A.   Yes.

14   Q.   And you also knew that diversity was a part of the

15   Abercrombie's standard interview process?

16   A.   Yes.

17   Q.   Now, I believe you also testified in an answer you gave to

18   Mr. Lee that you filled out some paperwork that the manager

19   asked you to fill out on a computer.  Do you remember that?

20   A.   Yes.

21   Q.   If you could take a look hopefully at the screen in front

22   of you and take a look at what's been marked as Exhibit 7?

23   A.   There's nothing on the screen.

24   Q.   Try again.

25              THE CLERK:  Defendant's 7?
```

```
 1                 MR. CLARK:  This is Defendant's Exhibits 7.

 2                 THE COURT:  Has it been admitted?

 3                 MR. CLARK:  I'm asking her to identify it.  Do you

 4      want her to use the binder?

 5                 THE COURT:  You don't have anything on the screen

 6      there in front of you?

 7                 THE WITNESS:  No.  Well, it disappeared now.

 8                 MR. CLARK:  Would you like her to go through the

 9      binder first?

10                 THE CLERK:  No.  You shouldn't show it to the jury

11      until it's admitted.  They have got a monitor.  If it shows up

12      on that monitor, it shows up on the jury's monitor.  I don't

13      have a way to shut it down.

14                 MR. CLARK:  May I approach the witness, Your Honor?

15                 THE COURT:  You may.

16                 MR. CLARK:  We have a paper copy.

17      Q.   (By Mr. Clark)  Ms. Sepahvand, if you could take a look at

18      the document that's been marked as Defendant's Exhibit 7.  Do

19      you recognize this document?

20      A.   Yes.

21      Q.   What is this document?

22      A.   It is the appearance Look Policy acknowledgement.

23      Q.   And is this the Look Policy document that you completed at

24      the time you applied at abercrombie kids?

25      A.   Yes, from what I remember.
```

```
 1              MR. CLARK:  Your Honor, I would move the admission of

 2    Defendant's Exhibit 7 into evidence?

 3              THE COURT:  Any objection?

 4              MR. LEE:  Objection as to relevance, Your Honor.

 5              THE COURT:  Overruled.  Defendant's 7 is admitted.

 6    Q.   (By Mr. Clark)  Now, Ms. Sepahvand, if you could then turn

 7    in the binder in front of you to the document that's been

 8    marked as Defendant's Exhibit 6.  And do you recognize this

 9    document from September 2007, when you applied at abercrombie

10    kids?

11    A.   Yes, from what I remember.

12    Q.   And what is this document?

13    A.   It is the acknowledgment of equal employment opportunity

14    policies and reporting requirements.

15              MR. CLARK:  Your Honor, I would move the admission of

16    Defendant's Exhibit 6 into evidence.

17              THE COURT:  Any objection?

18              MR. LEE:  I object, Your Honor, to relevance and it's

19    not the entire document.

20              THE COURT:  All right.  Let me take a look at Exhibit

21    6.  What of the completeness objection?

22              MR. CLARK:  I believe this is the complete, this is

23    Exhibit 6.  It's one page.

24              THE COURT:  All right.  And I take it, Mr. Lee, you're

25    talking about the actual policies?
```

1          MR. LEE:  The entire policy, Your Honor.

2          THE COURT:  All right.  We talked about some aspects

3     of that policy.  If you will approach, please.

4          (Counsel approached the bench and the following

5     proceedings were had out of the hearing of the jury.)

6          THE COURT:  Is this the policy that we talked about

7     redacting aspects of it?

8          MR. KNUEVE:  No, Your Honor.

9          MR. CLARK:  This is simply the acknowledgement the

10    witness completed upon her hire.  This is not -- we are

11    offering only this with this witness.

12         MR. KNUEVE:  There are two separate documents, Your

13    Honor.  There is this acknowledgement and then there's the

14    handbook.  This acknowledgement is a complete document.  The

15    handbook, which contains the full policy, is Exhibit, I believe

16    it's Exhibit 1.

17         THE COURT:  All right, I think this is relevant to the

18    punitive damages aspect.

19         (Counsel returned to their respective places and the

20    following proceedings were had within the presence and hearing

21    of the jury.)

22         THE COURT:  The objection is overruled.  Defendant's

23    Exhibit 6 is admitted.

24    Q.   (By Mr. Clark)  Ms. Sepahvand, so based upon Defendant's

25    Exhibit 6, you would agree that you were informed of

1   Abercrombie's equal employment policies at the time that you

2   were hired in September 2007; is that correct?

3   A.   Yes, from what I remember.

4   Q.   And you, if you look at the middle of the first paragraph

5   of Exhibit 6, do you see the sentence that is bold.  It starts

6   "I understand that if I receive a complaint about or observe

7   anything that may violate the EEO policy, discrimination,

8   harassment or respect policies, it is my responsibility to

9   immediately report the suspected violation or allegations to

10  human resources"?

11  A.   Yes.

12  Q.   Do you recall that?

13       MR. LEE:  Your Honor, we're going to object.  That's

14  outside the scope of direct.

15       THE COURT:  Overruled.

16  Q.   (By Mr. Clark)  You never called human resources to report

17  any concerns about Abercrombie's treatment of Ms. Elauf.  Is

18  that correct?

19  A.   Yes.

20  Q.   You did not call?

21  A.   No, I did not.

22  Q.   Now, Ms. Elauf, I think you described her to me in your

23  deposition as your best friend; is that correct?

24  A.   Yes.

25  Q.   I think you testified you met in 10th grade?

1    A.   Yes.

2    Q.   Now, you talked to her before her interview and told her

3    to apply.  And I believe your testimony on direct, in response

4    to a question from Mr. Lee, was that at the time you spoke to

5    her before the interview, she already knew that there was a

6    Look Policy at Abercrombie; is that correct?

7    A.   Yes.

8    Q.   And you believe she knew that because she was in the store

9    all the time and familiar with how the store employees dressed;

10   correct?

11   A.   Yes.

12   Q.   Now, before her interview with Ms. Cooke, you specifically

13   told Ms. Elauf don't wear a black headscarf; correct?

14   A.   I honestly don't recall.

15         MR. CLARK:   Your Honor, may I approach the witness?

16         THE COURT:   You may, sir.

17         MR. CLARK:   Your Honor, I have a copy for the Court of

18   this witness' deposition.

19         THE COURT:   Please.

20   Q.   (By Mr. Clark)   If you could take the deposition

21   transcript that I've handed to you and turn to page 33.  Let me

22   know when you have found it.

23   A.   I found it.

24   Q.   And if you could specifically direct your attention to

25   line 15, my question to you:  "So the only specific instruction

1    you gave her was don't wear black?"  Your answer, "yes".  My

2    question.  "Did you talk to her about the headscarf?"  Your

3    answer, "Yes".  Question.  "What did you say?"  "Don't wear a

4    black headscarf."

5         Does that refresh your recollection as to your

6    conversation with Ms. Elauf before her interview?

7    A.   No.

8    Q.   Okay.

9    A.   I know that I told you that, but I don't remember it.

10   Q.   Are employees at the abercrombie kids store permitted to

11   wear black?

12   A.   No, they are not permitted to.

13   Q.   Do you know why not?

14   A.   It is against the Look Policy.

15   Q.   And you never had any problems, yourself, with Heather

16   Cooke as a manager; is that correct?

17   A.   No, I did not.

18   Q.   And you never spoke with Randall Johnson, your district

19   manager; is that correct?

20   A.   No, I had not.

21   Q.   Now a week after Ms. Elauf applied, you spoke to Heather

22   Cooke to ask what was going on with the application; correct?

23   A.   Yes.

24   Q.   Now you told -- after your conversation with Heather, you

25   went back and told Ms. Elauf that she wasn't going to be hired

1    and that her headscarf had played a role in that; correct?

2    A.   Yes.

3    Q.   After you told, shared that information with her, Ms.

4    Elauf didn't ask any questions, did she?

5    A.   No, she did not.

6    Q.   She didn't ask you to get any more information, did she?

7    A.   No, she did not.

8    Q.   She didn't ask you to call human resources?

9    A.   No, she did not.

10   Q.   Now you and Ms. Elauf were in the mall about a month after

11   the interview and you ran into Heather Cooke again; is that

12   correct?

13   A.   Yes.

14   Q.   Okay.  And in that meeting, there were no discussions of

15   the details of why Ms. Elauf wasn't hired; correct?

16   A.   No, there was not.

17   Q.   Heather was a friend of yours; correct?

18   A.   Yes.

19   Q.   Heather remains a friend of yours; correct?

20   A.   Yes.

21   Q.   Now after those conversations, you spoke to Ms. Elauf and

22   she told you that her mother had encouraged her to pursue

23   litigation in response to not being hired by Abercrombie?

24         MR. LEE:  Objection, Your Honor.  That's definitely

25   outside the scope of cross -- or direct.

1    THE COURT:  Sustained.

2    Q.   (By Mr. Clark)  Now you continued to work at Abercrombie

3    after Ms. Elauf wasn't hired; correct?

4    A.   Yes.

5    Q.   You didn't quit in response to your friend not being

6    hired?

7    A.   No, I did not.

8    MR. CLARK:  I don't have any additional questions.

9    Thank you.

10    THE COURT:  Redirect.

11                      REDIRECT EXAMINATION

12    BY MR. LEE:

13    Q.   Ms. Sepahvand, at the time that Ms. Elauf was applying,

14    she never became an employee, subject to the EEO policies of

15    Abercrombie; is that right?

16    A.   Yes.

17    MR. LEE:  I don't have any further questions.

18    THE COURT:  Recross?

19    MR. CLARK:  No, Your Honor.

20    THE COURT:  Very well, you may step down.  Now, may

21    this witness be excused or is she expected to be called in the

22    defendant's case?

23    MR. CLARK:  We do not.

24    THE COURT:  Very well.  You may be excused.  The

25    plaintiff may call its next witness.

1        MS. SEELY:  We would call Randall Johnson by video

2   deposition.

3        THE COURT:  Very well.  Ladies and gentlemen, once

4   again, the next witness is to be called via video deposition.

5   Once again, the witness has been sworn and is subject to

6   cross-examination and you should consider the testimony of this

7   witness as if the individual were before you live.  You may

8   begin.

9                        RANDALL JOHNSON

10  Called as a witness on behalf of the plaintiff, being

11  previously sworn, testified by video deposition as follows:

12  EXAMINATION BY MR. LEE:

13  Q.   All right.  If we could go into a little bit of your work

14  history.  Well, let me just back up.  At some point in time in

15  your life, did you work for Abercrombie & Fitch?

16  A.   Yes, sir.

17  Q.   When did you start working there?

18  A.   September 2001.

19  Q.   Which Abercrombie & Fitch did you go to work for?

20  A.   I started as an MIT in Lubbock, Texas.

21  Q.   And prior to going to work for Abercrombie & Fitch in

22  2001, had you been employed anywhere else?

23  A.   No.  I worked as -- for Abercrombie & Fitch as a brand

24  rep, as well, at the same time, so...

25  Q.   A brand rep?

1    A.    And then got promoted to MIT.

2    Q.    Mr. Johnson, we're talking about so you first became a

3    brand rep; is that correct?

4    A.    Yes, sir.  Which is now referred to as models.  They

5    renamed it.

6    Q.    Let's go through your history briefly with Abercrombie &

7    Fitch.  So I have you hired in September 2001 as a brand rep.

8    Were you also hired into the Manager in Training program at the

9    very same time?

10   A.    No, it was like six months after that, so.

11   Q.    So you were a brand rep for six months and then you went

12   into the Manager in Training program?

13   A.    Uh-huh.

14   Q.    And that is a yes?

15   A.    Yes, I'm sorry.

16   Q.    And how long did you train under the Manager in Training

17   program?

18   A.    It's a four month -- three month, three to four month

19   program.

20   Q.    And then what was your next -- I'm assuming you then

21   became a --

22   A.    An assistant.

23   Q.    Assistant what?

24   A.    Just assistant manager.

25   Q.    Just assistant manager.  And what store was that at?

```
 1    A.   Lubbock.

 2    Q.   And is there only one Abercrombie & Fitch store in

 3    Lubbock?

 4    A.   Yes.  They also have a kids and a Hollister there.

 5    Q.   And your whole experience as a brand rep, MIT and

 6    assistant manger was at the Abercrombie & Fitch store?

 7    A.   Yes, sir.

 8    Q.   Did you ever have any cross training over at Hollister or

 9    the abercrombie kids store?

10    A.   Yes, sir.

11    Q.   And do you know about what year you became assistant

12    manager?

13    A.   Yes, 2001, still.

14    Q.   And how long did you work for -- as assistant manager in

15    the Lubbock store?

16    A.   I was there for two years as an assistant, one year as a

17    store manager.

18    Q.   And so how long were you a store manager in the Lubbock

19    store?

20    A.   About a year, year and a half.

21    Q.   And where did you go from there?

22    A.   To San Antonio, to the North Star Mall.

23    Q.   And when you transferred there, what was your position

24    down in San Antonio?

25    A.   Assistant store manager of men's.
```

1    Q.   So you were transferring as a store manager down to become

2    an assistant store manager in San Antonio; is that correct?

3    A.   Yes, it's same equivalent as store manager, but they're

4    just called store managers, I guess.

5    Q.   Was the pay equivalent or did you get a raise?

6    A.   I got a raise.

7    Q.   So in San Antonio, you were assistant store manager for

8    how long?

9    A.   For about a year.

10   Q.   And then what was your next step with Abercrombie & Fitch?

11   A.   I was promoted to the new store or opened a new store at

12   Lacantera, Abercrombie & Fitch.

13   Q.   I'm sorry.  You opened a new store and then what?

14   A.   Lacantera.

15   Q.   What's that?

16   A.   It's a mall that opened in San Antonio.

17   Q.   Oh, okay.  And what was your position with that store?

18   A.   Store manager.

19   Q.   Was that also viewed as a promotion?

20   A.   Yes, sir.

21   Q.   And how long were you the store manager at that --

22   A.   For a year.

23   Q.   And then where did you go from there?

24   A.   Back to North Star as the GM.

25   Q.   So I take it the North Star store is broken down a little

1    bit different than some of the stores in Oklahoma; is that

2    correct?

3    A.   Yes, sir.

4    Q.   So let me just see if I can sum this up.  The North Star

5    store in, abercrombie store in the San Antonio mall had a

6    general manager over the whole store; is that correct?

7    A.   Yes, sir.

8    Q.   And then who would be the store manager position?

9    A.   There are two store managers.  There was a manager of

10   men's, manager of women's and then we both had two assistants

11   underneath us and they had two MITs underneath them.

12   Q.   And how long did you serve as a general manager?

13   A.   For a year and a half.

14   Q.   And then where did you go from there?

15   A.   I got promoted to district manager in Oklahoma.

16   Q.   And what year would that have been?

17   A.   I want to say it was 2006 or '7, somewhere in there.

18   Q.   And where was your home office when you were promoted to

19   district manager in Oklahoma?

20   A.   Columbus, Ohio is my home office, but my home store was

21   Penn Square Mall.

22   Q.   So the district managers for these different regions for

23   Abercrombie would have a home store to have their office in?

24   A.   Yes, sir.

25   Q.   And would that have been -- as a district manager for

1  Abercrombie & Fitch, would that have been -- would Heidi Elliot

2  have been your direct supervisor?

3  A.   No, sir.  Eric Hoffman was.

4  Q.   And what was his position?

5  A.   Regional manager.

6  Q.   So if Mr. Hoffman was your immediate supervisor, do you

7  recall who Mr. Hoffman's supervisor was?

8  A.   Chad Moorefield.

9  Q.   And is that Mr. Moorefield, he's the director of stores?

10 A.   Yes, sir.  Of the Midwest region.

11 Q.   And just briefly, how long did you -- how long were you a

12 district manager with Abercrombie & Fitch?

13 A.   About a year and a half.

14 Q.   Are you still with Abercrombie & Fitch?

15 A.   No, sir.

16 Q.   When did you leave Abercrombie & Fitch?

17 A.   '08.

18 Q.   And why did you leave Abercrombie & Fitch?

19 A.   I was laid off, downsizing the company.

20 Q.   And who laid you off?

21 A.   Eric Hoffman.

22 Q.   Do you know about what month that would have been in 2008?

23 A.   I want to say May, but I'm not sure.

24 Q.   Maybe let me see if I can refresh your memory a little

25 bit.  Do you recall --

1    A.   Or it might have been 2009.  I can't -- dates are

2    confusing.

3    Q.   That's fine.  I'll put it, I'll try to put it in a

4    timeline perspective.  It's been the testimony in this case

5    that Samantha Elauf actually applied for an Abercrombie & Fitch

6    or position with abercrombie kids in June of 2008.  Does that

7    help your recollection?

8    A.   Okay.

9    Q.   Can you tell me then when you, does that help you refresh

10   your recollection as to when you might have left Abercrombie's?

11   A.   So, I mean, then I was a district manager until 2009.

12   Q.   And do you still think it was -- May was the month?

13   A.   Yeah, May was the month.

14   Q.   So I have, it looks like we've testified that you began

15   working in 2001 and then ended your employment with Abercrombie

16   & Fitch in 2009; is that correct?

17   A.   Yes, sir, nine years.

18   Q.   And as a district manager in Oklahoma, can you just give

19   me a brief description of what your job duties were?

20   A.   Just to supervise.  I had seven stores, I supervised and

21   maintained the company standard and made sure everything was

22   running day-to-day basis and just hiring and firing managers

23   and made sure that they run basic programs.

24   Q.   And do you recall, in order to become a district manager,

25   what training that you had?

1   A.   Training?  I mean just work experience, working through

2   the stores, running basic programs from MIT level all the way

3   up to general manager.

4   Q.   So as a district manager, you had authority to hire and

5   fire employees; is that correct?

6   A.   Yeah -- yes, sir.

7   Q.   You kind of hesitated.  Why don't you explain that for me,

8   then.

9   A.   Well, I mean, we didn't do the actual hiring in the store,

10  because I worked at about seven stores, every store has about a

11  hundred employees, so I can't hire and fire a hundred employees

12  in seven different stores.  So they would, they were solely

13  towards the store manager responsibility.  Like I said, I just

14  interviewed and hired MIT's.

15  Q.   And if you had a question about hiring an MIT or any

16  questions about hiring, who would you call up with a question?

17  A.   My HR manager.

18  Q.   And during your time in Oklahoma, who was your HR manager?

19  A.   Amy.  And I can't remember her last name.

20  Q.   Would that be -- I'll help you refresh it.  Would that be

21  Amy Yoakum?

22  A.   Yep.

23  Q.   And during the whole time that you were in Oklahoma, was

24  she always your HR manager?

25  A.   Yes, sir.

1    Q.   And do you recall any training or policies that if some

2    issue comes up in the store, you're supposed to call Amy Yoakum

3    as opposed to Eric Hoffman?

4    A.   Any HR related issue with -- coming to hiring and firing,

5    Look Policy, anything like that, we had to roll up to HR

6    manager.

7    Q.   And then when it came -- well, then, so if Ms. Yoakum

8    handled any HR issues, what would Mr. Hoffman handle, then, as

9    far as questions?

10   A.   Questions would just be anything related to store, store

11   programs and business.

12   Q.   And would that include sales?

13   A.   Yes, sir.

14   Q.   I think we talked about having -- were there any other

15   qualities to having good stores for Abercrombie & Fitch?

16   A.   Abercrombie & Fitch is based on, like, store standard,

17   making sure everything is perfect in the store when you walk in

18   for the store experience for the customer.  So that's --

19   basically, we walked in and we went over a bunch of folding

20   methods, making sure the customer is greeted, there's always a

21   brand up in the front of the store and it smelled decent.  We'd

22   always spritz the store every hour on the hour.

23   Q.   And play music?

24   A.   And play music, yes.

25   Q.   And I think I've actually seen some reports dealing with

1    store experience.  Is that something that Abercrombie would

2    rate the different stores?

3    A.   Yes, sir.  We were secret shopped at least once a month,

4    maybe sometimes twice a month.  And they would send someone in

5    there and shop the store, making sure the store is folded down,

6    there was a greeter in the front room, the greeter said the tag

7    line, the store was spritzed and everyone was being friendly

8    and said hello through the store and offered help.

9    Q.   Okay.  And were the store managers supposed to rate their

10   own stores, as well?  And you became -- I'm sorry, district

11   manager for Oklahoma in 2006; is that right?

12   A.   2006, 2007, somewhere in there.

13   Q.   And as district manager, how often would you visit the

14   stores in your region?

15   A.   At least once or twice a week.

16   Q.   During that training, did Abercrombie & Fitch change any

17   ways that the stores would hire or fire people?

18   A.   They basically, they came out with an interview packet and

19   you had to go through the interview packet.

20   Q.   Is that the interview guide?

21   A.   Interview guide, yes, sir.

22   Q.   And who was supposed to use this interview guide?

23   A.   The assistant HR manager.

24   Q.   And so dealing with your own people as a district manager,

25   what did you do to make sure that your managers below you were

1  following the interview guides?

2  A.   We would have to -- going through our daily store audit,

3  we'd have to go through those and make sure they were being

4  sent off to home office.

5  Q.   So are there different interview guides for the different

6  store positions?

7  A.   Yes, there's for the model position and then for a stock

8  position.

9  Q.   And then I've heard this other description of a manager.

10  I think there's testimony that Mr. McJilton testified that he

11  was a visual manager?

12  A.   Visual, yes.  They broke it down after -- each store had

13  at least two to three assistants, you had your store manager,

14  your HR, your visual and then your stock.

15  Q.   Okay.  Run that by me again?

16  A.   Your visual manager.

17  Q.   Okay.

18  A.   Which is in charge of all the presentation of the floor.

19  Your HR manager was in charge of hiring and firing and

20  interviewing people.  And then your stock was in charge of

21  shipments, floor sets and transferring things in and out of the

22  store.

23  Q.   Okay.  And do you recall in 2008 who was the HR manager

24  for the abercrombie kids store?

25  A.   It was Heather.

1    Q.   Was that Heather Cooke?

2    A.   Yes, sir.

3    Q.   So during your time as district manager, can you recall

4    who the, in 2008, who were the managers underneath you for the

5    abercrombie kids store in Tulsa?

6    A.   I'm not a hundred percent sure on who all was there.  Like

7    I said, I had seven stores and each store had at least four to

8    six managers.  So Heather Cooke, I think was one of them and

9    then Andrew.  And I don't know who the third one, it might have

10   been Caleb or Kalen.

11   Q.   And Andrew was referring to Andrew Sturm-Hamilton?

12   A.   Yes, sir.

13   Q.   And Kalen was referring to Mr. Kalen McJilton?

14   A.   Yes, sir.

15   Q.   Did you -- well, let me back up.  Did you hire any one of

16   these three people for their positions?

17   A.   Heather.

18   Q.   And how did you come about hiring Heather?

19   A.   Heather came to me from California.  She was a brand rep

20   in California and she was referred to me by one of the GM's in

21   California.

22   Q.   Okay.  And I guess do you go through a -- well, let me

23   just ask you.  How do you make a decision as to hiring a

24   manager as opposed to like hiring just a model or a stock

25   position?

1   A.   We go through the same interview guide as, or pretty much

2   the same.  Just different, I guess, depending if they graduated

3   school and things like that.  So we go through an interview

4   guide and at the end of the day, depending on the need and if

5   she fits the qualifications for our need right then, we can

6   hire her.  We have this -- as DMs, we have the authority to

7   hire them.

8   Q.   And did you have a -- well, let me back up.  As far as any

9   discipline as to the assistant managers, who would handle that?

10  A.   I would.

11  Q.   Okay.  So as to any managers, then you would handle that,

12  as well?

13  A.   Yes, sir.  I mean, I would have to talk to my HR first, HR

14  manager first about any discipline actions I could do and then

15  we would go from there.

16  Q.   Do you recall issuing any discipline, let's start with Ms.

17  Cooke?

18  A.   I had some disciplinary actions with violating Look Policy

19  with Heather.

20  Q.   What was the violations of policy?

21  A.   Violations, wearing too much makeup, not coming in dress

22  code, time and attendance.

23  Q.   And now when that violation of policy, was that for her

24  specifically or the people underneath her?

25  A.   Her, specifically.

1   Q.   Did Mr. McJilton and Ms. Cooke both have supervisory

2   authority to discipline staff members underneath them?

3   A.   Yes, sir.

4   Q.   So if a staff member, whether it be a model or an impact

5   person, came into the abercrombie kids store, not in, not in

6   the dress code, then it would be up to the assistant managers

7   to take care of that?

8   A.   Yes, assistants and store, yes, sir.

9   Q.   Let me just ask you, what does diverse mean to you, I

10  guess?

11  A.   Diverse.  Diverse is, I mean, people from different

12  religions, backgrounds, race, all coming together and working

13  as one in one diverse group.

14  Q.   Well, let's go to June of 2008, if I can take you back.

15  Do you recall an applicant by the name of Samantha Elauf?

16  A.   Yes, sir.

17  Q.   Prior to Ms. Elauf ever making application to Abercrombie

18  & Fitch, did you know her?

19  A.   No, sir.

20  Q.   An did you ever know of her?

21  A.   No, sir.

22  Q.   And well, why don't you just tell me what you remember

23  about the hopeful application of Samantha Elauf as we sit here

24  today?

25  A.   Okay.  Heather Cooke interviewed Samantha.  I was in

1   Oklahoma City at my Penn Square store.  She called me and asked

2   me if she could hire this girl, Samantha and I asked her did

3   she do an interview guide?  She said yes.  We went through some

4   of the questions and we went over some Look Policy questions

5   and she wasn't complying with that, so I ended the discussion.

6   I told Heather, I was like is she compliant with the guideline,

7   does she pass and she was like no.  And then I was like well,

8   there's your answer.  You cannot hire her.

9   Q.   Okay.  Well, let's break that down.  So what, exactly, did

10  Heather say she was not compliant with?

11  A.   Dress code.

12  Q.   And what did she say that was not in compliance with that?

13  A.   She was wearing a hat -- or a headscarf.

14  Q.   And did Ms. Cooke tell you why Samantha was wearing a

15  headscarf?

16  A.   No, sir.

17  Q.   So is it your recollection today that Ms. Cooke didn't

18  explain to you that she thought Ms. Elauf was wearing a

19  headscarf for religious reasons?

20  A.   No, sir.

21  Q.   And can you tell me how the headscarf is not in compliance

22  with the dress code?

23  A.   It's in our code of conduct and Look Policy that you

24  cannot wear a hat while on the floor.

25  Q.   I'm sorry.  Cannot wear a what?

1    A.    A hat.

2    Q.    Okay.

3    A.    While on the floor.

4    Q.    So there is a -- can you just read that for the record,

5    what's the cap policy?

6    A.    Just, you know, sales caps, they are considered too

7    informal for the image we project.  Caps are not allowed to be

8    worn on the sales floor.

9    Q.    Okay.  And so it's your understanding that when Ms. Cooke

10   was talking to you about a headscarf, is this the provision you

11   were telling her that was not compliant with the dress code?

12   A.    Yes, sir.

13   Q.    Is there any other provision in the Abercrombie Look

14   Policy that deals with wearing a headscarf?

15   A.    No, sir.

16   Q.    And was it your determination that if somebody is wearing

17   a headscarf then they are not in compliance with the Look

18   Policy for Abercrombie?

19   A.    In my eyes, a headscarf and a cap is the same thing.

20   Q.    Okay.  Have you ever seen a headscarf worn by a Muslim

21   woman?

22   A.    On TV.

23   Q.    And if you had a question, hypothetically, if you had a

24   question whether a headscarf was the same as a cap, who would

25   you have called to determine whether or not that complied with

1    the Look Policy?

2    A.   I would have called an HR manager.

3    Q.   So the HR department, rather than the -- Eric, Mr.

4    Hoffman; is that correct?

5    A.   Yes, sir.

6    Q.   So is it your understanding that the HR department is

7    responsible for compliance with the Look Policy?

8    A.   Yes, sir.  I mean, yes, sir.

9    Q.   Mr. Johnson, we were talking previously about the

10   telephone call that you had with Ms. Cooke.  I just wanted to

11   go over a few things with that?

12   A.   Okay.

13   Q.   So about how long a phone call did this conversation

14   transpire, how long?

15   A.   Maybe five minutes, ten at the most.

16   Q.   And how did she, when she called you, how did she present

17   the problem to you?

18   A.   She called and said she just went through a group

19   interview.  She says she has this girl, Sam, that she wants to

20   hire, but she has some issues with her wearing a headscarf.

21   And she wanted to know what she should do in the situation.

22   Q.   Did you say -- did you ask Ms. Cooke a question along the

23   lines of can she take the headscarf off?

24   A.   Did I ask her that?  I can't recall.

25   Q.   And did she have -- so at the time that she's calling, was

1   there any other issues dealing with non-compliance with the

2   dress code other than the headscarf?

3   A.   Not that I know of.

4   Q.   Was there any issues with regard to the interview guide or

5   not meeting the standards on the interview guide?

6   A.   Not that I know of.

7   Q.   Not that Ms. Cooke related to you; is that correct?

8   A.   Yes, sir.

9   Q.   Was it your impression that Ms. Cooke would have hired

10  Samantha Elauf except for wearing of the headscarf?

11  A.   Yes, sir.

12  Q.   In fact, did she state that to you?

13  A.   That she would, yes, sir.

14  Q.   And I can't recall your exact phraseology, but you

15  basically instructed -- well, let me back up.  So when Ms.

16  Cooke, she was asking your permission to go ahead and hire her;

17  is that correct?

18  A.   She was asking my permission, yes, sir.

19  Q.   And you told her what?

20  A.   My response is if she's not complying with dress code then

21  she can not be hired.

22  Q.   Did you have a discussion on how she might come in -- how

23  the applicant might come into compliance with the dress code?

24  A.   Not that I recall.

25  Q.   Now was that -- looking back, was that -- how many times

1   had Ms. Cooke asked you about, questions about hiring

2   applicants?

3   A.   She never has in the past, no.

4   Q.   So this was an unusual circumstance; is that correct?

5   A.   Yes, sir.

6   Q.   Did you, at that time, think we might want to call HR at

7   that time?

8   A.   No, sir, I didn't.

9   Q.   And during this conversation, did Heather Cooke tell you

10  she had already filled out the interview guide and given her

11  the grade on the evaluation that she was -- what's the word I'm

12  trying to say, she was eligible for hire?

13  A.   She said she filled it out, but she didn't say she was

14  eligible for hire.

15  Q.   But did she already talk or she didn't tell you that she

16  had already made a score on the grading scale on the evaluation

17  standards?

18  A.   I can't recall that.

19  Q.   So to the best of your recollection, did you ever tell her

20  that she needed to go back and fill out a different form?

21  A.   No, sir, I never did.

22  Q.   And let's go past that day of the conversation that you

23  had with Heather about the headscarf applicant.  Did Heather

24  Cooke actually use her name?

25  A.   Samantha?

1    Q.    Yeah?

2    A.    I can't recall if she did or not.  I just know she said

3    she had an applicant with a headscarf on.

4    Q.    Had you had any training on how to handle when somebody

5    complained of employment discrimination?

6    A.    Yes, sir, we roll it up to home office.

7    Q.    That was the extent of your training, to roll it up to

8    home office?

9    A.    We first contact our HR manager.

10   Q.    So, in general, if an employee complained of I think I'm

11   being discriminated against because of some aspect of

12   employment, whether it be race or religion, what was your

13   training to do?

14   A.    To contact our HR manager.

15   Q.    And if the store manager received that complaint, what was

16   the store manager supposed to do?

17   A.    He was supposed to contact his DM and then the DM would

18   contact the HR manager?

19   Q.    And then as to if it was an assistant store manager, who

20   were they supposed to contact?

21   A.    They could either go to the store manager directly or come

22   straight directly to myself.

23   Q.    And looking at Plaintiff's Exhibit No. 6 and 7, would

24   Samantha, to your own opinion, been a good candidate to hire as

25   a model, except for the headscarf?

1   A.   If she was -- yeah, she would have been.

2   Q.   During the time that you were -- from 2001 to 2009, were

3   you aware that Abercrombie was actually allowing exceptions to

4   the Look Policy in other stores?

5   A.   Was I aware?

6   Q.   Yeah, nationwide.

7   A.   No.  Yeah, I mean, if there was an exception, you would

8   have to go contact your HR manager and they would make those

9   exceptions.

10  Q.   What I'm trying to find out is if you were aware that in

11  other stores in Abercrombie & Fitch, they had actually allowed

12  store models to wear a yarmulke?

13  A.   I wasn't aware of that, no.

14  Q.   In your opinion, would a yarmulke not been allowed at any

15  of your stores in the Oklahoma region?

16  A.   In my opinion, I mean it's still a hat, it's still a ball

17  cap or a head cap.

18  Q.   And that's what I was trying to determine.  So in your

19  opinion, as when you were a district manager, you wouldn't have

20  seen any difference between if a applicant wanted to wear a

21  yarmulke versus a headscarf.  Is that correct?

22  A.   No, sir, or a ball cap or a helmet for all that matter,

23  it's still a cap.

24  Q.   Now let's take your ball cap example.  So if an applicant

25  said, came up and said, hey, my religion says I need to wear

1    this ball cap while working, you still would have denied?

2    A.   Still would have denied them, yes, sir.

3    Q.   Let's walk through the steps of the person with the

4    religious ball cap.  And if you had become aware or the

5    assistant manager said, hey, this person says they have to wear

6    this ball cap for the California Angels and said it's because

7    of religious purpose, what would the process have been for

8    considering that ball cap?

9    A.   For considering, you would have to contact my HR director

10   and they would make that exception or determination if we could

11   hire them or go forward with that applicant.

12   Q.   Okay.  And during your time as a district manager, had you

13   ever contacted your HR regional manager to talk about or

14   discuss somebody who had requested an exception to the Look

15   Policy?

16   A.   I never had to make an exception, no or make a -- or

17   called HR to make an exception.

18   Q.   And I understand that they may not have made the

19   exception, but did you ever called HR department to discuss

20   whether or not an exception should be allowed?

21   A.   I mean they went through scenarios, just like through home

22   office training and stuff, they went through different

23   scenarios.  But then again, they are always like we will make

24   that decision, you need to call us or roll it up to us before

25   we do make that exception.

1   Q.   Okay.  And as to any -- as your training, do you recall

2   any actual training on religious accomodation?

3   A.   Any trailing?

4   Q.   Any training?

5   A.   Besides just roll it up to HR and they make that decision,

6   that's it.

7   Q.   Okay.  And that's kind of what I was probably getting at

8   is how would you know if somebody was requesting a religious

9   accommodation?

10  A.   I mean, I would -- hopefully, they would ask and then we

11  would go from there, but like this religion accommodation, we

12  would ask our HR manager about it.

13  Q.   And back to your conversation with Ms. Cooke, talking

14  about the applicant that wore a headscarf.  Did the question of

15  the color of the headscarf come up, to your knowledge?

16  A.   No, sir.

17  Q.   Would you have had done anything different, knowing what

18  you know now, if you had received the Heather Cooke telephone

19  conference today?

20  A.   Would I?

21  Q.   Have done anything different?

22  A.   Different.  I would just roll it up to HR ask them what I

23  should be doing.

24  Q.   And that is different than what you actually did, back

25  when Heather Cooke actually called you; is that correct?

1    A.   Yes, it is correct.

2    Q.   And were you aware that Heather Cooke has also testified

3    that you made some remark about a person could paint themselves

4    green and call it a religion?

5    A.   Don't recall making that conversation.

6    Q.   Okay.  And Ms. Cooke has also testified that in that

7    conversation with you about Samantha Elauf, it was her

8    testimony that she stated that she wore the scarf for religious

9    reasons because she, she being Samantha Elauf, was Muslim.  Do

10   you recall that in your conversation?

11   A.   No, sir.

12   Q.   Is that something that you would forget?

13   A.   Would I forget?  I mean, if it's a religion issue, I'd

14   have to -- as soon as I -- I'd have to roll it up to HR.  She

15   never said that.  She said she wore a headscarf.

16   Q.   Okay.  So the statements that Ms. Cooke is testifying that

17   in a conversation she had with you, are you just not recalling

18   those conversations or she did not make those statements to

19   you?

20   A.   She didn't make those statements to me.

21   Q.   And the statement about the person being painted green,

22   you said you did not make that statement?

23   A.   No, sir.

24   Q.   And did you -- Ms. Cooke also testified that you told her

25   to change the interview evaluation score so that Ms. Elauf

1    could not -- would not have a high enough score to be

2    recommended for hire.  Do you recall saying that to her?

3    A.   I never said that.

4    Q.   Did you ever tell her to go back and fill out the

5    evaluation standard guide?

6    A.   No, she was supposed to be filling that as she went

7    through the interview guide.

8    EXAMINATION BY MR. CLARK:

9    Q.   In your testimony today you've described the Look Policy

10   and also referred to the dress code?

11   A.   Yes, sir.

12   Q.   Are those terms synonymous?

13   A.   They're the exact same thing, yes.

14   Q.   When you say, when you refer to dress code, you're talking

15   about the Look Policy?

16   A.   Look Policy, yes, sir.

17   Q.   Can you describe for us what the, I guess, the

18   significance of the Look Policy is in Abercrombie's business?

19   A.   Yeah.  Well, the significance is that they want the

20   all-American guy or girl, all natural, metro guy has to be

21   clean-cut, clean-shaven, no earrings.  Girl, no dyed hair, no

22   long earrings, just natural.  And the reason is because they do

23   the customer experience through the stores and they don't

24   really advertise throughout the -- without -- they don't do

25   television advertising or like magazines or anything like that,

1    so it's all in-store.  So the more store experience they have,

2    the customer has, that's how they promote themselves or market

3    themselves.

4    Q.   Now, you testified earlier about Heather Cooke's personal

5    violations on the Look Policy?

6    A.   Yes, sir.

7    Q.   Setting those aside, what was your experience as her

8    district manager with Heather, in terms of enforcing the Look

9    Policy among the models in her store?

10   A.   Well, I mean, Heather always had Look Policy violations

11   and she would just absolutely try not to do it.  She would just

12   try to find a way to go around it without doing it, she'd let

13   anyone walk in the building.  So as a DM or as her store

14   manager, you would have to come there and retrain her on how to

15   address dress code and what we're looking for in the store.

16   Q.   Is that something you did personally with Heather?

17   A.   Yes, several times.

18   EXAMINATION BY MR. LEE:

19   Q.   Let me just ask you on -- it sounds like you are

20   characterizing Ms. Cooke as having a lot of Look Policy

21   violations?

22   A.   Yes, sir.

23   Q.   Could you give me a number?

24   A.   A number?  Every time I've come in there, we would discuss

25   Look Policy violations with her, either with her managing Look

1    Policy or her managing herself in Look Policy by wearing too

2    much makeup, wearing the wrong type of denim, wearing tennis

3    shoes when she should have been wearing sandals, wearing big

4    hoop earrings, and the same thing would go to her associates

5    that would be working during her time slot, so we would have to

6    go back and readdress the issue of her wearing and going over

7    Look Policy with each individual brand rep.

8              (Videotape deposition ends.)

9              THE COURT:  Very well.  Is that the end of the

10   deposition?

11             MS. SEELY:  Yes, it is, Your Honor.

12             THE COURT:  Very well, do we have enough time to call

13   another witness this afternoon?

14             MS. SEELY:  We have one more short video deposition,

15   about 23 minutes.

16             THE COURT:  Very well.  It would fit perfectly.

17             MS. SEELY:  Plaintiff calls Kalen McJilton by video

18   deposition.

19             THE COURT:  Very well, you may begin.  And the jury

20   will recall the Court's previous statements with regard to the

21   testimony presented to you by videotape.  You may begin.

22                          KALEN MCJILTON

23   Called as a witness on behalf of the plaintiff, having been

24   previously sworn, testified by video deposition as follows:

25   EXAMINATION BY MS. SEELY:

1    Q.   Are you currently employed, Mr. McJilton?

2    A.   Yes.

3    Q.   Who do you work for?

4    A.   I work for Guess.

5    Q.   Guess, G-U-E-S-S?

6    A.   Yes.

7    Q.   The retailer?

8    A.   Yes.

9    Q.   Okay.  And where do you work for Guess, what location?

10   A.   On Rodeo Drive.

11   Q.   How long have you worked for them?

12   A.   13 months.

13   Q.   Okay.  Can you tell me your current address, please?

14   A.   XXXX XXXXX XXXX XXXXXXXX XXXXXXXXX XXX XXXXXXXXXX

15   XXXXXXXXXX.

16   Q.   How long have you lived there?

17   A.   Six months.

18   Q.   And where did you live immediately before that?

19   A.   I lived in West Hollywood.

20   Q.   How long did you live in West Hollywood?

21   A.   Over a year and a half.

22   Q.   And where did you live immediately before that?

23   A.   Venice.

24   Q.   How long did you live in Venice?

25   A.   Oh, eight months, almost a year.

1   Q.   Okay.  And how -- I'm sorry.  Where did you live

2   immediately before Venice?

3   A.   In Tulsa, Oklahoma.

4   Q.   How long did you live in Tulsa?

5   A.   My whole life.  I grew up there.

6   Q.   Where did you graduate from high school?

7   A.   Owasso High School.

8   Q.   Okay.  When was that, that you graduated?

9   A.   2003.

10  Q.   And did you go to college after that?

11  A.   I did, Oklahoma State University.

12  Q.   Did you graduate?

13  A.   Yes.

14  Q.   When did you graduate?

15  A.   2007.

16  Q.   After you graduated from high school, it looks like you

17  went directly to college, I mean, in the fall?

18  A.   Uh-huh.

19  Q.   Did you work immediately after graduating from high

20  school?

21  A.   Yes.

22  Q.   That summer?

23  A.   Yes.

24  Q.   Where?

25  A.   Abercrombie & Fitch.

```
1    Q.   When did you start there, approximately?

2    A.   It was almost right after graduation, so May or June.

3    Q.   And how long did you work for them?

4    A.   I worked on and off for them until I left in 2008, so...

5    Q.   Until you left Oklahoma to come to California?

6    A.   Yeah, it was on and off.  I wouldn't say it was

7    continuous, but I would work like, you know, I would come home

8    for breaks and I would work during the breaks or whenever,

9    whenever I was out in -- out of class, I would work.

10   Q.   Okay.  So what store did you start working at?

11   A.   Actually, I started here.  It's kind of a complicated

12   story.

13   Q.   Okay.  Well, tell me.

14   A.   I -- my -- no, I started back home.  I'm sorry about that.

15   I started in Tulsa, where I was kind of enrolled into the

16   system and everything and I was actually working there.  But

17   then whenever I moved here for a semester, I took like an

18   internship here, sophomore year of college, I transferred to

19   here where I worked at The Grove.

20   Q.   I've heard of that.

21   A.   Here in Glendale.  And then when I went back home, I

22   transferred back to the Woodland Hills Mall location.

23   Q.   Okay.  So is it fair to say that you start -- your first

24   job with Abercrombie was in the Woodland Hills Mall in Tulsa?

25   A.   Yes.
```

1   Q.   Okay.  And which -- was it abercrombie kids, Abercrombie?

2   A.   It was Abercrombie & Fitch.

3   Q.   It was the Abercrombie & Fitch store.

4   A.   Uh-huh.

5   Q.   Okay.  At some point, did you start working at abercrombie

6   kids?

7   A.   Yes, that was after my -- after I graduated college.  I

8   became manager and it was a good six months before I was

9   transferred down to the kids store.

10  Q.   So you were a manager at Abercrombie & Fitch for six

11  months before you were transferred to abercrombie kids?

12  A.   Yes.

13  Q.   And what -- what was your title as manager?  I mean, what

14  kind of manager were you at Abercrombie & Fitch for that six

15  month period?

16  A.   I was an MIT, a Manager in Training, and then I became --

17  I was just a regular assistant manager and then when I moved to

18  the kids store, I became official manager.

19  Q.   What were your duties as an assistant manager in the

20  abercrombie store, after you graduated from college?

21  A.   Pretty much just help, help run the store.

22  Q.   And what did you do to help run the store?

23  A.   Everything from stock to opening and closing, schedules,

24  everything that the job entailed.

25  Q.   Did you have any duties with respect to hiring models?

1    A.    Yes.

2    Q.    What were your duties with respect to hiring models?

3    A.    Just the interview process and recruiting.

4    Q.    Then when you went to abercrombie kids as a visual

5    manager, how did your duties change, if they did?

6    A.    It went from running the store to, I mean, just making

7    sure, like it was pretty much all be behind the scenes, making

8    sure everything looked a certain way per company standards.

9    Q.    Can you tell me what you mean by that, making sure things

10   looked the way they should?

11   A.    We would receive new product or older product, depending

12   on what it was, and I would have to make sure it hit the floor

13   and went out and it was folded a certain way and displayed a

14   certain way, according to just how the company wanted it set

15   up.

16   Q.    And you mentioned you were in charge of everything behind

17   the scenes?

18   A.    Uh-huh.

19   Q.    What do you mean by that, what went on behind the scenes?

20   A.    Like the stockroom, making sure the stockroom was

21   organized and clean.  I had to deal with all the transfers,

22   that was my responsibility, sale product.

23   Q.    Did you supervise any particular people?

24   A.    Yes, I was over the stock supervisor.

25   Q.    And --

1    A.   And I had a couple visual people that would help me in the

2    mornings before we opened.

3    Q.   And when you say you supervised the stock supervisor, that

4    implies to me that there were some people that worked for the

5    stock supervisor; am I correct?

6    A.   She was in charge of her stockroom.  I wouldn't say that

7    she directly was over anyone.  She -- we would give her support

8    and she would direct them during that day, but I wouldn't say

9    that she was directly over anyone.  I mean, the stockroom was

10   hers, but the people around her weren't necessarily like her

11   responsibility.

12   Q.   Did those people you are talking about that were around

13   her in the stockroom, did they have a title?

14   A.   Impact, yes.

15   Q.   They were called impact?

16   A.   Yeah, they were our impact associates.

17   Q.   Impact.  Okay.

18   A.   Because of the way they impacted the sales floor.

19   Q.   And would, if the stock supervisor wasn't responsible for

20   those impact associates, who was?

21   A.   Any of the managers that were on duty.

22   Q.   Okay.  Were you directly responsible for those impact

23   associates?

24   A.   If I was on duty, yes.

25   Q.   You know, I didn't ask you this, but when you moved out to

1    California, immediately before you moved to California, were

2    you working for Abercrombie?

3    A.   Yes.

4    Q.   And when you came to California, what, two years ago?

5    A.   A little over, yes.

6    Q.   A little over two years ago.  Did you work for Abercrombie

7    out here?

8    A.   Yes.

9    Q.   And what store did you work in?

10   A.   I worked at the Third Street Promenade.

11   Q.   And what were you doing there?

12   A.   They started me back over on the Manager in Training

13   program because it was such a high volume store.

14   Q.   Okay.  Was that a three month program?

15   A.   Supposed to be, yes.

16   Q.   Did you finish it?

17   A.   No, I ended up leaving within the first month.

18   Q.   Okay.  Why did you leave then?

19   A.   Because I had pretty much run two stores and I got another

20   job offer.  I felt that I was past the training program again.

21   Q.   Okay.  So you quit?

22   A.   Yes.

23   Q.   Now when you worked in the abercrombie kids store in

24   Tulsa --

25   A.   Uh-huh.

1    Q.   -- who -- you said your store manager was Andrew

2    Sturm-Hamilton and was he the store manager the whole time you

3    worked for abercrombie kids?

4    A.   Yeah, the whole time I was downstairs, he was my store

5    manager.

6    Q.   And was Randall Johnson your district manager the whole

7    time you worked for abercrombie kids?

8    A.   For abercrombie kids, yes.

9    Q.   And who were the other managers in the store at

10   abercrombie kids when you worked for them?

11   A.   It would have been myself, Heather Cooke, Whitney Proctor

12   and then Andrew.  There was four of us.

13   Q.   Are you familiar with the Look Policy?

14   A.   Yes.

15   Q.   Okay.  And what is your understanding of what the Look

16   Policy is?

17   A.   Just that they -- we want to hire people who promote the

18   brand in a positive way.

19   Q.   Now, other than caps, is it your understanding that the

20   Look Policy prohibited any other, anything other than baseball

21   caps, with respect to headwear?

22   A.   What do you mean?

23   Q.   Well, it says specifically in Exhibit 8 that caps are not

24   allowed to be worn on the sales floor; correct?

25   A.   Uh-huh.

1  Q.   And what I wanted to know is was it your understanding

2  that other headwear could be worn pursuant to -- in accordance

3  with the Look Policy?

4  A.   Not -- no.  We also sold like beanies and stuff like that

5  and we couldn't wear any of them.

6  Q.   Okay.

7  A.   As far as I understood it, like no hats of any kind were

8  allowed on the sales floor.

9  Q.   Now under the Look Policy, is it your understanding that

10  models did not have to wear actual Abercrombie clothes?

11  A.   Yeah, as long as it didn't have a competitor's logo, you

12  could wear it.

13  Q.   They could wear any kind of clothing they wanted to, as

14  long as it looked like Abercrombie's?

15  A.   It had to, yeah, resemble Abercrombie's look and it

16  couldn't be black, like we weren't allowed to wear black

17  clothing.

18  Q.   Okay.

19  A.   Because Abercrombie didn't sell it, so we weren't allowed

20  to wear it.  It was obviously not from our store.

21  Q.   Describe to me what you mean when you say they had to wear

22  clothing that was in the Abercrombie look.  What's the

23  Abercrombie look to you besides moose?

24  A.   Yeah, umm, just kind of like a casual, like a casual look,

25  I guess.  I don't mean -- casual to like almost like a preppy

1    look.  I really don't know how else to explain it.  I mean,

2    it's there, there's a way it looks, but I honestly don't -- I'm

3    not sure.

4    Q.   Okay.  And within the confines of the Look Policy that

5    they had to dress in manner that was like the Abercrombie look,

6    could the models choose each day what they wanted to wear, as

7    long as it looked like the clothing that Abercrombie sold?

8    A.   I mean we have like key colors and so forth that we were,

9    you know, asked to adhere to.  But that was more so like when

10    we were being visited by like our, you know, like uppers and so

11    forth, just to kind of show that we were maintaining our look.

12    But for the most part, it was, yeah, you could wear whatever,

13    as long as it pertained within the Look Policy.

14    Q.   But -- and I'm not asking for a specific moment, but do

15    you recall ever seeing any customers, female customers, who

16    came into the store to shop who wore headscarves in the manner

17    of a -- that a Muslim would wear a headscarf?

18    A.   Yes.

19    Q.   Okay.  There are Muslims wearing headscarves in Oklahoma

20    that you have seen; correct?

21    A.   Yes.

22    Q.   In the Tulsa area?

23    A.   Yes.

24    Q.   And do you remember seeing -- strike that.  Now when you

25    were also at Abercrombie & Fitch, not at abercrombie kids, but

```
1    do you recall customers coming into the store who wore

2    headscarves?

3    A.    Yes.

4    Q.    And they bought clothing and items there; correct?

5    A.    Absolutely.

6    Q.    And Abercrombie was glad to sell the merchandise to the

7    women with headscarves; correct?

8    A.    Yes.

9    Q.    Now do you know Samantha Elauf?

10   A.    I know who she is.

11   Q.    Do you know her personally, at all?

12   A.    No.

13   Q.    All right.  So you knew Samantha Elauf from seeing her

14   around the mall?

15   A.    Yes.

16   Q.    And you talked to her occasionally.

17   A.    Yeah.

18   Q.    Like how are you doing?  Were you sometimes in groups when

19   you exchanged words with her?

20   A.    I would say that's how it mostly was, yes.

21   Q.    Groups of other kids?

22   A.    Yeah.

23   Q.    Were they kids who worked for Abercrombie or abercrombie

24   kids?

25   A.    Yes.
```

```
1    Q.   At some point in time when you worked for abercrombie

2    kids, did you become aware that Samantha wanted -- was

3    interested in possibly working for abercrombie kids?

4    A.   Yes.

5    Q.   How did you learn that?

6    A.   I believe her friend Farisa said that she was looking for

7    a position there.

8    Q.   And did she say -- did Farisa say that to you?

9    A.   Yes.

10   Q.   Okay.  And --

11   A.   And I would even say that it was more specific to she was

12   wanting to come and like join visuals.

13   Q.   Now at the time you had seen Samantha at the mall and

14   talked with her, had she always been wearing headscarf?

15   A.   I honestly do not remember.  I know that I had seen her

16   with one, but I honestly can't say yes or no that I always saw

17   her with one.

18   Q.   Okay.

19   A.   I would assume, but I can't give you a definite.

20   Q.   Did you think she wore a headscarf because she was a

21   Muslim?

22   A.   I assumed so, yes.

23   Q.   Do you remember expressing your opinion as to whether or

24   not you thought it should be okay for Samantha to work on the

25   floor wearing a headscarf?
```

1   A.   I -- see, this is -- I'm not sure because I was always

2   under the impression that she was going to be working with me,

3   so -- doing visual stuff, so I don't, I don't know.

4   Q.   Would it have made a difference, in terms of her working

5   at Abercrombie, wearing a headscarf if she had been working for

6   you in visuals versus a model out on the floor?

7   A.   I think so.

8   Q.   Why?  What made it different?

9   A.   Well, we had -- like most of my visual people were hockey

10  players for in the morning, and they never worked on the floor,

11  they were only in the morning before the store opened and they

12  would -- we would -- they would wear like beanies and wool caps

13  and so forth and then leave at 10:00 a.m. before the store was

14  ever opened.

15  Q.   Uh-huh?

16  A.   So if she was, you know, working with me in the mornings,

17  then it would have been a different scenario versus her being

18  on the floor.

19  Q.   Okay.  The hockey players that worked for you in visuals,

20  was it your understanding that they didn't have to comply with

21  the Look Policy because they left before the store opened?

22  A.   Yes, because they weren't face-to-face with customers,

23  so...

24  Q.   In your personal opinion, the Look Policy aside, should

25  she have been allowed to work as a model on the floor wearing

1   the headscarf, such as she is wearing in Exhibit 6 and 7?

2   A.   I felt that the standard needed to be applied across the

3   board when you are on the floor.  That's why I took out my

4   earrings and so forth.  You know, everybody had to apply to the

5   same rules.  Like if the store was closed or if there were not

6   customers in the store that you were working with, then I

7   didn't see an issue with any of it, but while we were open,

8   that you should have to stick to the Look Policy.

9   Q.   Have you heard of any other occasions or situations in

10  which a model was allowed to deviate from the Look Policy?

11  A.   Yes, there was one girl who, she was, again, one of the

12  people who worked with me in the mornings.  She, I believe, was

13  Pentecostal.

14  Q.   Uh-huh.

15  A.   But I'm not a hundred percent on that and I believe

16  something, her faith was she had to wear dresses and she

17  couldn't wear jeans.

18  Q.   Uh-huh.

19  A.   And they had to be a certain length.

20  Q.   Uh-huh?

21  A.   And I think that what her mother had done was taken a pair

22  of Abercrombie pants and turned them into a dress so she could

23  wear them.

24  Q.   Uh-huh?

25  A.   But so she'd wear these like denim dresses.

```
1    Q.   Okay.  That was allowed?

2    A.   Yeah, that was allowed.

3    Q.   Management knew about that?

4    A.   Yeah, because it was in the Look Policy so...

5    Q.   And you were a manager then?

6    A.   Yes.

7    Q.   Did this occur when you were a visual manager at

8    abercrombie kids?

9    A.   Yes.

10   Q.   And she worked -- what were her hours of work?

11   A.   She was a visual, one of my visual team.

12   Q.   Uh-huh.

13   A.   So she would usually leave like around 10:00 or 11:00 a.m.

14   Q.   Was the store open then?

15   A.   It would be -- sometimes she would leave, she would work

16   the first hour of being open and then she would leave.

17   Q.   Okay.  And when employees left the store, such as this

18   young lady, did they have a back door they went through or did

19   they just walk out through the sales floor?

20   A.   Through the sales floor.

21   Q.   And do you know if this young lady wearing the skirt, the

22   longer skirt, ever went out on the sales floor to work during

23   normal opening hours?

24   A.   Yes.

25   Q.   And so she was on the sales floor working, wearing a
```

1    longer skirt?

2    A.   Yes.

3    Q.   And by longer, are we talking about like knee length or

4    below?

5    A.   I want to say it was at least knee length, yes.

6    Q.   And at that time, did Abercrombie sell knee-length skirts?

7    A.   No.

8    Q.   In terms of Abercrombie, did you ever here the word

9    diversity used with respect to the Abercrombie business?

10   A.   Yes, we actually went through a diversity training.

11   Q.   And when -- the diversity training that you went through,

12   which store were you working for at that time?

13   A.   I believe the kids store.

14   Q.   During that online training on diversity, were you given

15   any training on providing religious accommodations to

16   employees?

17   A.   I can't remember.

18   Q.   Were you ever given any training by Abercrombie at any

19   time on the laws that prohibit discrimination in employment?

20   A.   I'm not sure.

21   Q.   Now when I say the phrase "religious accommodation" to

22   you, do you know what that means, do you have any impression in

23   your head what that means?

24   A.   Yes, I believe it means that within a certain parameter,

25   like people are allowed certain permissions, special

```
1   permissions, depending on their religious beliefs.

2   Q.   Did you ever get any training in that topic while you

3   worked for Abercrombie?

4   A.   I cannot remember.

5   Q.   Now you said that you had responsibilities as an assistant

6   manager for hiring; correct?

7   A.   Uh-huh.

8   Q.   Not a visual manager, but when you were an assistant

9   manager for Abercrombie, you did some hiring?

10  A.   At the adult store, yes.

11  Q.   Yes, at the adult store.  Did you ever -- were you ever

12  told by any manager or the home office what you should do in a

13  hiring situation if an employee asked you for a religious

14  accommodation or an applicant?

15  A.   I don't believe that ever came up when I was there.

16  Q.   And nobody told you what you should do if it did come up?

17  A.   All I can remember was that I was supposed to ask or talk

18  to my district manager about it or just bring it to my district

19  manager's attention.

20  EXAMINATION BY MR. CLARK:

21  Q.   What was the role of the models in the in-store experience

22  at the abercrombie store?

23  A.   We didn't use marketing, like we didn't use ads or

24  commercials or anything, so the models were all kind of our

25  advertisement, what they wore projected the image of the brand.
```

1    So if they wore hoodies, then that was the hoodie that people

2    would come in and ask for.  So you tried to want them to be

3    current in wearing what we sold in the store.

4    Q.   Do you recall testifying what the -- your policy would

5    have been if you had been presented with a request of a

6    religious accommodation, how that would be handled?

7    A.   The only thing I would have known to do would have been to

8    go to a superior.

9    EXAMINATION BY MS. SEELY:

10   Q.   You testified on cross-examination that Abercrombie --

11   that Abercrombie did no advertising.  Is that right?

12   A.   Yes.

13          (Video deposition ends.)

14          THE COURT:  That completes the testimony for today and

15   it completes today's session.  We will be in recess until 9:30

16   a.m. tomorrow morning.  Arrive early enough that you can start.

17   Hopefully we will start right at 9:30 a.m.  Please recall the

18   Court's instructions applicable to recesses and once again let

19   me remind you that if anyone asks what you are, what type of

20   case you are sitting on, just tell them that I have instructed

21   you you can't talk about it.  Please try to avoid any media

22   reporting on this subject.  And do more than try.  In fact,

23   avoid it.  And we will be in recess until 9:30.

24          (The following proceedings were had outside the

25   presence and hearing of the jury.)

1        THE COURT:  I do need to ask the lawyers one question

2   here.  Relative to the other three deposition transcripts that

3   I have and the objections, do I need to rule on any of those

4   objections?

5        MS. SEELY:  Your Honor, we have Chad Moorefield that

6   we will be presenting with an employee, one of our employees in

7   the chair.  So we do need that ruled upon.

8        THE COURT:  Thank you.

9        MS. SEELY:  And that will be tomorrow.

10       THE COURT:  All right.  I will rule on those this

11  evening.

12       MS. SEELY:  But I don't think we have got others that

13  we need.

14       MR. KNUEVE:  We don't have any.

15       THE COURT:  All right.  Thank you.  Anything else?

16       MR. KNUEVE:  Your Honor, I did have one question.

17       THE COURT:  Yes, sir.

18       MR. KNUEVE:  In the event that we get through with the

19  evidence about 2:30 or so tomorrow, would you expect that we

20  would give closings tomorrow afternoon?

21       THE COURT:  I doubt it, because we would not have

22  sufficient time for you to review the Court's proposed jury

23  instructions and its not my practice to send a jury out that

24  late, particularly here in federal court.  If we were over in

25  state court, the practice is quite different, but here we

1   attempt not to keep a jury or put at jury in a position where

2   they have to stay late.

3          I think the most important thing here, given that

4   we're treading on ground that is not well established, I think

5   we need to wrestle together to try to get the jury instructions

6   as perfect as possible.  Obviously, perfection is impossible,

7   but we need to try to avoid any error so that we don't have to

8   try this again.  So I think we will all be wrestling with these

9   jury instructions tomorrow and I'll be wrestling with them

10  tonight to try to help give you a clean set tomorrow, so you

11  will have some time to review them.

12         MS. SEELY:  Do you expect that we will have the

13  instruction conference tomorrow evening or the late afternoon?

14         THE COURT:  Well, it would be -- of course, it depends

15  on when we finish, but that would be likely, and depending on

16  whether or not you have had any time to review them.

17  Obviously, if we are tied up all day here, you-all have to pay

18  attention to the testimony so that you can make objections and

19  I'm not going to expect you to have had time to review those,

20  because as I say, the instructions here are very important.  So

21  we will just play it by ear.

22         Thank you.  We will be in recess.

23         (Recess.)

24                          -   -   -   -   -

25

1          A TRUE AND CORRECT TRANSCRIPT.

2

3          CERTIFIED:    s/ Glen R. Dorrough
                         Glen R. Dorrough
4                        United States Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25