```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   EQUAL EMPLOYMENT OPPORTUNITY )
     COMMISSION,                  )
 5                                )
                    Plaintiff,    )
 6                                )
     V.                           )  No. 09-CV-602-GKF-FHM
 7                                )
     ABERCROMBIE & FITCH STORES,  )
 8   INC., an Ohio Corporation    )
     d/b/a abercrombie kids,      )
 9                                )
                    Defendant.    )
10

11             REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                  HAD ON JULY 19, 2011

13                  JURY TRIAL - VOLUME II

14

15

16   BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

17

18   APPEARANCES:

19   For the Plaintiff:    Ms. Barbara A. Seely
                           Equal Employment Opportunity Commission
20                         1222 Spruce Street, Room 8100
                           St. Louis, Missouri 63103
21
                           Mr. Jeff A. Lee
22                         Equal Employment Opportunity Commission
                           215 Dean A. McGee, Suite 524
23                         Oklahoma City, Oklahoma 73102

24                         Ms. Jennifer L. Hope
                           Equal Employment Opportunity Commission
25                         801 Market Street, Suite 1300
                           Philadelphia, Pennsylvania 19107
```

1    (APPEARANCES CONTINUED)

2    For the Defendant:    Mr. Mark A. Knueve
                          Mr. Daniel J. Clark
3                         Vorys Sater Seymour & Pease LLP
                          52 East Gay Street
4                         Columbus, Ohio 43215

5                              -   -   -   -   -

6                              CONTENTS

7                                                      Page No.

8    WITNESSES CALLED ON BEHALF OF PLAINTIFF:

9    DEON ANN RILEY

10        Direct Examination by Ms. Seely.................... 191

11        Cross-Examination by Mr. Knueve.................... 260

12   CHAD MOOREFIELD (By deposition)......................... 272

13   SAMANTHA ELAUF

14        Direct Examination by Ms. Seely.................... 295

15        Cross-Examination by Mr. Knueve.................... 318

16        Redirect Examination by Ms. Seely................. 332

17        Recross-Examination by Mr. Knueve................. 333

18   PLAINTIFF RESTS........................................ 334

19   WITNESSES CALLED ON BEHALF OF DEFENDANT:

20   KATHLEEN LUNDQUIST

21        Direct Examination by Mr. Knueve.................. 350

22        Cross-Examination by Mr. Lee...................... 365

23   DEON RILEY

24        Direct Examination by Mr. Knueve.................. 371

25        Cross-Examination by Ms. Seely.................... 409

1  (CONTENTS CONTINUED)

2     Redirect Examination by Mr. Knueve.................. 423

3  DEFENDANT RESTS........................................ 425

4                    -   -   -   -   -

5                       PROCEEDINGS

6                      July 19, 2011

7          (The following proceedings were had outside the

8  presence and hearing of the jury.)

9          THE COURT:  Please be seated.  Do we need to address

10  anything before we get started this morning?

11         MS. SEELY:  Yes, Your Honor, I believe we do, a few

12  housekeeping matters.  Plaintiff intends to call Deon Riley

13  this morning in its case.  Ms. Riley is going to be live.

14  She's the human resource vice president for Abercrombie & Fitch

15  and one of the matters that I intend to get into with her is

16  the net worth of the company and I want to know when you would

17  like that.

18         THE COURT:  Second stage.

19         MS. SEELY:  Pardon me?

20         THE COURT:  That would be in the second stage.

21         MS. SEELY:  Okay.

22         THE COURT:  If the jury were to find reckless

23  disregard, or reckless indifference rather, reckless disregard

24  is the Oklahoma standard, then we don't get into net worth and

25  those sorts of issues until second stage.

1          MS. SEELY:  So how would that work?  Is the jury going

2    to go out with the instruction and then come back and say we

3    found reckless disregard?

4          THE COURT:  Yes.  Yes.  The way it works is they

5    render a verdict on compensatory and, as I'm reading the law

6    right now, we can discuss this, in this particular case the

7    jury would have to award at least nominal damages of one dollar

8    and that would qualify.  Were they to find reckless

9    indifference, and I have yet to see -- this is not to preclude

10   evidence of malice, but I've seen no evidence of malice -- if

11   we were to go to the jury with the questions, the

12   interrogatory, it would be framed something like this.  We do

13   blank, do not blank, check one, find that Abercrombie acted

14   with reckless indifference to the federally protected rights of

15   Samantha Elauf.  And if they check yes, we do, then you go to a

16   second stage, you call them back in and then you present the

17   evidence with regard to net worth.

18         Now frankly, now that you raise the issue, it might be

19   worth discussing, very briefly, this whole issue of vicarious

20   liability.  My understanding of the law, and I'm going to be

21   doing some more reading up here with regard to vicarious

22   liability, is if Johnson was, in fact, trained to do the right

23   thing here, kick it up to HR, but he blew it off -- I read with

24   interest in the deposition that you had me rule on yesterday

25   that contrary to what he told the jury yesterday, that he was

1    laid off, in fact, his boss says no, he was fired.  So that

2    will be of interest, I'm sure, to the jury.  But if, in fact,

3    one cannot be -- or Abercrombie cannot be vicariously liable

4    for punitive damages if Abercrombie did, in fact, train him to

5    do the right thing, i.e. kick it up to HR.

6         And by the way, we need to also discuss Johnson's

7    testimony yesterday that Cooke didn't tell him that Elauf was a

8    Muslim.  Well, that makes no sense because if, in fact, one

9    doesn't need to show up at the interview complying with the

10   Look Policy, of course the issue of Ms. Elauf being a Muslim

11   had to have come up, because they couldn't have denied her

12   employment by virtue of the fact that she had a headscarf on at

13   the interview.  Of course, that came up.  But, of course, it's

14   a dispute between Cooke and Johnson in this record, but it had

15   to have.  Otherwise, he couldn't have told her not to hire

16   Elauf; right?

17        MS. SEELY:  Well, certainly the headscarf came up and

18   we believe that more than that came up, Your Honor, that he

19   knew, having seen women on TV wearing headscarves, he knew that

20   the headscarf signified that she was Muslim.

21        THE COURT:  But it's undisputed here that one doesn't

22   have to comply with the Look Policy in the interview; correct?

23        MS. SEELY:  Correct.

24        THE COURT:  So what basis would he have had to have

25   told Cooke not to hire her, unless he knew that she was a

1    Muslim?

2         MS. SEELY:  I think, Your Honor, that that goes to the

3    training he got.  We do not believe that he was trained that

4    applicants didn't have to be in compliance with the Look Policy

5    at the interview.

6         THE COURT:  The problem with that, of course, is that

7    he repeats over and over and over in his deposition that, in

8    fact, he was trained.  He knew that he had to roll these issues

9    on up to HR in Columbus.

10        MS. SEELY:  Your Honor, I think his testimony is that

11   if someone asked for an exception to the Look Policy, he knew

12   to roll it up to HR.  And that is going to be our point and we

13   are going to have evidence on that.  But in fact, unless there

14   had been a formal request made for an exception to the Look

15   Policy, the store management was not supposed to roll it up to

16   HR, only if there was a request.  And in Samantha's case, there

17   was no request.

18        THE COURT:  Well, that's really where the rubber hits

19   the road here because as you say, the clear policy was if there

20   was a request, roll it up.  And your position is that Title VII

21   applies even to applicants.

22        MS. SEELY:  That's right.

23        THE COURT:  And that Johnson didn't know to roll it on

24   up to HR in Columbus if an issue came up in the interview?

25        MS. SEELY:  That's correct.

1          THE COURT:  All right.  That's very interesting.  Go

2     ahead.

3          MS. SEELY:  Your Honor, if I could just address your

4     comments about the vicarious liability.  I think Kolstad

5     teaches that someone like Randall Johnson, that the company is

6     vicariously liable for his actions if when he did what he did

7     he was acting in a managerial capacity and within the scope of

8     his employment.  And I think the evidence is very clear that

9     that was the case.

10          Now, the training issue that you raise, Your Honor,

11     comes up with respect to defendant's affirmative defense that

12     even if it acted with malice or reckless indifference, it made

13     good faith efforts to comply with the law.  And that's where

14     the training aspect comes up and that is defendant's burden, to

15     show that Mr. Johnson and the other managers at Abercrombie

16     were trained to recognize religious accommodation and to roll

17     up not only requests, but issues.  I think that's their burden

18     and so there's a distinction between vicarious liability and

19     the training and I think Kolstad is very clear on that.

20          THE COURT:  Well, as I said, I'm going to be reading

21     the law there, but I was told here that training ties in with

22     vicarious liability, that even if one is acting in a managerial

23     capacity, that if one has been trained to do the right thing

24     but does not, then that individual or that company cannot be

25     vicariously liable.  So you are saying that's not true?

```
 1            MS. SEELY:  I'm saying the analysis is slightly
 2    different.  First, you look to see if the company can be
 3    vicariously liable.  And that, and the way you look at that is
 4    did Johnson act in a managerial capacity?  And he did, he was a
 5    district manager.  And was he acting within the scope of his
 6    employment?  And he was, because he was authorized to consult
 7    with the managers, the interviewing managers in the stores and
 8    to give them advice on Look Policy exceptions.
 9            THE COURT:  All right, but you can see that that's not
10    the end of the analysis with respect to vicarious liability in
11    a punitive damages context?
12            MS. SEELY:  No, Your Honor, I think that is the end of
13    the question of vicarious liability.  But then the defendant,
14    according to Kolstad, can raise the affirmative defense that it
15    made good faith efforts to comply with the law.  And that's
16    where the training comes in and that is defendant's burden, to
17    show that it trained it's people to do what's required by Title
18    VII with respect to religious accomodation.
19            THE COURT:  All right.  So the basic point you are
20    making is that this is -- the good faith defense is an
21    affirmative defense, that it would go to the jury if those two
22    basic prongs are met, acting in a managerial capacity and
23    acting within the scope of employment and then it goes to the
24    jury and they can consider the affirmative defense together
25    with all the other evidence --
```

1          MS. SEELY:  Correct.

2          THE COURT:  -- on deciding whether or not Abercrombie

3     acted with reckless indifference?

4          MS. SEELY:  Correct.  And it must understand that the

5     defendant has the burden to prove that by a preponderance of

6     the evidence.

7          THE COURT:  All right.  Mr. Knueve, do you disagree

8     with the basic analysis that Ms. Seely has offered?

9          MR. KNUEVE:  I disagree with a few points, Your Honor.

10    On the Kolstad analysis, the EEOC first has to show reckless

11    disregard within the scope of employment and as you have

12    already pointed out, there's no evidence that -- if we believe

13    that Johnson knew that this -- that Ms. Elauf was Muslim, okay,

14    if we believe that, and he did not do the right thing, he did

15    not roll it up to HR, then he was not acting within the scope

16    of his employment, because his training was to roll matters

17    like that up to HR, that was throughout his deposition.

18          And second, his training was you don't try to handle

19    these things yourself, you get it to HR.  Now, I disagree, I

20    could not disagree more strongly with Ms. Seely's

21    representation about Abercrombie's training.  Abercrombie's

22    training is any time religion is mentioned at all, any time it

23    comes up, it goes to HR.  And in fact, we'll see very shortly

24    when Deon Riley testifies that that's Abercrombie's training,

25    it's in the documents.

1        With respect to the question of whether or not Mr.

2   Johnson knew that Ms. Elauf was Muslim, other people wear

3   headscarves besides Muslims.  Grace Kelly was always pictured

4   with a headscarf.  The simply fact that somebody wore a

5   headscarf doesn't mean that they're Muslim.

6        THE COURT:  But had Grace Kelly shown up in an

7   interview for Abercrombie and Ms. Cooke called her regional

8   manager, why would the regional manager have said no, you can't

9   hire that individual if, in fact, one does not have to adhere

10  to the Look Policy in the interview?  It would be a simple

11  matter of telling Grace Kelly she can't wear the scarf while

12  she's working there.  And certainly, you would have been happy

13  to have had Grace Kelly working for you.

14        MR. KNUEVE:  Well, maybe, maybe not, Your Honor.

15  Because the inquiry is not just the appearance, but it's also

16  the sense of style and does the applicant wear the Abercrombie

17  style.

18        And I think the evidence is, what the evidence is is

19  although an applicant doesn't have to be 100 percent in

20  compliance with the Look Policy, the manager is evaluating the

21  person on the clothes that they are wearing.  And the

22  expectation is that somebody who applies for employment is

23  already going to know about the brand, is already going to know

24  about the Look Policy, like Ms. Elauf did.

25        THE COURT:  So you are suggesting to this jury that

 1    the conversation between Cooke and Johnson was entirely upon

 2    Ms. Elauf's sense of style because she was wearing a headscarf?

 3          MR. KNUEVE:  That's absolutely what -- that's

 4    absolutely what the conversation was, Your Honor.

 5          THE COURT:  I don't know if you can sell that, but

 6    good luck.

 7          MR. KNUEVE:  Well, that's what Mr. Johnson testified.

 8    That's how he testified, that all --

 9          THE COURT:  He also testified that he was laid off and

10    he was, in fact, fired.

11          MR. KNUEVE:  Well, but Ms. Cooke changed her story

12    three times in the deposition about what Ms. Farisa and she

13    also had Look Policy violations, frequent Look Policy

14    violations.  And, in addition, Your Honor, she left Abercrombie

15    on bad terms.  Now, you wouldn't let us put that evidence into

16    the record.

17          THE COURT:  Well, because it was allegations of sexual

18    harassment and touching, unwanted touching, and I didn't want

19    that in. I mean, you didn't want that in.

20          MR. KNUEVE:  Well, Your Honor, there was no

21    allegations --

22          THE COURT:  Right?  You didn't want that in,

23    allegations that she was touched while at work; correct?

24          MR. KNUEVE:  We didn't want the evidence that she had

25    alleged sexual harassment, but there was no allegation of

1    unwanted touching.

2         THE COURT:  No.  She said -- no, clearly, there was

3    testimony that I excluded in there about her being touched by

4    some -- well, I forget if it was a supervisor, but unwanted

5    touching while at work; correct?  And you didn't want it in.

6         MR. KNUEVE:  We did not want the sexual harassment in,

7    Your Honor, but I don't recall, I don't believe the allegation

8    was on one of touching, it was different than that.

9         THE COURT:  All right.  Well, but the problem is if

10   some of that comes in, all of it comes in.

11        MR. KNUEVE:  Fair enough, Your Honor.  But the point,

12   I guess, with respect to the punitive damages analysis, at the

13   end of the day, there is no hook here for punitive damages

14   because there's no way to dispute that -- either, you believe

15   Mr. Johnson that he never knew that she was Muslim, okay; or

16   you don't believe and you believe that he knew and that he was

17   acting in reckless disregard.  If you believe that, then his

18   training was get it to HR.  That is undisputed and he didn't do

19   it.  He violated policy.  As a result, there's no hook for

20   punitives.

21        THE COURT:  Well, I'm not the finder of fact, that's

22   why I wanted to discuss this with you.  But you're saying

23   there's still room for a jury decision as to Johnson's

24   credibility.  Johnson says, in his discussion with Cooke, there

25   was never a discussion of religion; correct?

1          MR. KNUEVE:  Yes.  There is room for a jury decision

2     on that issue, but I don't believe there's any room for a jury

3     decision on the vicarious liability issue, Your Honor.  I think

4     that judgment as a matter of law on punitive damages is

5     necessary because of this vicarious liability issue.

6          If you believe that Johnson knew the religion and

7     didn't roll it up to HR, then you must find that he acted

8     outside of the scope of his employment and he acted contrary to

9     the way he was trained.

10         THE COURT:  But you disagree that all the EEOC has to

11    show is acting in a managerial capacity and acting within the

12    scope, generally.  And you disagree that the burden is then on

13    you, in the context of an affirmative defense, to show good

14    faith efforts to comply?

15         MR. KNUEVE:  I would say that they -- that general

16    step process is accurate, but I think they have to show more

17    than what they have indicated.  They also have to show that he

18    acted in reckless disregard of her federally protected rights.

19    And I think the evidence is clear that he didn't.  His state of

20    mind was protecting the brand.

21         THE COURT:  All right.  Here we go.

22         MS. SEELY:  Your Honor, I have some more housekeeping

23    matters.

24         THE COURT:  All right.  Please.

25         MS. SEELY:  We also intend to present some testimony

1    through Deon Riley that goes to injunctive relief only.  Would

2    you like us to do that at the end and you excuse the jury or do

3    you want her to testify about that at the end of the trial?

4              THE COURT:  It depends on Ms. Riley's obligations.  If

5    she can stay around, we will do it while the jury is

6    deliberating, so as to save some time.  But we may be into

7    deliberations tomorrow, I take it; correct?

8              MS. SEELY:  We may be.

9              THE COURT:  So I don't know whether Ms. Riley will be

10   available tomorrow.  What's the situation there?

11             MS. SEELY:  And of course, as Your Honor said, we

12   would need her for the net worth information, as well, unless

13   defendant will stipulate.

14             THE COURT:  So she will have to be here tomorrow,

15   then, anticipating that -- I think we have to presume that

16   perhaps we may need her for that; correct?

17             MR. KNUEVE:  Your Honor, she will be here tomorrow.  I

18   don't have an objection if we excuse the jury and we do the

19   equitable relief here in the plaintiff's case.

20             THE COURT:  All right.

21             MS. SEELY:  But she will need to be here tomorrow for

22   the net worth testimony, unless you're going to stipulate to

23   that.

24             MR. KNUEVE:  I'll talk with my co-counsel about -- I

25   mean, tomorrow is tomorrow.  I guess I don't know how we're

1    going to not agree to the net worth that's published in public

2    records.

3              THE COURT:  Right.  Okay.

4              MS. SEELY:  Okay.  Also, Your Honor, we are going to

5    read several responses of defendant to our interrogatories

6    during discovery and one of them is Interrogatory No. 5 and

7    that is an interrogatory that you actually ruled on in a motion

8    to compel.  And when the defendant answered that interrogatory,

9    after you ruled for us on our motion to compel, it kind of

10   buried the lead.  It was -- the question was "State with

11   specificity if defendant has determined or assigned a financial

12   or numerical figure to the undue burden it is claiming in its

13   affirmative defense number 8, set forth in its answer.  And if

14   the answer is yes, then state the value of the undue burden in

15   a numerical figure and state how defendant calculated this

16   numerical figure."

17            This is plaintiff's first set of interrogatories,

18   number 5.  And their response was four paragraphs long.  The

19   third paragraph finally answered the question and that was

20   "Defendant has not assigned a specific financial value to this

21   undue burden."  But buried in there, they made all their

22   defenses again about how it didn't have to be numerical, that

23   undue burden could be more than just money.

24            And I don't want to read this entire answer to the

25   jury because it's nonresponsive.  I only want to read the

 1    response to the question asked.  And I would like Your Honor's

 2    permission to do that.  I can show it to you, if you like.

 3            THE COURT:  Response.

 4            MR. KNUEVE:  Your Honor, I object on two grounds.

 5    First, if you are going to read the interrogatory, you've got

 6    to read the whole response.  But second, what's the relevance?

 7    I mean, what is the relevance?  This is a damages trial.

 8            MS. SEELY:  Well, if there was going to be no mention

 9    of undue burden in defendant's case, I would agree with you.

10    But I suspect that there's going to be quite a bit of

11    testimony, both from Ms. Riley and also both experts.  And I

12    think that it's very important that the jury understand that

13    the defendant has never assigned a dollar figure to this undue

14    hardship that they will claimed and that they claimed they

15    reasonably believed.

16            THE COURT:  All right.  And once again, the Court has

17    decided, on summary judgment, that the defendant did not

18    produce anything more than speculative evidence in the summary

19    judgment proceedings as to undue burden and found that

20    insufficient.  My understanding on punitive damages, although

21    we've referred to it as undue burden, it's really something

22    different here.  It's more akin to reasonable attempts to

23    protect the brand.  I don't know how Mr. Knueve wants to

24    characterize it, but --

25            MR. KNUEVE:  That's absolutely, that the mind-set of

```
 1   Randall Johnson was to protect the brand and enforce the Look
 2   Policy.
 3           THE COURT:  As opposed to, or in contrast to reckless
 4   indifference?
 5           MR. KNUEVE:  Right.
 6           THE COURT:  So undue hardship doesn't really apply in
 7   the punitive damage context.
 8           MS. SEELY:  Well, Your Honor, I would agree.
 9   Depending upon how the testimony plays out, I may ask Your
10   Honor's permission to read this again.
11           THE COURT:  All right.  Let me take a look at it, too,
12   so I can be prepared for that time.  Thank you, Ms. Steely.
13           Any other housekeeping matters.
14           MS. SEELY:  One other thing.  Sorry, Your Honor.
15           THE COURT:  Not at all.
16           MS. SEELY:  But we did not read any of the
17   stipulations at the beginning of the trial and I'm not sure
18   when you normally do that.  And actually, some of them have
19   become kind of irrelevant.  But there are two that we want to
20   read and one of them, Stipulation Number 7, we would like to
21   read at the end of our case before we rest.  That is the
22   stipulation regarding defendant's knowledge that Title VII
23   required religious accommodation.
24           And then we would also like to, and I think we've
25   agreed, it's in the pretrial order, that Stipulation Number 8,
```

1    regarding the amount of money that Dr. Joachimsthaler's firm

2    was paid for his testimony, we would like to read that after

3    his testimony in the defendant's case.

4            THE COURT:  You indicated that you wished to read that

5    on cross-examination of Dr. Joachimsthaler?

6            MS. SEELY:  Yes.  Yes.

7            THE COURT:  All right.  We have it in the proposed

8    jury instructions, the stipulation.  And if you'd like, I can

9    read the seven stipulations to the jury at the beginning of

10   today's session.  Your thoughts?

11           MS. SEELY:  That's fine.

12           THE COURT:  Mr. Knueve?

13           MR. KNUEVE:  Your Honor, my view is that the horse is

14   out of the barn and frankly, I think the evidence has already

15   shown all of the -- has already proved all of those

16   stipulations.  With respect to whether Abercrombie knew that

17   Title VII required religious accommodations, I think I said

18   that in my opening statement, Your Honor, and we're about to

19   get Deon Riley up.  I mean, she can ask did you understand that

20   Title VII required religious accommodations?  I just think it's

21   needlessly distracting and highlights those stipulations above

22   the other evidence.

23           THE COURT:  As Ms. Seely says, most of these

24   stipulations have already come in.  I'm not certain with

25   respect to item 7, but certainly Ms. Seely can ask that

1    question and the answer is a foregone conclusion; correct?

2         MS. SEELY:  Well, Your Honor, you know, one never

3    knows when you have a witness on the stand.  And I think that --

4         THE COURT:  Well, if she doesn't admit to that, then

5    you can have me read the stipulation.

6         MS. SEELY:  I absolutely think the stipulation should

7    be read.  That was -- I mean, when you enter into a stipulation

8    you assume it's going to be read at trial and it's in the

9    pretrial order.

10        THE COURT:  Well, it is.  It's going to be, it's going

11   to be given to them, but your concept of when they should be

12   given to the jury is not mine; all right?

13        MS. SEELY:  And that's fine.

14        THE COURT:  So if she testifies contrary to the

15   stipulation, I will read it to the jury.  All right.  Anything

16   further?

17        MS. SEELY:  No, Your Honor.

18        THE COURT:  Let's call the jury in.

19        MS. SEELY:  Plaintiff calls Deon Riley.

20        (The following proceedings were had in the presence

21   and hearing of the jury.)

22        THE COURT:  Be seated, please.  Before the jury, the

23   plaintiff the may call its next witness.

24        MS. SEELY:  Plaintiff calls Deon Riley.

25        THE COURT:  Very well.

<u>DEON ANN RILEY</u>

1

2   Called as a witness on behalf of the plaintiff, being first

3   duly sworn, testified as follows:

4           THE COURT:  State your full name for the jury, please.

5           THE WITNESS:  My name is Deon Ann Riley.

6           THE COURT:  Ms. Seely, you may inquire.

7                       <u>DIRECT EXAMINATION</u>

8   BY MS. SEELY:

9   Q.   Where do you live, Ms. Riley?

10  A.   I live in New Albany, Ohio.

11  Q.   And who are you currently employed by?

12  A.   I am employed by Abercrombie & Fitch.

13  Q.   And where is your office?

14  A.   My office is in New Albany, Ohio.

15  Q.   What is your current job title?

16  A.   My current job title is the group vice president of human

17  resources.

18  Q.   And when were you hired by Abercrombie & Fitch for the

19  first time?

20  A.   I started with Abercrombie & Fitch May of 2007.

21  Q.   And what job were you first hired into?

22  A.   I was hired into the role of vice president of human

23  resources for the stores.

24  Q.   And when did you become group vice president of human

25  resources?

1   A.   I became group vice president of HR in February of this

2   year.

3   Q.   Who do you report to as group vice president of HR?

4   A.   As the group vice president, I report to the senior vice

5   president of HR.

6   Q.   And do you know who he reports to?

7   A.   He reports to our CEO.

8   Q.   Now, what are your duties as group vice president of human

9   resources, generally?

10  A.   My -- oh, I'm sorry, go ahead.

11  Q.   Just very generally?

12  A.   Okay.  My duties include handling any of the

13  employment-relations issues from the 80,000 plus employees that

14  work in our stores.  I also do training and development for our

15  managers, so both operational and managerial training.  And

16  we -- I also help to manage the recruiters who recruit on

17  college campuses.

18  Q.   How were your duties different when you were vice

19  president of human resources, as opposed to group vice

20  president?

21  A.   I think the group vice president role is in recognition of

22  when I started we were mostly a domestic company, we did not

23  have any stores internationally with the exception of one that

24  opened before I started in February of 2007, which is in

25  London.  Since then, we've opened 50 plus stores

1    internationally and I am responsible for those stores, as well.

2    Q.   So you were vice president of human resource from May of

3    '07 until when?

4    A.   February of 2011.

5    Q.   Now, was your deposition taken in this lawsuit, Ms. Riley?

6    A.   Yes, it was Ms. Seely.

7    Q.   Mr. Lee took it; correct?

8    A.   Yes, he did.

9    Q.   And in fact, you were designated to testify on behalf of

10   Abercrombie & Fitch pursuant to a Rule 30(b)(6) deposition

11   notice; correct?

12   A.   Yes.  Yes, I was.

13   Q.   And do you expect to testify for the defendant at this

14   trial?

15   A.   Yes, I do.

16        MR. KNUEVE:  Objection, Your Honor.

17        THE COURT:  Overruled.

18        MS. SEELY:  Your Honor, plaintiff requests leave to

19   treat this witness as an adverse witness in questioning.

20        THE COURT:  Any objection?

21        MR. KNUEVE:  No objection, Your Honor.

22        THE COURT:  Very well, you may.

23   Q.   (By Ms. Seely)  Now, as vice president of human resources

24   in 2008, is it correct that -- how many people did you

25   supervise?

1    A.   Directly or indirectly?

2    Q.   Altogether?

3    A.   Altogether, in 2008, I would estimate that my staff was

4    about 30 people at that time.

5    Q.   And at that time, human resources performed a variety of

6    personnel related functions for all of the Abercrombie brands;

7    correct?

8    A.   For all the abercrombie stores and all the brands;

9    correct.

10   Q.   And the brands are Abercrombie & Fitch; correct?

11   A.   Yes.

12   Q.   Hollister?

13   A.   Yes.

14   Q.   And abercrombie kids?

15   A.   Yes.

16   Q.   And your department, human resources, handled the

17   personnel matters for all brands?

18   A.   Yes.

19   Q.   Now, one function of human resource in 2008 was to clarify

20   the Look Policy for store management; correct?

21   A.   Correct.

22   Q.   And human resources assisted with that clarification of

23   the Look Policy for store management, if the store management

24   team called human resources for assistance; correct?

25   A.   The process is that if the stores needed further

1    clarification of the policy, they must call human resources.

2    Q.   And if there were questions around the Look Policy, the

3    store management team would consult your team for assistance;

4    correct?

5    A.   That's correct.

6    Q.   If there were no questions surrounding the Look Policy at

7    the store management level, they didn't have to call human

8    resources; correct?

9    A.   Correct, as long as they were managing within the policy,

10   there was no need to call human resources.

11   Q.   Now, the store manager in a situation where he or she had

12   questions around the Look Policy, was to call either human

13   resources or the manager above him or her; correct?

14   A.   Yes, that is our protocol.

15   Q.   And the managerial level above the store manager is the

16   district manager; correct?

17   A.   That's correct.

18   Q.   And store management employees included the assistant

19   manager; correct?

20   A.   Correct.

21   Q.   The store manager?

22   A.   Correct.

23   Q.   And the district manager?

24   A.   That would be correct.

25   Q.   Now, another function that human resources performed in

1    2008 was to answer questions from store management related to

2    the interviewing process; correct?

3    A.   Could you -- I'm sorry.  I wasn't quite sure what you are

4    specifically asking me.  Just once more, I'm sorry.

5    Q.   Okay.  That's fine.  Another function that human resources

6    performed in 2008 was to answer questions from store management

7    related to the interviewing process in the stores; correct?

8    A.   If they have questions around interviewing, we will be

9    happy to answer questions for them.  They are also trained on

10   how to interview.  There is a script that they can specifically

11   follow.  So there is rarely, there are rarely questions around

12   the interviewing process, itself.

13   Q.   But you have gotten questions from store management about

14   the interviewing process; correct?  Human resources?

15   A.   Human resources would get questions.

16   Q.   Yes.  And it was perfectly fine for the store management

17   to call human resources about -- when they had questions about

18   the interview process; correct?

19   A.   Yes, it would be fine.

20   Q.   Now, the store management could also address the questions

21   about the interview process to his or her direct supervisor;

22   correct?

23   A.   They can ask any questions of their direct supervisors;

24   correct.

25   Q.   All right.  Now, if the store management doesn't have any

1   questions about the interview process, they don't call human

2   resources; correct?

3   A.   That would be correct.

4   Q.   Now, when a manager did call, when a store manager called

5   human resources with questions about either the Look Policy or

6   at the interview process, he or she would be connected to

7   someone on your staff by phone; correct?

8   A.   That's correct.

9   Q.   And the people on your staff who take those calls are

10  human resource professionals?

11  A.   Yes.

12  Q.   And when they get a call, isn't it true that the

13  professional, the human resource professional, some of those

14  questions require resolution, a resolution?

15  A.   If there are issues that the store manager needs guidance

16  on, yes, the HR manager will work to help them get to a

17  resolution.

18  Q.   And some of the questions that are addressed to human

19  resources by store management don't require any resolution;

20  correct?  They are informational.

21  A.   I'm not quite sure what you mean.

22  Q.   Well, for instance, if some calls might be from the store

23  manager like what do I do with this form.  That doesn't require

24  a resolution, does it?

25  A.   No, I would think everything would require resolution,

1    because our answer is going to be file it, toss it or whatever

2    the alternative may be.  So I'm sorry, that's why I'm a little

3    confused.

4    Q.   Well, the answer what do I -- the question what do I do

5    with this form, the answer would be to give information to the

6    manager, send it up to HR or whatever; right?

7    A.   Yes, so giving information would be a resolution.

8    Q.   If a call requires a resolution, it is generally the

9    practice of the HR professional to make a record of that call;

10   correct?

11   A.   It is.

12   Q.   And when the HR professional makes that record, he enters

13   information about the call into a computer database; right?

14   A.   Yes.

15   Q.   And that database is called the HR contact record system;

16   correct?

17   A.   That's correct.

18   Q.   And about 95 percent of all calls that HR receives from

19   store management are recorded in that system; right?

20   A.   I would say the majority of the calls that HR receives are

21   logged into the system.  I'm not quite sure of the percentage.

22   Q.   Do you recall that Mr. Lee took your deposition in March

23   of this year?

24   A.   Yes.

25   Q.   I'm going to hand you your deposition.

```
1              MS. SEELY:  My I approach the witness, Your Honor?
2              THE COURT:  You may.
3    Q.  (By Ms. Seely)  I'm going to direct your attention to page
4    36 of your deposition, Ms. Riley.  Lines 14 through page 37,
5    line 8.  Actually, let's make it 36, page -- I'm sorry.  Page
6    36, line 23 over to 37, line 9.  Do you recall Mr. Lee asked
7    you:
8              "Is this information recorded in the system?
9              "Answer:  Every call, no.
10             "Question:  Is there training on when a call should be
11   entered into the system?
12             "Answer:  I would say it's general practice.  Over 95
13   percent of the calls are entered into the system.  If it's
14   something that's as simple as what do I do with this form,
15   that's not recorded.  If it's an issue that requires
16   resolution, then it's entered into the system."
17             Does that refresh your recollection?
18   A.  That does.  As I said, the majority of the calls, and I
19   may have said 95 percent at that time.  So, yes.
20   Q.  Now, when the HR professional is entering information into
21   the HR contact record database, the HR professional is supposed
22   to enter or record the question or the issue that's been
23   raised; correct?
24   A.  Correct.
25   Q.  And the professional is also supposed to record the
```

1    information provided in the call by the caller; correct?

2    A.   Correct.

3    Q.   And the HR, I'm just going to call it an HR person; all

4    right?

5    A.   That's fine.

6    Q.   The HR person is supposed to record the resolution or the

7    disposition of the question raised in the call; correct?

8    A.   Correct.

9    Q.   And that contact record information or the contact record

10   would include the date that the call came in?

11   A.   Yes, that's correct.

12   Q.   That's essentially the date that the record is opened.  Is

13   that what you say in HR?

14   A.   Yes.

15   Q.   Okay.  And the HR contact record database would also

16   include the date the record was closed or the resolution was

17   reached?

18   A.   Yes.

19   Q.   And the name of the HR person who took the call?

20   A.   Yes.

21   Q.   And what the issue was raised by the caller?

22   A.   Yes.

23   Q.   And the action that the HR person took regarding the issue

24   is supposed to be recorded in the database; correct?

25   A.   Correct.

```
 1   Q.   And if the HR person talked to the actual employee or
 2   applicant who might have been the subject of the call, what was
 3   said was supposed to be recorded in the database; correct?
 4   A.   It may not be word for word, but the gist of what was said
 5   is recorded, yes.
 6   Q.   Okay.  And the HR contact records are maintained in the
 7   ordinary course of Abercrombie & Fitch's business; correct?
 8   A.   Yes, they are.
 9   Q.   Now, all the HR professionals who worked for you in 2008
10   had access to the HR contact record database; correct?
11   A.   The HR managers, specifically, and the HR reps have access
12   to the records database.
13   Q.   And they generally looked at those records to see how an
14   issue had been handled in the past when they were trying to
15   answer a question for store management; correct?
16           MR. KNUEVE:  Objection, Your Honor, speculation.
17           THE COURT:  Sustained.  Rephrase.
18   Q.   (By Ms. Seely)  Do you know, Ms. Riley -- strike that.
19   You said all the HR managers have access to the contact
20   records; correct?
21   A.   The HR managers, yes.
22   Q.   Okay.  And they may, and you are aware -- strike that.
23   And they may or may not actually look at the contact record
24   database when they are trying to answer a question for store
25   management?
```

1          MR. KNUEVE:  Objection, Your Honor, speculation.

2          THE COURT:  Sustained.

3    Q.  (By Ms. Seely)  Are you aware, Ms. Riley, of what, if

4    anything, your HR managers and HR reps do or use the contact

5    record system for?

6    A.  We use the contact records just to write down what has

7    occurred in terms of the issues.

8    Q.  Well, you said that your HR managers have access to the

9    contact record database?

10   A.  Yes, they do.

11   Q.  Are you aware of what, if anything, they do with respect

12   -- other than entering the information into the database?

13         MR. KNUEVE:  Objection, Your Honor, asked and

14   answered.

15         THE COURT:  Overruled.

16   Q.  (By Ms. Seely)  What do they use it for?

17   A.  They use it to record whatever has occurred, whether it's

18   an issue or a resolution or whatever it may be.  And in some

19   instances, we have to produce them for trials like this.

20   Q.  Are you aware of whether the HR managers ever look at the

21   database for informational purposes?

22   A.  They may.

23   Q.  And that's fine for them to do that; correct?

24   A.  Yes, it would be fine.

25   Q.  Now, you are familiar with the Look Policy; correct?

1    A.   Yes, I am.

2    Q.   And the Look Policy was in place at Abercrombie & Fitch

3    when you were hired in May of 2007; correct?

4    A.   Yes, it was.

5    Q.   And the Look Policy has not changed since you were hired

6    in May of 2007, has it?

7    A.   The Look Policy has been clarified, but the core of the

8    policy is still the same as it was when I was employed in 2007.

9    Q.   I would like you to look, please, at your deposition,

10   again, at page 22, lines 21 through page 23, line 2.  And at

11   that time in your deposition, Ms. Riley, Mr. Lee asked you:

12          "Question:  And did you review the current Look

13   Policy; is that correct?

14          "Answer:  Yes, I did question.

15          "Question:  Did you go back --"

16          THE COURT:  Just one second.  Is this impeaching a

17   statement that she just made?

18          MS. SEELY:  I believe it is, Your Honor.  The witness

19   said that the Look Policy was clarified but the core of it had

20   not changed and I think this testimony is different.

21          THE COURT:  Go ahead.

22   Q.   (By Ms. Seely)  I'll start again.  Line 21.

23          "Question:  And did you review the current Look

24   Policy; is that correct?

25          "Answer:  Yes, I did.

1          "Question:  Did you go back and look to see if the

2     Look Policy has changed since it's inception?

3          "Answer:  The Look Policy has not changed."

4          Do you recall that testimony?

5     A.   Yes, and I still stand by that.  As I said, the Look

6     Policy has not changed.  We may have clarified it, but the Look

7     Policy has stayed the same in its core.

8     Q.   Now, the Look Policy applied across all the brands in

9     store operations; correct?

10    A.   Yes.  The Look Policy applies across all stores.

11    Q.   So it applies to Abercrombie & Fitch, abercrombie kids and

12    Hollister; correct?

13    A.   That would be correct.

14    Q.   And it always has?

15    A.   Always has.

16    Q.   And the Look Policy has always applied to all employees in

17    the stores; correct?

18    A.   Yes, the Look Policy applies to every associate in the

19    store.

20    Q.   Now, it also -- it applies to models; correct?

21    A.   Correct.

22    Q.   And it did in 2008?

23    A.   Correct.

24    Q.   And it has always applied to impact associates, as well;

25    correct?

1    A.   Yes.

2    Q.   And it has always applied to managers in the stores;

3    correct?

4    A.   It applies to everyone, yes.

5    Q.   And stock room people as well; correct?

6         MR. KNUEVE:   Objection, Your Honor.   Asked and

7    answered.   She already said it applies to everybody in the

8    stores.

9         THE COURT:   Sustained.

10   Q.   (By Ms. Seely)  Now, Ms. Riley, in 2008, Abercrombie

11   employed about 200 to 250,000 employees during that entire

12   year; correct?

13   A.   Yes.

14   Q.   And about 70,000 to 100,000 of those employees were

15   models; correct?

16   A.   That's correct.

17   Q.   And about 90 to 120,000 of those employees were impact

18   associates; right?

19   A.   That's right.

20   Q.   Now, I'm going to ask you to please look at the book of

21   exhibits in front of you and turn to Exhibit No. 8, Plaintiff's

22   Exhibit No. 8.

23        MS. SEELY:   May I approach the witness, Your Honor?

24   She has the wrong...

25        THE COURT:   You may.

1          THE WITNESS:  I'm sorry, is it this one?

2          MS. SEELY:  No, it's the one on the floor.

3          THE WITNESS:  Oh, it's on the floor.

4    Q.   (By Ms. Seely)  Do you have it in front of you?

5    A.   Yes, I do.

6    Q.   And you recognize Plaintiff's Exhibit 8 as the store

7    associate handbook that was in effect as of September of 2006;

8    correct?

9    A.   That's correct.

10   Q.   And this is the handbook that was also in effect in 2008;

11   right?

12   A.   That's correct.

13   Q.   And in 2008 and before -- strike that.  Between September

14   of 2006 and June of 2008, all the employees who came to work

15   for Abercrombie & Fitch in the stores were given a copy of

16   Plaintiff's Exhibit 8; right?

17   A.   Yes.

18   Q.   And if you would look, please, at page 29 and 30 of

19   Exhibit 8?

20   A.   Okay.

21   Q.   Okay.  About six lines down on page 29 and then over into

22   30, there is a description of the Appearance/Look Policy;

23   right?

24   A.   Yes, there was.

25   Q.   And the Look Policy did not require models to wear actual

1   Abercrombie clothes at all times; correct?

2   A.   The Look Policy has never required that any of our

3   associates wear Abercrombie specific clothing.  It says

4   clothing that is styled like ours and that is non-logoed, which

5   basically means that if you are wearing a pair of Levi jeans,

6   which most Americans would recognize the logo, that would not

7   be acceptable.  However, it would be acceptable to wear a pair

8   of Gap jeans that has no visible logos on it.

9   Q.   If you look at the page 30 of Exhibit 8, towards the top

10  of the page, there is a section that says caps.

11  A.   Yes.

12  Q.   And the Look Policy, according to Exhibit 8, says that

13  "Even though Abercrombie & Fitch sells caps, they are

14  considered too informal for the image we project.  Caps are not

15  allowed to be worn on the sales floor."  Is that what it says?

16  A.   It does say that.  We allow no headwear.

17  Q.   And that's my next question was even though Exhibit 8 only

18  refers to caps, the Look Policy actually, in practice,

19  prohibited all headwear; correct?

20  A.   Yes, it did.

21  Q.   Now, according to the Look Policy then, no baseball caps

22  were allowed to be worn on the floor; correct?

23  A.   Baseball caps are outside of the Look Policy; correct.

24  Q.   And no religious headwear was allowed to be worn on the

25  sales floor; correct?

1    A.   That was an exception to policy, as well.

2    Q.   Okay.  And no religious headwear or baseball caps were

3    allowed to be worn in the stock room either; correct, according

4    to the Look Policy?

5    A.   According to the Look Policy.

6    Q.   And according to the Look Policy, headscarfs were

7    prohibited; correct?

8    A.   Any headwear.

9    Q.   Do you know what a yarmulke is?

10   A.   Yes, I do.

11   Q.   You used to live in Brooklyn, New York; correct?

12   A.   Yes.

13   Q.   So you have seen some yarmulkes in your time?

14   A.   A lot.

15   Q.   Now, a yarmulke is a religious cap that some Jewish men

16   wear; correct?

17   A.   That's correct.

18   Q.   And a yarmulke was also prohibited by the Look Policy;

19   correct?

20   A.   Yes, it would be prohibited by the policy.

21   Q.   And the Look Policy did not allow any kind of piercings,

22   other than a single piercing in a female model's ears; correct?

23   A.   Right.

24   Q.   No nose piercings?

25   A.   Nose piercings were not allowed according to the Look

1    Policy.

2    Q.   And men were not allowed to wear any facial hair; correct,

3    according to the Look Policy?

4    A.   Yes, according to the policy, they were supposed to be

5    clean shaven.

6    Q.   And the Look Policy required, as you said, that the store

7    employees wear clothes that were similar to those clothes sold

8    by Abercrombie; correct?

9    A.   Correct.

10   Q.   And so knee length skirts or skirts that were knee length

11   or longer were not allowed under the Look Policy; right?

12   A.   No.

13   Q.   Now, before June of 2008, Abercrombie made some exceptions

14   to the Look Policy, didn't they?

15   A.   Yes, we did.

16   Q.   And in fact, Abercrombie allowed some store employees to

17   wear baseball caps; right?

18   A.   Yes, I know of several occasions where we have allowed an

19   exception to the Look Policy for baseball caps, mostly medical

20   or we had one veteran who came back from Iraq and he had scars

21   on his head and we permitted him to wear a baseball cap, yes.

22   Q.   Now, these exceptions -- strike that.  You said that you

23   recall one exception or one time when the veteran came back

24   with scars on his head?

25   A.   I said I --

```
 1              MR. KNUEVE:  Objection, Your Honor, I don't think
 2    that's what she said.  She said there were several occasion.
 3              THE WITNESS:  Yeah.
 4    Q.  (By Ms. Seely)  Several occasions.
 5    A.  Yes.
 6    Q.  Okay.  Were they all veterans?
 7    A.  No, I also said I recall one medical exception, as well.
 8    Q.  Now the medical exception that you recall, that employee
 9    was actually an employee; correct?
10    A.  Yes.
11    Q.  Not an applicant?
12    A.  No, he was an employee.
13    Q.  And the gentleman, the veteran with scars on his head, did
14    he make a request for -- strike that.  I'm going to show you or
15    ask you to look, please, at Exhibit 115 in the book before you.
16    A.  Okay.
17    Q.  Okay.  And I want to talk about a number of exceptions
18    that were made to the Look Policy by Abercrombie & Fitch before
19    June of 2008.  Is 115, Exhibit 115, a human resource contact
20    record?
21    A.  Yes, it is.
22    Q.  And this is also Bates stamped 4313.  And this is a
23    printout of information that's in the human resource contact
24    record database; correct?
25    A.  That's correct.
```

1    Q.   And this particular contact record was dated, opened

2    October 23rd, 2007; correct?

3    A.   That is correct.

4    Q.   And does this contact record record a call from a store

5    manager regarding an employee who was hired and needed to wear

6    a headscarf?

7    A.   Yes.

8         MS. SEELY:  Plaintiff offers Exhibit 115 into

9    evidence.

10        THE COURT:  Any objection?

11        MR. KNUEVE:  No objection, Your Honor.

12        THE COURT:  Plaintiff's 115 is admitted.

13   Q.   (By Ms. Seely)  Now, Ms. Riley, at the first full

14   paragraph of Exhibit 115 -- well, strike that.  This call was

15   taken in October of 2007 by an HR employee named Robyn Wilson;

16   right?

17   A.   That's correct.

18   Q.   And a store manager named Tiffany Heartley called Ms.

19   Wilson in HR; right?

20   A.   Yes, it is.

21   Q.   And Ms. Wilson recorded in Exhibit 115 the following, "I

22   spoke with store manager Tiffany regarding recent PTI new hire

23   Sara Magzoub.  Sara had been hired, but had not yet been

24   scheduled due to an HR investigation.  Sara told Tiffany that

25   her religion requires her to wear a headscarf.  She cannot

1    remove the headscarf while at work.  Per Tiffany, the scarf

2    covers Sara's forehead, neck and all of her hair.  Tiffany said

3    that Sara recently came into the store and brought a copy of

4    the HCO, the Hollister policy handbook.  Tiffany said..."  I'll

5    stop there.  That's what the Exhibit 115 says; correct?

6    A.   Yes.

7    Q.   And if you would look at the bottom, it says resolution.

8    It says, "Resolved, accommodation made for associate."  Is that

9    correct?

10   A.   Yes, it does.

11   Q.   So Exhibit 115 indicates that Abercrombie & Fitch in

12   October of 2007 actually allowed an employee to wear a

13   headscarf; correct?

14   A.   Yes, an accomodation was granted.

15   Q.   And that employee, that person, Ms. Sara Magzoub, was

16   already hired by Abercrombie when she made a request to wear a

17   headscarf; correct?

18   A.   Yes, she was a current employee.

19   Q.   She was not an applicant?

20   A.   No, she was an employee.

21   Q.   And according to Exhibit 115, she actually made a request

22   to be allowed to wear a headscarf; correct?

23   A.   Yes, she did.

24   Q.   Now, if you would look please at Exhibit 104; which is

25   contact record 4193.

A.   Yes.

Q.   Is Exhibit 104 also a printout of the human resource contact record database?

A.   Yes, it is.

Q.   And does Exhibit 104 reflect a call made to HR on February 13th, 2006?

A.   Yes, it does.

       MS. SEELY:  Plaintiff offers Plaintiff's Exhibit 104 into evidence.

       MR. KNUEVE:  No objection.

       THE COURT:  Plaintiff's 104 is admitted.

Q.   (By Ms. Seely)  Ms. Riley, Exhibit 104 indicates that a call was received on the 13th of February, 2006 by an HR professional named Harold Gomez; correct?

A.   That's correct.

Q.   And the caller was an Andy Zarkades?

A.   Yes.

Q.   And Mr. Zarkades was a store manager or a management employee in one of the stores; right?

A.   Yes.

Q.   Does Exhibit 104 indicate that a request was made by an employee who was a veteran and he asked to wear a hat to cover scars on his head?

A.   Yes.

Q.   And is it true that Exhibit 104 indicates that the hat was

1    permitted as an exception to the Look Policy?

2    A.   Yes, it was, he was a part-time impacter.

3    Q.   And the employee, the person who asked for the exception

4    to the Look Policy was an employee at the time; correct?

5    A.   Yes.

6    Q.   He was not applicant?

7    A.   No, he already worked for the company.

8    Q.   And he specifically asked to be allowed to wear a hat as

9    an exception to the Look Policy?

10   A.   Yes, he did.

11   Q.   Now, if you would look, please, at Exhibit 102.  Let me

12   know when you are ready.

13   A.   Yes, I'm there.

14   Q.   Okay.  Is Exhibit 102 also a printout of the human

15   resource contact record database?

16   A.   Yes, it is.

17   Q.   And does Exhibit 102 reflect a phone call made to human

18   resources on July 10th, 2007?

19   A.   Yes, it is.

20   Q.   And the call was taken by an HR professional named Ellen

21   Wullbrandt; correct?

22   A.   Yes.

23   Q.   And the caller was an Aaron Nett; correct?

24   A.   Yes.

25   Q.   And Aaron Nett was a store manager or a management

1    employee in one of the stores.  Is that right?

2    A.   That's right.

3    Q.   And Exhibit 102 -- strike that.

4         MS. SEELY:  Plaintiff offers Exhibit 102 into

5    evidence.

6         MR. KNUEVE:  No objection, Your Honor.

7         THE COURT:  Plaintiff's 102 is admitted.

8    Q.   (By Ms. Seely)  Exhibit 102 says, under the caller

9    information, "I spoke with Aaron Nett, he said that Chad Wenzel

10   is asking for an accomodation to the Look Policy.  Aaron said

11   that Chad disclosed he's on medication for an illness that

12   makes his hair fall out in patches.  He said that he is

13   uncomfortable with the way he looks and wants to wear an

14   Abercrombie baseball cap while at work when this happens."

15        Is that correct?

16   A.   Yes.

17   Q.   And at the bottom, does it say that the resolution was

18   that "Andy Wheeler approved the baseball cap temporarily."

19   A.   That's correct.

20   Q.   Now, Mr. Wenzel was an employee at the time he asked for

21   the exception to the Look Policy; correct?

22   A.   Yes, he was an existing employee.

23   Q.   He was not an applicant?

24   A.   No, he was not.

25   Q.   And he made a specific request to be allowed to wear a

1    hat?

2    A.   Yes, he did, an Abercrombie & Fitch hat.

3    Q.   Now, the resolution said he was allowed to wear the

4    baseball cap temporarily.  There's no other information on

5    Exhibit 102 that indicates how long he was allowed to wear the

6    hat, is there?

7    A.   No, there isn't.

8    Q.   I would like you to look, please, at Exhibit 107.

9    A.   Okay.

10   Q.   Is Plaintiff's Exhibit 107 a printout of a human resource

11   contact record?

12   A.   Yes, it is.

13   Q.   And does it reflect a call that was made to human

14   resources on February 14th, 2007?

15   A.   Yes.

16          MS. SEELY:  Plaintiff offers Exhibit 107 into

17   evidence.

18          MR. KNUEVE:  No objection, Your Honor.

19          THE COURT:  Plaintiff's 107 is admitted.

20   Q.   (By Ms. Seely)  Now, Exhibit 107 reflects that a call was

21   made on February 14th, 2007 and taken by an HR professional

22   named Ramzi Bivens; correct?

23   A.   Yes.

24   Q.   And the caller was a Scott Kalkowsky; right?

25   A.   Yes.

1    Q.   And Scott Kalkowsky was a management employee in one of

2    the stores; right?

3    A.   Yes.

4    Q.   And Exhibit 107 says, "Scott has a male model who is

5    Jewish and wears a yarmulke while working.  Scott has also..."

6    Well, I won't read the rest of it, but I'm interested in the

7    yarmulke.  So does this Exhibit 107 reflect that a call was

8    made regarding a request from a male model who needed to wear a

9    yarmulke for religious reasons?

10   A.   Yes.

11   Q.   And if you look at the bottom of the page, does it

12   indicate that the yarmulke was permitted as an exception to the

13   Look Policy by human resources?

14   A.   Yes, it was not distracting from a style, so it was

15   granted the exception.

16   Q.   And the male model who needed to wear the yarmulke was

17   actually employed at the time; correct?

18   A.   Yes, he was an employee.

19   Q.   He was not applicant?

20   A.   No, he was not an applicants.

21   Q.   And the male model who needed to wear the yarmulke

22   specifically asked for an exception to the Look Policy;

23   correct?

24   A.   Yes.

25   Q.   I would like you to look at Exhibit 106, please.  Now,

1    Exhibit 106 is actually about five pages long; is that right?

2         MR. KNUEVE:  Your Honor, may I approach the bench on

3    this exhibit?

4         THE COURT:  You may, sir.

5         (Counsel approached the bench and the following

6    proceedings were had out of the hearing of the jury.)

7         THE COURT:  Yes, sir.

8         MR. KNUEVE:  Your Honor, we haven't objected to a lot

9    of these exhibits, obviously.  This one is longer, it's

10   confusing, it's a medical, it's a request for a medical

11   exception, not a religious exception.  It's a very convoluted

12   story, I believe it's cumulative.  It doesn't add anything

13   beyond what's already kind of been gone over here and I think

14   it's confusing for the jury, and frankly it's not relevant.

15        MS. SEELY:  Your Honor, any exception to the Look

16   Policy is relevant to whether or not it was an undue hardship

17   as of 2008, whether the company was reasonable in believing it

18   was an undue hardship.

19        THE COURT:  Undue hardship is not an issue.

20        MS. SEELY:  But whether the company reasonably

21   believed it was, I believe Your Honor has said is an issue.

22        MR. KNUEVE:  Well, Randall Johnson, he's testified he

23   wasn't aware of any exceptions.  This has nothing -- all this

24   is showing is the company has a policy to provide exceptions

25   and enforces it.

1          THE COURT:  And this is not a religious issue?

2          MS. SEELY:  No, Your Honor, but the question is

3     whether the company was reasonable in believing that it could

4     make any exceptions to the Look Policy without hurting its

5     brand.  That will be the company's evidence.  They'll say we

6     thought that we couldn't do that.  And therefore, it should not

7     -- any exceptions for any reason should be put before the jury.

8     The jury needs to see that they could make exceptions and it

9     wasn't -- they did and it wasn't reasonable for them to believe

10    that they couldn't and they could have done it for Samantha.

11         MR. KNUEVE:  Well, that's a mischaracterization of our

12    evidence.  Our evidence in my opening statement was that the

13    company does consider exceptions, makes exceptions when it's

14    not an undue hardship and that's our defense.  Our defense in

15    this case is that Randall Johnson never called HR as he should

16    have and HR never had a chance to consider.  This document is

17    cumulative, it's confusing, it's not a religious issue and it

18    doesn't add anything.

19         THE COURT:  Let me take a quick look.

20         MS. SEELY:  Your Honor, I don't intend to go through

21    the whole document with her.

22         THE COURT:  Apparently, this individual was obsessive

23    compulsive and acted out by needing to wear a hat; is that

24    right?

25         MS. SEELY:  That's correct, and he was allowed to.

1    That's the gist of it.

2            THE COURT:  I'm going to grant the objection on the

3    grounds of relevance and confusing.  It's too far afield.

4            (Counsel returned to their respective places and the

5    following proceedings were had within the presence and hearing

6    of the jury.)

7            THE COURT:  The objection is sustained.  Ms. Seely.

8    Q.   (By Ms. Seely)  Please turn to Exhibit 130, Ms. Riley.

9    A.   Okay.

10   Q.   Is Exhibit 130 a human resource contact printout?

11   A.   Yes, it is.

12   Q.   And does Exhibit 130 reflect a telephone call made to

13   human resources on January 11th, 2007?

14   A.   Yes, it does.

15   Q.   And this call -- the subject of the call was a request for

16   an exception to the Look Policy?

17   A.   Yes.

18           MS. SEELY:  Plaintiff offers Exhibit 130 into

19   evidence.

20           THE COURT:  Any objection?

21           MR. KNUEVE:  No objection, Your Honor.

22           THE COURT:  Plaintiff's 130 is admitted.

23   Q.   (By Ms. Seely)  Exhibit 130 indicates that the call was

24   taken by a human resource person named Erin Chura; correct?

25   A.   That's correct.

1    Q.   And the caller was a Mike Skrbin?

2    A.   Yes.

3    Q.   Mr. Skrbin was a management employee in one of the stores;

4    is that right?

5    A.   Yes.

6    Q.   And the first full paragraph says, "Mike just transferred

7    into H391.  Mike Gibson is the stock lead and he has a beard.

8    He is Muslim and has a beard for religious reasons.  It's a

9    pretty full beard and it is obviously against the Look Policy.

10   Natalie Ford, the current district manager, was the store

11   manager when he was hired.  According to Mike, Natalie told him

12   the beard was against Look Policy but she needed good stock

13   lead so she would make an exception."

14        Did I read that correctly?

15   A.   That's correct.

16   Q.   Now, if you look at the next to the last paragraph.  It

17   says "Mike will explain to Mike Gibson that he can keep his

18   beard."  Is that right?

19   A.   Yes.

20   Q.   So an exception for this stock lead's beard was permitted

21   by Abercrombie's human resources department?

22   A.   Yes, an exception was made because the issue hadn't been

23   addressed properly, which it says so in the contact records.

24   And in addition, it applied only to his current job role as

25   stock lead.  And stock leads do not interact a lot with

1    customers.

2    Q.   Now, facial hair was prohibited by the Look Policy; right?

3    A.   Yes, it is.

4    Q.   And Exhibit 130 indicates that this particular stock lead

5    was allowed to work with a beard as an exception to the Look

6    Policy; correct?

7    A.   Yes, that accomodation was made.

8    Q.   And the stock lead who had the beard was an employee when

9    he made a request to be allowed to wear the beard; right?

10   A.   That's right.

11   Q.   He wasn't an applicant?

12   A.   No, he wasn't.

13   Q.   And he made a specific request to be allowed to wear his

14   beard as an exception to the Look Policy; correct?

15   A.   Yes, he did.

16   Q.   Would you please look at Exhibit 136?

17   A.   Okay.

18   Q.   Exhibit 136 is a printout of a human resource contact

19   record; correct?

20   A.   Yes, it is.

21   Q.   And it reflects a call that was made to human resources

22   dated May 9th, 2006; right?

23   A.   Yes.

24        MS. SEELY:   Plaintiff offers Exhibit 136 into

25   evidence.

1          MR. KNUEVE:  No objection, Your Honor.

2          THE COURT:  Plaintiff's 136 is admitted.

3    Q.   (By Ms. Seely)  Now, if you look at the first paragraph --

4    well, strike that.  Have you had a chance to read over 136, Ms.

5    Riley?

6    A.   I read it during the deposition.

7    Q.   Okay.  Is it true that Exhibit 136 reflects a request for

8    an exception to the Look Policy regarding facial hair?

9    A.   Yes.

10   Q.   And there was an associate in one of the stores who had

11   some facial hair; correct?

12   A.   Correct.

13   Q.   He was a model; right?  I think it says that in the third

14   paragraph.  It starts, on Thursday, May 4th?

15   A.   Yes.

16   Q.   It says the associate identified himself as Chris Banks, a

17   model at Willow Grove.

18   A.   Yes.

19   Q.   And it further says that Mr. Banks had worked for

20   Abercrombie since October 2005; right?

21   A.   That's correct.

22   Q.   And does Exhibit 136 reflect that Mr. Banks requested

23   permission or an exception to the Look Policy for his facial

24   hair?

25   A.   Yes, for a short period.

1    Q.   And he was allowed to wear facial hair as an exception to

2    the Look Policy; right?

3    A.   Yes, he was, for a period of time.

4    Q.   And Mr. Banks was a Muslim and needed to wear the facial

5    hair because of his religion; correct?

6    A.   Yes.

7    Q.   Now Mr. Banks was an employee and not an applicant at the

8    time he made the request; correct?

9    A.   Yes, he was.

10   Q.   And he specifically asked for permission for an exception

11   to the Look Policy for his facial hair?

12   A.   Yes, he did.

13   Q.   Would you please look at Exhibit 110?

14   A.   Yes.

15   Q.   Is Exhibit 110 a printout of a human resource contact

16   record?

17   A.   Yes, it is.

18   Q.   And does it reflect a call that was made to human

19   resources on March 19th, 2007?

20   A.   Yes.

21        MS. SEELY:   Plaintiff offers Exhibit 110 into

22   evidence.

23        THE COURT:   Any objection?

24        MR. KNUEVE:   No objection, Your Honor.

25   Q.   (By Ms. Seely)  Would you please look at the paragraph

1    that starts, "Sara just transferred to the store".  Does

2    Exhibit 110 reflect that an employee named Meghan had a nose

3    ring for religious purposes and wanted to be allowed to wear it

4    as an exception to the Look Policy?

5    A.   Yes.

6    Q.   And at the bottom, does Exhibit 110 say resolution

7    accommodated?

8    A.   Yes, it does.  This contact record is pretty incomplete,

9    so it doesn't really say how it was accommodated.

10   Q.   It was redacted by the defendant; right?  That's why it's

11   incomplete?

12           MR. KNUEVE:  Objection, Your Honor, speculative.

13           THE COURT:  Sustained.

14   Q.   (By Ms. Seely)  Does it say redacted at the top?

15   A.   It does.

16           MR. KNUEVE:  I object, Your Honor.  What's the point

17   of this question?

18           THE COURT:  I'm sorry.  What is your question?

19           MS. SEELY:  My question is does Exhibit 110 say in

20   large letters "redacted" at the top.

21           MR. KNUEVE:  The document speaks for itself, Your

22   Honor.

23           THE COURT:  Is this already admitted?

24           MS. SEELY:  It is admitted, Your Honor, I believe.

25           THE COURT:  All right.  The document speaks for

```
 1   itself.  Sustained.

 2            MS. SEELY:  I'll withdraw that.

 3   Q.  (By Ms. Seely)  Now, Meghan, who needed to wear the nose

 4   ring, she was an employee at the time that she made the request

 5   for the nose ring; correct?

 6   A.  She was an impact employee.

 7   Q.  She was not an applicant?

 8   A.  No, she was an employee.

 9   Q.  And she specifically requested permission to wear a nose

10   ring as an exception to the Look Policy; right?

11   A.  Yes, she did so on a religious basis.  She's Buddhist.

12   Q.  Would you please look at Exhibit 89?

13   A.  Yes.

14   Q.  Now exhibit, is Exhibit 89 a printout of a human resource

15   contact record?

16   A.  Yes, it is.

17   Q.  And does it reflect a call that was made to human

18   resources on September 4th, 2007?

19   A.  Yes, it does.

20            MS. SEELY:  Plaintiff offers Exhibit 89 into evidence.

21            THE COURT:  Any objection?

22            MR. KNUEVE:  No objection, Your Honor.

23            THE COURT:  Plaintiff's 89 is admitted.

24   Q.  (By Ms. Seely)  Ms. Riley, Exhibit 89 reflects a call

25   taken by Harold Gomez in HR; right?
```

1    A.   Yes.

2    Q.   And the caller was a Lauren Bartholomow; correct?

3    A.   That's correct.

4    Q.   And she was a store management official in one of the

5    stores?

6    A.   Yes, she would be a store manager.

7    Q.   And does Exhibit 89 show that an employee named ^Hannah

8    was hired and then informed Ms. Bartholomow that she had to

9    wear a skirt or a dress that reached her knees?

10   A.   Yes, she was hired and then she asked for the

11   accommodation of wearing a skirt.

12   Q.   And this was because of her religion, according to 89;

13   correct?

14   A.   Yes, according to her religion.

15   Q.   And if you look at the bottom of Exhibit 89, in says

16   "accomodation provided;" correct?

17   A.   Yes, and this was another employee who was also in an

18   impact role.

19   Q.   And Hannah, the employee specifically requested to be

20   allowed to wear a knee-length skirt as an exception to the Look

21   Policy; correct?

22   A.   Yes.

23   Q.   Because Abercrombie didn't normally sell knee-length

24   skirts; correct?

25   A.   Not normally.

1   Q.   So wearing a knee-length skirt was, in fact, an exception

2   to the Look Policy that was allowed?

3   A.   Yes, it's an exception.

4   Q.   Now, let's talk about the religious accommodation

5   procedure that was in effect in 2008 and before.  One of the

6   functions of human resources was to handle decisions on

7   requests for accommodation for religion; correct?

8   A.   Correct.

9   Q.   And all requests for religious accommodation by employees

10  or applicants in the stores had to be communicated to human

11  resources for a decision; right?

12  A.   That's what we train our managers to do.  All

13  accommodation requests, including religious accommodation must

14  go to the human resource team.

15  Q.   So the human resources had the authority to make the

16  decisions on religious accommodation; right?

17  A.   Yes, with the collaboration of store management.

18  Q.   Because, of course, you had to hear from store management

19  in order to make the decision on a request for religious

20  accommodation; correct?

21  A.   I wouldn't say we have to hear from them, but we work in

22  an environment that's very collaborative and since it is their

23  store, it would feasible to have the discussion with them, as

24  well.

25  Q.   Well, if store management didn't call human resources and

1    say I've got a request for religious accommodation, human

2    resources wouldn't have to make that decision; right?

3    A.   Right.  I think I have to be more specific, Ms. Seely.

4    When I say store management, I would mean the more senior store

5    leaders, not specific to the store managers in the store, but

6    the regional managers who sit with the HR team in the same

7    floor.

8    Q.   Store managers were supposed to call human resources if

9    they had requests for religious accommodation; right?

10   A.   That's correct.

11   Q.   And district managers were supposed to call human

12   resources if they had requests for religious accommodation;

13   right?

14   A.   Yes, that's also correct.

15   Q.   And assistant managers were supposed to contact their

16   superiors; right?

17   A.   Yes.

18   Q.   Now, let's talk about the training that store managers

19   got, store management employees got on the hiring process.

20   When you became vice president of human resources in May of

21   2007, the process for hiring and interviewing store employees

22   was already in place; correct?

23   A.   Yes, it was.

24   Q.   And you were actually trained on the process for hiring

25   and interviewing when you came on board; right?

1    A.   Yes, I was.

2    Q.   Okay.  And you went to stores and sat in on interviews, as

3    well correct?

4    A.   Yes, in addition to the training itself, I also observed

5    several interviews in different stores.

6    Q.   And so you are familiar with the interviewing -- with what

7    the interviewing managers are supposed to do during the hiring/

8    interviewing process; right?

9    A.   Yes, I am.

10   Q.   And the way that process went, initially, was the

11   applicant for a model or an impact job was supposed to apply at

12   a kiosk using an electronic application; right?

13   A.   That's correct.

14   Q.   And every applicant was interviewed?

15   A.   Every applicant is interviewed.

16   Q.   And the interviewing manager would use the standardized

17   model group interview guide during the interview; correct?

18   A.   Yes, they would.

19   Q.   And the interviewing manager would fill out that guide,

20   either while the interview was going on or afterwards; correct?

21   A.   Correct.

22   Q.   And the interviewing manager would score each of the

23   applicants on the competencies that are set forth in the guide;

24   right? Yes.

25   Q.   And at the conclusion of the interview, the interviewing

1    manager would total up the scores and give an overall score to

2    each of the applicants; correct?

3    A.    That would be after the interviews.

4    Q.    Okay.  And then  if the applicant was going to be hired,

5    he or she would get a phone call from the interviewing manager;

6    right?

7    A.    Yes.

8    Q.    And that phone call would be to schedule them for

9    orientation?

10   A.    Yes, it would be to make the job offer and to set them up

11   for their first day of work.

12   Q.    And if that applicant was not going to be hired, the

13   interviewing manager simply did not call or communicate with

14   the applicant again; right?

15   A.    Yes.  At the end of the interview, we do tell all

16   applicants that if they are not selected, we will not call

17   them, which is partly for efficiency because we have over

18   200,000 employees in any given year, so you can imagine the

19   number of applicants we have.  But they are asked to reapply

20   for a position in six months, if they choose to.

21   Q.    Now, Ms. Riley, in June of 2008, the managers in the

22   stores who conducted the interviewers for models were the

23   assistant managers; right?

24   A.    Assistant managers, store managers.

25   Q.    And these assistant managers and store managers were

1   trained on how to conduct interviews; correct?

2   A.   All of our managers are trained on conducting interviews.

3   It's part of their initial training coming into the company as

4   a manager in training.

5   Q.   So if someone was a district manager, they would have

6   received the training on how to conduct interviews; right?

7   A.   Yes.  All of your district managers, regional managers,

8   directors and vice presidents know how to conduct a group

9   interview.

10  Q.   And they all went through the same training that you went

11  through when you first got hired; right?

12  A.   Similar training, yes.

13  Q.   Now, if the interviewing manager had questions about the

14  interview process, with respect to a particular applicant, they

15  could contact their direct supervisor; right?

16  A.   Yes, their managers can provide guidance.

17  Q.   Or they could call HR; correct?

18  A.   Or they can call their HR partner, yes.

19  Q.   Now, let's look at Exhibit 4, please, in your book.

20  A.   Okay.

21  Q.   Now, Exhibit 4 is the Model Group Interview Guide that, in

22  2008, was to be used with applicants for model positions;

23  correct?

24  A.   Yes, this is the same guide used for all model interview

25  training.

1    Q.   Okay.  And interviewing manager would have Exhibit 4 in

2    front of him or her when doing the interview; correct?

3    A.   Yes.

4    Q.   And the guide is designed to make sure that standardized

5    questions are asked of all applicants; right?

6    A.   Yes.

7    Q.   And the interviewing manager was supposed to take notes on

8    the guide with respect to each applicant; correct?

9    A.   Yes.

10   Q.   Now is there anywhere -- strike that.  There's nowhere in

11   Exhibit 4 that tells --  strike that.  Nowhere in Exhibit 4

12   does it say that an interviewing manager is supposed to tell an

13   applicant that headwear is not allowed, during the interview.

14   Am I right?

15   A.   In Exhibit 4, at the end of the interview, there is a

16   closing script.

17   Q.   That is on page 21; correct?

18   A.   Maybe.

19   Q.   Abercrombie 21?

20   A.   Yes, that would be it.

21   Q.   Okay.

22   A.   And it does give a brief summary of the Look Policy and at

23   that time, we ask the candidate or the manager asks if there

24   are any questions regarding our policies.  It's at that time

25   that we expect any applicant who may have a question, to ask a

1    question.

2    Q.   Ms. Riley, nowhere in the section -- well, nowhere in the

3    closing statement does it say that headwear is not allowed,

4    does it?

5    A.   No, it does not state that.  It does, you know, say that

6    we are simple, makeup, hair color and nail polish.

7    Q.   But it does not say anything about headwear, does it?

8    A.   And it does say you must wear a hair style that is natural

9    and classic, which I guess, I would interpret as we would see

10   your hair style, which would not be covered by headwear.

11   Q.   That's your interpretation?

12   A.   And I would probably think, without guessing, that that's

13   the interpretation of all managers at Abercrombie & Fitch.

14   Q.   Well, you don't know that for sure, do you?

15   A.   No, I don't.

16   Q.   Thank you.  Now, Ms. Riley, during the interview,

17   interviewing managers were trained not to raise the topic of

18   religion; is that right?

19   A.   That's correct.

20   Q.   That's a taboo topic, in other words; right?

21   A.   It is illegal for our managers to ask any questions around

22   religion or race or gender.

23   Q.   And that's what they were told?

24   A.   And that's what they are trained, yes.

25   Q.   Now, if an applicant raised the topic of religion during

1   an interview, the interviewing managers were trained not to

2   make any notes on that; right?

3   A.   That's correct.

4   Q.   There were to be no notes made in Exhibit 4 if the

5   applicant raised the topic of religion?

6   A.   If an applicant raises the topic of religion, we ask the

7   manager, the interviewing manager, not to take any notes on it.

8   However, if there are any issues raised, the manager must call

9   HR.

10  Q.   Now, if an applicant -- strike that.  The interviewing

11  managers were supposed to call either the district manager or

12  human resources if the applicant raised religion during the

13  interview; correct?

14  A.   Correct.  They can call either their DM or HR.  District

15  managers must call HR for anything to do with accommodation.

16  Q.   If the applicant raised the issue of religion, the

17  interviewing manager could seek guidance from the district

18  manager; correct?

19  A.   They must call HR.

20  Q.   Are you saying that they could not, that the interviewing

21  manager could not contact his or her district manager for

22  advice, if the applicant raised the issue of religion during

23  the interview?

24  A.   No, I'm not saying that.

25  Q.   Now, if the applicant raised -- strike that.  If the

1    applicant asked during the interview if he could wear religious

2    headwear or she could wear religious headwear, like a yarmulke,

3    the interviewing manager was supposed to talk to that applicant

4    after the interview and get clarifying information; correct?

5    A.   Correct.

6    Q.   And then the interviewing manager was supposed to contact

7    human resources?

8    A.   That's correct.

9    Q.   Because that would be an exception to the Look Policy;

10   correct?

11   A.   Yes, it would be.

12   Q.   And human resources would have to make the decision on the

13   request for an exception to the Look Policy made by the

14   applicant; correct?

15   A.   The request for accommodation, yes.  HR, in collaboration

16   with the store leadership, yes, would make a decision.

17   Q.   But if the applicant wore religious headwear to the

18   interview, like a yarmulke, and did not ask any questions about

19   his yarmulke, or raise it, raise the issue, the interviewing

20   manager was not supposed to call HR; correct?

21   A.   Correct; that would be making an assumption.

22   Q.   And that would also be true if the applicant came to the

23   interview wearing a headscarf; correct?

24   A.   That would be correct.

25   Q.   If the applicant didn't specifically ask for an exception

1    to the Look Policy or a religious accommodation, the

2    interviewing manager was not supposed to call human resources;

3    correct?

4    A.    No.

5    Q.    No?

6    A.    Human -- I mean, yes.  Human resources will call -- the

7    manager will call human resources.  I apologize.

8    Q.    Let me make sure that I'm clear on this.  If the applicant

9    wore a yarmulke or a religious headwear to the interview and

10   did not ask any questions and did not specifically ask for a

11   religious accommodation, the interviewing manager was not

12   supposed to call HR; correct?

13   A.    That's correct.  They don't have to call HR if the

14   applicant does not request an exception.

15   Q.    There's no need to call HR, no request has been made;

16   right?

17   A.    No request has been made so there is no need to consult

18   with the HR team.

19   Q.    And interviewing managers were trained that they did not

20   need to call HR if the applicant, if an applicant showed up at

21   the interview wearing religious headwear, but did not ask for

22   an exception or a religious accommodation; correct?

23   A.    Yes, there's no need to call if the applicant does not

24   specifically ask for an accommodation.

25   Q.    Now, let's look at the rating sheet on Exhibit 4, and that

1    would be page Bates stamped 24, the last page of the exhibit.

2    A.   Okay.

3    Q.   Now, this is the rating sheet that the interviewing

4    manager is supposed to fill out after the interview; correct?

5    A.   That's correct.

6    Q.   And the interviewing manager would assign points to each

7    of the three competencies to each candidate; correct?

8    A.   That's correct.

9    Q.   And those competencies are first, outgoing and promotes

10   diversity; right?

11   A.   Yes.

12   Q.   The second one is sophistication and aspiration?

13   A.   Yes.

14   Q.   And the third is appearance and sense of style; right?

15   A.   Yes.

16   Q.   And appearance and sense of style judges the applicant on

17   how attractive and well groomed they are; correct?

18   A.   Yes.

19   Q.   And the interviewing manager is supposed to give the

20   applicant either a one, two or three rating in each of these

21   three competencies; right?

22   A.   That's correct.

23   Q.   Three is the highest score; right?

24   A.   Yes.

25   Q.   And one is the lowest score; correct?

1    A.   That's correct.

2    Q.   Now, let's look back at the page before, page 23 in

3    Exhibit 4.  And this page sets forth the evaluation standards

4    that are to be applied by the interviewing manager when judging

5    appearance and sense of style of the applicant; right?

6    A.   Yes.

7    Q.   And one of the evaluation standards that the interviewing

8    manager is supposed to use is whether or not the applicant is

9    wearing clothing that fits the Abercrombie brand; right?

10   A.   Yes, clothing consistent with the brand, correct.

11   Q.   If you would look at the column that is headed one, below

12   expectations, in the last cell in that column, am I correct

13   that an interviewing manager is supposed to rate an applicant

14   as a one or below expectations if they are wearing clothes that

15   are inconsistent with the Abercrombie brand?

16   A.   Yes.

17   Q.   That's what it says; correct?

18   A.   Yes.

19   Q.   And this is the guide that the interviewing manager is

20   supposed to follow during the interview?

21   A.   That's correct.

22   Q.   Now, you would agree with me -- strike that.  It's your

23   testimony, is it not, that a headscarf is inconsistent with the

24   Abercrombie brand?

25   A.   Yes, it is.

1   Q.   So according to Exhibit 4, page 23, the evaluation

2   standards on appearance and sense of style, if an applicant

3   came to an interview wearing a headscarf, the interviewing

4   manager should rate that applicant with a one or below

5   expectations in appearance and sense of style; right?

6   A.   I would not say that, specifically, because an applicant

7   could have a great sense of style, be very well groomed,

8   extremely attractive, aspirational, exudes the brand and wear a

9   headscarf.

10  Q.   Does it not indicate, though, Ms. Riley, on page 23 in the

11  column headed "below expectations" that the third bullet point,

12  an applicant is supposed to get a one or below expectations if

13  she does not wear attractive, stylish, fashionable clothes and

14  hair style, makeup and accessories or wears clothes that are

15  inconsistent with the Abercrombie brand?

16  A.   It does say that.

17  Q.   Now, it's also true, isn't it, Ms. Riley, that an

18  applicant does not have to be in compliance with the Look

19  Policy at the time of the interview in order to be hired?

20  A.   That's correct.

21  Q.   If an interviewing manager wanted to hire an applicant who

22  was wearing a headscarf at the interview, she could reach out

23  to her district manager about whether she could hire that

24  applicant; correct?

25  A.   Yes, a manager can reach out to their district manager for

1   anything.

2   Q.   And the district manager's job, in part, is to give

3   guidance to the interviewing manager when he or she reaches out

4   for guidance on whether to hire someone, whether to hire a

5   particular applicant?

6   A.   Yes, regardless of what the issue may be.

7   Q.   That's part of the district manager's job?

8   A.   Yes, it is to oversee and to provide guidance.

9   Q.   Now, I would like to talk about some of the training that

10  was done in 2008 and prior, when you were vice president of

11  human resources.  The human resources department was primarily

12  responsible for training store managers and district managers

13  in HR policies and practices; right?

14  A.   Yes, in addition to EEO, we have an internal complaint

15  procedure, as well as our Respect Policy and our standard of

16  conduct.

17  Q.   So HR did the trainings for store management --

18  A.   Yes.

19  Q.   -- and HR issues.  And you had a training team that did

20  that; correct?

21  A.   Correct.

22  Q.   And the training team was part of human resources; right?

23  A.   They are part of the HR team, yes.

24  Q.   And the training team developed training materials for the

25  abercrombie store managers; correct?

1   A.   Yes.

2   Q.   And human resources reviewed and approved those training

3   materials before they were distributed; right?

4   A.   Yes.

5   Q.   Now, when an employee became a new manager, they went

6   through what's called a manager in training program; right?

7   A.   That's correct.

8   Q.   And in order to become an assistant manager, an employee

9   had to complete the MIT training program; correct?

10  A.   Yes, they did.

11  Q.   And you are familiar with that training, are you not?

12  A.   Yes, I am.

13  Q.   And that training lasted 10 to 12 weeks?

14  A.   Yes.

15  Q.   And that was true when you started working for Abercrombie

16  in 2007; right?

17  A.   Yes.

18  Q.   I would like you to look at Exhibit 11 in your book,

19  please.

20  A.   Yes, I'm there.

21  Q.   Exhibit 11, can you -- do you recognize that?

22  A.   Yes, that is a copy of our old manager in training

23  program.

24  Q.   Now, the manager in training program that you have in

25  front of you, Exhibit 11, that was the manager in training

1    program in effect from 2002 until 2009; correct?

2    A.   Yes, or some derivative of it.

3            MS. SEELY:  Plaintiff offers Exhibit 11 into evidence.

4            THE COURT:  Any objection?

5            MR. KNUEVE:   Yes, Your Honor.  May I approach?

6            THE COURT:  Yes.

7            (Counsel approached the bench and the following

8    proceedings were had out of the hearing of the jury.)

9            MR. KNUEVE:  Your Honor, Heather Cooke testified that

10   she never saw this document and this was, I think Ms. Riley

11   said this document or a derivative of it.  This document is

12   only operational procedures, it's not a human resources

13   procedures and I think it's misleading to say that this is the

14   MIT program that was applicable to this case.

15           MS. SEELY:  Your Honor, it was the MIT program that

16   was in effect in 2008 and until 2009, and Ms. Riley can

17   certainly explain, if she wishes, but this was operational.

18   But she testified, in depth and in detail in her deposition

19   about this.  She's familiar with it and if she wants to say

20   there was other training that is not in this book, she can do

21   that.  It goes to training, which the company has raised as an

22   issue here, that they have trained their employees and we are

23   entitled to --

24           MR. KNUEVE:  This is not training, Your Honor, on the

25   process for religious accommodation or religious

1    discrimination.  This is training on procedural aspects of

2    being a manager.  The training on religious discrimination and

3    religious accommodation we've had extensive testimony about

4    already from Ms. Riley.  There are other documents that the

5    EEOC has that relate to interviewing, hiring and

6    discrimination.  This is not it.  And she was asked about it at

7    deposition because Ms. Seely chose to ask it, but I objected to

8    it at the time.  It's not relevant.

9            THE COURT:  What was it that Cooke testified to as to

10   this document, because I do recall she did address this

11   document?  Ms. Seely.

12           MS. SEELY:  She didn't think she had ever seen this

13   document.  And that's another reason why it's relevant, Your

14   Honor, because if they give training, why didn't Ms. Cooke

15   recognize the document.  And they do talk about the training in

16   the Look Policy.

17           THE COURT:  Wait, wait.  Mr. Knueve says this is not

18   the document that's relevant to religious accommodation;

19   correct?

20           MR. KNUEVE:  Right.

21           THE COURT:  So why would one wave a document that

22   doesn't even purport to deal with religious accomodation?

23           MS. SEELY:  What this document does purport to deal

24   with is the Look Policy, is how the managers are trained,

25   managers in training are trained on the Look Policy.  And

```
1    there's nothing in this document that says anything about

2    religious accommodation.

3            THE COURT:  Well, that's Mr. Knueve's point.  He's

4    saying that religious accommodation is contained in another

5    document.  Is that correct?

6            MR. KNUEVE:  Yes, the policies regarding -- the policy

7    that we have been talking about is in the PSP training, the

8    policy to call HR if a religious issue is brought up is in the

9    PSP training.

10           THE COURT:  Okay.  Where, where, specifically, are we

11   going to refer in this particular document, which is a

12   multi-page document?

13           MS. SEELY:  Let me find it here.  It's got the rest of

14   it here.  With respect to brand reps dressed correctly and

15   energize.  And there's another section in here that talks

16   about the Look Policy.  My point, Your Honor, is that this is

17   how managers in training are trained.  If they are also trained

18   by human resources in religious accommodation, Ms. Riley can

19   say that.  And I am not aware that there's any document or any

20   reference in the PSP about training employees to recognize the

21   need for religious accommodation.  I'm sure he'll put that on

22   in his case.

23           THE COURT:  Is that not the case, Mr. Knueve?

24           MR. KNUEVE:  The training, Your Honor, is if religion

25   is raised, then call HR immediately.  That's consistent with
```

1    the entire testimony throughout this case.  It will be

2    prejudicial and misleading to the jury for her to wave this

3    document around and say this doesn't talk about discrimination

4    or religion when there are other documents that she knows about

5    that do.

6              THE COURT:  Well, all right.  I think I can resolve

7    this.  This looks to me to be grist for both of you to ask

8    about.  The particular page that Ms. Steely is referring to

9    here, for the record, is Bates numbered A&F 98.  And I take it

10   that the EEOC wishes to say here's the document, the 12 week

11   manager training program and it doesn't say anything about

12   religious accommodation.  And Mr. Knueve can say well, that may

13   not, but there's another document that does.  The objection is

14   overruled.

15             (Counsel returned to their respective places and the

16   following proceedings were had within the presence and hearing

17   of the jury.)

18             MS. SEELY:  I believe I offered it into evidence.

19             THE COURT:  The objection is overruled.

20             MS. SEELY:  So plaintiff offers Exhibit 11 into

21   evidence.

22             THE COURT:  Exhibit 11 is admitted.

23   Q.  (By Ms. Seely)  Now Ms. Riley, does Exhibit 11 list the

24   training topics that each manager in training is trained in

25   each week during the 12-week program?

1    A.   Yes, it lists all the operational training topics, yes.

2    Q.   And the manager in training is required -- if you would

3    turn to page 83.  The manager in training is required to sign

4    off at the bottom of each of the pages of the exhibit; is that

5    correct?

6    A.   Yes, along with their store manager.

7    Q.   And the reason is to -- strike that.  And that is because

8    it is important -- all of the topics that are listed that the

9    MIT is trained in are important to Abercrombie; right?

10   A.   Right.  And as I stated earlier, this is the operational

11   training.  We also, if you'll refer back to the interview

12   training, we also do that during the manager in training period

13   and they are also required to do diversity training, as well.

14   Q.   Ms. Riley, let's focus on Exhibit 11; okay?

15   A.   Oh, I'm sorry.

16        MR. KNUEVE:  Objection, Your Honor.  The witness is

17   clarifying the evidence.

18        THE COURT:  Sustained.  Go ahead.

19        MS. SEELY:  Would you please look at --

20        THE COURT:  No, I'm sorry.  Ma'am, you can complete

21   your answer.  Go ahead.

22   A.   Okay.  And I was also going to say we also cover a

23   diversity training, which specifically speaks EEO laws, Title

24   VII, discrimination and harassment and that our company does

25   not support anything that would be outside of the law.

1    Q.   (By Ms. Seely)  Now, there is nothing in Exhibit 11, is

2    there, that refers to diversity training?

3    A.   No, there isn't anything specifically in Exhibit 11, but

4    everyone is required to take diversity training, who is going

5    to be a manager at Abercrombie & Fitch, during their first

6    three months with Abercrombie.

7    Q.   Let's look at page 85, please, of Exhibit 11.

8    A.   Yes.

9    Q.   If you would look at the number one item, it says

10   orientation.  And there is a box that says review Look book,

11   review dress and grooming code.  Do you see that?

12   A.   Yes.

13   Q.   And there's no mention on this page or anywhere, is there,

14   in Exhibit 11, of what to do if exceptions to the Look Policy

15   are requested by applicants or employees?

16        MR. KNUEVE:  Objection, Your Honor.  The witness has

17   already testified this is not the training manual for that kind

18   of thing.

19        THE COURT:  All right, just one second.  Overruled, go

20   ahead.

21        THE WITNESS:  Could you repeat that?

22   Q.   (By Ms. Seely)  Yes, there is no mention in Exhibit 11, is

23   there, of -- that the -- strike that.  There's no mention

24   anywhere in Exhibit 11 to indicate that a manager in training

25   is given any training on what to do if an applicant or an

1    employee requests an exception to the Look Policy?

2    A.   It does say to review the Look book, review dress and

3    grooming code, which is our appearance and look policy.  And as

4    you referred to earlier, in that Look Policy it does say what

5    is expected.

6    Q.   There's no mention on page 85 or anywhere in Exhibit 11 of

7    what a manager in training is supposed to do if an employee or

8    applicant asks for an exception to the Look Policy, is there?

9    A.   No, it's not.  But it is outlined in the PSP that if there

10   are any exceptions or any questions, they must call HR.

11   Q.   Now, there is no mention in Exhibit 11 of that, is there?

12        MR. KNUEVE:  Objection, Your Honor.  Asked and

13   answered.

14        THE COURT:  Sustained.

15   Q.   (By Ms. Seely)  Now, Ms. Riley, there's no mention in

16   Exhibit 11 anywhere, is there, of what a manager in training is

17   supposed to do if an applicant or employee asks for religious

18   accommodation?

19        MR. KNUEVE:  Objection, Your Honor, asked and

20   answered.

21        THE COURT:  Sustained.

22   Q.   (By Ms. Seely)  Ms. Riley, is there -- are you aware of

23   whether there is any training covered in Exhibit 11 regarding

24   religious accommodation?

25        MR. KNUEVE:  Objection, Your Honor, asked and

1    answered.

2         THE COURT:   Sustained.

3    Q.   (By Ms. Seely)   Managers in training are not trained to

4    handle requests for religious accomodation, are they?

5    A.   None of our managers are asked to manage or trained to

6    handle religious accommodation.   They are asked to call the HR

7    team who is trained to handle those issues.

8    Q.   And they are asked to call HR when a request has been made

9    by an applicant or employee for religious accommodation;

10   correct?

11   A.   Yes, they're asked to do that.

12   Q.   And if they're not asked, if the manager is not asked for

13   an exception to the Look Policy for religious accommodation,

14   they are not to call HR; correct?

15   A.   They can call --

16        MR. KNUEVE:   Objection, asked and answered.

17        MS. SEELY:   Withdrawn.

18   Q.   (By Ms. Seely)   In fact, Ms. Riley, isn't it true that

19   Abercrombie & Fitch does not train its managers to be HR

20   experts?

21   A.   We do not train our managers to be HR experts.   We have

22   thousands of managers, we have a very high turnover, so we do

23   not feel confident that managers should be making these

24   decisions at the store level.   The HR team is trained to handle

25   these issues and we feel at Abercrombie & Fitch, that that

1    gives us a better advantage in terms of being fair with anyone

2    who comes to us with an issue.  The issue will be handled by

3    someone who is capable of actually handling the issue.

4    Q.   And that would be handled by HR in corporate headquarters;

5    right?

6    A.   That would be handled by the store's HR team.

7    Q.   And that store's HR team is located in corporate

8    headquarters; correct?

9    A.   Not everyone sits in corporate headquarters, but they

10   belong to the store's HR team.

11   Q.   The HR team is not actually located in the various stores,

12   is it?

13   A.   No, it's not.  The majority of the HR team does sit with

14   me in New Albany, Ohio.  However, we have several HR managers

15   who live within the geography of the stores that they support.

16   Q.   Okay.  But they don't actually have offices in the stores

17   that they support; correct?

18            MR. KNUEVE:  Objection, Your Honor, relevance.

19            THE COURT:  Overruled.  Go ahead.

20   A.   Some -- our HR managers may have what's called a home, so

21   it's one that we go into.  We visit our stores regularly.  So

22   we are always in contact with what is going on with a store, we

23   know what manager issues are.  But they are not officed in a

24   store with the exception of our New York store which has an HR

25   office.

1    Q.   Now, Ms. Riley, I believe you testified a few minutes ago

2    that before June of 2008, that store management had received

3    diversity training?

4    A.   Yes.

5    Q.   And that training is done by your Office of Diversity.  Is

6    that correct?

7    A.   It's done through the Office of Diversity, that's correct.

8    Q.   That's a department or an office that's located in

9    headquarters?

10   A.   Yes.

11   Q.   And you are familiar with that diversity training?

12   A.   Yes, I am.

13   Q.   And before June of 2008, the trainees, people who were

14   trained in the diversity training, received a handbook; is that

15   correct?

16   A.   I'm sorry?

17   Q.   A handbook, a booklet that sort of summarized the

18   training?

19   A.   Yes, they received handouts of the diversity training.

20   Q.   Would you please look at Exhibit 14?

21   A.   Yes.

22   Q.   Is Exhibit 14 the handout or handouts that were given to

23   the managers who received diversity training before June of

24   2008?

25   A.   Yes, this is the handout that was given for diversity

1    training for all people who are becoming or all associates who

2    are becoming managers for us, as well as existing management

3    associates.  It's done on an annual basis.

4              MS. SEELY:  Plaintiff offers Exhibit 14 into evidence.

5              THE COURT:  Any objection?

6              MR. KNUEVE:  No objection.

7              THE COURT:  Plaintiff's 14 is admitted.

8    Q.  (By Ms. Seely)  Now, if you could look, please, at page 3

9    of Exhibit 14 and that would be Bate number 726?

10   A.  Okay.

11   Q.  I'm sorry, 730, Bate number 730.

12   A.  Okay.

13   Q.  There's a block towards the upper third of the page that

14   is headed Title VII.  Do you see that?

15   A.  Yes, I do.

16   Q.  And this block describes the requirements of Title VII

17   according to Abercrombie & Fitch; is that right?

18   A.  Yes.

19   Q.  And it says in the first bullet point, "Title VII

20   prohibits discrimination in terms, conditions and privileges of

21   employment based on the protected classes which are race,

22   color, national origin, religion or sex/gender."  Do you see

23   that?

24   A.  Yes, I do.

25   Q.  Now, there's nothing in that block headed Title VII that

1    says anything about the obligation under Title VII to provide

2    religious accommodation, is there?

3            MR. KNUEVE:  Objection, Your Honor.  I think that

4    mischaracterizes the law.

5            MS. SEELY:  I'm asking about what's in the paper.

6            THE COURT:  If you'll approach, please.

7            (Counsel approached the bench and the following

8    proceedings were had out of the hearing of the jury.)

9            THE COURT:  Do you have this document?  I'm trying to

10   get jury instructions done here.  What are we focusing on,

11   here?

12           MS. SEELY:  Right here.  This is what they have in

13   their diversity training about Title VII and it does not

14   mention anywhere that part of Title VII's requirement is to

15   provide religious accommodation.

16           THE COURT:  All right.  Mr. Knueve?

17           MR. KNUEVE:  Your Honor, Title VII defines the

18   obligation to provide a religious accommodation as no

19   discrimination based on religion.  This is another

20   mischaracterization.

21           MS. SEELY:  The definition of religion in Title VII

22   specifically says that reasonable accomodation is required

23   unless to do so would be an undue hardship.  It is part of

24   religious discrimination and it is not an obvious part to

25   someone who is being trained.

1          THE COURT:   The objection will be overruled.

2          (Counsel returned to their respective places and the

3    following proceedings were had within the presence and hearing

4    of the jury.)

5          THE COURT:   The objection is overruled, go ahead.

6    Q.   (By Ms. Seely)  Ms. Riley, isn't it correct that nowhere

7    in the block on Exhibit 14 headed Title VII does it say that

8    Title VII requires an employer to provide religious

9    accommodation unless to do so would be an undue hardship?

10   A.   It does not say so as it's written, but all our managers

11   are aware that if there are any issues around what we refer to

12   as a taboo topics in the PSP, which is the interview training,

13   you must call HR, and those specifically, actually point out

14   religion.

15   Q.   Now, there's no mention anywhere in Exhibit 14, is there,

16   that Title VII requires religious accommodation?

17   A.   But as HR professionals who make those decisions, we do

18   know and we do practice daily that Title VII requires that we

19   make accommodations unless it causes undue burden to the

20   company.  And that's how we do our business.

21   Q.   This diversity training manual that we're looking at,

22   Exhibit 14, is given to store managers and management employees

23   in the stores; correct?

24   A.   That is correct.  But this manual is only part of what we

25   do.  There are discussions, there are role plays, so I think in

1    its sense, it's not the most comprehensive of training.  There

2    is additional material.

3    Q.   But nowhere in Exhibit 14 is the obligation of an employer

4    to provide religious accommodation mentioned?  That's my

5    question.

6    A.   It is not written in there, no.

7    Q.   Now, I would also like you to look, please, at Exhibit 8.

8    And if you would look at page 7 of the employee handbook,

9    Exhibit 8, which is also Bate number 31.

10   A.   Okay.

11   Q.   In the middle of the page, there is a block headed Equal --

12   I'm sorry, Discrimination and Harassment?

13   A.   Okay.

14   Q.   Let's go to the block that is headed Equal Employment

15   Opportunity Policy.  Do you see that?

16   A.   Yes.

17   Q.   Now, there is no mention in that block, is there, of

18   Abercrombie's obligation to provide religious accommodation to

19   its applicants and employees?

20   A.   It does state that we do not tolerate unlawful

21   discrimination, but it does not specifically say how to call

22   for accommodation.

23   Q.   And this store associate handbook is handed out to all

24   employees; correct?

25   A.   That's right.

1    Q.   And the purpose of page 7 or Bate 31 is to make all

2    employees of Abercrombie aware of the company's policies

3    regarding discrimination; correct?

4    A.   Yes, it is to make them aware of our policies.

5    Q.   Now, Ms. Riley, you testified at the beginning of your

6    testimony that you were aware that Abercrombie had made

7    exceptions to the Look Policy since May of 2007 when you were

8    hired; correct?

9    A.   Yes.

10   Q.   And we went through several human resource contact records

11   that even predated May of 2007; right?

12   A.   Correct.

13   Q.   And you are aware of only one study that Abercrombie &

14   Fitch has done about the effect of allowing exceptions to the

15   Look Policy on its business; is that right?

16          MR. KNUEVE:  Objection, Your Honor.  We've been

17   talking about this.  May I approach?

18          THE COURT:  You may.

19          (Counsel approached the bench and the following

20   proceedings were had out of the hearing of the jury.)

21          MR. KNUEVE:  This is the undue burden stuff, again.

22          THE COURT:  I'm sorry.  I wasn't over here by the

23   microphone.  Go ahead.

24          MR. KNUEVE:  This is the undue burden stuff, again,

25   Your Honor.  I mean, we've have already discussed this.  She's

1   going to ask about Dr. Joachimsthaler's study.  The point is

2   that's been decided.  The point here is Mr. Johnson believed

3   that he needed to enforce the Look Policy because of its

4   importance to the business.

5           THE COURT:  Ms. Seely.

6           MS. SEELY:  You know, Your Honor, I'm really confused.

7   Mr. Knueve keeps talking about Mr. Johnson and I understand

8   that.  But if he's focussed on what Mr. Johnson thought, then I

9   don't understand why we're going to have Dr. Joachimsthaler or

10  Deon Riley or Dr. Lundquist testify in his case-in-chief.

11          THE COURT:  All right, you won on undue burden.  The

12  objection is sustained.

13          MS. SEELY:  Your Honor, may I make one more argument?

14          THE COURT:  I'm sorry, Mr. Knueve.  Go ahead.

15          MS. SEELY:  I need to make this for the record, Your

16  Honor.  If Mr. Knueve is going to argue that it was reasonable

17  for the company to believe that allowing exceptions to the Look

18  Policy would be an undue hardship and therefore, they did not

19  act with malice or reckless indifference, then we should be

20  allowed to ask about the studies that were done and whether

21  they had any reasonable reliance on any empirical research or

22  any of that.  He can't have it both ways.  He can't argue it

23  was reasonable for them to believe and not let me show that it

24  wasn't reasonable.

25          THE COURT:  Mr. Knueve.

1          MR. KNUEVE:  We're not arguing that there is a study.

2   We are arguing that this is the way the company does its

3   business, that this is in accordance with acceptable brand

4   principles, that this is the way the entire company is trained

5   and it's a core belief of the business.  She's, ironically,

6   relitigating liability and she already won.

7          THE COURT:  Well, she's contending -- and I thought

8   we'd dealt with this at summary judgment.  Had I known we were

9   going to litigate the whole thing again --

10          MS. SEELY:  I don't want to litigate it over, Your

11   Honor.

12          THE COURT:  Well, he has a right to defend himself on

13   punitive damages and you're saying that because he's contending

14   he had a reasonable good faith belief that you can get into

15   whether empirical studies were done on the effect of

16   exceptions; correct?

17          MS. SEELY:  Yes, because that goes to reasonable.

18          THE COURT:  All right, I'm drawing the line.  The

19   objection, again, is sustained.

20          (Counsel returned to their respective places and the

21   following proceedings were had within the presence and hearing

22   of the jury.)

23          THE COURT:  The objection is sustained.

24          MS. SEELY:  If I can have just a minute, Your Honor?

25          THE COURT:  Yes.

1          MS. SEELY:  That's all I have for now.  Thank you.

2          THE COURT:  Very well.  Cross -- oh, does anyone need

3     to take a break?  All right, cross-examination.

4                          CROSS-EXAMINATION

5     BY MR. KNUEVE:

6     Q.   Good morning, Ms. Riley.

7     A.   Good morning.

8     Q.   Ms. Riley, you testified that your department was

9     responsible for training district managers on human resources

10    policies?

11    A.   My department trains district managers on our policies.

12    In the same way, we don't expect the store managers to be

13    experts, we do not expect the district manager to be experts,

14    but they do receive more training than the store managers.

15    Q.   What was the district manager trained to do by your

16    department if any issue regarding religion came up from an

17    applicant?

18    A.   Call HR.

19    Q.   What was the district manager trained to do if religion

20    was even mentioned by an applicant?

21    A.   Call HR.

22    Q.   What was a district manager trained to do if an assistant

23    manager asked a question about religion regarding an applicant?

24    A.   Call HR.

25    Q.   Under Abercrombie's policies, are district managers

1   permitted to handle issues regarding religious practices of

2   applicants on their own, without calling HR?

3   A.   Absolutely not.

4   Q.   There was a lot of testimony, a lot of testimony regarding

5   the contact record database that Abercrombie has; do you

6   remember that?

7   A.   Yes.

8   Q.   Were there any contact records regarding Ms. Elauf?

9   A.   No, we never heard about Ms. Elauf, so as a result, we

10  never looked into that issue.

11  Q.   And in fact, the human resources department has made

12  exceptions to the Look Policy for medical or religious reasons,

13  you heard about that from Ms. Seely?

14  A.   Yes, we have.

15  Q.   In fact, there was a hat for a war veteran and there were

16  also exceptions for Muslim employees; correct?

17  A.   Yes.

18  Q.   But human resources has to obviously be called to make an

19  exception; correct?

20  A.   Yes.   No exceptions are made without someone on the HR

21  team participating.

22  Q.   And no one called regarding Ms. Elauf, did they?

23  A.   No, as I said before, they did not.

24       MR. KNUEVE:   At this time, Your Honor, no further

25  questions.

```
 1              THE COURT:  Very well.  Redirect.

 2              MS. SEELY:  No, Your Honor.

 3              THE COURT:  Very well.  You may step down.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  Ladies and gentlemen of the jury, the

 6    parties have entered into some stipulations of fact, here, most

 7    of which have already been addressed, but given that they are

 8    stipulations of fact and that you are to consider these as

 9    true, the Court will, at this time, read the following

10    stipulations to you, and you are to take these admitted facts

11    to be true for the purposes of this case.

12              The first two are really jurisdictional facts which

13    are for the Court, but since the parties have agreed to these,

14    I'll read them to you.

15              Number one.  The parties are properly named and

16    identified.

17              Number two.  The parties admit that this Court has

18    jurisdiction and venue is proper.

19              Number three.  The EEOC is an agency of the United

20    States of America charged with the administration and

21    enforcement of Title VII of the Civil Rights Act of 1964, 42

22    United States Code, Section 2000(e) et seq. as amended.

23              Number four.  On July 25, 2008, Samantha Elauf applied

24    for a model position at the abercrombie store located in the

25    Woodland Hills Mall in Tulsa, Oklahoma.
```

1          Number five.  Samantha Elauf was interviewed by

2     assistant manager Heather Cooke on or about June 26, 2008 at

3     the Woodland Hills Mall.

4          Number six.  At all relevant times, defendant has

5     employed over 500 employees.

6          Number seven.  At all relevant times, defendant was

7     aware that Title VII prohibited religious discrimination, which

8     included providing religious accommodation to applicants and

9     employees, unless to do so caused undue hardship on the

10    operation of defendant's business.

11         There is one final stipulation the parties have agreed

12    that would be read to you a bit later in the proceeding.

13         The plaintiff may call its next witness.

14         MS. SEELY:  Plaintiff calls Chad Moorefield.  This is

15    not actually Mr. Moorefield, he is an employee of Equal

16    Employment Opportunity Commission and we will read his

17    testimony with Mr. Holman on the witness stand.

18         THE COURT:  Very well.  Ladies and gentlemen, just as

19    in the case of a video deposition, a deposition that is going

20    to be read to you is to be considered by you as if the

21    individual who is being deposed appeared before you live.  You

22    are to consider the testimony of this witness just as you do

23    any other witness.

24         As Ms. Seely says, Mr. Moorefield, obviously, is not

25    here live, but in an effort to make this a little bit more

1    understandable, rather than having one person read both sides

2    of the deposition to you, we're going to have the back and

3    forth here.

4           Ms. Seely, I'm going to need -- actually I need to

5    take a quick break to make a telephone call.  So let's be in a

6    very short recess at this time so that I can make this call and

7    we'll be back shortly.

8           (Recess).

9           (The following proceedings were had outside the

10   presence and hearing of the jury.)

11          THE COURT:  Be seated, please.  I'm informed that Ms.

12   Seely wants to make an offer of proof with regard to wishing to

13   put into evidence Abercrombie's not having specific data with

14   regard to the effect, the economic effect, of exceptions to the

15   Look Policy.  The Court ruled at sidebar that that was

16   particularly relevant with regard to the issue of liability,

17   the Court ruled in the plaintiff's favor.

18          Plaintiff wants to get into it here on punitive

19   damages, as I understand it, with the approach that that is

20   evidence that the defendant has recklessly or has exhibited

21   reckless indifference to the rights of Ms. Elauf under Title

22   VII.  Go ahead and make your offer of proof.

23          MS. SEELY:  Your Honor, if Ms. Riley, if plaintiff was

24   permitted to question Ms. Riley on that subject, it is our

25   position that she would have testified that the only study that

1    she was aware of, as of June of 2008 -- I'm sorry.  That the

2    only study she is aware of currently regarding the effect of

3    allowing exceptions to the Look Policy is the study that was

4    done by Dr. Joachimsthaler specifically for this litigation,

5    that that study was the only study she was aware of or is aware

6    of.  That human resources does not review Abercrombie & Fitch's

7    sales for any purpose.  That she didn't know whether allowing

8    exceptions to the Look Policy has hurt Abercrombie's sales.

9    That exceptions to the Look Policy -- strike that.  That human

10   resources did not track or review exceptions to the Look Policy

11   on a regular basis.  That human resources has not measured any

12   negative impact on how customers view the Abercrombie style

13   because of exceptions made to the Look Policy.  That Ms. Riley

14   has nothing but personal observations by which to measure the

15   impact of exceptions on the Abercrombie style.  That although

16   Abercrombie has allowed at least store employee to wear a

17   headscarf before Samantha Elauf applied, that Abercrombie has

18   never attempted to measure any negative impact of allowing

19   headscarves on its sales.  That human resources has not talked

20   to customers about the Look Policy and that it has done no

21   customer surveys to determine the effect of allowing exceptions

22   to the Look Policy.

23           THE COURT:  All right.  As I say, that was a large

24   basis of the Court's ruling on summary judgment.  I don't think

25   its particularly relevant, frankly, with regard to punitive

1    damages.  And I appreciate Ms. Seely's zealousness here, but at

2    a certain point, policy wonkishness goes over the top and we

3    exceed the bounds of relevance.  Mr. Knueve, your response?

4         MR. KNUEVE:  Your Honor, frankly, I wish that

5    liability was still in play, but it's not.  And our defense

6    again is that Mr. Johnson, his mindset was enforcing the Look

7    Policy as he had been trained to do.

8         The evidence that we're going to submit is that the

9    Look Policy is central to this business.  We're not going to

10   get into undue burden and all -- the undue burden as far as

11   what Ms. Seely is saying.  You know, frankly, there's no basis

12   for punitive damages in this case and we intend to move for

13   judgment as a matter of law when plaintiffs finish their case.

14        The evidence that we just heard was that district

15   managers were trained to roll this up to HR any time religion

16   was mentioned at all.  Mr. Johnson did not do that,

17   indisputably.  There's no hook for punitive damages at all.

18   We're getting far afield on punitive damages and it's really --

19   there's no basis for it.

20        THE COURT:  All right, but since you mention it and

21   Ms. Seely addressed this a bit earlier, that there's no

22   question that Title VII applies to applicants, as well;

23   correct?

24        MR. KNUEVE:  Correct.

25        THE COURT:  And if an applicant is unaware of the

1    policy of a corporation such as Abercrombie, that it is to --

2    that an applicant or employee is to make an accommodation

3    request, then how does one address that applicant's rights,

4    particularly if one knows or has good reason to know that one

5    is covered by the Act?

6          MR. KNUEVE:  Your Honor, we believe this is squarely

7    addressed in the EEOC's own compliance manual and that's,

8    frankly, what's so distressing about the arguments that are

9    being made here on the other side.

10         The compliance manual says clearly two things.  An

11   applicant cannot remain silent when they need an accommodation.

12   And number two, an employer is not supposed to bring up

13   religion when they are interviewing people.  And the other

14   thing is --

15         THE COURT:  And I understand number two.  Go ahead.

16   Number three.

17         MR. KNUEVE:  Number three is the EEOC compliance

18   manual actually says that employers should use scripted

19   interviews, like Abercrombie does.  These are best practices

20   that were prepared by an expert industrial organizational

21   psychologist.  Now, Your Honor --

22         THE COURT:  Well, and Cooke testified that she felt

23   constrained to ask the questions that were given to her, that

24   she's only supposed to ask those questions.  Now but if one

25   doesn't know that they are not being hired because they are a

 1   Muslim and wearing a headdress, what then?  That's what I meant

 2   yesterday when I said this case falls between the cracks here.

 3   You understood what I was saying; correct?

 4        MR. KNUEVE:  I absolutely do, Your Honor.  And I think

 5   you've ruled on liability and I think when you -- and we are

 6   preserving our arguments for appeal, but I think that when you

 7   ruled you stated in your order that this is limited to the

 8   facts and circumstances of this case.

 9        THE COURT:  Absolutely.

10        MR. KNUEVE:  And so what I read that is is you found a

11   violation of Title VII in this case, a mistake was made, but

12   that's not enough for punitive damages, Your Honor.

13        THE COURT:  I understand.  Well, I was thinking about

14   liability here because we are talking about undue burden.  But

15   just as a matter of law because, you know, we're all here in

16   the search for justice.

17        MR. KNUEVE:  Right.

18        THE COURT:  Insofar as this case, these particular

19   facts really do fall in the crack, because we all understand

20   that one ought not ask about one's religion in an interview, I

21   mean, it's really inappropriate.  But in this case, it is a

22   very rare case because Ms. Cooke says, yeah, I knew she was a

23   Muslim, although later, interestingly, Ms. Seely follows up

24   with a question after she had already gotten the perfect answer

25   from Cooke, you mean you assumed she was a Muslim and she says

1    yes, so that you jump on that and say it was a mere assumption.

2    So that, as a matter of fact, that's a very interesting aspect

3    of this case.  But she knew that Ms. Elauf was a Muslim and

4    there is, because of that knowledge imputed to Abercrombie,

5    because she wore a headscarf, she wasn't hired.  It's very fact

6    specific.

7              MR. KNUEVE:  It is, Your Honor.  And I guess I want to

8    make two points.  I think I want to address your question of

9    what should be -- what's the best practice?  And our view is

10   the best practice is train your managers not to make

11   assumptions about religion.  Tell the applicants the

12   expectations of the job and then ask the applicant do you have

13   any questions about those expectations?  And at that point, the

14   applicant -- if the applicant knows, is sitting there saying

15   wait a second, I have this religious accommodation or I have

16   this religious thing that I've been wearing for, you know, four

17   years, the applicant has to come forward and say yes, I do have

18   a question on the expectation.

19             Now, I'll admit, in this particular case in 2008, when

20   we described the Look Policy at the end of the interview, we

21   did not say specifically headwear is not permitted.  That's

22   part of what might have been a miscommunication here.

23             THE COURT:  And now, other than just caps, you have

24   expanded the Look Policy to include all headwear?

25             MR. KNUEVE:  Right.  So that was part -- that

1   contributed to the miscommunication here, in my belief.  But I

2   think that what the EEOC is asking for is not -- it's a

3   violation of Title VII.  They are asking us to make inquiry

4   into an applicant's religion.  That is, it's inconceivable.

5         I think the second thing, Your Honor, is Cooke was in

6   a difficult position.  She made an assumption against her

7   training, but she made an assumption.  She said she raised it

8   with her district manager and that her district manager said

9   you can't hire her.  Now, what should she have done?  She

10  should have called HR.  That's what she was trained to do, just

11  like Mr. Johnson should have called HR.  If HR would have

12  gotten involved, we don't know what would have happened, but

13  something different would have happened.

14        THE COURT:  Johnson could have called HR, as well;

15  correct?

16        MR. KNUEVE:  If he was told that this woman was

17  Muslim, it's not could have, he should have.  He was trained to

18  do that.  And that is what Ms. Riley testified.

19        THE COURT:  But as you say, that's a dispute under the

20  record here, because Johnson denies, under oath, that Cooke

21  told him.

22        MR. KNUEVE:  It's a dispute as to whether he knew that

23  she was Muslim.  That is a jury issue.  What is not in dispute

24  is that if he knew, he should have called HR.  And that's why

25  there absolutely cannot be punitive damages in this case.  It's

1  squarely within the Kolstad exception.  The company has a

2  policy on religious -- and it prohibits religious discrimination,

3  has a procedure on religious accommodations, it trains its

4  managers on that procedure.  Mr. Johnson was trained.  And

5  number three, it enforces and makes good faith efforts to

6  enforce the religious accommodation procedure and that's

7  evidenced from Ms. Seely's cross of Ms. Riley.  I mean, we

8  heard about eight exceptions.  Clearly the company makes

9  exceptions.  What was different in this case?  HR was never

10 called.  There's no punitive damages here, Your Honor.

11         THE COURT:  All right.  We're now edged up close

12 enough to 12:00, I think I'm going to cut the jury loose and

13 then we'll take the -- is it Moorehead, is that the name?

14         MR. KNUEVE:  Moorefield.

15         THE COURT:  Moorefield, after lunch.  This dialogue,

16 actually, was very helpful because I think this touches upon

17 the request for injunctive relief.  So let's call them in and

18 I'll excuse them for lunch.

19         (The following proceedings were had in the presence

20 and hearing of the jury.)

21         THE COURT:  Be seated, please.  Ladies and gentlemen,

22 I'm calling you in only to excuse you for lunch.  I'm a lawyer,

23 just like the lawyers out here and we sometimes get tied up

24 talking about legal issues, which in this case were very

25 helpful for the Court.

1          Because it's noon, I'm going to cut you loose and

2    we'll reconvene here at 1:15.  Please recall the Court's usual

3    instructions during breaks and recesses and we're in recess

4    until 1:15.

5          (Recess.)

6          (The following proceedings were had in the presence

7    and hearing of the jury.)

8          THE COURT:  Be seated, please.  Ms. Seely, if your

9    reader will retake the stand and we will commence the portions

10   of the deposition designated of Mr. Chad Moorefield.  You may

11   begin.

12                        CHAD MOOREFIELD

13   Called as a witness on behalf of the plaintiff, being

14   previously sworn, testified by deposition as follows:

15   Q.   Are you currently employed?

16   A.   Yes.

17   Q.   Who do you work for?

18   A.   Abercrombie & Fitch.

19   Q.   Okay.  Mr. Moorefield, what's your educational background?

20   A.   I graduated from University of Kansas with an advertising

21   degree.

22   Q.   KU?

23   A.   Yes.

24   Q.   Go Jawhawks.

25   A.   Absolutely.

1    Q.   With an advertising degree?

2    A.   Yes.

3    Q.   Okay.   Is that an undergraduate degree?

4    A.   Yes.

5    Q.   Like a B.A. or a B.S.?

6    A.   B.A.

7    Q.   Okay.   When did you graduate?

8    A.   '97.

9    Q.   Did you go directly to work for Abercrombie after

10   graduating from college?

11   A.   Yes.

12   Q.   And tell me what your first job was that you held with

13   Abercrombie?

14   A.   Manager in training.

15   Q.   Was that in a retail store?

16   A.   Yes.

17   Q.   So is it fair to say that since you've worked for

18   Abercrombie & Fitch, the Look Policy has required brand reps to

19   wear clothing that look like the kind of clothing that

20   Abercrombie sells?

21   A.   Yes.

22   Q.   When you say it was your job as regional manager to drive

23   sales through, what do you mean by that?

24   A.   Make sure that they are upholding the standard of our

25   brand through visuals, through quality of kids or models, the

1    brand reps back then, to make sure that they are filling their

2    sales floors, to make sure that they're are floor supervising,

3    to make sure that they are staffing the stores correctly.

4    Q.   When you say it was your job to make sure the store

5    managers were -- I'm sorry.  The district managers were, you

6    said something about standard of the brand?

7    A.   Yes.

8    Q.   I didn't quite get that.  What responsibilities did the

9    district manager have with respect to the standard of the

10   brand?

11   A.   I mean, there are essentially brand protectors out there

12   so they live in the field and they are responsible that the

13   stores put on a certain show or esthetics.  So when customers

14   come in, whether it's the look of the stores, the smell of the

15   stores, the lighting of the stores, the quality of the brand

16   reps, or models at that time, the customer experience that they

17   are having, just to make sure that they are upholding those

18   standards.

19   Q.   What was your next position with Abercrombie & Fitch after

20   being regional manager for Abercrombie & Fitch in Texas?

21   A.   Director of stores.

22   Q.   When did you become director of stores?

23   A.   Almost four years ago.

24   Q.   So that would in 2007, approximately?

25   A.   Yes.

1   Q.   And what was your geographic region that you were

2   responsible for?

3   A.   Midwest.

4   Q.   What were your duties as director of stores?

5   A.   Managing, developing the regional managers as well as kind

6   of being a gatekeeper for the store organization.  Any new

7   processes that would go into stores get run through us, so we

8   sign off on a lot of things.

9   Q.   Are you familiar with a district manager who was over the

10  Tulsa district of the Tulsa store named Randall Johnson?

11  A.   Yes.

12  Q.   And do you recall that he was a district manager and his

13  district included Woodland Hills Mall in Tulsa, Oklahoma?

14  A.   Yes.

15  Q.   And that's the abercrombie kids store that was in his

16  district; correct?

17  A.   Yes.

18  Q.   As director of stores, did you have any responsibility or

19  duties with respect to terminating district managers?

20  A.   Yes.

21  Q.   What was your responsibility?

22  A.   I was involved in the conversation and the final decision

23  on if they should be or not.

24  Q.   And who would you be having that conversation with?

25  A.   A regional manager and an HR manager.

1    Q.   So if a district manager under your jurisdiction was

2    terminated, you would be made aware of that; correct?

3    A.   Yes.

4    Q.   I'm going to show you what's been marked Exhibit 3.  I'll

5    ask you to take a look at that.  Look it over and let me know

6    when you are done.

7    A.   Okay.

8    Q.   Okay.  Is this a PeopleSoft or a screen shot of a

9    PeopleSoft page with respect to Randall Johnson?

10   A.   Yes.

11   Q.   And does it indicate at the very top of the column headed

12   or the section headed job history, does it indicate that

13   Randall Johnson was terminated for unsatisfactory performance?

14   A.   Yes.

15   Q.   Do you have any reason to believe that is not why Randall

16   Johnson was terminated?

17   A.   No.

18   Q.   Does it refresh your recollection, as you sit here today,

19   that Randall Johnson was terminated from his position of

20   district manager?

21   A.   Yes.

22   Q.   And the effective date of Randall Johnson's termination

23   for unsatisfactory performance was April 24th, 2009 according

24   to Exhibit 3; correct?

25   A.   Yes.

1    Q.   So Randall Johnson was not laid off for lack of work, was

2    he?

3    A.   No.

4    Q.   In your various positions with Abercrombie & Fitch, have

5    you become familiar with the job description for the model

6    position?

7    A.   Yes.

8    Q.   I'm going to show you what's been marked as Exhibit 4 and

9    ask you to look at that document and tell me what it is, if you

10   can.

11   A.   It's a description of what our model does in stores.  It's

12   the job.

13   Q.   Exhibit 4 says at the top right-hand corner, job

14   description for model.  Do you see that?

15   A.   Yes.

16   Q.   Have you ever seen this job description before?

17   A.   Yes.

18   Q.   And under entry requirements on page 1 of Exhibit 4, am I

19   correct that no education is required for the position of

20   model?

21   A.   Yes.

22   Q.   And no retail experience is required for the position of

23   model?

24   A.   Yes.

25   Q.   And no supervisor or managerial experience is required for

1    the position of model?

2    A.   Yes.

3    Q.   So essentially what's required of the applicant is that

4    they are handsome, great looking; correct?

5    A.   Represent us, yes.

6    Q.   They don't actually have to have any particular skills

7    when they come to work as a model, do they?

8    A.   No.

9    Q.   That's not correct?

10   A.   It is correct, yes.

11   Q.   Now, the next subsection of the tasks of the model on

12   Exhibit 4 says represents the brand; correct?

13   A.   Yes.

14   Q.   Now tell me about that, what are the model's tasks with

15   respect to representing the brand?

16   A.   That they would come in and follow our Look Policy so

17   clean shaven, if it's a male, natural, female.  They would wear

18   our merchandise that's representative of that season or

19   merchandise close to that season.  They would represent -- they

20   would come in and wear merchandise that is the same kind of fit

21   as that season.  That would be the main part of it.

22   Q.   When you say fit, what do you mean?

23   A.   Our brand is -- we're not -- in certain degrees, in

24   certain times of the year, we are not baggy, so maybe we would

25   have slim jeans versus a couple years ago it used to be more

1    baggy fit.  And that would be our style, so we would want them

2    to wear merchandise that is of similar style and similar fit to

3    what we currently have in the store.

4    Q.   Now, the next full sentence under representing the brand

5    of Exhibit 4 says, adheres to Abercrombie guidelines in

6    personal appearance.  Are you referring -- or strike that.  Is

7    Exhibit 4 referring to the Look Policy?

8    A.   Yes.

9    Q.   One of the competencies listed under what you need to

10   bring to the job is diversity awareness?

11   A.   Uh-huh.

12   Q.   What does that mean in the context of this job

13   description?

14   A.   That you are accepting and inviting of any culture,

15   religions, backgrounds, just you're an open person, you are

16   aware that you will have a customer that's of all backgrounds

17   coming into your store.  Everybody should be treated the same.

18   Q.   Is it fair to say then that the competency of diversity

19   awareness has to do with the model's openness to diverse

20   customers?

21   A.   Yes.

22   Q.   A diversity of customers?

23   A.   Sorry, yes.

24   Q.   Now, I would like to focus, please, on the hiring process

25   when you were director of stores.  Did the hiring process for

```
 1    models change in any significant respect during that time

 2    period?

 3    A.   I mean, we came out with the People Selection Process,

 4    which is the PSP guide.

 5    Q.   PSP guide is the People Selection Program; is that

 6    correct?

 7    A.   Process.

 8    Q.   Process?

 9    A.   Yeah, uh-huh.

10    Q.   Okay.  Can you tell me what that is or that was?

11    A.   I mean, it's -- I don't know exactly, the questions, but

12    basically, it's here, the question so -- sorry.  But basically,

13    here's the question so everybody gets judged fairly and you

14    don't have random people out there making decisions based on

15    how they feel or what questions they think are the right ones

16    to ask.  You get everybody to ask the same kind of questions

17    when they are interviewing people.

18    Q.   Okay.  And the People Selection Process, who was trained

19    in that?

20    A.   Everyone, all managers.

21    Q.   From assistant managers to store managers?

22    A.   Yes.

23    Q.   To -- to district managers?

24    A.   District managers, yes, to regional.

25    Q.   Okay.  And even you as the director of stores?
```

1    A.   Yes, some degree.

2    Q.   Okay.  Now, is it fair to say then, that at least at that

3    time, having a diverse work force was an important part of

4    Abercrombie's People Selection Program?

5    A.   Yes.

6    Q.   Okay.  In your view, did the diversity objectives of

7    Abercrombie have anything to do with attempting to improve

8    diversity in the work force with respect to religion?

9    A.   No.

10   Q.   Why, in your understanding, is the appearance competency

11   given more weight in evaluating applicants?

12   A.   I think that is -- the model position is our advertising

13   for our company.  We don't do a lot of print, we don't do

14   radio, we don't do television.  We uphold a certain brand image

15   that people come to expect and we think the first part of our

16   advertising or the show, as we would call it, would be that

17   somebody would walk in and see a great looking person with a

18   sense of style in our store.

19   Q.   Okay.  Now, if an applicant received a total score of six

20   or seven on the interview rating sheet, but received a one in

21   appearance, could that applicant be hired?

22   A.   I believe not.

23   Q.   So even if the applicant got a good score in outgoing,

24   promotes diversity and a good score on sophistication and

25   aspiration, let's say a three on each of those, if the

1    applicant got a one on appearance and sense of style, he or she

2    could not be hired; is that your understanding?

3    A.   Yes.

4    Q.   Now on page 30 of Exhibit 7, there's a paragraph that

5    says, "Caps.  Even though Abercrombie & Fitch sells caps, they

6    are considered too informal for the image we project.  Caps are

7    not allowed to be worn on the sales floor."  Now, you testified

8    earlier that the Abercrombie brand or look was casual and not

9    --

10   A.   Yes.

11   Q.   -- formal; correct?

12   A.   Yes.

13   Q.   What is it about caps that are too informal for the casual

14   informal brand that Abercrombie projects?

15   A.   I would describe casual and classic as somebody that's

16   more preppy versus sloppy.  It would be a cap that would be a

17   little bit I just hopped out of bed and didn't take a shower,

18   threw on my hat on to go somewhere, threw on a big sweatshirt

19   to go somewhere versus somebody that had a sense of style, that

20   was casual, which wasn't trying to dress up but was trying to

21   have some style when they went out.

22   Q.   Now, this section of the Look Policy on page 30 says no

23   caps are allowed, but it doesn't say anything about no other

24   kind of headwear is allowed, does it?

25   A.   No, not specifically.

1    Q.   And at the time this Look Policy was in effect, and I want

2    to limit it now to June of 2008, June, July of 2008, were other

3    kinds of headwear allowed under the Look Policy?

4    A.   No.

5    Q.   And why is that?

6    A.   I mean, I mean we would consider it as distracting, so

7    it's more about our clothes.  It's not a product of ours, so we

8    would want somebody to -- if it's casual and classic, we would

9    want somebody to notice that product that's representative of

10   casual and classic.

11   Q.   So you said that any other kind of headwear wouldn't be a

12   product of ours?  Does that mean under the Look Policy, models

13   would not be allowed to wear items of clothing that Abercrombie

14   didn't sell?

15   A.   I mean, the Look Policy states that you can wear

16   merchandise that's not ours as long as it is representative of

17   our style and fit and it doesn't bear a logo that you would

18   identify if somebody walked up and saw it.

19   Q.   When you were store manager, were you personally involved

20   in enforcing the Look Policy?

21          (Deposition reading stops.)

22          MR. HOLMAN:  Sorry, are we at 170?

23          MS. SEELY:  We are at page 168.

24          MS. HOPE:  That's been stricken.

25          MS. SEELY:  That's been stricken.  Sorry.  170.

```
1              (Deposition reading begins.)

2    Q.   Now, we were talking previously this morning and you

3    mentioned that one of the things that you did, I believe, as

4    regional manager was to do store audits?

5    A.   Correct.

6    Q.   Okay.  At all times since you have been regional manager,

7    up to the present, do the store audits include evaluation on

8    presentation?

9    A.   Correct.

10   Q.   Okay.  Operations?

11   A.   Yes.

12   Q.   Store experience?

13   A.   Yes.

14   Q.   And systems?

15   A.   Yes.

16   Q.   Okay.  Then looking at store experience, what data did you

17   look at to evaluate the store experience category in your store

18   audits?

19   A.   I believe there's a question about, like, the last secret

20   shop, quality of the models that day, are they handsome,

21   beautiful faces, diversity, floor supervision, friendliness.

22   Q.   Do any of the categories on Exhibit 10 that went into the

23   total grade have to do with the appearance of the models?

24   A.   Yes.

25   Q.   Which one?
```

```
1    A.   Store experience.

2    Q.   And the well-groomed and properly dressed aspect of the

3    store experience, does that have to do with the Look Policy?

4    A.   Yes.

5    Q.   Okay.  So if an employee is dressing inconsistent, is in

6    violation of the Look Policy, is it fair to say that a secret

7    shopper, if that shopper saw the model, might give the store a

8    low grade on properly dressed?

9    A.   Yes.

10   Q.   So in evaluating store experience, the secret shoppers

11   look at the appearance of the model, but they can also look at

12   other aspects of what's going on in the store; right?

13   A.   Yes.

14   Q.   Okay.  The appearance of the model is not the only thing

15   that the secret shopper would look at in evaluating store

16   experience; correct?

17   A.   Correct.

18   Q.   You also looked at the quality of the models, you said?

19   A.   Yes.

20   Q.   How did you -- what do you mean by quality of the models?

21   A.   Like whether they're properly dressed, great looking,

22   brand positive.

23   Q.   What do you mean by brand positive?

24   A.   That they represent us by wearing our merchandise or

25   merchandise that's similar to our merchandise.  That they are,
```

1   in fact, handsome, beautiful, natural, all of those things that

2   we talked about that are in the Look Policy.

3   Q.   So in evaluating the quality of the models in doing your

4   audit, you look at the physical appearance of the model and

5   whether they are dressed in accordance with the Look Policy?

6   A.   Yes.

7   Q.   Is there anything else you look at in determining the

8   quality of the models in doing your audit?

9   A.   You watch to see during the day how -- are they friendly,

10  are they engaging, are they saying the tag line, are they

11  helping customers, are they being friendly.  Other jobs like

12  we've talked about, maintaining the sales room, are they

13  working, are they staying in their zone.

14  Q.   That's all involved in store experience?

15  A.   Yeah.

16  Q.   Okay.  And I think you said friendly was one of the things

17  you looked at.  That's really part of the quality of the models?

18  A.   Yes.

19  Q.   As Director of Stores, do you have an opinion as to

20  whether or not a drop in the overall store audit score would

21  indicate any -- would have any impact on the sales of a

22  particular store?

23  A.   Are you asking do I think it has an impact on it?

24  Q.   Uh-huh.

25  A.   Yes.

1    Q.   Okay.  Why do you think that?

2    A.   I think a core value of our company is that we believe

3    that the customer's experiences and what people have when they

4    come into our store is what drives our business.

5    Q.   Okay.  And have you seen any empirical research that backs

6    up your opinion or is this just your feeling as Director of

7    Stores?

8    A.   We do have data that shows that stores -- that we believe

9    that stores that have lower secret shop scores in the

10   experience sections, it's a part of it, just like anything

11   else, just like stores that have bad filling scores that you

12   would know that the merchandise is not there and that affects

13   and drives lower sales or can add to better sales.  Stores that

14   have higher store experiences in scores typically have higher

15   sales.

16   Q.   Well, I thought you said that you knew of no analyses

17   attempting to relate a change in the store audit scores with a

18   change in sales for a particular store.  Did I misunderstand

19   you?

20   A.   I've never seen a final.  I know that there's -- I believe

21   I met with some guy a couple of months ago that's working on

22   something, but I don't -- he's never presented -- they've never

23   presented anything to us that said that is exactly how it's

24   driving business.

25   Q.   Have you ever seen any kind of document that indicates in

1    any way that a drop in the overall store audit scores is

2    correlated with a drop in sales, whether it's final or not?

3    A.   I believe that when you look in these types of documents,

4    we directly correlate them to lower secret shops equals lower

5    sales.  Have I looked in store A and followed it for 365 days

6    and put those two pieces, no.

7    Q.   Have you done anything like that?

8    A.   No.

9    Q.   Okay.  All right.  So since you've been director of

10   stores, is it your testimony that you personally look at the

11   secret shopper reports for each store and then look at the

12   sales for that store to see if you can draw any conclusion, any

13   correlation?

14   A.   In my area, yes.

15   Q.   In your area.  What do you mean?

16   A.   I don't look at it for every store.

17   Q.   Okay.  And with all the data that you have, how can you

18   isolate, for instance, a low score on properly dressed and

19   determine that that is the reason, as opposed to anything else,

20   any of the other data that has caused the drop in sales that

21   you observed?

22   A.   I'm not saying it's the single, only thing that's causing

23   it, but it is a cause of that.  Does that make sense?

24   Q.   It could be a cause?

25   A.   Yes.

```
 1    Q.   There could be other things happening, too; right?

 2    A.   Yes.

 3    Q.   Like you say, story cleanliness could be down?

 4    A.   Yes.

 5    Q.   That could be part of the problem?

 6    A.   Yes.

 7    Q.   That could be part of the reason why the sales have

 8    dropped?

 9    A.   Absolutely.

10    Q.   Okay.  Do you believe that -- strike that.  But you've

11    never tried to do any kind of mathematical calculation to

12    determine whether that's true; correct?

13    A.   No.

14    Q.   And you don't know of anyone at Abercrombie & Fitch who

15    has done any kind of statistical study to correlate a low score

16    in the properly dressed category to a drop in sales in any

17    store; am I right?

18    A.   No.

19    Q.   Am I right?  I am right?

20    A.   Yes.  I don't know of anybody that's took the secret shop

21    reports.

22    Q.   So your gut feeling is, based on your experience with

23    Abercrombie & Fitch, that a low score on the properly dressed

24    category could have a negative effect on sales?

25    A.   Absolutely.
```

1    Q.   How do you know that those low sales scores were just

2    because the managers did a poor job of enforcing the Look

3    Policy, as opposed to some other aspect of managing the stores?

4    A.   I took the knowledge that I had at those times and the

5    data I had at those times and that's the conclusion I came up.

6    Q.   What data did you have at those times?

7    A.   The same stuff I rattled off to you.

8    Q.   The stuff you rattled off to me was?

9    A.   It could be shrink, it could be data on our EUSR system,

10   which is filling.  It could be turnover report.  It could be

11   hours usage.  It could be previous audit scores that I had

12   completed in stores, depending on what level I was.  It could

13   be staffing numbers.  It could be retention.  It could be

14   diversity in the store.  If I thought about it, there would

15   probably be a lot more.

16   Q.   So are you saying that in stores where you've had

17   experience with managers who do a poor job of enforcing the

18   Look Policy, that you've considered all of the other aspects,

19   shrink, user, turnover, et cetera and that you have absolutely

20   determined that the reason that the sales of that store

21   declined was because the manager did a poor job of enforcing

22   the Look Policy and nothing else?

23   A.   Yes.

24   Q.   And that is your -- did you ever record that anywhere?

25   A.   No.

1    Q.   And did you ever do any kind of mathematical calculations

2    with all of the scores, or whatnot, or shrink, or EUSR, turn-

3    over, et cetera --

4    A.   No.

5    Q.   -- to do a mathematical calculation?

6    A.   No.

7    Q.   So failing to -- a manager not requiring its employees to

8    comply with the Look Policy, in your experience, has been a

9    factor in the sales being down in a particular store?

10   A.   Yes.

11   Q.   Not the only factor?

12   A.   Yes.

13   Q.   Yes, not the only factor?

14   A.   Yes, not the only factor.  One of the factors.  And in

15   cases like I've discussed before there has been -- usually when

16   you walk into a store that has problems, there just isn't one

17   thing, but some -- rarely, you do walk in and see that.

18   Q.   Is that, in fact, your understanding that human resources

19   can grant an exception to the Look Policy prohibiting headwear?

20   A.   Correct.

21   Q.   What is your understanding of the process or procedure

22   that must be followed in order for an exception to be allowed

23   to the Look Policy?

24   A.   If someone comes to us and it is religious or medical, it

25   would be just given to HR and they would deal with it.

1    Q.   When you say when someone comes to us for either religious

2    accommodation or medical accommodation, who is us?

3    A.   I would say the store manager, any associate that would

4    come to them, I want to say associate, model or impacter or

5    manager challenging the Look Policy or wanting an exception to

6    it, then they would take that to their district manager and it

7    would go to their HR representative, and they would deal with

8    it from there.

9    Q.   Would a request for an exception to the Look Policy come

10   up to you as director of stores?

11   A.   No.

12   Q.   You mean the yarmulke case?

13   A.   Yes.

14   Q.   Okay.

15   A.   I believe it is a negative impact on our business.

16   Q.   Why do you believe that?

17   A.   I think it's distracting.

18   Q.   That's your personal opinion?

19   A.   Yes.

20   Q.   Do you know of any studies, report or analyses performed

21   by Abercrombie & Fitch to determine whether allowing that model

22   to wear a yarmulke had a negative effect on the company's

23   business?

24   A.   No.

25   Q.   Now, human resources, as far as you know, allowed this

1    person to wear a yarmulke; right?

2    A.   Yes.

3    Q.   Do you know if anyone at human resources did any study or

4    analysis to determine whether or not allowing this male model

5    to wear the yarmulke had a negative impact on its business?

6    A.   No.

7    Q.   Now, since you have been director of stores, have you had

8    any training on religious discrimination?

9    A.   I've had diversity training, which would be inclusive of

10   that.  Would include it.

11   Q.   You had diversity training?

12   A.   Yes.

13   Q.   When did you have diversity training?

14   A.   From prior to being a director.  As a regional manager,

15   district manager, I've had diversity training.  And even as a

16   director, I've sat through it.

17   Q.   Has it been live training or computer-based training?

18   A.   All live.

19   Q.   All live.  Do you know who gave it?

20   A.   Our senior vice president of diversity.

21   Q.   What is that person's name?

22   A.   Todd Corley.

23   Q.   Todd Corley?

24   A.   Yes.

25   Q.   When did that take place?

```
 1    A.   I can't give you specific dates.

 2    Q.   Roughly?

 3    A.   Roughly, within -- every year when we bring our district

 4    managers to home office, there is some type of training that

 5    goes on with diversity.

 6    Q.   But I'm talking about the time that you personally, as

 7    director of stores, sat through live training given by Todd

 8    Corley.  When was the last time that occurred?

 9    A.   The October visit.

10    Q.   October of 2010?

11    A.   Yes.

12    Q.   You said during that diversity training, you had training

13    on the topic of religious discrimination?

14    A.   It was one of the topics.

15    Q.   What did Mr. Corley say on the topic of religious

16    discrimination during that training?

17    A.   Just be mindful of people and their backgrounds.

18    Q.   Did Mr. Corley explain that religious discrimination

19    violated Title VII of the Civil Rights Act?

20    A.   No.

21    Q.   Did Mr. Corley talk about providing religious

22    accommodation to employees or applicants?

23    A.   No.

24    Q.   Are you aware of whether or not the company has any policy

25    regarding providing religious accommodation to employees and
```

1    applicants?

2    A.   I'm not aware.

3              (Deposition reading ends.)

4              MS. SEELY:  Thank you, Mr. Holman.

5              THE COURT:  And does that complete the deposition?

6              MS. SEELY:  It does, Your Honor.

7              THE COURT:  Very well.  The plaintiff may call its

8    next witness.

9              MS. SEELY:  Plaintiff calls Samantha Elauf.

10                          SAMANTHA ELAUF

11   Called as a witness on behalf of the plaintiff, being first

12   duly sworn, testified as follows:

13             THE COURT:  State your full name for the jury, please.

14             THE WITNESS:  Samantha Elauf.

15             THE COURT:  Ms. Seely, you may inquire.

16                        DIRECT EXAMINATION

17   BY MS. SEELY:

18   Q.   Ms. Elauf, can you spell your last name?

19   A.   E-L-A-U-F.

20   Q.   And where do you live?

21   A.   Exact address?

22   Q.   No, in what town or city?

23   A.   I live in Tulsa.  I live near 81st and Memorial.

24   Q.   And when were you born?

25   A.   I was born XXXX XXXXX XXXX.

```
1    Q.   So how old are you, now?

2    A.   I will be 21 on my birthday, but right now, I'm 20.

3    Q.   And where were you born?

4    A.   I was born in Tulsa, Oklahoma.

5    Q.   How long have you lived in Tulsa?

6    A.   All my life.

7    Q.   Who do you live with, in Tulsa?

8    A.   I live with my mom, brother and sister.

9    Q.   Now, did you graduate from high school in the Tulsa area?

10   A.   Yes, I graduated from Union High School.

11   Q.   And when?

12   A.   In 2008.

13   Q.   And Samantha, do you drive a car?

14   A.   Yes.

15   Q.   Do you have a Facebook account?

16   A.   Yes.

17   Q.   How often do you go on Facebook?

18   A.   My Facebook account is logged on to my cell phone, so any

19   time someone writes on my wall or I get a notification, it does

20   go to my cell phone.  So I want to say at least five times a

21   day if I'm working, but if I'm not busy, I'm usually on it a

22   lot of the day.

23   Q.   Do you text message?

24   A.   Yes.

25   Q.   How many times a day do you do that?
```

1   A.   I actually text message more than I talk on the phone, so

2   the majority of the day.

3   Q.   Samantha, what does your bedroom look like right now?

4   A.   It's messy.

5   Q.   What do you like to do for fun?

6   A.   I like to hang out with my friends, go shopping, I love

7   clothes.  I like going to the movies.  I like sushi a lot, so

8   any time we go out to dinner or something, I usually want to go

9   get sushi.

10  Q.   Do you go to the mall?

11  A.   Yes, I love the mall.  It's like my second home.

12  Q.   What was the last movie you saw?

13  A.   The last -- I actually went and watched Harry Potter 7.  I

14  don't really like Harry Potter, I went with my friends.  I went

15  to the midnight premiere so I was asleep a majority of the

16  time.

17  Q.   Do you like music?

18  A.   Yes, I love music.

19  Q.   What kinds?

20  A.   I like Taylor Swift, Adele, anything that is on the radio

21  and is played often, although I do get sick of it, if it is

22  played too much.

23  Q.   Now are you -- have you had any education beyond your high

24  school degree?

25  A.   Yes, right now I'm going to Tulsa Community College.

```
 1    Q.   And how long have you been attending TCC?

 2    A.   Since I graduated in May 2008, I've been attending.

 3    Q.   And about how many classes have you taken each semester?

 4    A.   When I started going to TCC, I was taking full-time, so

 5    four classes.  But I, like, started working and I was getting a

 6    ton of, like, working full-time hours, I cut back on classes.

 7    Last semester I only took two and then I'm also taking one

 8    summer class, this summer.

 9    Q.   Now, are you studying towards a particular degree at TCC?

10    A.   Yes, I plan on majoring in business management.

11    Q.   And are you going to get an associate's degree at the end

12    of two years?

13    A.   After the class I'm taking this summer, I'll have two more

14    classes to take at TCC, and then I will have reached an

15    associate's in business management and then I plan on finishing

16    my degree at the University of Oklahoma State, at the Tulsa

17    campus.

18    Q.   How have you financed your associate -- your schooling at

19    TCC?

20    A.   Actually, I was able, since I graduated from a Tulsa

21    school, I was able to file for Tulsa Achieves, which is a

22    program for students who graduate with higher than a 2.0 GPA, I

23    think.  I think it's a 2.0 or maybe it's 3.0.  You get 63 hours

24    of college credit for free, it's paid for, you only have to pay

25    for books, but I also got financial aid to do that.
```

1    Q.   Did you have to do anything to get the Tulsa, or to keep

2    the Tulsa Achieves scholarship?

3    A.   To actually get that credit, to be able to get your

4    transcript after being in Tulsa Achieves, you have to do 40

5    hours of community service every year, which I have been doing

6    at the Tulsa Aquarium.

7    Q.   Now, after you finish at TCC, do you plan -- well, I think

8    you said you were going to go to OSU Tulsa or hope to?

9    A.   Yes.

10   Q.   And what are your career goals?  I mean, what do you want

11   to do with all of this, eventually?

12   A.   Well, right now I'm the visual manager at Forever 21, but

13   I plan on savings up my own money to open a clothing store,

14   like a little boutique.

15   Q.   What kind of clothing do you want to sell?

16   A.   Any -- clothes that are in style.  Really fashion forward

17   stuff, cute stuff, things that a lot of -- anyone from the age

18   of let's say, 14 to 25, would wear.

19   Q.   Now, have you ever worked in fashion retailing before?

20   A.   Yes, that's the only thing -- well, I worked at somewhere

21   else, but that's usually what I'm -- that's what all of my work

22   experience, the majority of it is in.

23   Q.   Now, I think you said you currently -- are you working at

24   Forever 21 now?

25   A.   Yes.

1   Q.   And what does Forever 21 sell?

2   A.   It sells very fashion-forward clothing, a lot of crazy

3   pieces.  They really like mixing patterns.

4   Q.   And how long have you worked there?

5   A.   I've worked there for, it's been three years July 2nd.

6   Q.   So you started there on July 2nd of 2008?

7   A.   Yes.

8   Q.   And where is the Forever 21 store that you work at?

9   A.   It's at Woodland Hills Mall.

10  Q.   What's your current job there?

11  A.   I'm the visual manager.

12  Q.   And when you started in July of 2008, what was your job?

13  A.   I was a sales associate.

14  Q.   And how long -- can you tell me what your career path was

15  or what the jobs were that you held at Forever 21?

16  A.   I first started as a sales associate.  Within six months

17  of being a sales associate, I was promoted to accessory

18  specialist and then after six months of being accessory

19  specialist, I was promoted to being a visual merchandiser and

20  then after six months of that, I was promoted to visual

21  manager.

22  Q.   And how many people do you supervise as visual manager?

23  A.   The visual manager with Forever 21, the company, is

24  equivalent to a co-manager, so anyone under me, I was their

25  boss, but as far as directly supervising, about ten associates.

1   Q.   Now, you said that you have worked in retailing?

2   A.   Yes.

3   Q.   Other retailing jobs; right?

4   A.   Yes.

5   Q.   What was the first job that you ever held in retailing?

6   A.   My first job was at Limited Too at Woodland Hills Mall,

7   which is now called Justice.

8   Q.   And when did you work there?

9   A.   It was September of '06 is when I started working there.

10  Q.   When did you leave?

11  A.   I left after a year and a half, so I want to say around

12  May 2008.

13  Q.   And at the time you started with Limited Too, how old were

14  you?

15  A.   16 year old.  I had just turned 16 that summer, yes.

16  Q.   What kind of clothing did -- well, what did Limited Too

17  sell?

18  A.   They sold clothes for, I think the smallest size was a

19  size 6 to a size 20 and these were girl sizes.

20  Q.   So it sold clothing for kids?

21  A.   Yeah, it was a girl's store, for little girls.

22  Q.   And what did you start out as?

23  A.   Sales associate.

24  Q.   Did you hold any other job at Limited Too?

25  A.   No, the entire time I was working at Limited Too, I was a

1   sales associate because you have to be 18 to be a key holder or

2   a manager at Limited Too.

3   Q.   Now, how did you get the job with Limited Too?

4   A.   I was at the mall one day and I filled out an application

5   there.  They called me for an interview, it was a group

6   interview.  I went through the interviewing process and then

7   she called me and offered me the job.

8   Q.   And you worked there for about a year and a half, you

9   said; right?

10  A.   Uh-huh.

11  Q.   And on average, how many hours a week did you work?

12  A.   It depended on the season and how much payroll there was

13  at the time.  So let's say if it was holiday time, I would work

14  anywhere from, like, 25 hours to 35 hours because I was out of

15  school, or but, like on average, it would be anywhere from,

16  like, 8 to 15 hours.

17  Q.   Now, why did you leave Limited Too in, around May or June

18  of 2008?

19  A.   I had worked there for a long time.  I really enjoyed

20  working at Limited Too, but I was kind of over it and I wanted

21  something new.

22  Q.   Did you work at any other job while you were in high

23  school, other than Limited Too?

24  A.   Yes, I actually worked at Fruit Fondue, which was a little

25  kiosk that sold fruit and chocolate and you put whipped cream

```
 1    on top.

 2    Q.   Was that also at the Woodland Hills Mall?

 3    A.   Yes.

 4    Q.   And what did you do for them?

 5    A.   I was kind of responsible for everything there was to do.

 6    I made cups of fruit and chocolate for customers.  I worked the

 7    cash register.  That was basically it at Fruit Fondue.

 8    Q.   And how long did you work for Fruit Fondue?

 9    A.   I worked there for about four months.

10    Q.   And why did you leave then?

11    A.   Fruit Fondue actually didn't do as well as the owner

12    thought it would do, so he had to shut down.

13    Q.   Did you like that job?

14    A.   It was my favorite job.

15    Q.   Why?

16    A.   I just enjoyed the concept and I thought it was fun and I

17    ate a lot of fondue.

18    Q.   Now, how many hours a week did you work at Fruit Fondue?

19    A.   Whenever I wasn't working at Limited Too, I would give him

20    my schedule every week, so when I wasn't working, he would

21    schedule me, so on average, probably like 15 hours.

22    Q.   Okay.  Now, have you ever worked at any other retailer?

23    A.   Just in general?

24    Q.   Yeah, at any time?

25    A.   I worked at Limited Too, I've worked at Old Navy and
```

```
 1   Forever 21.
 2   Q.   When did you work for Old Navy?
 3   A.   It was the summer of 2008.  I didn't work there very long
 4   because I just didn't like it very much.
 5   Q.   Did you start working for Old Navy around the same time
 6   you started for Forever 21?
 7   A.   Yeah, I was like -- like around the same time.
 8   Q.   And that was in July of 2008?
 9   A.   Uh-huh, I got both jobs and Forever 21 was more fun and I
10   enjoyed the people I worked with there more than Old Navy, so I
11   decided to stay with Forever 21.
12   Q.   Samantha, why did you work so many hours in high school?
13   A.   Whenever I was 16 I wanted my own job, just so I could
14   have my own money to pay for clothes and any time I would hang
15   out with my friends.  And then also, I had just gotten a car,
16   so I wanted to help my mom out because she did buy my car, so I
17   paid for car insurance and gas.
18   Q.   Now, Samantha, what is your religion?
19   A.   I am Muslim.
20   Q.   And how long have you been a Muslim?
21   A.   All my life.
22   Q.   Are your parents Muslim?
23   A.   Yes.
24   Q.   Now, I see you're wearing a headscarf today?
25   A.   Uh-huh.
```

```
 1   Q.   How often do you wear that headscarf?

 2   A.   All day every day.

 3   Q.   And when did you begin wearing a headscarf?

 4   A.   When I was 13, so when I was in eighth grade.

 5   Q.   And where do you get your headscarves from?

 6   A.   Any retailer that sells scarves, they are not necessarily

 7   made to -- like, they're just normal scarf.  This one was from

 8   Forever 21, actually.

 9   Q.   Now, do your religious beliefs require you to wear any

10   particular color of headscarf?

11   A.   No, it's up -- you can wear whatever color you want.

12   Q.   And did you wear a headscarf while you were working at

13   Limited Too?

14   A.   Yes.

15   Q.   Did you wear a headscarf when you were working at Fruit

16   Fondue?

17   A.   Yes.

18   Q.   Did you wear a headscarf when you were working at Old

19   Navy?

20   A.   Yes.

21   Q.   Have you worn at headscarf since you have been working at

22   Forever 21?

23   A.   Yes.

24   Q.   Do you ever appear in public without your headscarf?

25   A.   No.
```

1   Q.   Now, in high school, when you were in high school, did you

2   ever shop at Abercrombie & Fitch?

3   A.   Yes.   Abercrombie & Fitch was one of the stores that I

4   enjoyed shopping at.

5   Q.   Did you ever buy anything at abercrombie kids, even though

6   you were in high school?

7   A.   I didn't buy their jeans, because I couldn't fit in their

8   jean sizes, but I did buy their sweatshirts and like their --

9   they're T-shirts, the graphic tees that said Abercrombie &

10  Fitch.

11  Q.   How about Hollister, did you buy anything at Hollister?

12  A.   I remember buying jeans, but not so much their tops, just

13  jeans.

14  Q.   And when you shopped at Abercrombie & Fitch, what kind of

15  clothes did you buy?

16  A.   I bought their jeans, their tank tops, sweatshirts.   I

17  loved Abercrombie sweatshirts and then just like their

18  T-shirts.

19  Q.   And in high school, what was your opinion of Abercrombie &

20  Fitch's clothes?

21  A.   It was what everyone was wearing, so it was in style and

22  cool.

23  Q.   Did you ever apply for a job with an Abercrombie & Fitch

24  store?

25  A.   I applied for a model position at the abercrombie kids

1   store, which to fill out an application, you would have to

2   apply at the Abercrombie & Fitch store, yes.

3   Q.   But the job you applied for was actually going to be at

4   abercrombie kids?

5   A.   Yes.

6   Q.   And where was that store located?

7   A.   At Woodland Hills Mall.

8   Q.   And do you remember when you first applied for a job with

9   abercrombie kids?

10  A.   June, 2008.

11  Q.   Was it towards the end of June?

12  A.   Yes.

13  Q.   At that time, had you applied for any other jobs?

14  A.   No, I just wanted to work there.

15  Q.   Now, were you still working at Limited Too when you

16  applied for a job at abercrombie kids?

17  A.   No, I had just -- sorry.  I had just quit.

18  Q.   Why did you want to work at abercrombie kids?

19  A.   First of all, I liked the clothing that they sold.  And I

20  had a friend who worked there, Farisa.  And she told me that

21  they got a really good discount and she liked the people she

22  worked with and that it was a fun environment.  And so I

23  thought it would be a good idea.

24  Q.   Did your friend Farisa, did you ever go visit her at the

25  abercrombie kids store when she was on duty?

1    A.   Yes, quite often.

2    Q.   How often did you do that?

3    A.   Any time I was working either at Limited Too or Fruit

4    Fondue and I was on break, I would always go visit her.

5    Q.   And did you meet any of the other people who worked at

6    abercrombie kids when you went to visit Farisa?

7    A.   Yes, a lot of the sales associates that worked there, I

8    would usually talk to them, just because I was always in that

9    store, so they all knew who I was.

10   Q.   And do you remember any of the names of the people that

11   you got to know or that you met?

12   A.   As far as sales associate, I knew Spencer, I knew Andrew.

13   I can't -- do you need the last names?

14   Q.   No.

15   A.   Spencer, Andrew and then Taylor Newman.  Those were three

16   people that I often talked to.

17   Q.   Did you know any of the managers there or meet them?

18   A.   As far as managers, the managers I usually talked to or

19   saw were Kalen and Heather.

20   Q.   Is that Kalen McJilton?

21   A.   Yes.

22   Q.   And Heather Cooke?

23   A.   Yes.

24   Q.   Did you know the store manager of the abercrombie kids.  I

25   think his name was Andrew Sturm-Hamilton?

1    A.   I often saw him, but I didn't usually talk to him because

2    he wasn't there as often as the other two.

3    Q.   When you saw him, did you notice if he wore anything on

4    his head?

5    A.   Actually, there were more than one time where I would see

6    him wearing a baseball cap.

7    Q.   And he was working at the time or was he out in the mall?

8    A.   He was working.

9    Q.   Now, did you tell Farisa that you were interested in

10   working at abercrombie kids, before you applied?

11   A.   Yeah, she knew that I was looking for a new job so it was

12   either me who told her I wanted to or she told me I should come

13   work there.

14   Q.   Okay.  And how did you go about applying for the job with

15   abercrombie kids?

16   A.   I went upstairs to the kiosk at Abercrombie & Fitch and

17   just filled out an application on the computer, typed in my

18   information.

19   Q.   What job did you apply for?

20   A.   The model position, which is equivalent to a sales

21   associate or the same thing as a sales associate.

22   Q.   Do you remember what kind of information the electronic

23   application asked you for?

24   A.   Just basic information, like my name, where I lived, any

25   previous job experience that I had and then also my, if I had

1    graduated, I think it also asked me that, from high school.

2    Q.   Was there any information on the kiosk or on the computer

3    in the kiosk about what you would have to wear if you got hired

4    by abercrombie kids?

5    A.   Not that I remember.

6    Q.   Do you recall any reference on the computer at the kiosk

7    to something called the Look Policy?

8    A.   No.

9    Q.   Was there any information on the kiosk or on the

10   application on the kiosk about whether or not you could wear

11   headwear?

12   A.   No.

13   Q.   Now, after you applied, what happened with respect to

14   getting hired?

15   A.   After I applied, there was a question asked me when I

16   would be able or when I wanted to have an interview.  I checked

17   the next day at 4:00 p.m.  I either got a phone call from

18   Heather or I was told by Farisa to -- that Heather told me to

19   come in the next day at 4:00 for an interview.

20   Q.   So you don't remember exactly how you found out that you

21   had an interview?

22   A.   No, I just know that I had an interview the next day at

23   4:00.

24   Q.   Were you nervous about the interview?

25   A.   I wasn't necessarily nervous, just because I know that

1    they knew that I wanted the job and Farisa worked there, so I'm

2    sure she talked me up to the managers.  But I wasn't -- like, I

3    wasn't nervous, because I'd worked in retail before, also.

4    Q.   Now, do you know -- who interviewed you?

5    A.   Heather Cooke.

6    Q.   Do you know what position she held at abercrombie kids, at

7    the time?

8    A.   She was an assistant manager and I'm assuming she was the

9    one that was in -- it was her duty to do the hiring.

10   Q.   Where did your interview take place?

11   A.   It was at Woodland Hills Mall.  It was outside the store

12   on two chairs.

13   Q.   So it was out in sort of the middle of the mall?

14   A.   Yeah, but it wasn't like where everyone was walking.  It

15   was kind of to the side, but yeah, it was outside in the mall,

16   sorry.

17   Q.   Now, before you were interviewed by Heather Cooke, did you

18   know whether Abercrombie & Fitch or abercrombie kids had a

19   dress code?

20   A.   The only thing that I knew was that you were supposed to

21   dress like Abercrombie as far as wear Abercrombie clothes.  And

22   if you weren't going to wear Abercrombie clothes, things that

23   look like Abercrombie.  And then I knew that you weren't

24   allowed to wear black because Farisa would always complain

25   about not being able to wear black.

```
 1    Q.   And did you know whether you had to wear certain colors at
 2    certain times?
 3    A.   Yeah, she also let me know that certain seasons of the
 4    year they would have to wear like navy blue and gray or they'd
 5    have to wear cream and brown.  I guess it depended on what was
 6    in style or what the -- something like that.
 7    Q.   Did you have any problem with dressing as Farisa described
 8    was required?
 9    A.   No, I understood that was like a dress code.
10    Q.   And had you ever heard, before being interviewed by
11    Heather Cooke, that Abercrombie had something called a Look
12    Policy?
13    A.   No.
14    Q.   Did anybody ever tell you before the interview that you
15    had, that you couldn't work at abercrombie kids wearing a
16    headscarf?
17    A.   No, I had no idea.
18    Q.   At the time of your interview, was there anyone else being
19    interviewed, as well?
20    A.   No, it was just a one-on-one group interview with me and
21    Heather.
22    Q.   What did you wear to the interview?
23    A.   I wore Abercrombie jeans, and Abercrombie top, my
24    headscarf and sandals.
25    Q.   Why did you wear Abercrombie jeans and Abercrombie top?
```

1    A.   Because I was going to an interview for Abercrombie so I

2    thought I should wear Abercrombie clothes.

3    Q.   Now, what color was your -- what color was the headscarf

4    you wore to the interview?

5    A.   I did wear a black headscarf to the interview.

6    Q.   Why did you wear a black headscarf to the interview if

7    Farisa had told you you couldn't wear black?

8    A.   First of all, I hadn't gotten the job yet so I just

9    thought I would be able to wear whatever color, because I

10   wasn't necessarily working yet.  And then also, I remember I

11   was wearing black scandals and then I thought your shoes and my

12   scarf would have to match, so I wore a black scarf because I

13   was wearing black sandals.

14   Q.   Now, when you had the interview with Heather, can you tell

15   me, as best you recall, what Heather said to you and what you

16   said to her?

17   A.   She asked me the basic questions, if I've ever worked in

18   retail, why I wanted to work at Abercrombie and then if I knew

19   what diversity meant.  And of course, I knew what diversity

20   meant, and Farisa told me I needed to make sure I knew that

21   question.  And then she also let me know that I would have to

22   wear clothes that looked like Abercrombie if I wasn't going to

23   wear Abercrombie clothes and -- what else did she tell me?  Oh,

24   yeah, and then I need to look natural, so I couldn't wear heavy

25   makeup or I couldn't wear -- what else?  Heavy makeup or nail

1    polish.  I just had to look natural.

2    Q.   Okay.  And did Heather Cooke mention something called the

3    Look Policy to you during the interview?

4    A.   No, I had no idea what the Look Policy was.

5    Q.   You've heard about the Look Policy since then; correct?

6    A.   Yes, plenty of times.

7    Q.   Now, did Heather Cooke tell you during the interview that

8    you could not wear anything on your head?

9    A.   No.

10   Q.   Did Heather Cooke mention your headscarf to you at all

11   during the interview?

12   A.   No.

13   Q.   Did you mention your headscarf to Heather during the

14   interview?

15   A.   No, I didn't think there was any need to talk about my

16   headscarf.

17   Q.   Why not?

18   A.   I've never been asked in an interview or been told that I

19   needed to.  Like, I didn't even think it was a question.

20   Q.   Had you worn your headscarf in all your other jobs up to

21   then?

22   A.   Yes.

23   Q.   At the end of the interview, did you have any sense of

24   whether -- or any feeling whether or not you had gotten the job

25   or were going to get the job?

```
 1    A.   Yeah, after the interview was complete, Heather asked me

 2    if I had any questions and then she said I'll call you back and

 3    let you know when orientation was.  And in my mind, orientation

 4    meant you basically got the job, that was when you'd fill out

 5    paperwork and get the handbook and all of that, so I thought I

 6    had the job.

 7    Q.   So Heather said she'll call you back?

 8    A.   And let me know when orientation was, yes.

 9    Q.   And did Heather call you back?

10    A.   No.

11    Q.   What happened next?

12    A.   That was a Thursday, a couple days passed, because she did

13    tell me she would call me the next day or the day after.  I

14    never got her phone call.  Farisa either asked me if I got a

15    phone call or I asked her why they weren't calling, I'm not a

16    hundred percent sure on that, I can't recall.  But after that,

17    Farisa was working that Sunday and she told me that she would

18    ask and see why they hadn't called.

19              MR. KNUEVE:  Objection, Your Honor, it's hearsay.  I'm

20    a little concerned that we're going to get into double hearsay

21    in a little bit, in a moment.

22              THE COURT:  All right.

23              MS. SEELY:  Your Honor, it goes to notice.

24              MR. KNUEVE:  Notice has been decided, Your Honor.

25              THE COURT:  No, it's still hearsay.  The jury is
```

1   instructed to disregard the substance of what another

2   individual told Ms. Elauf, that's hearsay if it's offered for

3   the truth, so you are to disregard that.  The objection is

4   sustained.  Go ahead.

5   Q.  (By Ms. Seely)  Samantha, did you ever find out that you

6   were not going to be hired by abercrombie kids?

7   A.  Yes, I did.

8   Q.  Did you ever find out that you were not going to be hired

9   by abercrombie kids because you wore a headscarf?

10  A.  Yes, I did.

11  Q.  And when you found that out -- strike that.  Who did you

12  find that out from?

13  A.  Farisa.

14  Q.  And when Farisa told you that you were not going to be

15  hired because you wore a headscarf, how did you feel?

16  A.  First of all, I -- I was born in the United States and I

17  thought I was the same as everyone else.  I had never been

18  discriminated by before.  I thought I wasn't good enough for

19  the job.  I had worked in retail before, I didn't know it was

20  necessary that I wouldn't be able to wear a headscarf for a

21  job.  I...

22  Q.  How did you feel, Samantha, you know, after the initial

23  shock of that, how did you -- did you think about it, did you

24  think about what had happened?

25  A.  Yeah, I thought about it.  I felt like I was insulted and

1    I was disrespected because of my religious beliefs.  I thought

2    it wasn't fair, I was treated unfairly.  I do consider myself

3    an American, I guess you could say an American Muslim, but I am

4    like any other -- at that age, I was like any other teenager.

5    I don't know why the fact that I wear a headscarf makes me

6    different.  I don't -- how was I supposed to know that I wasn't

7    going to get a job or I should ask if I could wear my headscarf

8    to work.  Like, it was shocking to me.  I didn't think it was a

9    question.

10   Q.  Has that experience had any, you know, lasting effect on

11   the way you feel about yourself?

12   A.  Any time I -- right now, everyone I work with knows I do

13   wear a headscarf because any time they see me I am wearing a

14   headscarf, but let's say we have a corporate visit and someone,

15   for example, our regional manager came, when was it, I think

16   she came in March and I was wearing a headscarf.  I -- in the

17   back of my mind, I was wondering if she was judging me just

18   like I was judged when I was being interviewed by Abercrombie,

19   obviously.  So yeah, any time someone looks at me, I'm

20   wondering what they are thinking.  Are they categorizing me

21   again, like what...

22   Q.  Had you felt that way before?

23   A.  No.  To be completely honest, when I started wearing a

24   headscarf, I didn't think anyone would think of me different,

25   just because I do drive a car, I speak English.  English is my

1    first language.  I was born in the United States.  I thought I

2    was like everyone else.

3    Q.   Now, you were 17 at the time this happened to you; is that

4    correct?

5    A.   Yes.

6    Q.   And had anything this upsetting ever happened to you

7    before?

8    A.   As far as a job, no.

9    Q.   How long do you think you will remember that you weren't

10   hired by Abercrombie & Fitch because of your headscarf?

11            MR. KNUEVE:  Objection, Your Honor, speculation.

12            THE COURT:  Overruled.

13   A.   Any time I go look for a new job or I see someone looking

14   at me different, that's the first thing that's going to come to

15   my mind.

16            MS. SEELY:  Thank you, Samantha.

17            THE WITNESS:  You're welcome.

18            THE COURT:  Mr. Knueve.

19                        CROSS-EXAMINATION

20   BY MR. KNUEVE:

21   Q.   Good afternoon, Ms. Elauf.

22   A.   Good afternoon.

23   Q.   I'm going to ask you a couple questions.  We met in

24   January of 2011 when I took your deposition.  Do you recall

25   that?

 1    A.   Yes, I do remember that.

 2    Q.   Now, you testified that before you went to the interview

 3    with Ms. Cooke, you knew that you were not allowed to wear

 4    black at Abercrombie; correct?

 5    A.   I knew that the sales associate or any employee of

 6    Abercrombie was not allowed to wear black, yes.

 7    Q.   And you knew that because your best friend, Farisa

 8    Sepahvand always complained about the fact that she couldn't

 9    wear black at work; right?

10    A.   That's -- yes.

11    Q.   And in fact, Ms. Sepahvand told you not to wear black to

12    your interview, didn't she?

13    A.   She didn't tell me not to wear black.  She didn't tell me

14    what I should wear.  It was my choice to wear black.

15    Q.   Were you here yesterday when Ms. Sepahvand testified in

16    open court?

17    A.   Yes, I was.

18    Q.   Do you recall her testifying that she specifically told

19    you not to wear black?

20    A.   I heard her say that, but I don't remember her saying

21    that.

22    Q.   So you are saying that Ms. Sepahvand was not telling the

23    truth?

24    A.   How long -- this was a while ago so she could have may

25    have thought she said that.  I'm not going to say she's a liar,

1   but I don't remember her telling me what to wear to the

2   interview.

3   Q.   Regardless of which one of you is telling the truth, you

4   knew you weren't supposed to go into the interview with a black

5   headscarf; right?

6   A.   I knew that Abercrombie didn't allow you to wear black.

7   Q.   But you wore a black headscarf anyway?

8   A.   Yes, I did.

9   Q.   And you also said today that you also wore black shoes to

10  the interview; correct?

11  A.   Yeah, black sandals.

12  Q.   Now, you said today that you had no idea what the Look

13  Policy was.  That was your testimony today; right?

14  A.   I don't know what the Look Policy is, yes.  I didn't know

15  what it was.

16  Q.   But Farisa told you before the interview that this was a

17  model position; correct?

18  A.   Yes, I knew I was applying for a model position.

19  Q.   And Farisa also said that you had to wear clothes that

20  looked like the stuff Abercrombie sells -- sold?

21  A.   That's why I was wearing Abercrombie.

22  Q.   And you had been to the store a bunch of times?

23  A.   Yes, plenty of times.

24  Q.   And you were told that you had to wear the style at work?

25  A.   Yeah, I knew that I had to look like Abercrombie.

1   Q.   And you were told not to wear black?

2   A.   I wasn't told not to wear black.  I've already said that.

3   Q.   Well, you knew lots of people who worked at the

4   abercrombie store; right?

5   A.   And I knew they didn't wear black.

6   Q.   And despite all of that, despite knowing all the people

7   that worked there, having gone to the store, being told you

8   were going to be a model, being told to wear the style, your

9   testimony is you had no idea what the Look Policy was?

10          MS. SEELY:  Objection, asked and answered.

11          THE COURT:  Overruled.

12   Q.   (By Mr. Knueve)  You can answer.

13   A.   Would you repeat that?

14   Q.   Your testimony is that you had no idea what the Look

15   Policy was?

16   A.   I had no idea what the Look Policy was.  I knew that you

17   weren't allowed to wear black, but that doesn't mean I know

18   exactly what the Look Policy is.

19   Q.   Now, my other question is yesterday, Ms. Sepahvand

20   testified in open court and you were here and she said that you

21   definitely already knew that the Look Policy -- knew about the

22   Look Policy before your interview.  Do you recall her saying

23   that?

24   A.   Yes, and again, I did not know what the Look Policy was

25   before I started working there.

1    Q.   So again, one of you is telling the truth and one of you

2    is not; right?

3    A.   Okay.   Okay.

4    Q.   Today you said that you were asked if anybody ever wore a

5    hat at the store and you, today you said that Andrew

6    Sturm-Hamilton wore a hat sometimes when you saw him?

7    A.   Yes, I did.

8    Q.   Now, I asked you at your deposition if you ever saw

9    anybody wearing hats and you said no, you couldn't remember

10   that.

11   A.   I thought you asked me if I had ever seen someone wear a

12   yarmulke, which I haven't.

13          MR. KNUEVE:   May I approach the witness, Your Honor?

14          THE COURT:   You may.

15   Q.   (By Mr. Knueve)   118 please.   I'm going to direct you to

16   page 118 of your deposition, lines 15 to 19.   Question.   This

17   is the question I asked you:

18          "You've never seen anybody wearing any kind of

19   headwear at an abercrombie store; correct?"

20          This was your answer.   "I don't know.   I don't know if

21   I've ever seen them wear hats or anything, but not that I

22   recall, no."   That was your answer then; right?

23   A.   I said I don't recall, but the more I think about it, he

24   was wearing a hat more than one time.

25   Q.   So in January of 2011, you didn't remember anybody wearing

1    hats, but now today, several months later, you do remember?

2    A.   Uh-huh.

3    Q.   Okay.  Now, during the interview, Ms. Cooke told you that

4    you'd need to wear clothing that looked like the Abercrombie

5    while you were working; correct?

6    A.   Yes.

7    Q.   And she told you that in the model position, you would be

8    modeling the A&F style; correct?

9    A.   She told -- I don't remember her saying the word modeling

10   the Abercrombie style.  She told me I need to like Abercrombie,

11   like wear Abercrombie clothes.

12   Q.   You knew that you would have to wear the A&F style, right,

13   the Abercrombie style?

14   A.   I did.

15   Q.   And at the end of the interview, Ms. Cooke asked you if

16   you had any questions; correct?

17   A.   Yes.

18   Q.   And you said that you had no questions; right?

19   A.   No.

20   Q.   You never mentioned your headscarf during the interview,

21   did you?

22   A.   Like I said before, I didn't know it was necessary for me

23   to ask --

24   Q.   And so you --

25   A.   -- any questions about my headscarf.

```
 1   Q.   And you didn't ask, did you?

 2   A.   No, I did not ask.

 3   Q.   And you never mentioned that you were Muslim during the

 4   interview?

 5   A.   No, I did not mention I was Muslim during the interview.

 6   Q.   And Ms. Cooke even asked you what diversity meant to you?

 7   A.   Yes, she did.

 8   Q.   But you never mentioned your religion or your headscarf?

 9   A.   No.

10   Q.   Now, Ms. Cooke was nice to you during the interview,

11   wasn't she?

12   A.   Yes, she was.

13   Q.   And she didn't call you any names?

14   A.   No.

15   Q.   She didn't do anything mean?

16   A.   No.

17   Q.   And in fact, you spoke to Heather Cooke in the mall after

18   your interview, after you were working at Forever 21; correct?

19   A.   Yes.

20   Q.   And she was friendly with you?

21   A.   Yes.

22   Q.   And you were friendly with her?

23   A.   Yes.

24   Q.   And you never spoke to Randall Johnson at all, did you?

25   A.   No, I did not.
```

1   Q.   Before you saw the video the other day, you wouldn't even

2   recognize him if he walked in this courtroom, would you?

3   A.   No.

4   Q.   And you also never talked to anybody in Abercrombie's

5   Human Resources Department either, did you?

6   A.   I didn't think I needed to.

7   Q.   After you were aware, after you became aware that you

8   weren't hired because of the headscarf, you didn't call anybody

9   in human resources, did you?

10  A.   I wasn't brought on to the company.  Why would I go and

11  call their HR?

12  Q.   And You didn't call, did you?

13  A.   No, I didn't call.

14  Q.   But you were positive at your deposition that there was a

15  toll free number that you could use to call Abercrombie's Human

16  Resources Department; right?

17  A.   Umm.  Sorry.  I know that every company has a human

18  resources number, of course.

19  Q.   But you didn't call that?

20  A.   No.

21  Q.   Now, you were interviewed by Ms. Cooke on June 27, 2008;

22  correct?

23  A.   Yes.

24  Q.   And a short time later, you started working at Forever 21?

25  A.   Yes.

1   Q.   And in fact, you started working at Forever 21 on July

2   2nd, 2008; correct?

3   A.   That's when my paperwork went through, but I'm pretty sure

4   I started working the next day, though, so July 3rd, yeah.

5   Q.   That was five days after your interviewed with Heather

6   Cooke?

7   A.   Sure.

8   Q.   Now, I think you testified before you got the job at

9   Forever 21, you already had a job at Old Navy; right?

10  A.   No.

11  Q.   Let's go back to your deposition --

12  A.   Okay.

13  Q.   -- page 137.  And I'll refer to you pages -- or I'm sorry,

14  on page 137, lines 13 to 20.  I don't know if I'll read it into

15  the record, I'll just ask you if it refreshes your

16  recollection.  Does that refresh your recollection?

17  A.   Wait.  Hold on.  Sorry, I'm not done reading it.  Wait.

18  Where does it say it?  It says that I was working at Forever

19  21.  I mean I was working at Old Navy before Forever 21?

20  Q.   If you look at line 14 -- or I'm sorry.  Line 13.  So when

21  -- your answer:

22          "Did I work at Old Navy:

23          "Question.  Yeah.

24          "Answer.  I don't remember.  I didn't work there for

25  that long.  I didn't really like it.  I just know I was working

1    there before I got the job at Forever 21."

2         That was your testimony; right?

3    A.   If I got it before, it was maybe a day before I'd got

4    called back there first.  I don't --

5    Q.   Well, nevertheless, the point is do you recall now that

6    you got the job at Old Navy before you got the job at Forever

7    21?

8    A.   They were around the same time, so sure, if I said once.

9    Q.   So you had another job -- after your interview with

10   Abercrombie, you had another job less than five days; right?

11   A.   Yes, because it wasn't hard for me to get a job as a sales

12   associate.

13   Q.   Yeah, in fact you got two jobs?

14   A.   Yes.

15   Q.   And in fact, you're still employed by Forever 21?

16   A.   I am.

17   Q.   And you've stayed employed with Forever 21 since July 2nd,

18   2008; correct?

19   A.   Yes.

20   Q.   And you've been promoted?

21   A.   Yes.

22   Q.   In fact, I think you said you've been promoted three

23   times?

24   A.   Yes.

25   Q.   Three or four times?  And you're now a visual manager?

```
 1    A.   Yes.

 2    Q.   And in fact, you like working at Forever 21; correct?

 3    A.   I do like my job.

 4    Q.   Would you accept a model job at Abercrombie now if it was

 5    offered to you?

 6              MS. SEELY:  Objection, speculation.  Calls for

 7    speculation.

 8              THE COURT:  Sustained.

 9              MR. KNUEVE:  May I approach, Your Honor?

10              THE COURT:  Is it relevant?

11              MR. KNUEVE:  Equitable relief.

12              THE COURT:  Approach.

13              (Counsel approached the bench and the following

14    proceedings were had out of the hearing of the jury.)

15              MR. KNUEVE:  If they're seeking reinstatement, Your

16    Honor, it's relevant to equitable relief.

17              THE COURT:  Oh, you are not really seeking

18    reinstatement here, are you?

19              MS. SEELY:  No.

20              THE COURT:  I didn't think so.

21              MR. KNUEVE:  Okay.  Thank you.

22              (Counsel returned to their respective places and the

23    following proceedings were had within the presence and hearing

24    of the jury.)

25              THE COURT:  The objection is sustained.  It's
```

```
 1   irrelevant.  Go ahead.

 2   Q.   (By Mr. Knueve)  Now, Ms. Sepahvand testified that she was

 3   the one who told you that you would not be getting the job at

 4   Abercrombie, is that true?

 5   A.   Yeah, I found out from Farisa.

 6   Q.   And Farisa testified yesterday that she told you that you

 7   wouldn't be getting the job at Abercrombie about a week after

 8   your interview; is that true?

 9   A.   She said about a week, but it was Sunday.  I remember

10   that.

11   Q.   So you already had the job at Old Navy before she told

12   you; right?

13   A.   The interview was Thursday, I don't think so.  I don't

14   think I got the job on the weekend.

15   Q.   Well, you might -- you don't remember whether or not she

16   told you before you got another job; is that fair?

17   A.   Say it again.

18   Q.   Is it fair to say you don't remember whether or not Farisa

19   told you that you wouldn't be getting the job at Abercrombie,

20   before you already had the job at Old Navy?

21   A.   Yeah, I don't remember.

22   Q.   Now, the EEOC has alleged that you suffered emotional

23   distress and you agree with them; right?

24   A.   Yes.

25   Q.   But you didn't go to a doctor as a result of any of this,
```

1    did you?

2    A.    I didn't go to a doctor.

3    Q.    And you didn't go to a psychologist?

4    A.    I didn't think it was necessary to go to a psychologist

5    when I had both my family and my friends to talk to about the

6    situation.

7    Q.    You didn't to go a therapist?

8    A.    No.

9    Q.    And you didn't take any medication?

10   A.    I didn't take medicine.

11   Q.    In fact, you feel that by being part of this case, you are

12   doing something that's right, don't you?

13   A.    I do think that I'm setting an example for other Muslim

14   girls, that if they're going to shop somewhere, they should be

15   able to get a job there, also.

16   Q.    And you've had some people tell you that you're doing the

17   right thing; right?

18          MS. SEELY:  Objection, relevance.

19          MR. KNUEVE:  It goes to damages, Your Honor.

20          MS. SEELY:  Objection, hearsay, as well, Your Honor.

21          MR. KNUEVE:  It's not hearsay, it what she's been

22   told.

23          THE COURT:  That's right, it doesn't go to the truth,

24   it goes to...  The objection is sustained.  It really doesn't

25   go to her claimed emotional distress.  Sustained.  Go ahead.

1    Q.   (By Mr. Knueve)   Now, you testified on direct that you

2    send text messages the majority of the day; do you recall that?

3    A.   I said that I text more than I talk on the phone, yes.

4    Q.   You text more than you should.   Now, during your

5    deposition in January of 2011, I asked you if you'd ever sent a

6    text message about Abercrombie; do you recall that?

7    A.   Yes.

8    Q.   And you said no.

9    A.   That's right.

10   Q.   And that was January 2011; correct?

11   A.   Uh-huh.

12   Q.   And you were interviewed in June of 2008; correct?

13   A.   Correct.

14   Q.   So in two and a half years, you never sent a text message

15   about Abercrombie, did you?

16   A.   No, I did not.   I talked to -- if I was going to talk

17   about the situation, it was in my own house.

18   Q.   Well, you text more than you talk; right?

19   A.   But if we're in the same house I'm going to talk.   I'm not

20   going to text them across the room.

21   Q.   Well, you didn't text any of your friends about

22   Abercrombie?

23   A.   No, I did not.

24   Q.   And you didn't post anything on Facebook, either, did you?

25   A.   No.

1          MR. KNUEVE:  One moment, Your Honor.  No further

2     questions.  Thank you.

3          THE COURT:  Redirect.

4                    <u>REDIRECT EXAMINATION</u>

5     BY MS. SEELY:

6     Q.   Samantha, defense counsel asked you, you said on your

7     cross-examination that you had -- you got a job at Forever 21

8     just a few days, five days, I think, after you found out that

9     you were not going to be hired by Abercrombie; right?

10    A.   Yes.

11    Q.   And you're not sure, but you started working for Old Navy

12    sometime around this same time; correct?

13    A.   Yeah, both jobs I got around the same time.  I can't

14    recall the exact day, as far as Old Navy, but it was around the

15    same time.

16    Q.   Okay.  Did the fact that you got another job fairly

17    quickly after being rejected by Abercrombie, make you feel any

18    better about what happened to you at abercrombie kids?

19    A.   No, because as I was being interviewed, in the back of my

20    head, I was thinking am I going to get the job.  That's the

21    first thing I thought about, are they going to say why is she

22    wearing a headscarf.  It doesn't -- that's not what we're

23    looking for.

24          MS. SEELY:  Thank you.

25          MR. KNUEVE:  Your Honor, can I do a quick follow-up?

1          THE COURT:  Yes.

2                       RECROSS-EXAMINATION

3     BY MR. KNUEVE:

4     Q.   Ms. Elauf, you have been employed from the time -- July

5     2nd, 2008 to now; right?

6     A.   Yes.

7     Q.   So you haven't even been interviewing, have you?

8     A.   That doesn't mean that whenever I think about if I wanted

9     to get another job or I pass by a store that I would like to

10    work.

11    Q.   Oh, so you are talking about what might happen if you did

12    interview, not about what did happen?

13    A.   No, I still said whenever I got interviewed for Forever 21

14    and Old Navy, that would be considered one of the times that --

15    Q.   I thought you testified you don't even remember whether

16    you knew you didn't get the job at Abercrombie when you were

17    applying at Old Navy?

18          MS. SEELY:  Your Honor, that wasn't the witness's

19    testimony.

20          THE WITNESS:  I didn't -- I didn't say that.

21          MR. KNUEVE:  I'll withdraw the question.

22          THE COURT:  You may step down.  The plaintiff may call

23    next witness.

24          MS. SEELY:  Your Honor, we do not have any more

25    witnesses.  If we could just check and make sure that we have

1    all our exhibits.

2              THE COURT:  Very well.

3              MS. SEELY:  Plaintiff rests, Your Honor.

4              THE COURT:  Very well.  Mr. Knueve.

5              MR. KNUEVE:  Your Honor, I would like to make a motion.

6              THE COURT:  Very well.  Ladies and gentlemen, we'll

7    need to address some legal matters outside your hearing.  We

8    will allow you to take a short recess while we're taking on

9    some legal questions.  We will be back as shortly as

10   possibility.  I don't want to venture a guess as to the exact

11   amount of time, but we will call you back in as soon as we are

12   through.  The jury is in recess.

13             (The following proceedings were had outside the

14   presence and hearing of the jury.)

15             THE COURT:  Mr. Knueve.

16             MR. KNUEVE:  Thank you, Your Honor.  At this point, we

17   would like to move for a judgment as a matter of law on the

18   EEOC's claim for punitive damages.  And judgment as a matter of

19   law is appropriate for several reasons, Your Honor, and we've

20   talked about them throughout the course of the trial.

21             But first, relating to the notice issue, we believe

22   that punitive damages cannot be awarded in this case where it's

23   undisputed that Ms. Elauf never requested an accommodation or

24   mentioned her religion.  There can be no reckless disregard of

25   federally protected rights when Ms. Elauf never invoked her

1    federally protected rights.

2          To the extent that the EEOC is arguing that a manager

3    must ask an applicant whether they need an accomodation, then

4    at the very least, the law on that issue is unclear and

5    disputed and under the Kolstad case, if an underlying theory of

6    discrimination is novel or poorly recognized, it's

7    inappropriate for punitive damages.

8          Now, the additional basis for our motion is there's

9    insufficient evidence of reckless disregard on the part of

10   Cooke and Johnson.  We will assume, for purposes of this

11   motion, that Johnson knew that Ms. Elauf was Muslim, but his

12   state of mind, it's clear from the evidence in the record, Your

13   Honor, was protecting the brand and enforcing the Look Policy,

14   which is critical to this company.  And there's no, absolutely

15   no evidence of malice whatsoever relating to Ms. Cooke or Mr.

16   Johnson.  There were know malicious things stated to Ms. Elauf,

17   nobody did anything mean to her as she just testified.

18         Moreover, Your Honor, even if you assume that one of

19   the two of them acted with the knowledge that they were

20   potentially in violation of federal law, the evidence is

21   absolutely clear that they were trained to call the human

22   resources department.  And I have some deposition cites from

23   Mr. Johnson's deposition, if you'd like me to get them, but he

24   testified over and over and over again that if there was any

25   issue relating to religion or discrimination, that he should

1    have called HR.

2           Ms. Riley testified that all district managers are

3    trained if religion comes up or if religion is mentioned or

4    even if there's a hint of religion, that the DM must call HR.

5    She also testified that a district manager is not permitted to

6    handle a religious accommodation issue on their own, without

7    HR.  So to the extent that the jury believes that Mr. Johnson

8    did that, he was acting outside the scope of his employment.

9    As a result, there's no vicarious liability.

10          Then we go to the next step, Your Honor, which is the

11   good faith defense under Kolstad and the three elements of the

12   defense as has been interpreted under the Tenth Circuit are the

13   company has a policy, that it takes good faith steps to educate

14   managers on the policy, and that it takes good faith steps to

15   enforce the policy.

16          Here, there is no dispute the company had a policy of

17   providing religious accommodations.  There's no dispute that

18   managers are educated to call HR if it came up.  And there's

19   also no dispute that the company made good faith efforts to

20   enforce its policy because the plaintiff has put into evidence

21   of other exceptions that were made, including exceptions for

22   Muslim employees, including an exception for a headscarf.

23          There is absolutely no basis for a punitive damages

24   instruction, Your Honor.  That's the motion.

25          THE COURT:  Ms. Seely.

1          MS. SEELY:  Ms. Hope will respond.

2          MS. HOPE:  May I approach, Your Honor?

3          THE COURT:  Please.  You know, some of these issues

4     are really at the heart of this lawsuit.  Go ahead.

5          MS. HOPE:  That's right, Your Honor.  Obviously,

6     plaintiffs contest defendant's Rule 50 motion.

7          On the first point that Mr. Knueve has raised on the

8     notice issue for punitive damages, their contention is that

9     well, if Elauf never knew about the accommodation, she never

10    requested one, so how could they put on notice.

11         Ms. Elauf, as you had already ruled, had worn a

12    headscarf to her interview and had obviously put Abercrombie on

13    notice that she was in need of an accommodation.  Heather

14    Cooke, in fact, had called Randall Johnson because she was

15    unclear as to whether or not Ms. Elauf would be able to wear

16    her headscarf for the Look Policy.  There is no dispute that

17    Title VII applies to applicants.  This is not a novel

18    situation.  I understand that we've and you have raised, Your

19    Honor, the crack, kind of the fatal flaw.

20         THE COURT:  But see, you miss the mark here because

21    you claim -- and I have agreed now numerous times on this

22    record with Ms. Seely that Title VII applies to applicants.

23    That's not the bulls eye here.  The bulls eye here has to do

24    not with whether or not it applies here, but the first issue --

25    and there are numerous issues here, as to who has to invoke it.

1    Because Abercrombie says that Ms. Elauf has to invoke it.  And

2    all you -- Ms. Seely continued to say Title VII applies, Title

3    VII applies.  You're not addressing my concern.

4           MS. HOPE:  On the issue of notice under Title VII, the

5    law does not state that an applicant must expressly request a

6    reasonable accomodation, a reasonable religious accommodation.

7           THE COURT:  Finally, your starting to hit their

8    argument head-on.

9           MS. HOPE:  All right.  Well, let's try to hit it a

10   little more head-on.

11          THE COURT:  Please.

12          MS. HOPE:  So Title VII doesn't require that an

13   employee or an applicant use the words "religious

14   accomodation."  Where an employer -- an employer still must

15   provide a reasonable religious accommodation where they are on

16   notice of a conflict between a policy and an employee or

17   applicant's religious beliefs.

18          They were aware of Ms. Elauf's religious belief or

19   assumed that there was a religious belief when Cooke contacted

20   Randall Johnson and informed him that she believed that Ms.

21   Elauf was Muslim and that she wore a headscarf because of that.

22   And so there is no express -- there doesn't need to be express

23   language.  And Mr. Knueve is correct that there does need to be

24   an interactive process, but he's incorrect in that it is always

25   the employee or applicant that needs to commence that process.

1           THE COURT:  All right.

2           MS. HOPE:  In terms of -- and plaintiff feels that

3    there is evidence of reckless disregard.  You know, Ms. Riley

4    testified that they train all of their district managers and

5    all of their managers about Title VII and its prohibition on

6    religious discrimination.  When Johnson testified, you know, he

7    didn't care whether or not it was a baseball cap, he didn't

8    care whether it was a headscarf, he didn't care whether it was

9    a yarmulke.  He had no cause for concern that it was any

10   different from a baseball cap.  Essentially, he equated

11   anything that was on the head to something as informal as a

12   baseball cap.

13           Further, Heather Cooke had testified that when she --

14   after calling district manager Randall Johnson, she thought

15   that there would be problems.  She wouldn't think there would

16   be problems unless she had a belief that what Abercrombie, what

17   she had done, the non-hiring of Samantha Elauf was in danger of

18   violating her federal rights.  In terms of the -- so we believe

19   that there is sufficient evidence of a reckless disregard of

20   Ms. Elauf's protected rights.

21           In terms of the vicarious liability, we, you know,

22   Randall Johnson was in certainly in a managerial capacity.  He

23   had the authority to hire and fire store managers and he was in

24   charge of, you know, over a hundred employees at seven stores,

25   so that's approximately 700 employees that he was in charge of.

1        Ms. Riley testified that in the event that a manager

2   had any questions, whether it was about interviewing or the

3   Look Policy, that it was appropriate to contact the district

4   manager and that's what she did.  She contacted her district

5   manager to consult about the Look Policy.

6        And in terms of the good faith effort.  Mr. Knueve

7   indicated that, you know, his state of mind that he was

8   protecting the brand.  Mr. Johnson didn't act in a vacuum, he

9   was acting within the frame work and the training or lack of

10  training that Abercrombie had provided him.  Everything was

11  about protecting the brand.  And so when we talk about, you

12  know, requesting a religious accommodation, it's in terms of an

13  exception to the Look Policy.  You know, an applicant has to

14  ask for an exception, but the applicant doesn't ask because

15  they don't know to ask, because there's no mention of the Look

16  Policy or at least the prohibition against headwear during the

17  interview.  Management doesn't ask HR, even though they know,

18  as Heather Cooke knew and Johnson knew, that an applicant here,

19  Elauf, needed an accommodation because they're not taught to

20  ask unless there's a specific request for a reasonable

21  accomodation, which as I explained previously, Title VII

22  doesn't require a specific request.  Where an employer is on

23  notice that a policy or practice of theirs conflicts with a

24  religious practice or belief of an employee or applicant, that

25  creates a duty to provide an accommodation.  Nowhere here do we

1    have Abercrombie offering to provide an accommodation or even

2    alerting the applicant to the fact that one, she wasn't hired

3    because she was in violation of the Look Policy or two, that

4    there were provisions in the event that she was hired and

5    needed an exception to the Look Policy.

6         And that goes to our good faith efforts, which Mr.

7    Knueve identified as the third element in punitive damages,

8    which is where the plaintiff has demonstrated, as I think we

9    have, that there has been a reckless, reckless indifference to

10   Ms. Elauf's protected rights and there's vicarious liability,

11   the employer can still avoid liability where it can demonstrate

12   good faith efforts to comply with Title VII, here the

13   provisions for providing religious accommodations.

14        You know, Abercrombie has a diversity policy.  A

15   diversity policy is not a policy that addresses accommodations

16   under Title VII.  It's a generalized policy of respect.  And as

17   the court in EEOC v. Wal-Mart indicated, a generalized policy

18   of respect is not sufficient to satisfy a policy for religious

19   accommodations.  Abercrombie educates its managers to call HR,

20   but it doesn't ever educate it's managers that religious

21   accommodations are permissible, what they are, what they may

22   look like.  It only says when someone comes to you with an

23   exception to the Look Policy, then you can maybe -- you can

24   call HR, but until that time, you know, we don't -- there's no

25   such thing as a religious accommodation.  So they don't train

1     their managers to identify that, well, even if someone doesn't

2     ask, we might need to alert them to the fact that we provide

3     for a religious accommodation.

4             And on that front, as you saw Heather Cooke and as Ms.

5     Riley testified, applicants are rated on whether or not they

6     are in compliance with the Look Policy, even though they don't

7     know that they are being rated.  So where an applicant is not

8     in compliance with the Look Policy at the time of the

9     interview, as Ms. Elauf was not, she's being rated a one, which

10    means she can't be hired because of her headscarf, but will

11    never have that opportunity.  That's a fundamental flaw in

12    Abercrombie's process, not in the statute.  It's a flaw that

13    after working -- Mr. Knueve had referenced human rights experts

14    that they worked with, an industrial organizational expert that

15    they had worked with, that's a flaw in the process.  Applicants

16    are still covered under Title VII.  And I know we've been

17    through this and we agree, but their decision to use that

18    process is reckless.  That's what's reckless.

19            THE COURT:  All right, thank you.  Number one, there's

20    no evidence here by which a reasonable jury could find malice,

21    so the Court will not instruct as to malice as a basis for

22    punitive damages here.  As to Mr. Knueve's four arguments.

23    First going to notice, I feel like I'm hearing arguments again

24    on summary judgment, we keep going back to that.  Frankly, both

25    sides seem to be pulling the Court back to those arguments.

1            But with regard to notice, we have a situation here

2      where you have an employee who doesn't know that she is, under

3      Abercrombie's procedure, supposed to commence the interactive

4      process.  Abercrombie continues to say that Ms. Elauf never

5      invoked those rights by requesting an accommodation.  She

6      didn't know she had to.  Abercrombie followed it's usual

7      practices, don't call us, we'll call you, but decided and a

8      reasonable jury here could decide that she was not hired

9      because she was Muslim and wore a headscarf.  The notice

10     argument is insufficient.

11           Secondly, with regard to sufficiency of the evidence

12     of reckless disregard here.  I was rather surprised by the

13     standard here established by the United States Supreme Court

14     relative to reckless indifference.  The standard appears to be

15     that a potential employer acts with reckless indifference if it

16     discriminates against a job applicant in the face of a

17     perceived risk that it's actions would violate federal law.

18     Here, Cooke herself, thought there would be a problem.  A

19     reasonable jury, under the facts presented here, could find

20     reckless indifference on behalf of Mr. Johnson and potentially

21     Ms. Cooke, although she was told by Mr. Johnson, her

22     supervisor, not to hire Ms. Elauf.

23           As to the third argument of no vicarious liability.

24     There's no question here that Mr. Johnson was acting in a

25     managerial capacity, he was acting within the scope of his

```
1    employment.  The second part of your argument, as I understand
2    it, was he was acting outside Abercrombie's policy; is that
3    correct?
4         MR. KNUEVE:  There were two points, Your Honor.
5    First, to the extent he was attempting to resolve an HR
6    situation on his own, he was acting outside the scope of his
7    employment.  Second, by failing to call HR, he was clearly
8    violating Abercrombie policy.
9         THE COURT:  All right.  Well, as to the first, at
10   least at the present time, I'm reading the court's definition
11   of acting within the scope as rather broad, a broader test.
12   We're reading the court's admonitions here that scope of
13   employment is based on whether employee's conduct was the kind
14   of conduct that employee was employed to perform.
15        As to the second argument, here Johnson knew that he
16   had to roll a request for accommodation up, but he was not
17   trained to roll up a religious accommodation issue that was not
18   presented to him in the form of a request, up to HR.  The
19   vicarious liability prong of the motion will be denied.
20        And as for good faith defense, here Ms. Seely pointed
21   out, and this is to some extent a reiteration of what I just
22   said, although Johnson knew he had to roll a request for
23   accomodation up, he was not trained, apparently, to roll up a
24   religious accommodation issue regarding an applicant when such
25   a religious accommodation issue presented itself.
```

1          Here there was no good faith policy to deal with this

2     specific factual situation, and that's what I'm talking about

3     in terms of this case falling between the cracks.  This just is

4     not the run of the mill religious accommodation issue.  Most of

5     those issues come up in the context of an existing employee.

6          So with due respect, the defendant's Rule 50 motion

7     will be granted in part and denied in part.  Granted with

8     regard to the allegations of malice, denied with regard to the

9     aspects of reckless indifference.

10         MR. KNUEVE:  Your Honor, I would like leave to renew

11    the motion after our case because I think that there will be

12    evidence that there was training on the issue you just

13    mentioned.

14         THE COURT:  Very well.  Very well.  You-all care to

15    take a short break while we've got the jury out?  Let's take a

16    short recess.

17         (Recess).

18         (The following proceedings were had outside the

19    presence and hearing of the jury.)

20         MS. SEELY:  Your Honor, if I may bring up one small

21    housekeeping matter before the jury --

22         THE COURT:  Well, we'll need to retrieve Mr. Overton

23    since he's going to be bringing the jury in in just a second.

24         Do you need to come to the sidebar?

25         MS. SEELY:  Yes, Your Honor.

1          (Counsel approached the bench and the following

2     proceedings were had out of the hearing of the jury.)

3          MS. SEELY:  Your Honor, at the pretrial conference, in

4     response to our objections to the relevancy of Dr.

5     Joachimsthaler and Dr. Lundquist's testimony, you suggested

6     that we might want to proffer a limiting instruction on what

7     the jury should be able to consider their testimony for, and we

8     did submit two proposed limiting instructions.

9          THE COURT:  When did you do that?

10         MS. SEELY:  With all of our instructions on the date

11    that we were required to submit them forth.

12         THE COURT:  All right.

13         MS. SEELY:  And my request or my question is are we

14    going to be able to -- will these granted?  If so, will they be

15    read now?

16         THE COURT:  Frankly, I have not seen them.  My law

17    clerk has been working on the instructions and I'm trying to

18    work on the instructions.  I've not seen those two.

19         MS. SEELY:  We're just concerned that --

20         THE COURT:  I wasn't aware that you had prepared any.

21    Is Dr. Joachimsthaler going to be the first witness?

22         MS. SEELY:  Dr. Lundquist will and she's the next

23    instruction.

24         THE COURT:  Mr. Knueve.

25         MR. KNUEVE:  I think it's inappropriate and

1    prejudicial.  I think that to the extent Your Honor finds that

2    a limiting instruction is necessary, then they can be provided

3    at the end of the case, along with all the other instructions.

4            THE COURT:  All right.  As I try this case, I'm trying

5    to hammer out this instruction regarding punitive damages which

6    is extremely complicated.  It's going to be very difficult,

7    frankly, for this jury to understand in terms of vicarious

8    liability, reckless indifference, good faith defense.  I mean,

9    we're almost asking this jury to do more than it ought to be

10   able to do.

11           I take it, from what I understand, here is that -- is

12   Joachimsthaler and Lundquist, bearing in mind that I'm learning

13   about this case as it's being tried here, are you using this

14   for part of an argument on good faith?

15           MR. KNUEVE:  Yes, Your Honor.  Dr. Lundquist drafted

16   the job description, the interview guide and the training that

17   we've been talking about the past two days.  That's the purpose

18   of her testimony.  She's also going to say that an essential

19   function of the model position is to model the style, but the

20   primary thrust of her testimony is why we interview people the

21   way we do.

22           THE COURT:  This is why employment discrimination,

23   frankly, to an old state court judge is so curious, because I

24   continue to get the impression that we're just kind of making

25   it up as we go, you know, kind of feeling our way along the

```
 1    dark hallways, trying to craft something we all believe to be
 2    fair in specific discrete factual situations, and I'm trying to
 3    find in Kolstad here something to guide me.
 4           But here, good faith, under Kolstad, applies to good
 5    faith efforts to comply with Title VII.
 6           MS. SEELY:  That's right.
 7           THE COURT:  Correct?
 8           MS. SEELY:  Yes.
 9           THE COURT:  It's not one's good faith in attempting to
10    abide by one's marketing strategy; correct?
11           MS. SEELY:  Correct.
12           MR. KNUEVE:  Well, Your Honor, we've had lots of
13    testimony about the interviewing procedures and about the job
14    description and about the training.  Dr. Lundquist prepared
15    that, she wrote that stuff.  So if they are going to challenge
16    our interview guide and our training, obviously, we have to be
17    able to respond and say why we put it together the way we did.
18    I mean, they are sitting here saying that we need to ask
19    applicants about their religion.  I think we can put on Dr.
20    Lundquist to say why th at's completely unlawful and it's
21    against the EEOC's own compliance manual.
22           MS. SEELY:  It's a sidetrack, but I totally disagree
23    with you.  Asking someone's religion is inadvisable, but it is
24    not against the law.
25           THE COURT:  Oh, boy.
```

1          MS. SEELY:  No, Your Honor --

2          MR. KNUEVE:    This is why punitive damages should not

3     be awarded.

4          MS. SEELY:  Your Honor --

5          THE COURT:  See, this is just indicative of, with all

6     due respect, Ms. Seely, the government coming in.  And if they

7     had asked about the religion, we would be in here in a lawsuit

8     about that.  I mean, that's nearly a ludicrous statement.  With

9     all due respect, I don't think these two special instructions

10    ought to be given.  I don't believe they address accurately,

11    from my reading, what the defendants intend to use the

12    testimony for and we will just take it as it comes.

13         (Counsel returned to their respective places and the

14    following proceedings were had within the presence and hearing

15    of the jury.)

16         THE COURT:  Mr. Knueve, the defendant may call its

17    first witness.

18         MR. KNUEVE:  Thank you, Your Honor.  The defendant

19    calls Dr. Kathleen Lundquist.

20                      KATHLEEN LUNDQUIST

21    Called as a witness on behalf of the defendant, being first

22    duly sworn, testified as follows:

23         THE COURT:  State your full name for the jury, please.

24         THE WITNESS:  Yes, Kathleen, Kathy Lundquist.

25         THE COURT:  Mr. Knueve.

```
 1              MR. KNUEVE:  Thank you, Your Honor.
 2                     DIRECT EXAMINATION
 3   BY MR. KNUEVE:
 4   Q.   Good afternoon, Dr. Lundquist.
 5   A.   Good afternoon.
 6   Q.   Dr. Lundquist, have you been retained to reach an expert
 7   opinion in this case?
 8   A.   Yes, I have.
 9   Q.   And have you reached an opinion regarding the model
10   position at abercrombie stores?
11   A.   I have.
12   Q.   We will talk about your opinion in detail in a few
13   minutes, but first I would like to talk about your
14   qualifications to testify as an expert in this case.  Could you
15   please tell the jury something about your education?
16   A.   Yes, I have a doctorate, a Ph.D., in psychology with a
17   specialization in psychometrics?
18   Q.   And how long did you have to study to obtain your
19   doctorate?
20   A.   Five years.
21   Q.   And what work have you done since receiving your doctorate
22   in psychometrics?
23   A.   I've spent the last 30 or so years working in the field of
24   industrial psychology.
25   Q.   And can you explain to the jury what industrial
```

1    organize -- I can't even say it -- industrial organizational

2    psychology means?

3    A.   Yes.   The field of industrial organizational psychology

4    takes psychological principals and uses them to measure people

5    in the work place.

6    Q.   And could you provide some examples of what an industrial

7    organizational psychologist might do?

8    A.   Yes.   An organizational psychologist might, for instance,

9    take learning theory and use it to develop a management

10   training program or use research methods to study a job and

11   determine what the selection procedure should be for the job.

12   Q.   And how long have you worked in the field of industrial

13   organizational psychology?

14   A.   In excess of 30 years.

15   Q.   And have you taught in the area of industrial

16   organizational psychology?

17   A.   I have.

18   Q.   And how long did you teach?

19   A.   More than four years, probably some place four to eight

20   years.

21   Q.   And have you written and published in the area of

22   industrial organizational psychology?

23   A.   I have.

24   Q.   And how many publications have you authored?

25   A.   More than ten.

1    Q.   And have you been asked to present at professional
2    conferences regarding industrial organizational psychology?
3    A.   I have.
4    Q.   And approximately how many times?
5    A.   Fifty or so, over the course of my career.
6    Q.   And have you been asked to provide expert testimony before
7    this case?
8    A.   Yes.
9    Q.   And have you testified on behalf of employees as well as
10   companies?
11   A.   Yes, on both sides.
12   Q.   And have you ever been asked to provide expert testimony
13   by the government?
14   A.   Yes, I have.
15   Q.   And can you describe those instances?
16   A.   I've been asked to be an expert for the U.S. Department of
17   Justice and the U.S. Department of Labor.
18   Q.   Have you been approved as an independent expert by a court
19   before?
20   A.   Yes, on several occasions.
21   Q.   And can you identify some of those occasions?
22   A.   Yes, in connection with cases against Coca Cola Company,
23   Ford Motor Company, Morgan Stanley Smith Barney, the FBI,
24   Sodexo and others.
25   Q.   And has the Equal Employment Opportunity Commission been

1    involved in any of the cases in which you were approved as an

2    expert?

3    A.   Yes, they have.

4    Q.   And do you know whether the EEOC approved you as an

5    independent expert in that case?

6    A.   Yes, the -- I believe the EEOC approved me as independent

7    expert in the Ford Motor case.

8    Q.   And has the EEOC asked you to appear before it?

9    A.   Yes.

10   Q.   And can you describe that occasion?

11   A.   Yes, I was invited to provide testimony in front of the

12   commissioners about selection issues.

13   Q.   So the EEOC invited you to come in and testify before it?

14   A.   Yes.

15   Q.   And approximately how many times have you been asked to

16   provide expert testimony before?

17   A.   More than 50 times.

18   Q.   When you work as an expert witness, are you compensated

19   for your time?

20   A.   Yes, as most professionals are.

21   Q.   And are you being compensated by Abercrombie for your time

22   on this case?

23   A.   I am.

24   Q.   And Dr. Lundquist, do you have an opinion relating to the

25   job duties of models employed by Abercrombie?

1    A.   I do.

2    Q.   And what is that opinion?

3    A.   That the job of model at Abercrombie is not your typical

4    sales person job, it is a model job, hence the title.  People

5    are there to advertise the clothing in the stores and to create

6    a certain in-store experience, that's the essence of the brand.

7    And as a result of that, my studies found that appearance and

8    sense of style in representing the brand are essential

9    functions of the job.

10   Q.   And in lay person's terms, could you describe the

11   importance of adherence to the Look Policy as it relates to the

12   model position?  You used the term "essential function."  What

13   does that really mean?

14   A.   An essential function of the job is you can't perform the

15   job unless you can perform that function.  So, for instance, a

16   typist has to be able to type, a truck driver has to be able to

17   drive, a model has to be able to model the clothes.

18   Q.   And how did you reach that opinion?

19   A.   On the basis of a formal job analysis.

20   Q.   And what's a job analysis?

21   A.   A job analysis is a formal research study of what somebody

22   does on the job and what it takes to do that.

23   Q.   And when was the job analysis conducted?

24   A.   We conducted it in 2004 and 2005.

25   Q.   So that was before this lawsuit was ever filed?

1    A.   That's my understanding, yes.

2    Q.   And how was the job analysis conducted?

3    A.   We used a series of steps in our research design,

4    including actually going to the stores and observing people,

5    speaking to and interviewing people currently performing the

6    job, gathering documentation about the job that the company

7    already had on file, creating a survey and then vetting that

8    survey meeting with subject matter experts and refining the

9    survey, and then ultimately administering a survey that asked

10   all the managers throughout the company to make ratings about

11   the various job functions.

12   Q.   You mention that you reviewed documents as part of the job

13   analysis.  What documents were reviewed?

14   A.   We reviewed performance appraisal forms, we reviewed

15   training materials and orientation materials and other things

16   that listed the duties that people would perform on the job.

17   Q.   And you mention that there were job observations.  How

18   were the job observations conducted?

19   A.   We actually went to stores and spent a period of time in

20   the stores watching people perform the job, speaking to them

21   and speaking to various members of the staff about what they

22   were doing.

23   Q.   You mentioned that there were focus groups as well.  How

24   were the focus groups conducted?

25   A.   The focus groups were conducted by members of my staff who

1    met with a selected group of individuals who would be a cross

2    section representing the organization and gathering their input

3    in a structured session.

4    Q.   And you mentioned that there was survey.  Who was invited

5    to participate in that survey?

6    A.   All store managers, approximately 700, over 700.

7    Q.   And who chose to survey store managers?

8    A.   That was our decision.

9    Q.   And why store managers?

10   A.   Because you want somebody to answer the questions about

11   the job who is knowledgeable about the job, who sets those

12   expectations on a day-to-day basis so they can see people

13   performing it.  And generally, the research shows that those

14   people in a first level supervisor job, right above the person

15   who is performing the job, are in the best position to be able

16   to say across people, what is it that we are expecting and what

17   do they do.

18   Q.   And what was the participation rate of those who were

19   invited to take the survey?

20   A.   Approximately 80 percent.

21   Q.   And how many questions were there on the survey?

22   A.   In all, the managers made ratings, over 300 ratings.

23   There were 90 different tasks that they looked at and made two

24   ratings on those and 55 competencies and they made two ratings

25   on those.

1    Q.   And who wrote the questions that were on the survey?

2    A.   They were developed by the industrial psychologists on my

3    staff and then reviewed by the internal subject matter experts

4    to make sure that our language was clear and would be

5    understandable to the people who were responding to the

6    questionnaire.

7    Q.   And what were the findings, with respect to the job duties

8    of the model position in adherence to the Look Policy?

9    A.   Adherence to the Look Policy was found to be a very

10   critical part of the job, so we asked people to rate the

11   importance of different things that were done and that was

12   rated in the highest importance category, so a three was the

13   highest point on the scale.  You could get a zero, one, two or

14   three.  Over these 650 people, the average rating for that was

15   in the 2.8 or 2.9 range, so very high.

16   Q.   And in lay person's terms, can you explain what that

17   means, everything you just said?

18   A.   That something is critical to the job, as rated by the

19   raters, they're saying that you can't do the job effectively,

20   that it would have terrible consequences in terms of your

21   successful performance of the job if you didn't do that aspect

22   of the job.

23   Q.   Was your job analysis conducted in a manner consistent

24   with the scientific method?

25   A.   Yes, it was.

1    Q.   And has the EEOC published guidelines regarding how a job

2    analysis should be conducted?

3    A.   I believe the EEOC is one of the signers of the uniform

4    guidelines which is a set of standards on how to do that.

5    Q.   So the EEOC has published or is a co-signer on standards

6    regarding job analyses?

7    A.   Yes.

8    Q.   And was your study conducted in accordance with those

9    standards?

10   A.   Yes.

11   Q.   Now, did you do anything with the results of the job

12   analysis?

13   A.   Yes.  After we studied the job to find out what it took to

14   do the various parts of the job, we then used that to develop

15   job descriptions and structured interviews.

16   Q.   And there's a notebook right there in front of you.  I'll

17   direct you to Defendant's Exhibit 5.  And can you identify

18   Defendant's Exhibit 5?

19   A.   Yes, it's the job description for the model position.

20        MR. KNUEVE:  Your Honor, I would move for admission.

21   The plaintiff's version of the exhibit is already into

22   evidence.

23        MR. LEE:  No objection, Your Honor.

24        THE COURT:  Very well.  And you're putting in the

25   Plaintiff's Exhibit?

1        MR. KNUEVE:  This is the Defendant's Exhibit 5, but

2   it's the same as the plaintiff's, a similar exhibit.

3        THE COURT:  All right.  So you don't want this

4   admitted separately?

5        MR. KNUEVE:  I would like it admitted separately.

6        THE COURT:  Very well, Defendant's 5 is admitted.

7        MR. KNUEVE:  Thank you, Your Honor.

8   Q.   (By Mr. Knueve)  Okay.  So your organization prepared this

9   job description?

10  A.   Yes, we did.

11  Q.   And this, your organization prepared this document after

12  the job analysis that you just described?

13  A.   Yes.

14  Q.   And can you direct us to the portion of that job

15  description that relates to the Look Policy?

16  A.   Yes, if you look at the bottom of the first page that

17  talks about representing the brands -- representing the brand,

18  it talks about adherence to guidelines in personal appearance

19  and rules of conduct.

20  Q.   Okay.  I'm going to turn your attention to Defendant's

21  Exhibit 2 in that notebook there, in front of you.  Can you

22  identify that document, please?

23  A.   Yes, sir.  This is the interview guide for the models.

24  Q.   And so did your organization prepare this document, as

25  well?

1    A.   Yes, we did.

2         MR. KNUEVE:   Your Honor, I'd move for admission of

3    Defendant's Exhibit 2.   Again, it's the same as the plaintiff's

4    version.   It's just --

5         THE COURT:   Any objection?

6         MR. LEE:   No objection, Your Honor.

7         THE COURT:   Defendant's 2 is admit.

8    Q.   (By Mr. Knueve)   Okay.   So this interview guide that we've

9    been talking about for the past couple of days, your

10   organization prepared this; correct?

11   A.   Yes.

12   Q.   And did your organization prepare this document after the

13   job analysis that you just described?

14   A.   Yes.

15   Q.   Now, why is the interview scripted?

16   A.   Well, it's a instructed interview and the idea of a

17   structured interview is to ensure that everyone goes through

18   exactly the same situation, a consistent process, so that it's

19   fair to everyone.   So exactly t he same questions are asked and

20   the evaluation standards are the same across all the

21   candidates.

22   Q.   And are managers trained to follow the script?

23   A.   Yes, they are.

24   Q.   And when you are conducted structured interviews, is it

25   best practiced to use a scripted interview?

1    A.   Yes, that's what the research shows, that these are more

2    predictive than other kinds of interviews, more predictive of

3    who will be successful on the job.

4    Q.   Okay.  And I would like to direct your attention to the

5    post-interview instructions?

6    A.   I need to see if I can find those, excuse me.  I see them.

7    Q.   Okay.  Thank you.  Did your organization prepare these

8    post-interview instructions?

9    A.   Yes.

10   Q.   And what's the purpose of this portion of the document?

11   A.   This is, as it says, a closing to the interview, but also

12   an opportunity for the interviewer to explain to the person or

13   persons who are being interviewed what the standards are in

14   terms of the Look Policy, what they would be expected to do in

15   the job and to solicit any questions they might have.

16   Q.   Do any of these instructions relate to adherence to the

17   Look Policy?

18   A.   Yes, they do.

19   Q.   Can you direct the jury to that?

20   A.   Yes, the section on Look Policy is, in fact, titled Look

21   Policy.  It's the second one down.

22   Q.   And this is the language that your organization drafted?

23   A.   Yes.

24   Q.   Does the interview guide provide an applicant with an

25   opportunity to ask questions?

1    A.   Yes, the interviewer is instructed to tell the person that

2    they should ask questions if they have them.

3    Q.   And can you direct the jury to that section of the

4    document?

5    A.   Well, under the section that says "Questions.  Please see

6    me after the interview for any questions you might have on

7    these expectations.  Does anyone have any final questions for

8    me?"

9    Q.   And if an applicant was going to request a religious

10   accommodation, where would that, in the procedures that you

11   drafted, where should that happen?

12   A.   If a person had questions about their ability to meet any

13   of the standards that went on, I would expect that it would

14   occur at this point.

15   Q.   Did your organization draft training on all of these

16   interview procedures?

17   A.   Yes, we did.

18   Q.   And I direct your attention to Exhibit 10, in front of

19   you, there.  And can you identify Exhibit 10?

20   A.   Yes, it's the training for interviewers.

21        MR. KNUEVE:  And, Your Honor, I would move for

22   admission of this.

23        MR. LEE:  No objection.

24        THE COURT:  Defendant's 10.  Any objection?

25        MR. LEE:  No.

```
 1            THE COURT:  Defendant's 10 is admitted.
 2   Q.   (By Mr. Knueve)  This is the training that your
 3   organization drafted on how to conduct interviews?
 4   A.   Yes.
 5   Q.   And going to direct your attention to Page A&F 685 of the
 6   training.
 7   A.   Yes.
 8   Q.   And this section of the training indicates that it's
 9   illegal to question candidates about a variety of protected
10   categories, including religion; correct?
11   A.   Yes, it does.
12   Q.   And why are managers trained not to ask questions about
13   religion?
14   A.   Because you would not want managers to discriminate
15   against somebody on the basis of their religion.
16   Q.   Is it best practiced to not question an applicant about
17   religion during a structured interview?
18   A.   Yes, it's best practice to question people about their
19   characteristics that are related to performing the job.
20   Q.   I'll direct your attention to the next page, 686.  And if
21   could get that up on the screen.  Okay, can you read that
22   portion on the left-hand side?
23   A.   Yes, it says "If a taboo topic is brought up, please let
24   HR know after the interview is over."
25   Q.   And religion is included within the taboo topics?
```

1    A.    Yes.

2    Q.    Could you read to the jury the second to last paragraph on

3    the right-hand side?

4    A.    "If a candidate tells you that they can not work at

5    particular times because of their religion, simply tell them

6    that you will get back to them concerning that and continue

7    forward with the interview."

8    Q.    And then read the next sentence, if you would?

9    A.    "If a taboo topic is brought up, please let HR know after

10   the interview is over.

11   Q.    And this is the procedure that your organization drafted;

12   correct?

13   A.    Yes.

14   Q.    And this is consistent with the EEOC's guidelines, to your

15   understanding?

16   A.    It is.

17   Q.    Now, what is your understanding of what employers

18   typically do to handle an applicant's need for an

19   accommodation, either religious or medical?

20   A.    In my experience, employers need to provide people with an

21   opportunity to indicate that they need an accommodation.

22   Q.    In other words, the applicant has to self-identify?

23   A.    Yes.

24   Q.    And that's because managers should not be asking questions

25   about a religion; correct?

1    A.   That is correct.

2    Q.   Now, in your professional opinion, would it be appropriate

3    for an interviewing manager to make an assumption about an

4    applicant's need for an accommodation?

5    A.   No.

6    Q.   And why not?

7    A.   Because the manager would be placing themselves or putting

8    their judgment in the place of the person.  So if the person

9    needs an accommodation, it's important for them to identify how

10   they need to be accommodated.

11   Q.   And these interviewing and hiring procedures that you

12   drafted for Abercrombie, they account for your professional

13   opinions?

14   A.   Yes.

15        MR. KNUEVE:  Thank you, very much.  No further

16   questions.

17        THE COURT:  Cross-examination.

18                          CROSS-EXAMINATION

19   BY MR. LEE:

20   Q.   Hi, Dr. Lundquist.  You may recall we did meet awhile back

21   this year, if you recall?

22   A.   I do recall.

23   Q.   All right.  And we talked about the job analysis, formal

24   job analysis that you did back in 2004-2005.  Who participated

25   in that job analysis?  With your company?

1    A.   Oh, with my company.  Okay.  That would have been Dr. John

2    Curtis, Dr. Christina Norris-Watts and myself, primarily.

3    There would be other associated administrative staff, et

4    cetera, who would have also been involved.

5    Q.   Okay.  And at the interview process that you've identified

6    here through the Model Group Interview Guide, Defendant's

7    Exhibit No. 2, you stated that the appearance and sense of

8    style is one of the competencies that are rated; is that

9    correct?

10   A.   That is correct.

11   Q.   And at the time that the applicant appears for an

12   interview, are they supposed to be in compliance with the Look

13   Policy?

14   A.   They are not expected to be in compliance with the Look

15   Policy because they don't know what the Look Policy is, at that

16   point.

17   Q.   Okay.  And as to Defendant's Exhibit 5, which is the job

18   description for the model, and that is the job description that

19   you-all developed; is that correct?

20   A.   Yes.

21   Q.   And over the two pages, on pages one and two of

22   Defendant's Exhibit 5, it lists several items that are in the

23   task that a model is supposed to perform; is that correct?

24   A.   Yes, it does.

25   Q.   Okay.  Within all of those tasks, within all of those

1    tasks, I guess part of the job description is just to model the

2    clothes; is that correct?

3    A.   That is one of the things that is contained within the job

4    description, yes.

5    Q.   Okay.  But so the applicant that's being rated by the

6    interviewing manager is being looked at to see if they could

7    perform all these other tasks as well; is that correct?

8    A.   They are being evaluated to see whether they can perform

9    some of those other tasks.  They are not all required upon

10   entry and they are not all as important as other things, so

11   when we create an interview, usually we have to cut it down to

12   cover the most important things that are being assessed for the

13   job.

14   Q.   And if the applicant had retail experience at the time of

15   the interview for the model position, would that have been a --

16   would that have been a good thing for the interviewing manager

17   to assess?

18   A.   Well, there are no previous work requirements that are

19   part of the minimum requirements of this position, so that

20   would not be necessary.

21   Q.   But in essence, a model for Abercrombie is not just a

22   sales associate standing around modeling clothes; is that

23   correct?

24   A.   A good deal of what the model's job is is to be modeling

25   the style and the look of the brand and to create an

1    environment within the store, to create a fun and engaging

2    environment within the store, and I would say that as compared

3    with a lot of other retail sales positions, this is one of

4    those positions that truly is a model, that is the largest part

5    of the expectation of the job.  It's not the only expectation,

6    but it certainly is the largest part.

7    Q.   Well, certainly the model has got to help clean up the

8    store; is that correct?

9    A.   I don't know that I would say they clean up the store.  I

10   think, occasionally, they are there folding pieces of clothes.

11   Q.   Folding, making it look nice for a good experience for the

12   customers; is that right?

13   A.   I'm sorry.  I didn't hear what you said.

14   Q.   Folding or cleaning up the store environment to make it a

15   good experience for the customers; is that right?

16   A.   When I think of folding the clothes, my understanding is

17   that there's a very specific set of guidelines at Abercrombie

18   about how many shirts you have to have in the pile and that

19   kind of thing, not so much like picking up stray pieces of

20   paper that might have fallen on the floor.  It's much more of

21   making a visual impact, because that's my -- based on our

22   study, that's the way the brand is executed, through that

23   visual impact of what's going on in the store.

24   Q.   Okay.  But as far as a typical sales associate, are they

25   still performing duties as a cashier?

1    A.   I think they may.

2    Q.   Okay.  Well, you developed the job description so I'm just

3    wondering if you recall that, that would be one of the job

4    duties?

5    A.   Yes, it is one of the job duties.

6    Q.   And then one of the job duties, I guess, shrinkage or

7    loss, there would be loss control managers, as well; is that

8    correct?

9    A.   I don't know that I would call them loss control managers,

10   but yes, they would have some responsibility in that area.

11   Q.   Okay.  And that responsibility is to make sure that the

12   items don't walk out the store without being paid for; is that

13   right?

14   A.   I would expect so, yes.

15   Q.   Okay.  So there's typical sales associate duties assigned

16   to the model position other than just the wearing of the

17   clothes; is that right?

18   A.   There are other duties assigned to the position.

19   Q.   And going back to the Model Group Interview Guide,

20   Defendant's Exhibit 2, as part of your training process, do you

21   also train -- well, you also train the managers, do you not,

22   that the applicant is not supposed to be in compliance at the

23   time of the interview?  Maybe let me strike that.  Let me asked

24   a better question.

25        Do you train the managers for -- or the training that

1    you give to Abercrombie managers that do the interviewing, is

2    it part of that training that you tell the managers the

3    applicant is not supposed to be in compliance with the Look

4    Policy at the time of the interview, or does not have to be in

5    compliance with the Look Policy?

6    A.   What we tell the managers is that they need to be

7    evaluating the candidate who comes in, or candidates, on

8    appearance and sense of style, based on the standards that are

9    provided to them for the interview.

10   Q.   Right.  But do you tell the manager that if they come in

11   wearing clothes that are not Abercrombie, that please don't

12   mark them down as below expectations?

13   A.   What they're told is they are supposed to evaluate the

14   person based on the standards in their totality.  They aren't

15   expected to be a hundred percent in compliance with the Look

16   Policy when they come for the interview.

17            MR. LEE:  Okay.  I don't have any further questions.

18            THE COURT:  Redirect?

19            MR. KNUEVE:  No, Your Honor.

20            THE COURT:  May this witness be excused?

21            MR. KNUEVE:  Yes, Your Honor.

22            THE COURT:  The defendant may call its next witness.

23            MR. KNUEVE:  The defense calls Deon Riley.

24                           DEON RILEY

25   Called as a witness on behalf of the defendant, having been

 1    previously sworn, testified as follows:

 2          THE COURT:  Ms. Riley, if you will retake the stand

 3    and let me remind you that you remain under oath.

 4          THE WITNESS:  Yes, sir.

 5          THE COURT:  Mr. Knueve, you may inquire.

 6                      DIRECT EXAMINATION

 7    BY MR. KNUEVE:

 8    Q.   Good afternoon, Ms. Riley.  I feel like I just saw you up

 9    there.  I won't go through all of the stuff that was discussed

10    this morning, but can you describe your educational background

11    for the jury, please?

12    A.   Sure.  I moved to the U.S. in 10th grade.  I went to high

13    school in Brooklyn, New York.  I went to college at Wellesley

14    College, it's a women's college in Massachusetts.  I have a

15    bachelor's degree in political science and English literature

16    and Spanish literature.  I taught school for awhile and then I

17    got the chance to go graduate school.  I have an MBA from Clark

18    Atlanta University, it's in Atlanta Georgia, in marketing.  And

19    I also have a doctorate in internation management with a focus

20    on leadership and human resources from Nova Southeastern

21    University in Florida.

22    Q.   Can you describe your professional experience as it

23    relates to human resource?

24    A.   Yes.  I moved into human resources out of a general

25    leadership program with United Technologies or Otis Elevator

1    Company.  It's the elevators you rode up and down in today.

2    And then I became the regional HR manager for all of their

3    mechanics who fix the elevators.

4         I then moved into their corporate headquarters.  I was

5    the manager of diversity for North America, for the entire

6    organization.  I was also the manager of leadership and

7    development, so I did a lot of the training, whether it was

8    managerial or leadership training and we also developed

9    technical training.  I worked in the headquarters as the

10   manager for our senior executives.

11        I then moved to the parent headquarters, which is

12   United Technologies Corporation and I managed the headquarters

13   and all of their executives.  I was one of the people on the

14   team who reported to the SVP of HR at that time and I worked on

15   everything from policies surrounding benefits for associates.

16        I then moved to PepsiCo where I worked for Gatorade.

17   I worked in plants, actually worked in Pryor, Oklahoma, helped

18   to open the plant there, so most of my work was on the floor

19   with them, as well as at Quaker Oats, which is in Iowa.

20        I moved from there to my current position at

21   Abercrombie & Fitch.

22   Q.   And what's your current position?

23   A.   I'm the group vice president for human resources for

24   stores.

25   Q.   And what year were you hired?

1    A.   2007.

2    Q.   And during the course of your employment, have you

3    developed a familiarity with Abercrombie's business strategy?

4    A.   Yes, I have.

5    Q.   And can you describe that for the jury, please?

6    A.   Certainly.  Our business strategy for our kids store or

7    the abercrombie stores, we targets 8 to 14 year olds, so it's

8    the youngest part of our brand.  It also extends to what the

9    rest of the brand is, which is we provide an experience that is

10   unique.  Let's face it.  We sell jeans and T-shirts, so does a

11   lot of other people.  But what differentiates us from the rest

12   of the retailers is what we offer and particularly to that is a

13   brand where people love coming into our store, they enjoy the

14   shopping experience and we hope that they also enjoy

15   purchasing, because they enjoy being in the store.

16   Q.   Tell us about the role of branding at Abercrombie?

17   A.   It's critical.  It's everything that makes our business

18   run, that makes us stay in business.  As I said before, we sell

19   jeans and T-shirts.  You can buy those at Target, you can buy

20   those at Wal-Mart, you can buy those at the Gap or Old Navy.

21        What is really important is the customer has come to

22   expect from Abercrombie & Fitch a certain experience when they

23   walk in the store.  It's how they interact with the people on

24   the floor, it's the music, it's everything you see when you go

25   in an Abercrombie & Fitch store.  So the Look Policy is really

1    critical, because it is part of our staging, it is what people

2    look at.

3        So for example, if you walk into a store and you see a

4    model wearing our clothes, that's so that she's sort of our

5    walking runway model.  That's so our customers can look at her

6    and see how they would look in our style or they may get ideas,

7    because we don't advertise outside of the in-store experience.

8        So any time we appeal to a customer, it's because they

9    have shopped with us.  There's nothing on TV, there's nothing

10   in the newspaper, it's just that shopping in-store experience

11   that you get as a customer.  So brand is really critical, it's

12   the only time we really get to touch our customers.

13   Q.   What is the Abercrombie brand image?

14   A.   The Abercrombie brand image is all that is truly American.

15   We say it's optimistic.  We hire people and we work in an

16   environment that is all about why the glass is half full,

17   everything is a great -- you know, it's a great thing.  No

18   matter how tough it may be, you can get through.  That's what

19   America is about and that's really what Abercrombie is about.

20       It's also very outdoorsy, Adirondack, so if you think

21   about the mountains and if you are a hiker or anything like

22   that, when you walk into our stores, we have canoes hanging on

23   the wall or there's a moose head over the cash register and

24   that's part of what we convey.  It's a very classic, outdoors,

25   all-American style.

1   Q.   Can you tell the jury how Abercrombie ensures everything

2   in the store contributes to the in-store experience?

3   A.   Yes.  We do, we have what is called the six senses in our

4   stores and every single store, whether the store is here in

5   Tulsa, Oklahoma or it's in London, England, the customer needs

6   to have that experience that we need them to have in order to

7   bring them back to the brand.

8   Q.   What are the six senses?

9   A.   That's always the tough one to remember all of them in

10  order, but it's sight, scent, smell, touch, taste and energy.

11  Q.   And tell us about the scent sense.  What does that mean?

12  A.   Scent.  If you have been into one of our stores, everyone

13  of the stores has an individualized scent that we spritz that

14  customers automatically recognize.  It's usually something that

15  you associate with the outdoors for Abercrombie.  If you're in

16  our Hollister brand, it's something you would associate with

17  southern California?

18  Q.   Tell us about sound?

19  A.   Sound is really critical to us.  It's part of how we bring

20  the customer into our lifestyle or, you know, what we call it

21  into our casting, into our movie casting.  It's because we

22  actually customize on a monthly basis, our sound tracks and

23  it's fun and it's energizing and it's the kind of music our

24  target customers want to hear.  So if you are 8 to 14 years

25  old, you hear the music that you probably hear on the radio

1    that you love and if you are in the older store, you hear a

2    different kinds of music, so we cater to the customer.

3    Q.   Tell us about taste.

4    A.   Taste is less so.  We recently started selling lip glosses

5    and the taste is like eating watermelon or melons or whatever.

6    They smell great and they taste amazing, so it's taste.

7    Q.   And tell us about the sense -- or the touch sense.

8    A.   Touch.  Touch for us is we self the softest merchandise in

9    any store, it's one of our core pieces for our merchandise, and

10   you hear it from all our customers.  We sell the softest and

11   T-shirts and jeans.

12   Q.   And tell us about the sight sense.

13   A.   Sight is truly important, it's everything you see.  So

14   when you walk into an abercrombie store, it's the lighting,

15   it's the tables where we put the merchandise, it's how things

16   are actually displayed.  It's also the models or the associates

17   that you see on the floor, it's all part of that sight.

18   Q.   And how is energy conveyed?

19   A.   Energy is conveyed truly through the associates you meet

20   on the floor.  So when you walk into a store, there are certain

21   expectations we set.  They need to greet you at the front door,

22   so if you've been into our store, you'll hear someone say hey,

23   what's up, or how are you doing, or how can I help you?  Part

24   of that is that interaction.  It goes back to the optimism, as

25   well.  One of our values is we hire nice, friendly, optimistic

1    people.  That's what you should interact -- that's what you

2    should expect to get and that's what you should get when you

3    walk into one of our stores as a customer.  And they're also

4    sort of our -- as I said, our walking runway models.  You see

5    our clothes or our styling on them and that's our advertisement.

6    Q.   Now, how does Abercrombie communicate this business

7    strategy to employees working in the stores?

8    A.   We communicate our strategy on a daily basis.  Even before

9    you become an employee of Abercrombie & Fitch, you're told

10   about the Look Policy, which is a critical part of our brand.

11   When you come in as a manager or any employee, you also

12   acknowledge that you understand the Abercrombie appearance and

13   Look Policy, so everybody fills out their acknowledgement form.

14       And if you are a manager, you are trained on not just

15   what the Look Policy is, but you are also trained on how to

16   enforce the Look Policy and why it is critical.

17       On a daily basis, one of our managers in the store is

18   designated as the store experience manager.  And basically,

19   this individual, we call it -- he or she does figure eights, so

20   they walk around the store.  And part of the job is they check

21   for all those senses, they make sure the music sounds right,

22   they make sure that the models are in Look Policy and then

23   they're upbeat and they're, you know, interacting with the

24   customers.  They make sure that the store smells amazing.  So

25   it's reinforced every day, many times during the day.

1    Q.   I'm going to direct you to Exhibit 1 in that notebook

2    there right in front of you.

3    A.   Yes.

4    Q.   Can you identify that, please?

5    A.   This is our store associate handbook.

6           MR. KNUEVE:  Your Honor, I move for admission of

7    Defense Exhibit 1.

8           THE COURT:  Any objection?

9           MS. SEELY:  No objection.

10          THE COURT:  Defendant's 1 is admitted.

11   Q.   (By Mr. Knueve)  And I'm going to direct you to page 29.

12   Can you identify the policy there?

13   A.   Yes, that's our Appearance and Look Policy.

14   Q.   And there's a section in italics there.  Could you read

15   that to the jury?

16   A.   "Abercrombie associates represent American style.  America

17   is diverse and we want diversity in our stores.  We do not

18   discriminate and will not tolerate discrimination in hiring

19   based on gender, race, color, religion, national origin, sexual

20   orientation, marital status, veteran status, citizenship,

21   ancestry or disability."

22   Q.   So that language is right there in the Look Policy?

23   A.   Yes, it is.

24   Q.   Now, was headwear permitted by the Look Policy?

25   A.   No, it was not.

1    Q.    And why not?

2    A.    Because headwear distracts from our styling.  As I said

3    before, our models are sort of the live runway, sort of walking

4    advertisement.  And we always say in the stores that if the

5    first thing you see is not our style, it's something else, then

6    it's a distraction, and headwear is a distraction.

7    Q.    I'm going to direct you to Exhibit 2 in that book in front

8    of you.

9    A.    Okay.

10   Q.    Do you recognize Exhibit 2?

11   A.    Yes, it's our Model Group Interview Guide.

12   Q.    And I notice that the interview guide is scripted.  Are

13   managers trained to follow the script?

14   A.    Yes.

15   Q.    Why is that?

16   A.    We follow the script because we feel that it gives

17   everybody a fair shake.  I mean if you can imagine walking into

18   a workplace and interviewing for a job and the manager may not

19   even know how to conduct an interview, I think as candidate or

20   as an applicant, you feel that you don't have a fair shake.

21   For us it's the same questions and managers are trained on how

22   to ask the questions, listen for the answers and follow the

23   script.  That way, we feel that we are giving everybody an

24   equal playing field and that you are measured on your actual

25   qualifications for the role and not just how someone is feeling

```
1     that day.

2     Q.   And can you turn to Exhibit 5 in the book?

3     A.   Yes.

4     Q.   And can you identify that?

5     A.   Yes, this is our job description for models.

6     Q.   And does this job description reference the Look Policy?

7     A.   Yes, it does.  It says in the model description that the

8     model projects and protects the image of the brand through

9     personal style, providing customer service and maintaining

10    presentation standards.

11         So personal style is what we refer to in the Look

12    Policy as wearing our styling so there's no logos or anything

13    else that relate to another business except for Abercrombie.

14    Yep.

15    Q.   And I'm going to direct you to Exhibit 7 in the book in

16    front of you.

17    A.   Seven, okay.

18    Q.   Can you identify that document?

19    A.   Yes, this is the -- this is actually an acknowledgment,

20    Appearance/Look Policy Acknowledgement that's dated 10/6/07,

21    taken from the file of Farisa Sepahvand.

22         MR. KNUEVE:  And can I get that -- I would like to

23    move for that to be admitted into evidence, Your Honor.

24         THE COURT:  All right.  And that number, again, sir?

25         MR. KNUEVE:  Exhibit 7.  Defense Exhibit 7.
```

```
 1              THE COURT:  Very well.  Any objection?
 2              MS. SEELY:  I think it's already admitted, but we have
 3    no objection.
 4              THE COURT:  All right.  We show Defendant's 7 already
 5    admitted, as well.
 6              MR. KNUEVE:  Thank you, Your Honor.  I apologize.
 7              THE COURT:  Yes, sir.
 8    Q.  (By Mr. Knueve)  Could you read point 7 -- I'm sorry.
 9    Point 4 to the jury?
10    A.  "I am required to wear clothes and accessories that are
11    consistent with the style."
12    Q.  Now, does Abercrombie provide training to managers on the
13    Look Policy and the Abercrombie style?
14    A.  Yes, we do.
15    Q.  And does Abercrombie provide examples to the managers of
16    the Abercrombie style?
17    A.  Yes, we do through several methods.
18    Q.  And I'm going to direct your attention to Exhibit 3.  Do
19    you recognize that document?
20    A.  Yes, this is one of our "Cast Of" documents.  These are
21    documents that are collected at least twice a year.  They are
22    training documents that show our styling for all our stores and
23    they are taken in stores and sent out to all the stores so that
24    associates can see them.
25              MR. KNUEVE:  I move for admission of Defendant's
```

1   Exhibit 3, Your Honor.

2           THE COURT:  Any objection?

3           MS. SEELY:  No objection.

4           THE COURT:  Defendant's Exhibit 3 is admitted.

5   Q.  (By Mr. Knueve)  Okay.  And what is the purpose of that

6   document?

7   A.  This document not -- it showcases our styling.  Everyone

8   who is in this document is an associate who works with us in

9   different stores.  So it's all about how we wear our clothing,

10  what an Abercrombie associate or model should be -- should look

11  like, should be doing.

12  Q.  The "Cast Of" book provides example of employees who met

13  the Abercrombie style?

14  A.  Yes.

15  Q.  I'm going to direct your attention to Exhibit 19.  Do you

16  recognize that document?  I'm sorry.  Exhibit 4.  My apologies.

17  A.  Yes, I do.

18  Q.  And can you identify that, please?

19  A.  Yes, this is our image book.  This is updated at least

20  twice a year, where we feature some of our Abercrombie

21  associates who fit the A&F image.

22          MR. KNUEVE:  Move for admission of Exhibit 4, Your

23  Honor.

24          THE COURT:  Any objection?

25          THE CLERK:  I have it already admitted.

```
 1              MS. SEELY:  No, Your Honor.

 2              THE COURT:  All right.  You say it's already admitted.

 3    Very well.  If it's not, it will be admitted.

 4              MR. KNUEVE:  All right.  Thank you, Your Honor.

 5    Q.  (By Mr. Knueve)  Okay.  What's the purpose of this

 6    document?

 7    A.   The purpose of this document is to reiterate or to

 8    reenforce our Look Policy, what's required, how they should be

 9    styled.  So if you look even at the pictures you are looking

10    at, you will see for the women, for example, we go for a very

11    natural look, so very little makeup.  Men are clean shaven, you

12    can see that.  No headwear, et cetera.

13    Q.   And I'll direct your attention to Exhibit 19.

14    A.   Yes.

15    Q.   Do you recognize that document?

16    A.   Yes, I do, it's another image book.

17              MR. KNUEVE:  Your Honor, I would move for admission of

18    Exhibit 19.

19              THE COURT:  Any objection?

20              MS. SEELY:  Well, Your Honor, I object to it as

21    cumulative.

22              MR. KNUEVE:  It's another example, Your Honor, of the

23    style.

24              THE COURT:  Different day or you say a different

25    style?
```

```
 1              MR. KNUEVE:  It's a different time frame, Your Honor.
 2              THE COURT:  All right.  Let's elicit the testimony,
 3    first.  The objection is sustained at this juncture.  Go ahead.
 4    Q.  (By Mr. Knueve)  Does the document indicate what time
 5    frame it's for?
 6    A.   No, this one does not have a date.
 7    Q.   Is that a different version from Exhibit 4?
 8    A.   Yes, it is.  It is probably even a later version because
 9    it features a lot of London UK people.
10    Q.   So Exhibit 19 is a later version than Exhibit 4?
11    A.   Yes.
12              MR. KNUEVE:  Your Honor, I move for the admission of
13    Exhibit 19.
14              THE COURT:  All right.
15              MS. SEELY:  Your Honor, I continue to object.  It's
16    cumulative and if it's not relevant to a time frame prior to
17    June of 2008, it's not relevant.
18              THE COURT:  Overruled.  Exhibit 19 is admitted.
19              MR. KNUEVE:  Thank you.
20    Q.  (By Mr. Knueve)  And what's the purpose of this document?
21    A.   It's the same as the other.  To reinforce our style.  To
22    show all our associates or retrain our associates in the stores
23    on the Abercrombie image, style and brand.
24    Q.   Now, does company conduct audits of the stores in
25    compliance with the Look Policy?
```

1    A.   Yes, we do.  In addition to what I referred to earlier,

2    which is each store experience manager on a daily basis,

3    whoever is designated to be store experience manager, when they

4    walk the floor, one of the points that they have to look at is

5    whether or not all associates are dressed per the Look Policy.

6    But in addition, the district managers audit on a weekly or

7    bi-weekly basis.  The regional managers also audit.  They

8    travel three days a week.  And we have a third party, it's

9    called the Secret Shopper Program where we hire people who go

10   into our stores who our store associates don't know and they

11   also audit for the Look Policy.

12   Q.   You mentioned secret shopper audits.  Are reports prepared

13   after those audits?

14   A.   Yes, they are.

15   Q.   And do you receive copies of those reports in the ordinary

16   course of business?

17   A.   Yes, I do.

18   Q.   And I'll direct your attention to Exhibit 18.

19   A.   Yes.

20   Q.   Can you identify Exhibit 18?

21   A.   Yes, this is a couple of pages out of a secret shopper

22   report that just goes through a couple of the malls that the

23   secret shopper has visited and then they have categories that

24   they audit on, specifically.

25        MR. KNUEVE:  Your Honor, I would move for admission of

1    Exhibit 18.

2              THE COURT:  Any objection?

3              MS. SEELY:  No objection.

4              THE COURT:  Exhibit 18 is admitted.

5    Q.   (By Mr. Knueve)  And if we look at the first page of

6    Exhibit 18, can you point to the section that relates to the

7    Look Policy?

8    A.   Yes, under both store experience and store presentation is

9    when we specifically look to the Look Policy.

10   Q.   All right.  And let's take a look at the second page of

11   the exhibit.  Can you direct us to the portions relating to the

12   Look Policy?

13   A.   Under store experience where it says well-groomed,

14   properly addressed -- or properly dressed.  Sorry.

15   Q.   Now, why does the company take all these steps relating to

16   the Look Policy?

17   A.   As I said before, it's pretty critical to our brand.  It

18   is the core of what we do in providing the in-store experience.

19   Any inconsistency is a brand for us, takes us off brand and is

20   costly to the business in some way or other.  So if we give the

21   customer what they expect, then we hope that they will come

22   back and purchase with us.

23   Q.   Now, you started with Abercrombie in May 2007.  Are you

24   familiar with the clothing that Abercrombie sold since then?

25   A.   Yes, I am.

 1    Q.   And can you describe it generally, for the jury?

 2    A.   We usually have some core offerings, so we sell jeans,

 3    T-shirts, hoodies, Polos, tank tops, flip flops, shorts and

 4    denims -- short denim skirts in the summer.

 5    Q.   To your knowledge, has Abercrombie ever sold a headscarf?

 6    A.   No.

 7    Q.   Has Abercrombie ever sold scarfs?

 8    A.   We sold scarfs as a fashion item.

 9    Q.   And I direct your attention to Exhibit 16.  And can you

10    identify that?

11    A.   Yes, this is a document we send out that our stores use

12    for styling, specifically.  We were using this for styling the

13    scarves.

14          MR. KNUEVE:  And I would move for admission of Exhibit

15    16, Your Honor.

16          THE COURT:  Any objection?

17          MS. SEELY:  No, Your Honor.

18          THE COURT:  Defendant's 16 is admitted.

19    Q.   (By Mr. Knueve)  Okay.  I notice that the document,

20    Exhibit No. 16, even tells the associate how to stand, how to

21    wear her other clothes and where to stand in the store.  Why is

22    that?

23    A.   We're pretty specific as part of the Look Policy is the

24    standard we set.  It's how we want all associates to represent

25    the brand.

```
 1   Q.   Now, this shows a scarf worn around a neck.  Would a

 2   headscarf be consistent with the Abercrombie style?

 3   A.   No, it would not be.

 4   Q.   Would a headscarf be consistent with the Look Policy?

 5   A.   No, it would not be.

 6   Q.   Now, as the VP of stores human resources, you mentioned

 7   that you manage the stores human resources department?

 8   A.   Yes, I do.

 9   Q.   And can you briefly describe that department?

10   A.   Yes.  I have eight direct reports, five of whom are

11   directors.  Three of those directors deal specifically with

12   employee relations, so they manage both the U.S. and

13   international.  I'm also responsible for training and

14   development, so I have a small training team, one of the

15   directors manages that.  We have a recruiting team for college

16   recruiting, someone else manages that team.  And I also have an

17   analyst, HRIS IT team that helps us to make sure that our

18   systems are running so that we can hire and schedule people.

19   Q.   And what's the primary focus of your department?

20   A.   To ensure that we do employee relations, training,

21   development, keep our systems reporting pieces out to the

22   government.  We also oversee the EEO policy, as well as our

23   internal complaint procedure.

24   Q.   Where can an employee find the equal employment policy and

25   internal complaint procedure?
```

1    A.   In the handbook.

2    Q.   And I'll refer you back to Exhibit 1, and I direct you to

3    page 7.  Can you direct the jury to the EEO policy there in the

4    handbook?

5    A.   Yes, it's in the middle.

6    Q.   And can you read the EEO policy to the jury?

7    A.   Sure.  "Abercrombie & Fitch offers equal employment

8    opportunity to all associates and potential associates.  It is

9    our policy in all employment matters to ensure that associates

10   and potential associates are evaluated on the basis of

11   qualifications and ability without regard to gender, age, race,

12   color, religion, national origin, sexual orientation, marital

13   status, veteran status, citizenship, ancestry or disability.

14   We do not and will not tolerate unlawful discrimination in

15   connection with hiring, placement, promotion, pay, and all

16   other aspects of employment."

17   Q.   So Abercrombie's policy states that it prohibits

18   discrimination based on religion?

19   A.   Yes, it does.

20   Q.   Does Abercrombie maintain a toll free number by which

21   somebody could call the human resources department?

22   A.   Yes, we have a toll free number in every store and when

23   they call in, if they don't get a live voice, they get a voice

24   mail.  They can leave a message and we get back to them within

25   48 hours.

1    Q.   And is that number in the handbook?

2    A.   It's in the handbook and it's also posted in the back of

3    every store on the HR cork board.

4    Q.   Now, does Abercrombie inform employees about the equal

5    employment opportunity policies?

6    A.   Yes, we do.

7    Q.   And I'll direct your attention to Exhibit 8.  Can you

8    identify that?

9    A.   Yes, this is an acknowledgment of equal employment

10   opportunity policies and reporting requirements that new

11   associates sign, and this one specifically came from Heather

12   Cooke.

13          MR. KNUEVE:  I move for admission of Exhibit 8, Your

14   Honor.

15          THE COURT:  Any objection?

16          MS. SEELY:  No objection.

17          THE COURT:  Defendant's 8 is admitted.

18   Q.   (By Mr. Knueve)  Okay.  Can you read the first three

19   sentences of this document to the jury?

20   A.   "I, Heather Cooke, acknowledge that I have received, read

21   and understand the equal employment opportunity policy,

22   policies on discrimination and harassment and the Respect

23   Policy which are contained in the associate handbook.  As a

24   member of management, I understand that it is an important part

25   of my job duties and a requirement of my position that I help

1    prevent and resolve possible violations of these policies.  I

2    understand that if I receive a complaint about or observe

3    anything that may violate the equal employment opportunity,

4    discrimination, harassment, or respect policies, that it is my

5    responsibility to immediately report the suspected violation or

6    allegations to human resources by calling the employee

7    relations help line number at 866-231-3028."

8    Q.   So if a manager believes that there is a risk that federal

9    law will be violated, what's that manager supposed to do?

10   A.   Call HR.

11   Q.   And it's right there in that document?

12   A.   Yes, it is.

13   Q.   And that document was executed by Heather Cooke; correct?

14   A.   Yes, it was.

15   Q.   Now, I'll direct your attention to Exhibit 6.  Can you

16   identify that, please?

17   A.   Yes, this is an acknowledgment of equal employment

18   opportunity policies and reporting requirements from Farisa

19   Sepahvand.

20          MR. KNUEVE:  This one, I believe, is already in

21   evidence, Your Honor.

22   Q.   (By Mr. Knueve)  This one says that -- what does it say

23   about an associate, if the associate believes a law is being

24   violated, what's the associate to do?

25   A.   If an associate -- do you want me to read it or just tell

1    you?

2    Q.   Just tell us.

3    A.   Call HR.

4    Q.   Now, to your knowledge, did either Ms. Sepahvand or Ms.

5    Cook contact human resources about anything relating to

6    Samantha Elauf?

7    A.   No, they did not.

8    Q.   And district managers, if a district manager believes that

9    there is a risk that federal law is being violated, what is the

10   district manager trained to do?

11   A.   Call HR.

12   Q.   And if an assistant manager tells a district manager that

13   there may be a religious issue with an applicant, what is the

14   district manager trained to do?

15   A.   Call HR.

16   Q.   Now, even if the applicant doesn't request, if there's any

17   religious issue, what is the DM trained to do?

18   A.   The DM has to call HR, even if it was a question from an

19   AM or an SM in the store.

20   Q.   Now, can you tell the jury generally how someone -- how --

21   I'm sorry.  But nobody called HR about Ms. Elauf; correct?

22   A.   No, we did not receive a call.

23   Q.   Now, can you tell the jury how somebody could make a

24   request for a religious accomodation?

25   A.   Yes, they can make a request specifically through the

1    supervisor.  So if they are already an employee, they can just

2    go directly to their supervisor who will then call HR and HR

3    will then speak with the individual to get clarification, if

4    needed, and we collaborate with the store's leadership.  And as

5    I said earlier this morning, store's leadership could be the

6    regional manager or the director, to see whether or not we are

7    able to grant the accommodation and whether or not there is

8    undue burden on the company to do so.

9    Q.   And what if the person making the request for religious

10   accommodation is an applicant for employment, not an employee?

11   A.   It's the same process, there is no different in the

12   process.

13   Q.   Now, how does the applicant know to ask for an

14   accomodation?

15   A.   At the end of the interview, we have a summary that talks

16   about the Look Policy and the manager, the interviewing

17   manager, then asks any applicants if they have any questions to

18   raise them at that point, and that's when an applicant can ask

19   any question they want to.

20   Q.   And I'll refer you back to Exhibit 2 and specifically,

21   page 8.  Is that what you were talking about?

22   A.   Yes.

23   Q.   Now does Abercrombie train managers to ask applicants

24   about their religion?

25   A.   No, we do not.

1    Q.   And why not?

2    A.   We believe that you shouldn't make assumptions about

3    anyone, so -- and we also believe that it is illegal to ask

4    about religion, race, gender, sexual orientation, any of the

5    protected class subjects.  We train our managers to interview

6    just for the qualifications of the job by following the script

7    that they have been taught to use and to make their decision

8    based on that.

9    Q.   Now, if an applicant does request a religious

10   accommodation, what's the process?

11   A.   If an applicant requests religious accommodation, the

12   manager is to get the information in terms of what

13   accommodation they would require and they need to call HR.

14   Q.   Now, we keep hearing about call HR, call HR.  Why don't

15   the managers just handle these issues themselves?

16   A.   We have 7000 managers, our turnover is anywhere between 50

17   and 70 percent, which means that of every hundred people we

18   hire, 70 people leave.  So to be assured, as a company, that we

19   are following the law, it would be unwise for us to leave these

20   decisions in the hands of people who may be newer, may not be

21   as mature or tenured in terms of their experience with us.

22        Our HR team is trained to specifically handle these

23   issues and that's one of the reasons we ask them to call us

24   instead, so we can make the decisions versus leaving the

25   decision to someone in a store who may not be capable of making

1    that decision.

2    Q.   Is it fair to say you want to get these important

3    decisions in the hands of the people who are trained to make

4    them?

5    A.   Yeah.

6    Q.   Now, how does Abercrombie train its human resources

7    managers?

8    A.   Our human resources managers, on average, as I said,

9    around nine years of average experience.  Lots of -- they used

10   to be lawyers, now they are on our side of the table most of

11   the time handling employee issues.  We are trained by our legal

12   department, at least quarterly, so any changes in laws and

13   regulations, we all have to sit through and that includes

14   myself.

15        They also have external training.  We are all Society

16   of Human Management certified, so it's like getting a CPA.  All

17   of us have an HR certification.  If, when you join us, you

18   don't have one, we actually have you go take the test within

19   the first year with us to ensure that you, at the very least,

20   know all of the regulations around managing people assets.  And

21   they also do external seminars, they do continuing education to

22   keep their certification.  So it's a very well put together,

23   very professional, very knowledgeable team of people.

24   Q.   Does Abercrombie train managers on its equal employment

25   opportunity policies?

1    A.   Yes, we do.

2    Q.   And describe that training, please.

3    A.   Our training on equal employment opportunity takes place

4    in different training methodologies.  We cover it in the

5    diversity training, which all our managers have to do on an

6    annual basis.

7         We also have what's called a training sweep and it's

8    usually in the fall in September, where all of the HR managers

9    would go on the road and we bring our managers into centers or

10   hotels or wherever will accommodate them and we train them on

11   diversity, all of our policies including EEO.  We also do some

12   management and leadership training at that time.

13        In addition, we have what's called the HR 411.  It's a

14   newsletter that the HR team, different members of the HR team,

15   they write the newsletter and most of it is around our polices

16   and reenforcing our policies, so some may have role play, some

17   may just have policy clarifications, some may just have

18   questions that we've had about policies, whatever it may be,

19   but they're all about reenforcing our policies.

20   Q.   I direct your attention to Exhibit 10.  Do you recognize

21   that document?

22   A.   Yes, this is our PSP program training document.

23   Q.   And who prepared this?

24   A.   This was done by an outside party, an industrial work

25   psychologist, Kathleen Lundquist did this document.

1    Q.   I'm going to direct your attention to the page stamped A&F

2    603.

3    A.   Yes.

4    Q.   And can you describe the purpose of that particular page?

5    A.   Yes, this page really speaks to our diversity and

6    inclusion.  Abercrombie takes diversity very seriously, so it's

7    integrated into many of our policies and our documents.  And

8    coincidently, our work force is actually more diverse than the

9    racial work force that's available in the U.S.  It's an

10   imperative for a business in the U.S. as well as

11   internationally.

12   Q.   I'm going to direct your attention to the page stamped A&F

13   639.

14   A.   Yes.

15   Q.   Take a look at the second sentence of the second

16   paragraph.  Could you read that?

17   A.   "When the candidate arrives, make small talk, but avoid

18   any discussion of family situation, religion, et cetera."

19   Q.   And why do you train managers that way?

20   A.   As I said, we don't want people to make assumptions based

21   on a conversation they have with someone.  The individual

22   should be interviewed for their merit to do their job, not

23   because of their gender, race, religion, et cetera.

24   Q.   Direct your attention to the page stamped 685.

25   A.   Yes.

1    Q.   What's the purpose of that page?

2    A.   This is part of training our managers on illegal questions

3    that we don't want them to ask.

4    Q.   And could you read aloud the first paragraph on the right?

5    A.   "There are some questions that you must avoid.  If the

6    candidate mentions some information that falls into one of the

7    categories you see here, you should not continue the discussion

8    or take notes on it.  You should especially not consider the

9    information when making your ratings."

10   Q.   And one of the questions in one of the categories is

11   religion on the page; correct?

12   A.   That's correct.

13   Q.   So managers are trained especially not to consider

14   religion when making their ratings?

15   A.   No, they're trained to follow the script and to judge the

16   candidate based on the competencies outlined in the script.

17   Q.   And they're trained not to consider religion; correct?

18   A.   That's correct.

19   Q.   And I'll direct your attention to the next page, A&F 686.

20   And what's the purpose of that page?

21   A.   That's to save any of the questions or any topics

22   regarding the illegal questions come up.  HR needs to know

23   after the interview is over, so all managers are directed to

24   call HR.

25   Q.   What if an applicant doesn't mention religion, but the

1    manager -- a manager mentions religion to a district manager,

2    what should the district manager do?

3    A.   A district manager needs to call HR.

4    Q.   Now, I will direct your attention to the next page, A&F

5    687.

6    A.   Yes.

7    Q.   What's the purpose of that page?

8    A.   This really talks about our compliance responsibilities.

9    So it also includes the EEO.  We select on job basis.  It talks

10   about a fairness and how we put our interviews together and how

11   we operate.

12   Q.   Does this remind the interviewing managers they are

13   responsible for complying with the equal employment laws?

14   A.   Yes, it certainly does.

15   Q.   Now, who receives this training that we've been just

16   talking about?

17   A.   Every manager we hire.

18   Q.   Now, direct your attention to Exhibit 17.

19   A.   Yes.

20   Q.   Can you identify that document?

21   A.   Yes, this is our diversity training document.

22   Q.   And can you generally describe the diversity training?

23   A.   Yes, diversity training covers several aspects, which also

24   includes EEO laws.  It talks about why Abercrombie embraces

25   diversity and why it's a core part of our strategy and our

```
1    culture.  It talks about diversity being more than just race

2    and gender, but who we are as unique individuals in

3    contributing to the brand.

4    Q.   I'll direct your attention to A&F 730.

5    A.   Yes.

6    Q.   What's the purpose of that page of this training?

7    A.   That is reinforcing Title VII and ADA compliance that's

8    required from all of our associates.

9    Q.   And can you read -- I'm sorry.

10         MR. KNUEVE:  Can I move for admission of this Exhibit

11   17?

12         MS. SEELY:  No objection.

13         THE COURT:  Very well.  Defendant's 17 is admitted.

14   Q.   (By Mr. Knueve)  Let's get A&F 730 up there.

15         And can you read the first bullet under the heading

16   Title VII?

17   A.   "Prohibits discrimination in terms, conditions or

18   privileges of employment based on the protected classes, which

19   are race, color, national origin, religion or sex/gender."

20   Q.   So religion is specifically mentioned?

21   A.   Yes, it is.

22   Q.   And then there's some text in italics down near the bottom

23   of the page.  Can you read that?

24   A.   It says "Compliance with EEO laws is key to Abercrombie &

25   Fitch's business policy and strategy.  What these laws
```

1   represent is at the core of our business and it is

2   non-negotiable in our workplace."

3   Q.   Take a look at page A&F 734, if you would please.

4   A.   Yes.

5   Q.   What's the purpose of that page?

6   A.   This part of the training was specifically talking about

7   religion in the world as part of our diversity.

8   Q.   And take a look at page A&F 759, if you would.

9   A.   Okay.

10   Q.   What's the purpose of that page?

11   A.   It says that we do not discriminate on any of the

12   protected classes and it's unlawful to make any decisions based

13   on those.

14   Q.   And that includes religion?

15   A.   Yes, it does.

16   Q.   And who should receive this diversity training?

17   A.   All of our managers receive the diversity training.

18   Q.   I'll direct your attention to Exhibit 12 in your book.

19   A.   Yes.

20   Q.   Can you identify that document?

21   A.   Yes, this is one of our HR 411 newsletters.

22   Q.   What's an HR 411 newsletter?

23   A.   It's a newsletter that HR sends out on at least twice a

24   month that talks to the policies, gives examples, provides

25   clarification for employees and we talk about everything.  This

1    one specifically talks about diversity and inclusion.  It's not

2    just black and white, but it really takes into effect the

3    entire person and that would include their religion.

4              MR. KNUEVE:  Your Honor, I move for admission of

5    Exhibit 12.

6              THE COURT:  Any objection?

7              MS. SEELY:  No, Your Honor.

8              THE COURT:  Defendant's 12 is admitted.

9    Q.   (By Mr. Knueve)  What's the purpose of this particular HR

10   411?

11   A.   This one talks just about diversity not just being a black

12   or a white thing, but it's about our similarities and

13   differences and embracing those similarities and differences.

14   Q.   I direct your attention to Exhibit 14.

15   A.   Yes.

16   Q.   Can you identify that document?

17   A.   Yes.  This is an HR 411 that specifically talked about our

18   hiring for a PSP.

19             MR. KNUEVE:  Your Honor, I move for admission of

20   Exhibit 14.

21             THE COURT:  Any objection?

22             MS. SEELY:  Your Honor, plaintiff does object.

23   There's no date on this and I don't know that it necessarily is

24   relevant to the issues in this case in terms of temporal scope.

25             THE COURT:  All right.  Let's see if Mr. Knueve can

1    solve those concerns.

2            MR. KNUEVE:  Your Honor, what's the --

3    Q.  (By Mr. Knueve)  I'm sorry.  Ms. Riley, what's the purpose

4    of this document?

5    A.   The purpose of this document is to reiterate our policy

6    around hiring.  It says, specifically, we set high standards

7    for our associates and if a candidate is not selected, personal

8    feelings or perceptions may arise that would lead the person to

9    notify the HR department or allege discriminatory hiring

10   practices.

11   Q.   And has that -- let me stop you.  Has that been the

12   training and the policy at Abercrombie since you have been

13   employed?

14   A.   Yes, it's the same policy that we have always had.

15           MR. KNUEVE:  Your Honor, I move for admission of

16   Exhibit 14.

17           THE COURT:  Any objection?

18           MS. SEELY:  The same objection, Your Honor.

19           THE COURT:  Do we know the time frame here, Mr.

20   Knueve.  This says for May, week four.

21           MR. KNUEVE:  May I approach, Your Honor?

22           THE COURT:  You may.

23           (Counsel approached the bench and the following

24   proceedings were had out of the hearing of the jury.)

25           MR. KNUEVE:  Your Honor, I don't know if she knows the

1  year.  I can represent that it's from 2008.  That's why we

2  selected it.

3          THE COURT:  That's my concern, was this prior to the

4  decision?  Ms. Seely?

5          MS. SEELY:  I don't know and I think without personal

6  knowledge, I don't think it should come in.

7          THE COURT:  I think she has to testify to that, I

8  agree.  So let's see if Mr. Knueve -- well, actually, let's see

9  if Ms. Riley knows.

10          (Counsel returned to their respective places and the

11  following proceedings were had within the presence and hearing

12  of the jury.)

13          THE COURT:  Mr. Knueve.

14  Q.   (By Mr. Knueve)  Ms. Riley, do you know what year this

15  document was prepared?

16  A.   Based on who wrote the document, if you go down to Global

17  Village and you go to the bottom, it says Shawn Knapp.  Ms.

18  Knapp was in my team until the middle of 2007 when she moved

19  over to the diversity and inclusion team to be their

20  administrative coordinator.  Prior to that, she was an employee

21  representative with me.  So I would say that it's within that

22  time period, if Ms. Knapp sent it out with the Global Village.

23  Q.   So prior to 2008?

24  A.   Yes.

25          MR. KNUEVE:  Your Honor, I move for admission.

```
 1            THE COURT:  All right.  Any objection?

 2            MS. SEELY:  No objection.

 3            THE COURT:  Very well.  With no objection, Defendant's

 4   14 is admitted.

 5   Q.  (By Mr. Knueve)  Okay.  I'm looking at the bullet points

 6   in the middle of the page of Exhibit 14.  Could you read that

 7   first one?

 8   A.  "Only managers that have completed the PSP training on The

 9   Link may conduct or sit in on interviews."

10   Q.  Why is that important?

11   A.  You have to have training in order to be able to do it the

12   right way and to do it objectively.

13   Q.  Could you read the fourth bullet point?

14   A.  "Read through the scripted section to interviewees."

15   Q.  Can you read the sixth bullet point, which is indented?

16   A.  "Don't mark stars next to those you intend to hire or

17   reference, race, religion or protected classes on the interview

18   guide."

19   Q.  Take a look at the seventh bullet point.  Could you read

20   that?

21   A.  "Be careful not to engage in inappropriate conversations

22   before, during or after the interview."

23   Q.  Okay.  I'll direct your attention to Exhibit 15.  Can you

24   identify that document?

25   A.  Yes, that's another HR 411 document.
```

```
 1     Q.   And what's the --

 2          MR. KNUEVE:  Your Honor, I move for admission of

 3     Exhibit 15.

 4          THE COURT:  Any objection?

 5          MS. SEELY:  Your Honor, again, I don't know that

 6     this-- there's no date on it and I don't think there has been

 7     proper foundation laid.

 8          THE COURT:  Let's see if Ms. Riley can date this.  Mr.

 9     Knueve?

10     Q.   (By Mr. Knueve)  Ms. Riley, can you identify the date?

11     A.   Yes, I can, Mr. Knueve.  If you go down to Global Village

12     again, you will see that we have several INROADS interns who

13     are sort of called out or applauded.  We had our INROADS

14     interns in 2007 and 2008.

15          MR. KNUEVE:  Move for admission of the exhibit, Your

16     Honor.

17          MS. SEELY:  No objection.

18          THE COURT:  Very well.  Defendant's 15 is admitted.

19     Q.   (By Mr. Knueve)  What's the purpose of Exhibit 15?

20     A.   Exhibit 15 specifically speaks to why our company embraces

21     diversity, but they also embrace on a larger scale inclusion.

22     It's not just about the gender/race piece, but it's also about

23     ensuring that we welcome people into our organization who are

24     different than we are.

25     Q.   Now, Ms. Riley, you have described the process for making
```

1    requests for religious accommodation and you've also described

2    the company's Look Policy.

3    A.    Yes.

4    Q.    Do applicants or employees ever ask for exceptions to the

5    Look Policy as a religious accommodation?

6    A.    Yes, they do.

7    Q.    And how does the company respond to those requests?

8    A.    As I said, the company takes it on a case-by-case basis.

9    We try our best to ensure that we are respecting the individual

10   without taking away from the brand identity.  If we can make

11   the accommodation without undue hardship, we make the

12   accommodation.

13   Q.    What are some relevant factors in determining whether a

14   requested exception would distract from the brand?

15   A.    There are a couple that we look at.  One is specifically

16   the job position itself.  Some of our jobs are always in the

17   presence of customers, so in that case, it can be very

18   difficult sometimes to make an exception to the policy.

19   However, some of our roles like our impact role or our stock

20   lead roles are usually at the back of the store and even those

21   associates -- even though those associates should be complying

22   by the Look Policy or should comply to the Look Policy, we are

23   able to make the accomodation for those jobs on an easier

24   basis.

25           Secondly, it's also the size of the store.  Some

1    stores only have three jobs, while other jobs like New York

2    Fifth Avenue may have a hundred jobs.  So it allows us to be

3    able to give the associate flexibility in another kind of job

4    that they may be able to move to.  And then it's also the

5    accommodation that's being required.  We have some people who

6    require maybe a small bracelet that has a religious icon on it,

7    which is easier to hide under a long sleeved shirt or we may

8    have someone who has a tattoo that has some religious bearing,

9    but they can hide it under their clothing so a customer won't

10   see it and we'll make those, we'll make exceptions in those

11   cases.

12   Q.   Before the time that Ms. Elauf applied in 2008, had the

13   company every allowed exceptions to the Look Policy as a

14   religious accommodation?

15   A.   Yes.

16   Q.   And you testified this morning about some of those

17   instances.  Do you recall that?

18   A.   Yes, I did.

19   Q.   Some of those instances related to Muslim employees;

20   correct?

21   A.   Yes, mostly around beards or facial hair.

22   Q.   And before 2008, the company had allowed an exception for

23   a Muslim woman to wear a headscarf?

24   A.   Yes.

25   Q.   Did a request relating to Samantha Elauf ever come to

1    human resources?

2    A.   No, Ms. Elauf's request or anything to do with Ms. Elauf

3    did not come to our attention, so we could not do anything with

4    it.

5    Q.   In this case, the EEOC has alleged that Abercrombie

6    deliberately trains managers not to ask about religion in order

7    to avoid having to make religious accommodations.  How do you

8    respond to that?

9    A.   I think that's absolutely inaccurate and untrue.  We train

10   our managers that if this should ever come up, they should call

11   the HR experts.  As I said earlier, you know, we have a lot of

12   managers, they move through jobs quickly.  We want to make sure

13   that every employee or every applicant has a fair shake and

14   going through the experts makes it much more fair than leaving

15   it to a manager who may not be able to make the right

16   decisions.

17            MR. KNUEVE:  I have no further questions.  Thank you.

18            THE COURT:  Cross-examination.

19                         CROSS-EXAMINATION

20   BY MS. SEELY:

21   Q.   Sorry, I lost my place here.

22   A.   Oh, no.  It gives me a chance to have water.

23   Q.   Ms. Riley, you said that the role of branding to

24   Abercrombie is critical; correct?

25   A.   Yes.

```
 1    Q.   And I think you said that that's because the customer
 2    expects a certain experience when they come in your stores?
 3    A.   Yes.
 4    Q.   And you said that that involves how the customer interacts
 5    with people on the floor; correct?
 6    A.   Yes.
 7    Q.   And interaction involves more than what the model is
 8    wearing; correct?
 9    A.   Interaction involves -- yes, you are bringing in the
10    person into our lifestyle.  They are becoming a part of who we
11    are, so the interaction is critical, but what the customer sees
12    is also critical.  And we have a phrase, it's called you're
13    very Abercrombie.  You can Google it.  Everybody -- Abercrombie
14    is now an adjective, it's no longer just a store.  And being
15    very Abercrombie means that you are styled well, you are great
16    looking, you're open, you're sort of like the kid next door
17    that everybody wants to be friends with or you hope your son or
18    daughter is.  And that's what the in-store experience is all
19    about.
20    Q.   And being Abercrombie would also involve being friendly
21    and outgoing; correct?  On behalf of the model?
22    A.   Yes, we expect all of our models to be friendly and
23    outgoing and to interact with our customers; correct.
24    Q.   And smiling and open; correct?
25    A.   Absolutely.
```

1    Q.   So it involves more than just clothes, it involves the

2    personality of the model; correct?

3    A.   Yes, it involves the entire package.

4    Q.   The entire package includes the personality, as well;

5    correct?

6    A.   The entire package includes personality and clothing.

7    Q.   Now, you said that the purpose of the store -- or I'm

8    sorry, the Abercrombie brand conveys the all-American style; is

9    that correct?

10   A.   That's correct.

11   Q.   And you also testified that a headscarf is inconsistent

12   with the Abercrombie style; is that right?

13   A.   Yes, it is.

14   Q.   So is it your testimony that a headscarf is not and cannot

15   be all-American?

16   A.   I think that would be twisting my words, Ms. Seely.  I do

17   feel that Abercrombie is all-American, it's who we are as

18   Americans.  I guess it's optimistic.  It's why people like my

19   parents wanted to come here to live here, because they feel

20   it's a land of opportunity, where you can succeed.  It doesn't

21   mean that it's the way Americans are expected to dress.  We're

22   a country that came from cowboys and jeans and that's what

23   Abercrombie conveys.  We are T-shirts, worn jeans, friendly

24   open people, that's pretty much it.

25   Q.   And we're also a country that has people that wear

1   headscarves; is that correct?

2   A.   In this country, people do wear headscarves, as in other

3   countries.

4   Q.   Let's look at the handbook, which is Defendant's Exhibit

5   1.

6   A.   Yes.

7   Q.   Now, I believe you said that this is -- that the

8   Abercrombie's diversity -- I'm sorry.  Abercrombie's EEO

9   policies are conveyed to the employees through Defendant's

10  Exhibit 1, the handbook.  Is that right?

11          MR. KNUEVE:  Objection, Your Honor.  She testified

12  that was one way.

13          MS. SEELY:  I'm sorry, what?  I didn't hear you.

14          MR. KNUEVE:  It mischaracterizes her testimony.

15          THE COURT:  Just one second.  Rephrase, please.

16  Q.   (By Ms. Seely)  Did you testify on direct examination that

17  Abercrombie's EEO policies are conveyed to its employees

18  through store associate handbook?

19  A.   Yes, it's conveyed in several ways, including the store

20  associate handbook.

21  Q.   Okay.  Now, you would agree with me, would you not, Ms.

22  Riley, that there's nothing in the store employee or store

23  associate handbook about religious accommodation?

24  A.   I think you asked me that question this morning.

25  Q.   And I'm asking you again.

1    A.   And I said at that time that it was not written, but

2    everyone knows if there are any questions, that they should

3    call HR.

4    Q.   Now let's also look...  Let's look at the diversity

5    training manual, Defendant's Exhibit 17.

6    A.   Okay.

7    Q.   And particularly on page 730, which was up on the screen a

8    few minutes ago?

9    A.   Yes.

10   Q.   In the middle, under the Title VII block, there is no

11   mention in the Title VII block, is there, that Title VII

12   requires religious accommodation for its applicants and

13   employees?

14   A.   As I said this morning, it's not written on that page.

15   Q.   And it's not written anywhere in this exhibit, is it?

16   A.   Not that I'm aware of.

17   Q.   Now, Ms. Riley, you said that -- and I believe this is

18   what you said, any inconsistency with respect to the Look

19   Policy takes us off brand and is costly.  Do you remember that?

20   A.   Yes.

21   Q.   Now, are you aware of any study that Abercrombie has done

22   to support that contention, other than the study of Dr.

23   Joachimsthaler that was done specifically for this lawsuit?

24        MR. KNUEVE:  Objection, Your Honor.  We've been

25   through this.

```
 1           THE COURT:  Sustained.
 2    Q.   (By Ms. Seely)  Now, let's look at the store audits.
 3    That's Exhibit 18.
 4    A.   Okay.
 5    Q.   When the store audits are done, am I correct that -- and
 6    Exhibit 18 indicates that the stores are audited on more than
 7    just the store experience; is that correct?
 8    A.   Yes.
 9    Q.   They are audited on store cleanliness?
10    A.   Yes.
11    Q.   Correct?  Running the business?
12    A.   Yes.
13    Q.   Rotating questions?  They audit on that?
14    A.   On rotating -- okay.  Yes.  Yes.
15    Q.   They are also audited on tag line greetings?
16    A.   Yes.
17    Q.   And the cashier tag line?
18    A.   Yes, they are.
19    Q.   And so there are a number of things that are considered by
20    the secret shoppers and the auditors; is that right?
21    A.   Yes.
22    Q.   Not just consistency with the Look Policy?
23    A.   Right.  They do look at store cleanliness, because that
24    does also help our maintenance crew to ascertain whether or not
25    the store is being cleaned up to standard and whether it's
```

1    going to be pleasing to the customer.  Store presentation, as I

2    talked about as one of our senses, it is the sight and the

3    smell that you have.  And then rotating has to do with our

4    merch.  The tag line greetings for both the, as you -- the

5    greeter that you meet coming into the store, as well as the

6    cashier.  That has to do with the interaction, which I referred

7    to earlier, where the model is expected to say hey, what's

8    going on, or how are you doing, or can I help you.  And then

9    store experience, as I explained before, is all about the model

10   themselves, whether they're modeling our style and whether they

11   are in Look Policy.

12   Q.   Let's look at the People Selection Program that's been

13   admitted into evidence.  That's Defendant's Exhibit 10.

14   A.   Okay.

15   Q.   And I believe you testified that you were familiar with

16   this; correct?

17   A.   Yes, I am.

18   Q.   Are you aware of any page in Exhibit 10 that refers to the

19   company's obligation to provide religious accommodation?

20   A.   There is no referral to that, but it does say that if

21   there are any taboo topics discussed, they are to call HR and

22   religion is listed as one of the taboo topics.

23   Q.   But the People Selection Process does not tell the

24   interviewing manager to -- strike that.  There's no mention of

25   the obligation of the company to provide religious

1   accommodation in the People Selection Program; correct?

2   A.   No, only to call HR with any issues.

3   Q.   And now, I think you talked about the Respect Policy;

4   correct?

5   A.   Yes, I talked about the Respect Policy.

6   Q.   And the Respect Policy does not say anything about the

7   obligation of the company to provide religious accommodation,

8   does it?

9   A.   No, it does not.

10  Q.   Now, I believe you testified that HR trains its managers

11  in the stores to contact human resources if the applicant makes

12  a request for religious accommodation.  Do you recall that?

13  A.   Yes, I testified that HR does train all managers to call

14  HR if there is any request for religious or any other

15  accommodation, yes.

16  Q.   Okay.  So if there's no request for a religious

17  accommodation, then the HR manager is not required to call HR;

18  correct?

19         MR. KNUEVE:  Objection, Your Honor.  That's an

20  incomplete hypothetical.

21         THE COURT:  Overruled.  Go ahead.

22         THE WITNESS:  You said the HR manager is not required

23  to call HR.  Did you mean the store manager?

24  Q.   (By Ms. Seely)  I'm sorry.  I did mean that, yes.  Let me

25  repeat my question.  If there is no request made in the

1    interview for religious accommodation, then the interviewing

2    manager is not required to call HR; correct?

3    A.   If the interviewing manager does not have any questions

4    around the interview or there are no accommodation requests

5    made, there is really no reason for them to call HR, unless

6    they just want to chat with us that day.

7    Q.   Now, you would agree with me that if an applicant comes to

8    an interview wearing a headscarf and does not know that the

9    Look Policy prohibits headwear, there would not necessarily be

10   any reason for her to ask for religious accommodation?

11        MR. KNUEVE:   Objection, Your Honor, hypothetical and

12   speculation.

13        THE COURT:   Overruled.

14   A.   I would say no, I would not agree with you.

15   Q.   (By Ms. Seely)   You would not agree with me?

16   A.   I would not agree with you that if an applicant comes to

17   an interview with a headscarf and doesn't ask for an

18   accommodation, that we should know that there may be an

19   accommodation needed.

20   Q.   Well, I don't think that was my question.

21   A.   Oh.  Then I'm sorry, Barbara.  Go ahead.

22   Q.   I said if an applicant comes to an interview with a

23   headscarf and Abercrombie does not tell the applicant during

24   the interview that headwear is not permitted, then you would

25   agree with me that there is no particular reason why an

1    applicant should know to ask for an exception or a religious

2    accommodation; correct?

3         MR. KNUEVE:  Objection, Your Honor.  This calls for

4    speculation.  It's an incomplete hypothetical.  It's

5    inconsistent with the evidence that's been in the case with

6    regard to what is told the applicants.

7         THE COURT:  Overruled.

8    A.   Our Look Policy, as I said, and the summary in the PSP

9    does talk about our Look Policy and then we ask the applicants

10   if they have any questions to call.  Now, if an applicant does

11   not ask the question and they do come to work following that,

12   so if they are hired or extended an offer, as we saw this

13   morning, the company does it's best to make the accommodations

14   when asked, as long as it does not put undue burden on the

15   company.

16        So even though an applicant may not ask for it, if

17   they are extended an offer and they need a religious

18   accommodation, the managers are told to call HR and we will

19   handle the issue.

20   Q.   (By Ms. Seely)  But, Ms. Riley, you would agree with me,

21   wouldn't you, that if an applicant comes to the interview

22   wearing a headscarf and she is not told that headwear is not

23   permitted, then she would have no reason to ask for a religious

24   accommodation?  That's my question.

25        MR. KNUEVE:  Objection, Your Honor, speculation.

1    We're getting into the mind of an applicant.

2              THE COURT:  Overruled.

3    A.    And then I would also say, and this is pretty general

4    knowledge, that anybody who comes to work for us at Abercrombie

5    & Fitch knows who we are.  We have over 200,000 employees per

6    year, many of them are friends, they're neighbors, they talk to

7    each other at school, they know about our Look Policy, it's not

8    a private issue at all.  You can probably Google and find our

9    entire Look Policy on the Web.  But most of the people who do

10   come in to our organization to interview know exactly what's

11   expected of them, even if we don't cover it in the interview.

12   Q.    And it's your testimony that a woman with a headscarf who

13   comes in for an interview should know she's not allowed to wear

14   a headscarf?

15   A.    That is not my testimony.

16   Q.    In 2008, do you think you could have Googled the Look

17   Policy and found out that no headwear was permitted?

18   A.    You probably could have, but that would be speculative on

19   my part.

20   Q.    We looked at several exhibits that were HR 411 documents.

21   Do you have those in front of you?  15 is one of them.

22   A.    Okay.

23   Q.    Is there any mention in 15 of the company's obligation to

24   provide religious accommodation to its employees and

25   applicants?

1    A.    No, this was just about a quick topic on diversity versus

2    inclusion.   It's nothing to do with accomodation of any kind.

3    Q.    What about Defendant's Exhibit 13?   That's another 411

4    document.   Is there any mention in this document of the

5    company's obligation to provide religious accomodation?

6    A.    No, there is nothing about accommodation.

7    Q.    And what about Defendant's Exhibit 12?   That's another 411

8    document.   Is there anything in this document, Exhibit 12, that

9    mentions the company's obligation to provide religious

10   accommodation?

11   A.    No, there is nothing.   This is just a reiteration of the

12   Look Policy.

13   Q.    Now, you talked about the company's religious

14   accommodation policy and that HR was responsible for granting

15   requests for religious accommodation; correct?

16   A.    Yes, HR is responsible for working with the stores to

17   grant accommodation, whether religious or medical.

18   Q.    Now, HR would only get involved with granting a request

19   for religious accommodation if there was a request; correct?

20          MR. KNUEVE:   Objection, Your Honor.   That's not the

21   testimony.

22          THE COURT:   Overruled.

23   A.    Could you just repeat that, Ms. Seely?

24   Q.    (By Ms. Seely)   Yes.   HR considers requests for religious

25   accommodation on a case-by-case basis; right?

```
 1    A.    Yes.

 2    Q.    And if there is no request that gets to HR, then HR never

 3    considers providing a religious accommodation to a particular

 4    applicant; correct?

 5    A.    We would be unable to provide any kind of consideration

 6    for accommodation if we don't know about anything and that's

 7    the specific reason we train all our managers to call HR if

 8    there's any issues surrounding, whether it's disability,

 9    medical or religion.  And that's the training we do, which is

10    if you hear anything, whether it's in the interview or whatever

11    it may be, you need to call HR.

12    Q.    But you don't train your managers to recognize when there

13    is an issue around religious accommodation, do you?

14    A.    I would never train my managers to recognize when there is

15    an issue, because as I said before, that's making assumptions.

16    Ms. Elauf may wear a scarf for religious reasons.  I wear a

17    scarf because I have a bad hair day.  You cannot make the same

18    set of assumptions that I may need religious accommodation.

19    Q.    Now, you are aware that Samantha Elauf applied for a job

20    with abercrombie kids in Tulsa; correct?

21    A.    Yes, I am aware.

22    Q.    And you are also aware that Samantha Elauf never made a

23    request for a religious accommodation; correct?

24    A.    Yes, and that's one of the reasons we have never

25    considered Ms. Elauf.
```

```
1    Q.   And you're also aware that Mr. Johnson never called HR;

2    correct?

3    A.   And he was not in compliance with our policy.

4    Q.   Didn't you testify earlier today that your policy is that

5    unless there's a request made, the interviewing managers are

6    not required to call HR?

7    A.   I testified that in the PSP, it says if there's any

8    mention of taboo, any questions come up through a manager, it

9    needs to go to HR.  So if a request is not made and nothing is

10   discussed outside of that request, no, it doesn't have to go to

11   HR.  But if a manager has any questions whatsoever, we teach

12   them to call HR.

13   Q.   But if they have no questions, they don't need to call HR;

14   correct?

15   A.   They don't need to call HR if there are no questions.

16   However, they have been told if there's anything mentioned

17   around religion, so I guess I should say it doesn't have to be

18   a question, it has to be any of those taboo topics, you call

19   us.  That's what we get paid to do.

20   Q.   If a taboo topic is mentioned, then they're supposed to

21   call HR?

22   A.   Yes.

23   Q.   If it's not mentioned, they don't need to call HR?

24   A.   No, if they have questions about it because they have

25   biases or assumptions, they should also call HR.
```

1     Q.   I want to direct your attention to Defendant's Exhibit 3,

2     that was The Cast of Back to School.  And in particular, let's

3     look at a few pages.  The page number 196, Abercrombie & Fitch

4     196, the girls are all wearing scarves; correct?

5     A.   Yes, scarves is one of our fashion items and you can see

6     that we teach them how to wear it in our Abercrombie style.

7     Q.   Let's look at page 201.  Again, lots of scarves; correct?

8     A.   A great fashion item at the time.

9     Q.   In fact, if you look throughout all of Defendant's Exhibit

10    3, you will see many, many, many scarves being worn by the

11    models; correct?

12    A.   Yes.  During that time, we did sell scarves in our stores

13    as an accessory.  And as I said before, if you look at the

14    pictures closely, you will see that they are all styled the

15    same way.

16              MS. SEELY:  Thank you.

17              THE WITNESS:  Thank you.

18              MR. KNUEVE:  Very briefly.

19              THE COURT:  Mr. Knueve.

20                        REDIRECT EXAMINATION

21    BY MR. KNUEVE:

22    Q.   Ms. Riley, I'm going to direct you back to Exhibit 10, and

23    specifically page 686.  And -- I'm sorry, I'll wait for you to

24    get there.

25    A.   Yes.

1  Q.   Look at the two paragraphs on the far right-hand side at

2  the bottom?

3  A.   Yes.

4  Q.   Can you read those?

5  A.   "If a candidate tells you that they cannot work at

6  particular times because of their religion, simply tell them

7  that you will get back to them concerning that and continue

8  forward with the interview.  If a taboo topic is brought up,

9  please let HR know after the interview is over."

10  Q.   What's the purpose of that?

11  A.   It's to let managers know that any taboo topic that is

12  brought up needs to be discussed with HR after the interview.

13  Q.   And isn't that training on religious accommodation?

14  A.   It could be viewed as training on religious accommodation,

15  yes.

16         MR. KNUEVE:  No further questions.

17         THE WITNESS:  Thank you.

18         THE COURT:  Recross.

19         MS. SEELY:  No.

20         THE COURT:  Very well.  May this witness be excused?

21         MR. KNUEVE:  As far as we're concerned, Your Honor, I

22  don't think we can.

23         THE COURT:  Oh, that's right.  Very well, you may step

24  down.

25         THE WITNESS:  Thank you.

```
 1              THE COURT:  The defendant -- let's see.  We're past

 2    5:00.  We need to recess for the evening.  Mr. Knueve.

 3              MR. KNUEVE:  Your Honor, actually, the defense rests.

 4              THE COURT:  Very well.  Ladies and gentlemen, we need

 5    some time, as lawyers, to hammer out the jury instructions.  I

 6    have a set of proposed jury instruction for the lawyers, they

 7    have not seen them, that's been, in part, what I've been

 8    working on up here.  We will need some time tomorrow morning

 9    before we can get this case to you, to hammer these things out.

10    As you might have suspicioned, there are some arguments

11    regarding the law applicable to this case.

12              So counsel, if you will approach and we'll try to give

13    the jury an idea of when they ought to come in.

14              (Counsel approached the bench and the following

15    proceedings were had out of the hearing of the jury.)

16              THE COURT:  You know, it's been my experience that it

17    typically takes more time to hammer these things out than one

18    expects.  Now, here, although this case is theoretically only

19    one as to damages, the law is not entirely crystal clear with

20    regard to some of these issues, vicarious liability, good

21    faith.  I've tried to do the best I can here in this first

22    draft, but I suspect we won't be able to get to this jury until

23    nearly, I would guess nearly 11:00 tomorrow morning.  Your

24    thoughts?  Do you want to try to get it to them earlier?

25              MS. SEELY:  11:00 is fine with me.
```

```
 1              MR. KNUEVE:  No objection, Your Honor.

 2              THE COURT:  Well, we could tell them 10:30 and see if

 3    we're lucky.  I'm not going to -- between you and me, I'm not

 4    going to predict that we're going to be able to get it to them

 5    by 10:30, but we'll try to give them the instructions at 10:30.

 6    If they have to cool their heels a little while, that will be

 7    all right.  Show up here at 9:00 and we will talk about these

 8    instructions in an informal conference, which is my typical

 9    practice, not on the record, so you can persuade me of those

10    portions of the jury instructions that are clearly erroneous

11    and after we then hammer out a second set of jury instructions,

12    we'll go on the record and you can make any objections you need

13    to.  So we'll see you at 9:00.  I'll have the jury come in at

14    about 10:30.

15              MS. SEELY:  Your Honor, do you want to take testimony.

16    Deon Riley, testimony from her pertaining to injunctive relief

17    or do you feel that you --

18              THE COURT:  Not right now.

19              MS. SEELY:  I don't mean right now, but at some point.

20              THE COURT:  I think I have to, but right now, it's

21    past 5:00 and I've been trying to pay attention both to the

22    testimony and working on these jury instructions and I'm not in

23    a place right now where I want to listen to Ms. Riley.  Let's

24    recess for the evening.  We'll see you at 9:00.

25              MR. KNUEVE:  Could I make one other point, Your Honor?
```

```
1            THE COURT:  Yes.

2            MR. KNUEVE:  We would like to renew our motion as a

3   judgment on a matter of law on punitive damages.  We can do

4   that in the morning if you'd rather.

5            THE COURT:  Well, let's do that, but let me cut this

6   jury loose.

7            (Counsel returned to their respective places and the

8   following proceedings were had within the presence and hearing

9   of the jury.)

10           THE COURT:  Ladies and gentlemen, my best estimate is

11  that we may be able to get this to you at 10:30 tomorrow

12  morning.  We will do our level best to do that.  The Court will

13  begin with its instructions, we'll follow with the closing

14  arguments of counsel.

15           Now, before we cut you loose for the evening, though,

16  I need to formally ask the plaintiff, any rebuttal evidence?

17           MS. SEELY:  No, Your Honor.

18           THE COURT:  Very well.  Ladies and gentlemen, we're in

19  recess for the evening until 10:30 tomorrow morning.

20           (The following proceedings were had outside the

21  presence and hearing of the jury.)

22           THE COURT:  Mr. Knueve.

23           MR. KNUEVE:  Your Honor, we'd like to renew our motion

24  as a matter of law on the punitive damages issue on all of the

25  same grounds that I raised this morning.
```

1          Without belaboring all of the grounds, I just want to

2    state we are renewing on all of the grounds we mentioned

3    earlier and then highlight the things that we know now.

4          THE COURT:  Particularly, the good faith defense.

5          MR. KNUEVE:  Yes, that's what, right --

6          THE COURT:  You really focussed on good faith efforts

7    to comply with Title VII.  I would like to ask you a question

8    in that regard, because I have <u>Kolstad</u> in front of me and

9    <u>Kolstad</u>, a Supreme Court decision from 1999, stands for the

10   proposition, in part, that "An employer may not be vicariously

11   liable for discriminatory employment decisions of managerial

12   agents for the purposes of imposing punitive damages when those

13   decisions are contrary to the employer's good faith efforts to

14   comply with Title VII."

15         Now, I think my question goes to the specificity of

16   those efforts, because as I hear Ms. Seely, she's saying well,

17   focusing on Mr. Johnson's directive, there was arguably no good

18   faith effort to comply with Title VII regarding religious

19   accommodation of those applicants denied employment and neither

20   informed about the discriminatory basis of the decision -- and

21   I know that that's an issue itself -- but neither informed

22   about the discriminatory basis of the decision not to employ

23   that applicant nor informed of the avenue available to request

24   religious accommodation through HR.

25         So arguably, Johnson's decision did not -- let's see

1    if I can frame this better.  Clearly, let's assume the decision

2    was contrary to Title VII.  But the good faith efforts arguably

3    don't prevent this sort of decision from occurring or this sort

4    of result from occurring.  Do you follow what I'm saying?

5          MR. KNUEVE:  I do.  I would like to address -- may I

6    approach, Your Honor?  I have some authorities here that I

7    would like to give you.

8          THE COURT:  Please.

9          MR. KNUEVE:  Your Honor, there has been a lot of

10   questions about whether or not -- a lot of discussion about

11   whether or not Abercrombie should ask applicants about religion

12   or not.  I've provided to you a section from the -- a page from

13   the EEOC's Web site which says, the first sentence says,

14   "Questions about an applicant's religious affiliation or

15   beliefs are generally viewed as non-job related and problematic

16   under federal law."

17         Then I also gave you a section from the EEOC's

18   Compliance Manual and if you look at page 47 there, it says at

19   the top, "An applicant or employee who seeks religious

20   accommodation must make the employer aware both of the need for

21   accommodation that's being requested due to a conflict between

22   religious and work."

23         Now, I want to stress, I'm not relitigating notice and

24   liability.  What I am talking about is Abercrombie's good faith

25   efforts to comply with Title VII.  And this was the law, this

1    is what the EEOC said the law was.

2           Now, Abercrombie drafted its interview procedures and

3    its model job description and its interview training, okay,

4    with this in mind.  And that's why Abercrombie trains its

5    managers not to make assumptions, not to ask questions;

6    instead, to give a description of the requirements of the job,

7    let the applicant ask the question.

8           THE COURT:  Well, you're responding in part to our

9    discussion at sidebar where Ms. Seely suggested that

10   Abercrombie should have asked about her religion.

11          MR. KNUEVE:  Yep.

12          THE COURT:  And you reacted to it and so did I.  I

13   mean, that's entirely inappropriate.  But that's not what

14   happened here.  The question wasn't put to Ms. Elauf about her

15   religion.  Rather, what really should have happened, was that

16   Ms. Cooke never should have called Johnson, the decision to

17   hire ought to have been made and then if Mr. Johnson had a

18   question with regard to the headscarf, then she would have been

19   plugged in, as an employee, to the process and could have

20   requested an exception to the policy.  But that's not what

21   happened here.

22          We're not saying, at this juncture, that Abercrombie

23   should have asked about her religion.  In fact, the best

24   response was Ms. Elauf's, herself, on the witness stand where

25   she laughed.  I mean, that's a ridiculous suggestion, that

```
1    someone ask someone about their religion.  Not in America.  So
2    that's not the argument, here.  Go ahead.
3           MR. KNUEVE:  But, Your Honor, then, if we all agree
4    that you can't ask about religion, then Ms. Cooke -- and that's
5    the way these procedures were drafted, okay, with that in mind.
6    Not for this one-off situation, which has unusual facts and
7    circumstances.
8           THE COURT:  It does; right?
9           MR. KNUEVE:  Those procedures were drafted with that
10   in mind.  Then what Ms. Cooke should have done is to call HR.
11   She had that EEO acknowledgment that we introduced into
12   evidence, Your Honor, and it said if you believe that a federal
13   law is being violated, call HR.  She didn't do it.  For that
14   reason, Abercrombie can't be held vicariously liable.
15          THE COURT:  But Kolstad talks about the decisions,
16   when the decisions are contrary to the employer's good faith
17   efforts to comply with Title VII.  It doesn't talk about
18   remedial efforts by the employer as in the suggestion that if
19   ever you sense that something wrong is going on, then call HR,
20   which is a good idea.  Kolstad tells me that, and I think I
21   have to tell the jury, that Abercrombie can't be vicariously
22   liable when the decisions of the managerial agents, here
23   Johnson, were contrary to the employer's good faith efforts to
24   comply.
25          Well, that decision didn't tie up, doesn't match with
```

1    the employer's good faith efforts to advise both Ms. Cooke and

2    Ms. Elauf's friend that if you ever suspect something wrong

3    going on here discriminatory, then call HR.  It doesn't prevent

4    that decision made by Mr. Johnson.

5              MR. KNUEVE:  I think it does, Your Honor, because it's

6    the decision not to call HR.  That was the decision that was

7    contrary to Abercrombie's policies.  Ms. Cooke made a decision

8    to not call HR, contrary to Abercrombie's policy.  Mr. Cooke

9    {sic} for purposes of this motion, made a decision not to call

10   HR in contravention of Abercrombie's.  Abercrombie has a policy

11   that when this kind of stuff comes up, call HR.  That's very

12   clear from the record.  And Abercrombie trains managers on that

13   policy.  We've got the EEO acknowledgment, we've got Johnson's

14   testimony, and I would refer you to page 72 of his deposition.

15   "If you had become aware that an assistant manager said hey,

16   this person said they have to wear this ball cap for the

17   California Angels and said it's because of religious purposes,

18   what would the process have been for considering that ball

19   cap."  Answer.  "For considering, we would have had to contact

20   my HR director and they would make that exception or

21   determination if we could hire."

22              We have testimony from Ms. Riley, we have the EEO

23   acknowledgement, we have the PSP training which says send it to

24   HR and also does have a description of the religious

25   accommodation issue.

1              So the decision that I'm talking about is the decision

2      to not call HR.  And that decision by Cooke, by Mr. Johnson,

3      assuming for purposes of the motion, and by Ms. Sepahvand,

4      frankly, all of those decisions were contrary to Abercrombie's

5      good faith policy to comply with Title VII.

6              Abercrombie's human resources can not address these

7      things unless they are called.  This is a far flung company

8      with more than a thousand stores, Your Honor.  We can't train

9      all these managers on the intricacies of Title VII.  We've got

10     to have a department of human resources manager that applies

11     Title VII.  And that's why the policy and the training is call

12     HR.  You can't train a thousand managers on that.  And that's

13     the point.  The decision to not call HR was the one that is

14     contrary to Abercrombie's policy.

15             THE COURT:  All right.  Ms. Seely.

16             MS. SEELY:  Your Honor, the evidence is clear that the

17     decision to not call HR was exactly the decision that Johnson

18     was trained to make.  Unless there was a request for an

19     accommodation, the interviewing managers were not supposed to

20     call HR.

21             And Mr. Johnson testified, himself, that he didn't

22     really know -- the only way he would know if someone needed a

23     religious accommodation is, and he said, I would hope they

24     would have asked.  Unless they asked, he was trained not to

25     call HR, unless they asked and that's exactly what happened

1    here.  Ms. Elauf didn't ask, because she didn't know she had to

2    ask and she didn't know she had to ask because they trained

3    their managers not to tell them that the Look Policy prohibited

4    headwear.

5         THE COURT:  Well, I'm not focusing on Elauf and I

6    don't believe Mr. Knueve is here.  Right now, we are focusing

7    on the decisions of Cooke and Johnson as managerial agents.

8    And Mr. Knueve is saying the decisions here made by Cooke

9    and/or Johnson were contrary to Abercrombie's good faith

10   efforts to comply with Title VII.  In other words, roll these

11   sorts of question up to those who are trained to deal with

12   them, HR in Columbus.

13        MS. SEELY:  But there wasn't a question in this

14   particular case, Mr. Johnson didn't have any question in his

15   mind.

16        THE COURT:  Well, no.  There was decision.  I'm

17   focusing on the language of Kolstad.  Kolstad says when those

18   decisions are contrary to the employer's good faith efforts to

19   comply with Title VII.  And there was a decision here,

20   obviously, not to hire Ms. Elauf, and frankly, I think a

21   reasonable jury could find that because she's Muslim.  In fact,

22   I've already found that in summary judgment.  But this is

23   punitive damages and for the purposes of imposing punitive

24   damages, the employer can't be vicariously liable when those

25   decisions, that of Cooke and Johnson, are contrary to the

1    employer's good faith efforts to comply with Title VII.

2            Mr. Knueve is saying well, it's clearly contrary

3    because that issue -- Cooke obviously stated she knew that

4    Elauf was a Muslim and then as I say, subsequently, in response

5    to your question, she said she assumed she was Muslim.  But the

6    decision was made not to hire Elauf and wasn't that contrary to

7    Abercrombie's good faith efforts to comply with Title VII by

8    telling its managers to roll it up to HR?

9            MS. SEELY:  But the question is what is it, Your

10   Honor.  And the HR did not train the managers in the field to

11   recognize that religious accommodation was required, number

12   one; and how to recognize, short of a verbal request, that

13   religious accommodation was needed.  If they had trained Mr.

14   Johnson in that if someone comes to an interview wearing a

15   headscarf, ooh, I better call HR because that's a religious

16   issue, then he probably would have done that.  He should have

17   done that and he would have done that, but he wasn't trained to

18   do that.

19           We had testimony from four managers, Moorefield,

20   Johnson, Cooke and McJilton, all of whom said they were never

21   trained in religious accommodation.  And religious

22   accommodation is part of the law, it's required by Title VII,

23   it's part of religious discrimination.

24           And the company cut it off at their EEO Respect Policy

25   level where they just said don't discriminate, but they never

1    told these managers that that involved recognizing when an

2    accommodation might be needed short of a verbal request.  And

3    that was their obligation, that they didn't make good faith

4    efforts to do that training.  And so I do not believe that a

5    reasonable jury could find that the company made good faith

6    efforts to comply with the law.  It's more than just respect

7    and don't discriminate.  It's provide religious accommodation

8    and if that issue is raised, roll it up.  But they didn't train

9    the managers to recognize the issue.

10             THE COURT:  All right.  Anything else, Mr. Knueve?

11             MR. KNUEVE:  Your Honor, I have to respond to that.

12   What the EEOC is asking is for supervisors to make an

13   assumption, as a matter of law, as policy, to make assumptions

14   about applicants' religions based on what they're wearing.

15   What's next?  We're going to make an assumption about their

16   religion based on somebody's name, based on the way somebody

17   wears their hair?

18             THE COURT:  No, they are not asking these people to

19   make those assumptions.  In fact, to the contrary, they're

20   saying don't make those assumptions, make these decisions on

21   objective criterion as set forth in the prescribed interview

22   questions and then, if a person is employed and needs

23   accommodation, then we deal with it.  That's ideally how this

24   system works; right?

25             MR. KNUEVE:  But, Your Honor, the system that the

1    company has was prepared by a professional who has been hired

2    by the EEOC, who has testified before the EEOC, and now the

3    government's coming in and saying you can't listen to that

4    professional, you can't look at our guidelines, you can't look

5    at the stuff we post on our Web site.  You can't do that.

6          I understand that liability has been decided, but

7    punitive damages is a different matter.  This company had no

8    notice, okay, that all of a sudden the government, the federal

9    government was going to change its mind and say hey, now, you

10   have to start making assumptions about people.  And there's no

11   way to make punitive damages.

12         And the other thing is there is training.  The

13   training is roll it up to HR, roll up these matters to HR, to

14   the trained professionals.  And we heard the testimony all day,

15   if religion ever comes up in any context, roll it up to HR.

16   Every witness testified to that.  And the decision to not roll

17   it up to HR by Cooke and Johnson was contrary to Abercrombie's

18   policies and as a result, punitive damages shouldn't even be

19   discussed.

20         THE COURT:  Counsel, if you'll approach.

21         (Counsel approached the bench and the following

22   proceedings were had out of the hearing of open court.)

23         THE COURT:  I think what I'm going to do, because this

24   is, I think a relatively close issue here, because basically

25   Ms. Seely is arguing they are fact issues.  Mr. Knueve says no,

1    Abercrombie made a reasonable good faith effort here.  I'm

2    going to let it go.  If I'm reading this jury right, they are

3    not going to award punitive damages here and they are going to

4    correct any potential error in me letting it go to the jury.

5    We'll see how that works.  But with due respect, I'm going to

6    deny the Rule 50.

7               (Counsel returned to their respective places and the

8    following proceedings were had within hearing of open court.)

9               THE COURT:  We'll deny the defendant's motion.  It

10   appears that issues of fact relative to whether or not the

11   decisions made were contrary to Abercrombie's good faith

12   efforts to comply with Title VII exist.

13              Is there anything further for this evening?

14              MR. KNUEVE:  Not from defendants, Your Honor.

15              MS. SEELY:  No, sir.

16              THE COURT:  Very well.  We are in recess until 9:00

17   a.m. tomorrow morning.

18              (Court adjourned.)

19

20          A TRUE AND CORRECT TRANSCRIPT.

21

22          CERTIFIED:   s/ Glen R. Dorrough
                         Glen R. Dorrough
23                       United States Court Reporter

24

25